# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————————

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,

*Plaintiff-Appellee*,

v.

GEN DIGITAL INC., fka Symantec Corporation, fka NortonLifeLock, Inc.,

*Defendant-Appellant*,

QUINN EMANUEL LLP,

*Sanctioned Party-Appellant*.

————————————

Appeals from the United States District Court for the Eastern District of Virginia
in No. 3:13-cv-00808-MHL, Judge M. Hannah Lauck

————————————

## OPENING BRIEF OF APPELLANT QUINN EMANUEL URQUHART & SULLIVAN, LLP

————————————

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP*

April 5, 2024

# CERTIFICATE OF INTEREST

Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") certifies the following:

1. The full name of every party represented by us is: Quinn Emanuel Urquhart & Sullivan, LLP.

2. There is no other real party in interest for Quinn Emanuel.

3. Quinn Emanuel has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4. Christopher Michel, of Quinn Emanuel, is the only attorney who filed an appearance on behalf of Quinn Emanuel in the lower tribunal. In addition, the following attorneys from Quinn Emanuel appeared in the lower tribunal on behalf of Defendant-Appellant Gen Digital, Inc.:

Alexander Rudis, Athena Dalton, David Morad Elihu, David Aaron Nelson, Derek Lawrence Shaffer, Jared Weston Newton, John Poulos, Kaitlin P Sheehan, Meghan Elizabeth Bordonaro, Nathaniel Andrew Hamstra, Nina Tallon, Richard Wolter Erwine, Stephen Andrew Swedlow, Yury Kapgan

5. Another appeal from the same civil action was previously decided by this Court in *Trustees of Columbia University in the City of New York v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016). Undersigned counsel is not aware of any

pending case in this Court or any other tribunal that will directly affect or be directly affected by this Court's decision in these consolidated appeals.

Dated: April 5, 2024

s/Paul D. Clement
Paul D. Clement

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF RELATED CASES ................................................ x

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 5

STATEMENT OF THE ISSUES .......................................................... 5

STATEMENT OF THE CASE ............................................................... 6

I.    Quinn Emanuel's Attorney-Client Relationship With Dr. Dacier ................. 6

      A.    Dr. Dacier Formally Engages Quinn Emanuel to Represent Him for Purposes of This Lawsuit ........................................ 6

      B.    Columbia Chooses Not to Pursue Its Claims for Nearly Four Years, and the Case Is Administratively Closed .................................. 8

      C.    When the Case Is Reopened, Quinn Emanuel Reaffirms That Dr. Dacier Is Represented and Should Be Contacted Only Through Counsel .................................................................. 9

II.   Norton's Motion For Sanctions Against Columbia ...................................... 10

      A.    Columbia's Counsel Repeatedly Communicates Directly With Dr. Dacier Without Quinn Emanuel's Knowledge or Consent .............................................................................. 10

      B.    Dr. Dacier Reaffirms That He Is Represented by Quinn Emanuel, and Norton Moves to Sanction Columbia for Violating the "No Contact" Rule ....................................... 12

      C.    The District Court Denies Norton's Motion for Sanctions ................ 15

III.  The District Court's *Sua Sponte* Order To Disclose Attorney-Client Communications ............................................................................ 16

A.  Norton Files Motions *In Limine* to Exclude Evidence Regarding Dr. Dacier's Absence From Trial and Out-of-Court Conversations .................................................................. 16

B.  The District Court Denies Norton's Motions *in Limine* and *Sua Sponte* Orders Quinn Emanuel to "Disclose on the Record in Writing All Information Garnered From Dr. Dacier" From 2017 Through 2020 .................................................. 18

C.  Quinn Emanuel Refuses to Comply With the Court's *Sua Sponte* Order to Disclose Privileged Communications ...................... 20

D.  The District Court Denies Norton's Motion for Reconsideration, and Quinn Emanuel Withdraws From Representing Dr. Dacier .................................................... 20

IV. The District Court Finds Quinn Emanuel In Civil Contempt For Refusing To Disclose Attorney-Client Communications. ........................... 22

SUMMARY OF ARGUMENT ........................................................ 26

STANDARD OF REVIEW ............................................................. 29

ARGUMENT ................................................................................. 30

I.  The District Court Erred In Holding That Dr. Dacier And Norton Had Conflicting Interests That Disqualified Quinn Emanuel From Representing Them Both ............................................................. 31

A.  There Was No Conflict of Interest Between Dr. Dacier and Norton ............................................................................... 33

B.  Any Purported Conflict of Interest Did Not Justify Automatically Disqualifying Quinn Emanuel From Representing Dr. Dacier ...................................................... 40

II. The District Court Erred In Holding That Any Purported Conflict Of Interest Destroyed Attorney-Client Privilege ............................................. 45

A.  Any Purported Conflict of Interest Did Not Destroy Attorney-Client Privilege Over Dr. Dacier's Communications With Quinn Emanuel. .................................................. 46

B.    Any Purported Conflict of Interest Did Not Somehow Automatically Terminate Dr. Dacier's Attorney-Client Relationship With Quinn Emanuel ...................................................... 49

III.    The District Court's Repeated Forays Outside The Adversarial Process And Remarkable Procedural Irregularities Provide Another Independent Basis For Reversal ................................................................. 54

CONCLUSION ........................................................................................... 59

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  2016 WL 6534273 (E.D. Tenn. Nov. 1, 2016).....................................................43

*Aetna Cas. & Sur. Co. v. United States*,
  570 F.2d 1197 (4th Cir. 1978) ..................................................... *passim*

*Ashcraft v. Conoco, Inc.*,
  218 F.3d 288 (4th Cir. 2000) ........................................................ 30, 46

*Atl. Diving Supply, Inc. v. Komornik*,
  2021 WL 8775676 (Va. Cir. Ct. 2021).................................................49

*Bonner v. Guccione*,
  1997 WL 91070 (S.D.N.Y. Mar. 3, 1997).........................................36

*Buffington v. Baltimore Cnty.*,
  913 F.2d 113 (4th Cir. 1990).............................................................58

*Caekaert v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
  2023 WL 3587287 (D. Mont. May 22, 2023)....................................48

*Cantu Servs., Inc. v. Worley*,
  2021 WL 2323721 (W.D. Okla. June 7, 2021) ..................................48

*Cromer v. Kraft Foods N. Am., Inc.*,
  390 F.3d 812 (4th Cir. 2004)...................................................... 58, 59

*D.S. Mags., Inc. v. Warner Publisher Servs., Inc.*,
  623 F.Supp. 624 (S.D.N.Y. 1985) ....................................................36

*Doe v. Va. Polytechnic Inst. & State Univ.*,
  77 F.4th 231 (4th Cir. 2023)...................................................... 55, 57

*Eureka Inv. Corp. v. Chi. Title Ins. Co.*,
  743 F.2d 932 (D.C. Cir. 1984) ................................................... 47, 48

*Farb v. Baldwin Union Free Sch. Dist.*,
  2011 WL 4465051 (E.D.N.Y. Sept. 26, 2011) ..................................34

*Greenlaw v. United States,*
    554 U.S. 237 (2008)..........................................................55

*Guillen v. City of Chicago,*
    956 F.Supp. 1416 (N.D. Ill. 1997) ....................................39

*Hawkins v. Stables,*
    148 F.3d 379 (4th Cir. 1998)...........................................30

*In re Contempt Finding,*
    663 F.3d 1270 (D.C. Cir. 2011) ........................................30

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.,*
    658 F.2d 1355, 1356 (9th Cir. 1981)................................32

*In re Gen. Motors Corp.,*
    61 F.3d 256 (4th Cir. 1995)............................................58

*In re Schwartz,*
    493 A.2d 1248 (N.J. 1985)..............................................50

*In re Search Warrant Issued June 13, 2019,*
    942 F.3d 159 (4th Cir. 2019)..........................................54

*In re Teleglobe Commc'ns Corp.,*
    493 F.3d 345 (3d Cir. 2007)...................................... 47, 48

*In re Under Seal,*
    749 F.3d 276 (4th Cir. 2014)...................................... 29, 30

*Marketel Media, Inc. v. Mediapotamus, Inc.,*
    2015 WL 3650765 (E.D.N.C. June 11, 2015).....................48

*Monsanto Co. v. E.I. Du Pont de Nemours & Co.,*
    748 F.3d 1189 (Fed. Cir. 2014) .......................................29

*New Phoenix Sunrise Corp. v. Comm'r,*
    408 F.App'x 908 (6th Cir. 2010)......................................47

*New York v. United Parcel Serv., Inc.,*
    2016 WL 10672076 (S.D.N.Y. Sept. 2, 2016) ............. 31, 36

*Philips Med. Sys. Int'l B.V. v. Bruetman*,
  8 F.3d 600 (7th Cir. 1993) .................................................................56

*RFF Fam. P'ship, LP v. Burns & Levinson, LLP*,
  991 N.E.2d 1066 (Mass. 2013) ...........................................................48

*Richmond Hilton Assocs. v. City of Richmond*,
  690 F.2d 1086 (4th Cir. 1982) ............................................... 33, 41, 44

*Shaffer v. Farm Fresh, Inc.*,
  966 F.2d 142 (4th Cir. 1992) ................................................. 30, 41, 45

*Simms v. Deggeller Attractions, Inc.*,
  2013 WL 49756 (W.D. Va. Jan. 2, 2013) .............................................41

*United States ex rel. Harris v. Lockheed Martin Corp.*,
  2013 WL 12328947 (N.D. Ga. Feb. 5, 2013) ......................................32

*United States v. Occidental Chem. Corp.*,
  606 F.Supp. 1470 (W.D.N.Y. 1985) ....................................... 36, 39, 42

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ............................................................... 54, 57

*United States v. Smallwood*,
  365 F.Supp.2d 689 (E.D. Va. 2005) ....................................................14

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981) ............................................................... 54

**Rules**

Va. R. Prof'l Conduct 1.3, cmt.4 ....................................................... 49, 50

Va. R. Prof'l Conduct 1.7 .....................................................................53

Va. R. Prof'l Conduct 1.7(a) ........................................................... 34, 41

Va. R. Prof'l Conduct 1.7(a)(1) ...........................................................42

Va. R. Prof'l Conduct 1.7(a)(2) ...........................................................42

Va. R. Prof'l Conduct 1.7(b) ........................................................... 41, 42

Va. R. Prof'l Conduct 1.7(b)(3) ..................................................................42

Va. R. Prof'l Conduct 1.7, cmt.23................................................ 35, 42, 53

Va. R. Prof'l Conduct 1.16...........................................................................49

Va. R. Prof'l Conduct 1.16(d)......................................................................50

Va. R. Prof'l Conduct 1.16, cmt.4...............................................................50

**Other Authorities**

J. Wigmore, Wigmore on Evidence (McNaughton rev. ed. 1961)...........................47

NYC Bar Ass'n, Formal Op. 2016-2 (July 22, 2016)...............................................31

## STATEMENT OF RELATED CASES

These consolidated appeals arise from a civil action in the U.S. District Court for the Eastern District of Virginia. *See Trustees of Columbia University in the City of New York v. Gen Digital Inc.*, No. 3:13-cv-00808-MHL (E.D. Va.). One other appeal arising from that civil action previously appeared in this Court: *Trustees of Columbia University in the City of New York v. Symantec Corp.*, No. 15-1146, *reported at* 811 F.3d 1359 (Fed. Cir. Feb. 2, 2016) ("*Columbia I*") (Dyk, J., joined by Prost, C.J. & Hughes, J.).

No other appeal from that civil action has previously arisen in this Court or any other appellate court. Counsel for Quinn Emanuel is not aware of any pending case in this Court or any other tribunal that will directly affect or be directly affected by this Court's decision in these consolidated appeals.

# INTRODUCTION

The district court's civil contempt finding against Quinn Emanuel and its associated sanctions were flawed at every turn. The district court managed to turn an offhanded conversation into a cause for disqualification, the vitiation of the attorney-client privilege, and the imposition of massive sanctions. In reality, there was no disqualifying conflict and absolutely no basis for vitiating *the client's* attorney-client privilege based on *the attorney's* perceived conflict. The rulings' manifest substantive flaws are explicable only by the district court's serial disregard for the most basic principles of party presentation and due process, culminating in improper contempt sanctions unaccompanied by even the minimum necessary procedural protections. The extraordinary orders and sanctions here cannot stand.

Plaintiff-Appellee Columbia University ("Columbia") filed this lawsuit against Defendant-Appellant Gen Digital, Inc., formerly known as NortonLifeLock, Inc. ("Norton"),[1] in December 2013. Shortly thereafter, Dr. Marc Dacier—a French computer scientist who worked for Norton through April 2014—was identified as a potential witness. Dr. Dacier formally retained Norton's counsel, Quinn Emanuel,

---

[1] When the litigation began, Gen Digital was known as Symantec Corporation. JA48574. In late 2019, it changed its name to NortonLifeLock, Inc. JA48574. Since early 2023, it has been known as Gen Digital. JA48574. Consistent with the district court's practice, this brief refers to the company as "Norton," including during periods when it operated under a different name. JA48574.

in connection with the litigation, at Norton's expense, and Quinn Emanuel represented him during a full-day deposition in August 2014.

A few months later, Columbia stayed all the claims to which Dr. Dacier's testimony was potentially relevant, and those claims went dormant for nearly four years. During that prolonged lull, Dr. Dacier saw a Columbia professor named Angelos Keromytis at a cybersecurity conference and allegedly expressed regret about some of Norton's actions related to one of the patents at issue.

Columbia eventually revived the case, and in October 2019, based on Professor Keromytis's version of the conversion, Columbia's counsel reached out to Dr. Dacier directly—with full knowledge that Quinn Emanuel had been representing him—and had substantive discussions about the matter without Quinn Emanuel's knowledge or consent. When Quinn Emanuel learned of this violation of the long-settled ethical rule prohibiting an attorney from contacting a represented person, it immediately objected and eventually moved for sanctions. The court not only brushed Columbia's misconduct aside, but eventually rewarded it by treating Dr. Dacier's purported comments as the basis for a series of remarkable orders sanctioning Quinn Emanuel.

In January 2022, Dr. Dacier (who was then living in Saudi Arabia, outside the court's subpoena power) informed Quinn Emanuel that he had decided not to make the long trip to Virginia to testify at trial. Norton subsequently filed motions *in*

*limine* to exclude comments and arguments regarding Dr. Dacier's absence and to exclude evidence regarding Dr. Dacier's alleged statements to Professor Keromytis as inadmissible hearsay. Although the briefing on these motions contained no mention of any potential conflict, the district court *sua sponte* identified a perceived conflict of interest that had "developed" between Dr. Dacier and Norton "sometime between 2017 and 2018," because Dr. Dacier's alleged remarks to Professor Keromytis were "adverse to Norton's position." JA43, JA49, JA51-52. The court then concluded its *sua sponte* conflict-of-interest analysis by issuing a *sua sponte* order directing Quinn Emanuel to "disclose on the record in writing any information garnered from Dr. Dacier during the period [its] representation of Dr. Dacier was a conflict," which the court elsewhere defined as 2017 through 2020. JA57; *see* JA49. In other words, as *sua sponte* sanctions for a self-identified conflict by Quinn Emanuel, the district court vitiated the client's privilege and demanded that Quinn Emanuel disclose these attorney-client communications by *the very next day*. JA57.

Quinn Emanuel was well within its rights to disobey this extraordinary order; indeed, given Quinn Emanuel's longstanding attorney-client relationship with Dr. Dacier, which Dr. Dacier had reaffirmed in a sworn declaration in June 2020, immediate and full *compliance* with the order would have been the real ethical breach. The district court plainly erred at the threshold in *sua sponte* deeming Quinn Emanuel's simultaneous representation of Dr. Dacier and Norton a conflict of

interest. Attorneys routinely represent both companies and their current or former employees in pending litigation without any hint of an ethical conflict, even when those employees may not fully agree with their employers' actions and may not provide unalloyedly helpful testimony. As long as employers and employees do not have concrete adverse interests at stake in the litigation that would materially limit an attorney's ability to represent both, there is no ethical conflict in the ubiquitous practice of agreeing to a simultaneous representation. That was precisely what happened here: As a nonparty witness, Dr. Dacier has no personal interest whatsoever in this litigation and there was no conflict. That was all manifest when Quinn Emanuel represented Dr. Dacier in seven hours of deposition testimony, which is why no one suggested any conflict at that time. Even if Dr. Dacier's offhand comments years later might provide an angle for cross-examination, they did not create a disqualifying conflict.

But even if Quinn Emanuel had a conflict of interest here, it would not have authorized the court to vitiate the client's privilege over years of attorney-client communications. On the contrary, as numerous courts have recognized, it is black-letter law that the client cannot be punished for the attorney's conflict of interest. That bedrock principle—which the district court (acting without the benefit of briefing or argument) flatly disregarded—independently requires reversal.

These remarkable substantive errors were accompanied—and likely explained—by equally remarkable procedural missteps, which independently warrant reversal. In reaching its decision below, the court largely disregarded the parties' adversarial presentation, repeatedly raising issues *sua sponte* and ordering relief that no party had requested. In the non plus ultra of that mode of proceeding, the court responded to Columbia's request for compliance-inducing civil contempt sanctions (after more than a year of an apparent pocket veto) with punitive sanctions that could only have been awarded via the heightened procedural protections demanded for criminal contempt, followed by hundreds of millions in enhanced damages. In short, the contempt orders and sanctions here were riddled with errors from start to finish and must be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1338(a). *See* JA9904. The court issued its civil-contempt order on September 30, 2023, *see* JA100-01, and Quinn Emanuel timely appealed on October 25, 2023, *see* JA48581-83. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred as a matter of law in holding that Dr. Dacier and Norton had conflicting interests that disqualified Quinn Emanuel from representing them both.

2. Whether the district court erred as a matter of law in holding that any purported conflict destroyed attorney-client privilege over Dr. Dacier's communications with Quinn Emanuel from 2017 through 2020.

3. Whether the district court's repeated forays outside the adversarial process and other procedural irregularities provide an independent basis for reversal.

## STATEMENT OF THE CASE

I. **Quinn Emanuel's Attorney-Client Relationship With Dr. Dacier.**

A. **Dr. Dacier Formally Engages Quinn Emanuel to Represent Him for Purposes of This Lawsuit.**

Columbia filed the present lawsuit against Norton in December 2013, alleging that Norton's antivirus software infringed several of Columbia's patents and that two Columbia professors should be named as inventors on Norton's U.S. Patent No. 8,549,643 ("the '643 patent"). *See* JA1162-206 (first amended complaint). Dr. Marc Dacier is a professor of computer science who was employed by Norton when Columbia filed this suit. JA36149, JA36169-70. In its initial disclosures in March 2014, Norton identified Dr. Dacier as someone who would likely have discoverable information and indicated that he, like other Norton employees, should be contacted only through Quinn Emanuel. JA14294-95; *see* JA2018 (setting initial-disclosure deadline). Shortly thereafter, Dr. Dacier voluntarily left Norton to pursue other professional opportunities. JA36169-72.

In June 2014, Columbia's counsel (at the time, Irell & Manella LLP) contacted Quinn Emanuel asking whether the firm represented Dr. Dacier and whether it would accept a subpoena on his behalf. JA14295. Quinn Emanuel responded and confirmed that it "represent[ed] Marc Dacier in connection with this action." JA14294. Although Dr. Dacier, as "a non-party residing in France," was not subject to the district court's subpoena power, Quinn Emanuel arranged for Columbia's counsel to depose him "at a mutually agreeable location in Europe." JA14294.

On June 18, 2014, Dr. Dacier signed an engagement agreement (the "Engagement Agreement") formally confirming that he "ha[d] retained Quinn Emanuel" for purposes of this litigation. JA16566-67. The Engagement Agreement indicated that Norton would pay for the representation, noting that Quinn Emanuel had determined that Dr. Dacier and Norton "share[d] a common interest" in the litigation based on discussions with each client and an assessment of the pertinent facts. JA16567. The Engagement Agreement also made clear that Quinn Emanuel's representation of Dr. Dacier was not limited to the upcoming deposition but would continue throughout the litigation, unless and until Dr. Dacier provided "written notice" that he wished to terminate it or Quinn Emanuel "bec[a]me aware of some reason why [the representation] would no longer be appropriate" and formally withdrew. JA16567. Lastly, the Engagement Agreement provided that "in the event

of [Quinn Emanuel's] termination or withdrawal," Dr. Dacier "consent[ed] to [its] continued representation of [Norton]" for purposes of Columbia's lawsuit. JA16567.

In August 2014, Dr. Dacier appeared for a deposition in Brussels, Belgium. *See* JA36128-367. An attorney from Quinn Emanuel helped Dr. Dacier prepare for the deposition and defended him during seven hours of questioning by Columbia's counsel. *See* JA36135, JA36169. No one contemporaneously suggested that these seven hours of testimony revealed any material conflict in Quinn Emanuel's continuing representation of both Norton and Dr. Dacier. Dr. Dacier testified about his involvement in cybersecurity research that led to the filing of the '643 patent. *See, e.g.*, JA36188-90, JA36202-42. This testimony was potentially relevant to Columbia's allegations that two Columbia professors—Angelos Keromytis and Salvatore Stolfo—were the sole inventors, or at least co-inventors, of the subject matter claimed in the '643 patent. *See* JA1171-77, JA1197-205. Dr. Dacier's testimony had no relevance to counts 1-6 of Columbia's amended complaint, which alleged infringement of six other patents. *See* JA1165-71, JA1178-96.

## B. Columbia Chooses Not to Pursue Its Claims for Nearly Four Years, and the Case Is Administratively Closed.

On October 7, 2014, the district court issued a claim construction order that fatally undermined all six of Columbia's patent-infringement claims. *See* JA1-2. On November 4, 2014, the district court granted the parties' joint motion to stay Columbia's claims regarding the '643 patent—the only claims to which Dr. Dacier's

testimony was potentially relevant—and to enter final judgment against Columbia on the six patent-infringement claims so that Columbia could immediately appeal the claim construction order. JA6227-28; *see* JA6197, JA6203.

For nearly four years, Columbia's claims regarding the '643 patent remained dormant while the parties litigated issues related to the six other patents before the Patent Trial and Appeal Board and the Federal Circuit. *See* JA6298-99 (order of Aug. 8, 2016, extending the stay until August 2017); JA6344-45 (order of Oct. 24, 2017, administratively closing the case). Quinn Emanuel thus had no reason to—and did not—correspond with Dr. Dacier for several years.

### C. When the Case Is Reopened, Quinn Emanuel Reaffirms That Dr. Dacier Is Represented and Should Be Contacted Only Through Counsel.

On August 7, 2018, the district court reopened the case and allowed Columbia's claims regarding the '643 patent to proceed. *See* JA6435. On December 28, 2018, Norton provided Columbia (now represented by Sullivan & Cromwell LLP) with supplemental disclosures that again identified Dr. Dacier as a person likely to have discoverable information. JA14306-07. These disclosures reiterated that Columbia's counsel was not authorized to communicate directly with Norton employees or other persons represented by counsel and expressly reaffirmed that Dr. Dacier should be contacted only through Quinn Emanuel. JA14306-07.

## II.  Norton's Motion For Sanctions Against Columbia.

### A.  Columbia's Counsel Repeatedly Communicates Directly With Dr. Dacier Without Quinn Emanuel's Knowledge or Consent.

In October 2019, Professor Keromytis told one of Columbia's attorneys, Dustin Guzior, that he had seen Dr. Dacier at a professional event many months earlier and that Dr. Dacier had "made a statement … to the effect that he still felt very badly about what had happened with the ['643] [P]atent."  JA14319; *cf.* JA15989 (Keromytis declaration of May 2020 averring that this alleged statement was made sometime "between late 2017 and late 2018").  Mr. Guzior knew that Quinn Emanuel had been representing Dr. Dacier in connection with this matter. *See, e.g.*, JA14322.  But instead of contacting Quinn Emanuel and ascertaining whether Dr. Dacier continued to be represented by the firm, Mr. Guzior asked Professor Keromytis to "make an introduction" via email, which he did.  JA14319-20.  Within minutes, Mr. Guzior responded to the introductory email asking if Dr. Dacier would be available for a phone call.  JA16013.

On November 14, 2019, Mr. Guzior and two other attorneys for Columbia had a 10- to 15-minute phone conversation with Dr. Dacier without Quinn Emanuel's knowledge or consent.  JA15982.  Mr. Guzior claims to have begun the call by "explain[ing]" that he needed to "confirm" that Dr. Dacier was "not represented" by Quinn Emanuel.  JA15982; *see* JA14322; *cf.* JA35939 ("According to Dr. Dacier, Columbia's counsel … informed him that he was no longer represented by Quinn

Emanuel."). Mr. Guzior also asserts that Dr. Dacier "responded that he … never had been or wanted to be represented by counsel." JA15982. *But see* JA16552 (sworn declaration by Dr. Dacier stating that Quinn Emanuel began representing him in June 2014 and continued to represent him as of June 2020); JA16566-67 (Engagement Agreement). Mr. Guzior proceeded to ask Dr. Dacier about the substance of his conversation with Professor Keromytis regarding the '643 patent and whether he would be willing testify about it at trial, JA15983—including incorrectly advising him "that the recording of his 2014 deposition could not be used at trial, so he had to attend the trial in person," JA35939.

On January 26, 2020, Columbia's counsel again contacted Dr. Dacier without Quinn Emanuel's knowledge or consent, asking for a second phone call. JA16019. That call took place on February 11, 2020. JA15984. This time, four of Columbia's attorneys were on the line. JA15984. According to Mr. Guzior, Dr. Dacier relayed a "decision" that "he was not, and did not want to be, represented by counsel in this matter." JA15984. Attorneys for Columbia proceeded to send Dr. Dacier a copy of his deposition transcript and "to coordinate a pre-trial meeting to review the deposition and discuss trial logistics." JA15984.

Following that phone call, attorneys for Columbia exchanged a series of emails with Dr. Dacier and made plans to travel to southern France for an in-person witness preparation session on April 1, 2020. JA16026-28. In mid-March 2020,

however, the meeting had to be postponed due to the COVID-19 pandemic. JA16032-34.

### B. Dr. Dacier Reaffirms That He Is Represented by Quinn Emanuel, and Norton Moves to Sanction Columbia for Violating the "No Contact" Rule.

On March 27, 2020, Columbia sent Norton a witness list that included Dr. Dacier. JA14290. Prompted by this list, an attorney from Quinn Emanuel reached out to Dr. Dacier and asked whether he had spoken to anyone from Columbia about the case. JA16063. On April 10, 2020, Dr. Dacier responded that he had "been contacted by the law firm representing Columbia" and had spoken to Columbia's counsel on the phone several times. JA14326. Dr. Dacier further informed Quinn Emanuel that in November 2019, he had sent two emails to Norton's then-Chief Technology Officer—a non-attorney—to ask whether "the [Quinn Emanuel] lawyer, paid by [Norton], that was present at [his] deposition [wa]s still representing [him]." JA14327. The CTO did not respond and left the company shortly thereafter. *See* JA14326. Neither Quinn Emanuel nor Norton's in-house litigation counsel received Dr. Dacier's emails to the CTO until April 10, 2020, when they learned of Columbia's attorneys' unauthorized *ex parte* communications with Dr. Dacier. JA14273-74. Later that day, Norton's in-house counsel responded to Dr. Dacier, confirming—consistent with the Engagement Agreement—that Quinn Emanuel continued to represent him (at Norton's expense). JA16073.

Upon learning of Columbia's attorneys' unauthorized, *ex parte* communications with its client, Quinn Emanuel contacted Mr. Guzior to express concern about the apparent violations of the "no contact" rule codified at Virginia Rule of Professional Conduct 4.2. JA14323. Mr. Guzior denied any such violation, asserting that it was proper for him and his colleagues to contact Dr. Dacier without notifying Quinn Emanuel in order to "ha[ve] a short discussion … to find out if he was actually represented by counsel," JA16069—despite the fact that Quinn Emanuel had expressly informed Columbia that it "represent[ed] [Dr.] Dacier in connection with this action," JA14294; arranged Dr. Dacier's deposition, JA14294-95; helped Dr. Dacier prepare for that deposition and represented him during it, JA36135, JA36169; and repeatedly indicated that Dr. Dacier should be contacted only through Quinn Emanuel, *see, e.g.*, JA14294-95, JA14306-07. Mr. Guzior refused to explain why he contacted Dr. Dacier directly, instead of simply asking Quinn Emanuel whether the firm continued to represent him. JA14318. Instead, Mr. Guzior asserted that Quinn Emanuel owed him "an apology" for raising concerns about his direct communications with Dr. Dacier and accused Quinn Emanuel of "wast[ing] time and distract[ing] [him] from imminent substantive deadlines," concluding: "[W]e are done with this topic." JA16065.

As further discussions appeared futile, Norton moved for sanctions. *See* JA14265-88. In connection with that motion, Dr. Dacier submitted a sworn

declaration stating: "Quinn Emanuel has represented me since June 18, 2014, and continues to represent me, in connection with the Columbia case." JA16552; *see also* JA35940 (reporting a phone conversation of June 17, 2020, in which Dr. Dacier "stated that he never intended to terminate Quinn Emanuel's representation, [and] confirmed that he wanted to continue to be represented by Quinn Emanuel"). As Norton's motion explained, Virginia Rule of Professional Conduct 4.2 "make[s] unmistakably clear that a lawyer may not ethically contact or direct others to contact a known represented party about the subject of that representation without the knowledge or consent of that party's counsel." JA14277 (quoting *United States v. Smallwood*, 365 F.Supp.2d 689, 695 (E.D. Va. 2005)). Accordingly, to the extent Columbia's counsel had any legitimate doubt about whether Quinn Emanuel still represented Dr. Dacier in October 2019, they were ethically obligated to contact Quinn Emanuel instead of reaching out directly to Dr. Dacier. JA14277-82.

Columbia attempted to avoid this straightforward conclusion on at least six separate grounds: It asserted that (1) Dr. Dacier did not wish for Quinn Emanuel to represent him in connection with this case, JA15962-64; (2) Quinn Emanuel's representation of Dr. Dacier was limited to the August 2014 deposition, JA15964; (3) the attorney-client relationship "terminated as a result of Norton's and Quinn Emanuel's failure to communicate with Dr. Dacier" from 2015-2019, JA15964-66; (4) "at least some of Dr. Dacier's deposition testimony was significantly adverse to

Norton," which supposedly required Quinn Emanuel "to perform a conflicts analysis," and "the only conclusion consistent with the [alleged] failure to analyze the [purported] conflict and obtain consent is that Quinn Emanuel does not represent Dr. Dacier," JA15966-69; (5) Mr. Guzior reasonably believed that Quinn Emanuel did not represent Dr. Dacier when the unauthorized, *ex parte* communications took place, JA15969-74; and (6) neither Dr. Dacier nor Norton was prejudiced by Columbia's violations of the "no contact" rule, JA15974-76.

Given the scattershot approach of Columbia's opposition brief, Norton had only limited space available in its reply brief to address Columbia's conflict-of-interest argument. *See* JA16544-46. Norton nevertheless squarely refuted that argument, explaining that "Dr. Dacier's deposition created no conflicts of interest because his testimony is fully consistent with Norton's interests" and, in all events, "any purported conflicts or alleged failure to perform conflict checks would not terminate Quinn Emanuel's attorney-client relationship with Dr. Dacier" as a matter of law. JA16544.

## C.    The District Court Denies Norton's Motion for Sanctions.

On September 29, 2021, the district court denied Norton's motion for sanctions. JA17736-38. Despite Quinn Emanuel's repeated statements making clear that it represented Dr. Dacier, the district court concluded that Columbia's counsel "reasonably believed that Dr. Dacier was not represented by [Quinn Emanuel]" when

they directly contacted him and had substantive conversations regarding the case. JA17738. It rested that conclusion primarily on Columbia's counsel's assertion that Dr. Dacier had informed them that he was no longer represented by counsel—even though Dr. Dacier had signed a formal retention agreement with Quinn Emanuel in June 2014, and even though Dr. Dacier submitted a sworn declaration in support of Norton's motion stating that Quinn Emanuel "ha[d] represented [him] since June 18, 2014, and continue[d] to represent" him. JA16552.

In reaching its decision to deny Norton's motion, the court did not address Columbia's assertion that Dr. Dacier's 2014 deposition testimony tended to harm Norton's litigating position, nor did it evaluate whether any such testimony might have created a potential conflict between Dr. Dacier and Norton that might have affected Quinn Emanuel's concurrent representation of both clients. Instead, the court explicitly found it unnecessary to decide "whether Dr. Dacier was or was not represented by Norton's attorneys in October 2019." JA17738 n.3.

## III. The District Court's *Sua Sponte* Order To Disclose Attorney-Client Communications.

### A. Norton Files Motions *In Limine* to Exclude Evidence Regarding Dr. Dacier's Absence From Trial and Out-of-Court Conversations.

After reviewing the district court's September 2021 order, two Quinn Emanuel attorneys contacted Dr. Dacier. JA35941. They informed him "that the decision of whether to attend the trial was his alone." JA35941. Dr. Dacier stated that "he would

prefer not to be involved in the litigation, and further confirmed that he did not have anything to say beyond what had already been discussed at his 2014 deposition." JA35941; *see also* JA35940 (noting that this was Dr. Dacier's consistent position over many months).

In January 2022, Dr. Dacier was living and working in Saudi Arabia, beyond the reach of the district court's subpoena power. JA18495; *accord* JA40 n.3. After conferring with Dr. Dacier, Quinn Emanuel informed Columbia's counsel that Dr. Dacier had "decided not to travel from Saudi Arabia to the United States to provide trial testimony." JA18497; *see* JA18495. In lieu of live testimony, Columbia designated excerpts from Dr. Dacier's videotaped deposition to be played at trial. JA18495.

Norton filed two motions *in limine* in light of Dr. Dacier's decision not to attend trial. JA19383-88. The first motion sought to exclude comments and arguments regarding Dr. Dacier's absence from trial because they "would be speculative, irrelevant, more prejudicial than probative, and would likely confuse the jury." JA19384. The second motion sought to exclude any out-of-court statements that Dr. Dacier had allegedly made to Professor Keromytis or to Columbia's counsel as inadmissible hearsay. JA19386-88.

**B.    The District Court Denies Norton's Motions *in Limine* and *Sua Sponte* Orders Quinn Emanuel to "Disclose on the Record in Writing All Information Garnered From Dr. Dacier" From 2017 Through 2020.**

On March 15, 2022, the district court denied both motions *in limine*. JA57. First, the district court ruled that it would allow Columbia to comment on Dr. Dacier's absence from trial and would issue a "missing witness" instruction, finding that Dr. Dacier was "available" to Norton and suggesting that Quinn Emanuel improperly discouraged Dr. Dacier from testifying at trial, including by incorrectly telling Dr. Dacier that the court had concluded Quinn Emanuel represented him. *See* JA49-53. Second, the district court ruled that Dr. Dacier's alleged statements to Professor Keromytis at professional conferences in 2017-2019 would be admitted under the residual hearsay exception of Federal Rule of Evidence 807. *See* JA53-56.

Instead of confining itself to the issues in the parties' briefing on the motions *in limine*, and without notice to the parties, the district court proceeded to hold that Quinn Emanuel had "developed" a conflict of interest in representing both Dr. Dacier and Norton "sometime between 2017 and 2018," when Dr. Dacier ran into Professor Keromytis at a conference and allegedly said that he was "sorry about what Norton had done" and "had opposed Norton's actions at the time." JA43, JA45; *see* JA47 ("[T]he Court identifies a conflict of interest for Quinn Emanuel as to Dr. Dacier's 2019 [*sic*] statement that he was 'sorry' about what Norton did … and that

he felt or expressed his disagreement at the time."); JA49 ("[A]t least in 2017 through 2020, Quinn Emanuel developed a conflict in representing both Norton and Dr. Dacier."). Despite simultaneously concluding that Norton and Dr. Dacier had a sufficient community of interest that Norton could have ensured Dr. Dacier's presence at trial, the court found that the alleged statement by Dr. Dacier "clearly runs contrary to Norton's defense," and so created a conflict of interest that prevented Quinn Emanuel from representing both. JA47. Indeed, according to the court, the effect of Dr. Dacier's alleged "statements against Norton's interest" to Professor Keromytis was to automatically "void the retainer agreement" between Quinn Emanuel and Dr. Dacier, which "was 'conditioned on the fact that Dr. Dacier and Norton share a common interest in the matters.'" JA48 (brackets and emphasis omitted) (quoting JA16567).

The district court then went even further. Based on its conclusion that Quinn Emanuel "should not have been representing" both Dr. Dacier and Norton after the purported conflict arose, the district court *sua sponte* ordered in a footnote that "no later than March 16, 2022"—the *very next day*—Quinn Emanuel "must disclose on the record in writing any information garnered from Dr. Dacier during the period [its] representation of Dr. Dacier was a conflict." JA55 n.7; *see* JA57. The court's footnote provided no explanation whatsoever for why its *sua sponte* conflict ruling—even if correct—would also require or even permit a *sua sponte* order

mandating that Quinn Emanuel disclose, on the record and in writing, Dr. Dacier's privileged communications with his attorneys for the previous four years (from "at least … 2017 through 2020," JA49).

**C.    Quinn Emanuel Refuses to Comply With the Court's *Sua Sponte* Order to Disclose Privileged Communications.**

On March 16, 2022, Norton filed a short response indicating that Quinn Emanuel would not comply with the district court's order "absent appellate review." JA34041-42.  That response disputed the district court's *sua sponte* determination that Dr. Dacier's alleged remarks had created to a disqualifying conflict of interest, noting that Columbia did not "raise any arguments relating to potential conflicts of interest" in its briefing on Norton's motions *in limine*.  JA34041.  The response further explained that irrespective of any purported conflict, the district court "ha[d] no authority to waive Dr. Dacier's attorney-client privilege."  JA34042.

**D.    The District Court Denies Norton's Motion for Reconsideration, and Quinn Emanuel Withdraws From Representing Dr. Dacier.**

On March 22, 2022—less than a week after the district court's order—Norton moved the district court to reverse its decision that a conflict of interest disqualified Quinn Emanuel from concurrently representing both Dr. Dacier and Norton, or in the alternative to allow the parties to submit briefing and evidence on that issue. JA34220-21.  Norton simultaneously requested to stay the proceedings until the conflict-of-interest issue was resolved.  JA34220.  Norton explained that even

assuming Dr. Dacier's alleged statements to Professor Keromytis were harmful to Norton's litigating position, they did not satisfy the demanding legal standard for disqualifying counsel—a standard that the district court's decision never even mentioned.  JA34237-39.

Norton also objected that it "did not have an opportunity to present evidence or argument about the alleged conflict of interest."  JA34240.  After all, Columbia's opposition to Norton's motions *in limine* did not reference any potential conflict. And the only time Columbia raised the specter of a conflict—almost two years earlier, as one of many arguments in opposition to Norton's motion for sanctions— it had argued that "at least some of Dr. Dacier's [August 2014] deposition testimony was significantly adverse to Norton."  JA15966-68.  But Columbia *never* raised— and Norton never had any reason to address—the argument that the district court adopted as the basis for its *sua sponte* conflict ruling: that a conflict arose only later based on Dr. Dacier's remarks to Professor Keromytis (in approximately 2017).  Nor did Norton (or Quinn Emanuel) have any opportunity to address whether any such conflict was waivable, or how any such conflict might affect the privileged nature of Dr. Dacier's communications with Quinn Emanuel from 2017 through 2020.

The district court denied the motion on the same day that it was filed.  The court held that Norton had received "a full and fair opportunity" to address the purported conflict 18 months earlier, in its reply brief in support of Norton's motion

to sanction Columbia's counsel. JA34351. The court also suggested that Norton should have somehow anticipated the court's *sua sponte* conflict analysis and preemptively introduced evidence showing that Quinn Emanuel should not be disqualified from concurrently representing Dr. Dacier and Norton. *See* JA34351-52.

At a hearing on March 25, 2022, the district court noted that it had denied the motion for reconsideration and asked Quinn Emanuel "to take a position on who[m] you represent." JA51337. Consistent with the Engagement Agreement, Quinn Emanuel informed the court that it would "continue to represent Norton" and was "in the process of withdrawing from [its] representation of Dr. Dacier." JA51337-38; *see* JA16567. On March 28, 2022, Quinn Emanuel formally confirmed that it "ha[d] withdrawn from its representation of Dr. Dacier." JA34921. In light of the court's conflict-of-interest ruling, Norton also retained new lead counsel from Latham & Watkins LLP.

## IV. The District Court Finds Quinn Emanuel In Civil Contempt For Refusing To Disclose Attorney-Client Communications.

On April 5, 2022, counsel from Latham & Watkins contacted Dr. Dacier to ask if he would be willing to testify at trial. JA35890. In the ensuing email exchange, Dr. Dacier waived attorney-client privilege over a portion of his communications with Quinn Emanuel from 2017 to 2020 by discussing them with Latham & Watkins. *See* JA35887-89. On April 7, 2022, Latham & Watkins

disclosed those emails to Columbia's counsel, who promptly filed them on the public docket. *See* JA35884-90.

On April 8, 2022, Quinn Emanuel filed a brief on its own behalf explaining that it did not "render[] Dr. Dacier unavailable" and that the court erred by ruling on the purported conflict of interest on a motion *in limine* in which neither party raised the issue. JA35926. This brief was accompanied by a sworn declaration from David Nelson, the Quinn Emanuel attorney who represented Dr. Dacier at his 2014 deposition. JA35936-43. Mr. Nelson recounted a June 17, 2020 conversation in which Dr. Dacier "stated that he never intended to terminate Quinn Emanuel's representation [and] confirmed that he wanted to continue to be represented by Quinn Emanuel," after which Dr. Dacier "signed a declaration to that effect." JA35940 (citing JA16552). Mr. Nelson further declared that "Quinn Emanuel acted in good faith throughout its representation of Dr. Dacier" and offered to appear in court and "answer any of th[e] Court's questions regarding this matter." JA35942-43. The court did not take Mr. Nelson up on this offer.

On May 24, 2022, Columbia moved for an order to show cause why Quinn Emanuel should not be held in civil contempt for failing to comply with the court's order directing it to disclose its attorney-client communications with Dr. Dacier. JA43929. Columbia emphasized that its motion was made "only to support compliance with" the court's order of March 15, 2022, and sought "only such

reasonable sanctions as may be necessary to cause [such] compliance"—e.g., "imposing monetary sanctions until compliance is achieved." JA43926.

On June 3, 2022, Quinn Emanuel filed its opposition. Quinn Emanuel explained that it was justified in "initially asserting the attorney-client privilege in its March 16, 2022 response," and that once Dr. Dacier waived privilege over certain of his communications by discussing them with Latham & Watkins, Quinn Emanuel substantially complied with the court's order by providing Mr. Nelson's declaration, which summarized Quinn Emanuel's communications with Dr. Dacier during the relevant timeframe. JA43947-48; *see* JA43950-51. On June 17, 2022, Columbia filed its reply, in which it maintained that Mr. Nelson's declaration was insufficient and reiterated that it was "seek[ing] only a coercive remedy that will encourage full compliance." JA45423-24.

For nearly a year and a half, the district court took no action on Columbia's show-cause motion. Finally, on September 30, 2023, the court issued a decision holding Quinn Emanuel in civil contempt for failing to comply with the court's *sua sponte* order to disclose attorney-client communications. JA58-99. The court concluded that Quinn Emanuel's obligation to "protect [Dr. Dacier's] confidences" did not justify its initial noncompliance with the underlying order and that, in any event, Mr. Nelson's declaration did not contain "'all information garnered from Dr. Dacier' by Norton's counsel from 2017 through 2020." JA91 & n.16 (quoting JA57).

In its contempt decision, the district court did not engage with (let alone grant) Columbia's request for compliance-inducing monetary sanctions aimed at causing Quinn Emanuel to disclose its attorney-client communications with Dr. Dacier. Instead, the district court invented its own remedies, choosing to consider—yet again, without a motion, briefing, or argument—whether to award Columbia some unspecified quantum of attorneys' fees or to sanction Norton by "mak[ing] a negative inference as to the contents of Quinn Emanuel's communications with Dr. Dacier" in connection with Columbia's post-trial motions for enhanced damages and attorneys' fees under 35 U.S.C. §§284 and 285. JA98. Speculating that the undisclosed attorney-client communications might contain "potential evidence of misconduct and bad faith," the court proceeded to hold *sua sponte* that it would "add a finding of egregious behavior in making findings as to enhanced damages and fees" in entering its judgment, JA97-98, even though the damages that Columbia sought to enhance were based on purported infringement of patents that were completely different from the '643 patent to which Dr. Dacier's testimony related, *see* JA238-39, and even though the court's adverse inference effectively punished Norton for Quinn Emanuel's refusal to comply. The court ultimately awarded enhanced damages against Norton by multiplying the jury's damages award by 2.6— adding nearly $300 million to the damages amount, for a total award of over $481 million—and also awarded attorneys' fees. JA143.

## SUMMARY OF ARGUMENT

The district court found Quinn Emanuel in civil contempt for failing to comply with its *sua sponte* order directing Quinn Emanuel to "disclose on the record in writing any information garnered from" its client Dr. Dacier from 2017 through 2020. When Quinn Emanuel refused, citing Dr. Dacier's attorney-client privilege, the district court found it in contempt and imposed sanctions that Columbia never even requested. That contempt finding and its accompanying sanctions must be reversed. The district court's order directing Quinn Emanuel to disclose its attorney-client communications with Dr. Dacier over the previous four years was invalid as a matter of law, and Quinn Emanuel properly refused to comply with that invalid order.

First, the district court erred at the threshold in finding any conflict of interest in Quinn Emanuel's simultaneous representation of Dr. Dacier and Norton. The district court concluded that a disqualifying conflict of interest "developed" based on statements that Dr. Dacier allegedly made to Professor Keromytis sometime in 2017 or 2018, which the court read as suggesting that if Dr. Dacier chose to appear at trial, some part of his testimony would be unhelpful to Norton. But even assuming that some of Dr. Dacier's testimony could potentially have undermined Norton's arguments at trial, the district court erred as a matter of law by concluding that any such unhelpful testimony would create a conflict of interest. Attorneys routinely represent both employers and their current and former employees, and it is hardly

unusual for an employee to be called upon to give some testimony that could harm his employer's case. None of that creates any kind of ethical conflict. The pertinent question for conflicts purposes is not whether some part of an employee's potential testimony might conceivably cut against the employer's litigating position, but whether the employee has any concrete personal interest in the litigation that conflicts with the employer's interests—and Dr. Dacier, as a nonparty witness, plainly had no such personal stake in the litigation here. And even if some potential conflict had existed, it would not have warranted the extreme remedy of automatically disqualifying Quinn Emanuel from representing Dr. Dacier, let alone retroactively disqualifying it as of 2017 (years before Quinn Emanuel even learned of Dr. Dacier's alleged comments to Professor Keromytis).

Even if there had been a disqualifying conflict of interest here, the district court committed an even more egregious error of law in concluding (without briefing or argument) that the Quinn Emanuel's purported conflict could destroy Dr. Dacier's attorney-client privilege. In fact, it is black-letter law that *an attorney's* conflict of interest does not negate *the client's* attorney-client privilege or otherwise authorize a court to order disclosure of attorney-client communications covered by that privilege. Numerous courts have recognized as much, and not one court—other than the district court below—has ever reached the opposite conclusion. And to the extent the district court believed that the purported conflict automatically terminated Quinn

Emanuel's representation of Dr. Dacier under the terms of the Engagement Agreement (and so no attorney-client relationship existed at all from 2017 on), the court plainly misread the relevant provision, which makes clear that the representation was to continue for the duration of the lawsuit unless either Quinn Emanuel or Dr. Dacier provided the other with formal notice of termination. The district court's contrary reading cannot be squared with either the text of the Engagement Agreement or settled ethical rules, and would create impossible results for both parties to the agreement, who could never be sure whether their attorney-client relationship (and attorney-client privilege) might be retroactively eliminated by the subsequent appearance of a previously unknown conflict.

The myriad substantive flaws can only be explained by the district court's serial procedural failures, which provide independent grounds for reversing the contempt finding and accompanying sanctions. Throughout the proceedings below, the district court repeatedly departed from the basic principles of party presentation and due process, raising and ruling on key issues on its own initiative without waiting for those issues to be properly presented or affording Quinn Emanuel any adequate notice and opportunity to respond. Those departures began with the underlying disclosure order itself, in which the court *sua sponte* raised the purported conflict of interest, immediately concluded that the purported conflict made Quinn Emanuel's representation of both Dr. Dacier and Norton improper, and then immediately

proceeded to order disclosure of Quinn Emanuel's attorney-client communications with Dr. Dacier the next day, all without giving Quinn Emanuel any notice or opportunity to be heard. And when Quinn Emanuel refused to comply with that order and Columbia sought sanctions, the court ignored Columbia's request for compliance-inducing civil contempt sanctions and instead invented its own punitive sanctions—an adverse inference of egregious behavior—which it imposed without notice, briefing, or argument, and which punished *Norton* for a perceived lack of compliance with an order directed at Quinn Emanuel. Those radical departures from the basic principles of the adversarial process not only help to explain the district court's egregious substantive errors, but independently warrant reversal. For all of these reasons, the district court's contempt order and accompanying sanctions cannot stand.

## STANDARD OF REVIEW

Because the issues presented in this appeal do not involve patent law, this Court applies the law of the regional circuit—here, the Fourth Circuit. *See, e.g.*, *Monsanto Co. v. E.I. Du Pont de Nemours & Co.*, 748 F.3d 1189, 1196 (Fed. Cir. 2014). Under Fourth Circuit precedent, a party appealing from a civil-contempt order may challenge not only "whether contempt was proper" but also the validity of the underlying "order alleged to have been violated." *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014); *see, e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301-03

(4th Cir. 2000) (civil contempt requires violation of "a valid decree," and so "reversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon").  This Court "review[s] the ultimate decision as to whether the contempt was proper for abuse of discretion, the underlying legal questions de novo, and any factual findings for clear error."  *In re Under Seal*, 749 F.3d at 285 (citation omitted).

The district court's determination that Quinn Emanuel could not ethically represent both Dr. Dacier and Norton after 2017 due to a purported conflict of interest is a legal question reviewed *de novo*.  *See Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992); *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1200 (4th Cir. 1978).  The district court's determination that the purported conflict of interest destroyed attorney-client privilege over Dr. Dacier's communications with Quinn Emanuel from 2017 through 2020 is also a legal question reviewed *de novo*.  *See Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998).  Finally, the issue of whether the district court's orders were procedurally improper is likewise reviewed *de novo*.  *In re Contempt Finding*, 663 F.3d 1270, 1274 (D.C. Cir. 2011).

## ARGUMENT

The district court's orders directing Quinn Emanuel to disclose privileged attorney-client communications, and then holding Quinn Emanuel in contempt for refusing to comply, were wrong from start to finish.  The court erred in finding any

conflict in Quinn Emanuel's simultaneous representation of Dr. Dacier and Norton; it erred in concluding that any such purported conflict would retroactively strip attorney-client privilege from Dr. Dacier's communications with his counsel; and it erred in raising and deciding these issues *sua sponte* rather than adhering to the traditional principle of adversarial presentation. For all of these reasons, the district court's orders must be reversed.

## I. The District Court Erred In Holding That Dr. Dacier And Norton Had Conflicting Interests That Disqualified Quinn Emanuel From Representing Them Both.

First and foremost, the district court erred in holding that there was any conflict of interest between Dr. Dacier and Norton that would have made it impossible for Quinn Emanuel to represent both. As countless cases demonstrate, it is "common practice for counsel to represent both an employer and its current and/or former employees" who may be called as nonparty witnesses. *New York v. United Parcel Serv., Inc.*, 2016 WL 10672076, at *1 (S.D.N.Y. Sept. 2, 2016); *see, e.g.*, *Aetna*, 570 F.2d at 1202.

This type of concurrent representation offers significant benefits, as it "eliminat[es] the need to hire multiple law firms, enhanc[es] the attorney's ability to coordinate litigation strategy, and improv[es] efficiency by reducing time needed for multiple attorneys to familiarize themselves with the case in order to prepare for non-party depositions." NYC Bar Ass'n, Formal Op. 2016-2 (July 22, 2016); *accord*

*Aetna*, 570 F.2d at 1202 (observing that concurrent representation of employer and employees can be "highly desirable").  And as numerous courts have recognized, there is nothing remotely improper about such an arrangement.  *See, e.g.*, *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 658 F.2d 1355, 1356, 1358-59, 1361-62 (9th Cir. 1981); *United States ex rel. Harris v. Lockheed Martin Corp.*, 2013 WL 12328947, at \*5 (N.D. Ga. Feb. 5, 2013).  Indeed, Columbia's counsel itself represents several of Columbia's current and former employees in connection with this litigation, underscoring that simultaneous representations of both an employer in litigation and its current and former employees as nonparty witnesses is a common practice and generally appropriate.  *See* JA20329-33 (listing multiple current and former Columbia employees represented by Columbia's counsel).

Not surprisingly, then, the district court did not find any conflict of interest in the fact that Quinn Emanuel agreed to simultaneously represent both Dr. Dacier and Norton in June 2014 and continued to represent Dr. Dacier at his deposition in August 2014. But the court then went quickly astray, holding that a conflict of interest "developed" later based on a conversation that Dr. Dacier allegedly had with Professor Keromytis at a professional event "sometime between 2017 and 2018." JA43, JA47, JA49.  In a declaration filed more than two years after this conversation took place, Professor Keromytis asserted that Dr. Dacier had said "he was sorry

about what Norton had done with the decoy technology" and "was against Norton's decisions with respect to the decoy technology because Norton was wrong." JA43; *see* JA15989. According to the district court, these alleged statements created a conflict of interest that automatically disqualified Quinn Emanuel from concurrently representing Dr. Dacier and Norton from 2017 on (and destroyed attorney-client privilege over any communications between Quinn Emanuel and Dr. Dacier from that point on)—even though Quinn Emanuel did not even know those alleged statements had been made until years later. *See* JA47-48, JA50, JA55 n.7.

That remarkable holding is wrong several times over. Contrary to what the district court apparently believed, the fact that a current or former employee expresses regret or provides some testimony that could potentially be unhelpful to his employer's case does not create an ethical conflict of interest, let alone one that would disqualify the same firm from representing both—a rule that would make simultaneous representations of employer and employee practically impossible. This Court should correct that egregious misunderstanding and eliminate the indefensible sanctions that flowed from it.

## A. There Was No Conflict of Interest Between Dr. Dacier and Norton.

The first question in determining whether a conflict of interest exists is, of course, "whether the interests of two clients will be or are likely to be in conflict." *Richmond Hilton Assocs. v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir. 1982);

*see* Va. R. Prof'l Conduct 1.7(a) ("concurrent conflict of interest" exists if clients are "directly adverse" or if there is "significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client").  In addressing that question, the district court here stumbled out of the gate. Rather than examine Dr. Dacier's and Norton's interests in this litigation and identify a potential conflict, the court simply assumed that a conflict existed just because Dr. Dacier might provide some testimony that could potentially be unhelpful to Norton—without identifying any "interest" that Dr. Dacier as a non-party witness might have had in the litigation, much less explaining how any such interest conflicted with Norton's interest in defeating Columbia's claims.  That approach was plainly incorrect.

1.  Concurrent representation may give rise to a conflict of interest where two clients have interests in the same litigation that are in actual or potential conflict, materially limiting a lawyer's ability to represent both—for instance, where one client could assert a legal claim against another, seek to avoid "personal liability" by "cast[ing] blame" upon the other, or increase its own monetary recovery at the expense of the other's recovery.  *Aetna*, 570 F.2d at 1201; *see* Va. R. Prof'l Conduct 1.7(a); *Farb v. Baldwin Union Free Sch. Dist.*, 2011 WL 4465051, at *14 (E.D.N.Y. Sept. 26, 2011) (observing that cases involving "a conflict of interest based on simultaneous representation … tend to involve circumstances in which one client

might assert a claim against the other client or in which recovery of one client is at the expense of recovery of another"). Conversely, where the two clients have no actual or potentially adverse interests in the litigation—such as where one client is a party and the other is a non-party witness with no personal stake in the dispute— there is generally little to no risk of an ethical conflict, even when the witness's testimony would not be unalloyedly helpful to the party. *See* Va. R. Prof'l Conduct 1.7, cmt.23 (explaining that a concurrent conflict exists where an attorney represents "opposing *parties* in litigation" or "*parties* whose interests in litigation may conflict, such as *co-plaintiffs* or *co-defendants*" (emphasis added)).

The Fourth Circuit—whose law governs here—has accordingly recognized that a conflict of interest does not exist unless there is some actual or potential conflict between the clients' interests in the litigation. In *Aetna*, for example, the district court held that a conflict of interest prevented the Department of Justice from representing both the United States and four individual air traffic controllers employed by the Federal Aviation Administration who were sued in connection with a plane crash. 570 F.2d at 1199-200. The Fourth Circuit reversed—even though the air traffic controllers were not just witnesses but also co-defendants alongside their employer—because the district court's suggestion that the individual defendants and their employer might have conflicting interests was "based solely upon conjecture," and in fact "there [wa]s little or no possibility" that the employees would "incur any

personal liability as a result of th[e] litigation." *Id.* at 1201. Numerous other courts have reached the same view, concluding that "[t]here is no potential for conflict" between a corporate defendant and employee-witnesses who "are not parties to the litigation in any sense" and will not "be subject to any liability." *United Parcel Serv.*, 2016 WL 10672076, at *2; *see Bonner v. Guccione*, 1997 WL 91070, at *2 (S.D.N.Y. Mar. 3, 1997) (similar); *D.S. Mags., Inc. v. Warner Publisher Servs., Inc.*, 623 F.Supp. 624, 625 (S.D.N.Y. 1985) (similar); *United States v. Occidental Chem. Corp.*, 606 F.Supp. 1470, 1474 (W.D.N.Y. 1985) (similar).

Those same principles control here. Dr. Dacier had no interest in this lawsuit beyond the generic interest that any potential witness has in avoiding inappropriate questions, attacks on his credibility, and minimizing impositions on his time or friction with acquaintances associated with the adverse party. *See Occidental*, 606 F.Supp. at 1474 (former employee called as non-party witness has no "interest" except "to be protected from unwarranted inquiries and to be able to consult with counsel during questioning when doubts arise"). While Dr. Dacier voluntarily sat for a deposition in 2014 and may have been willing to travel to the United States for trial if his schedule had permitted, there was zero prospect of him becoming a litigant, and he had nothing riding on the outcome of Columbia and Norton's dispute. And while Dr. Dacier was "happy to help the judicial process" if necessary, JA35889, he repeatedly indicated "that he would prefer not to be involved in the

litigation," JA35940-41. In short, Dr. Dacier had "nothing against Norton," JA35887, and any interest he may have had in this litigation was entirely compatible with Norton's interest in defeating Columbia's claims.

2. Instead of identifying Dr. Dacier's interests (if any) in the litigation and then comparing them to Norton's, as Fourth Circuit precedent requires, the district court adopted the remarkable view that a nonparty witness becomes adverse to a party—and so the same firm cannot represent both—whenever some portion of the nonparty witness's testimony could potentially be harmful to the party's litigating position. *See* JA47-48 (concluding that there was "a conflict of interest" because, the court believed, Dr. Dacier's alleged statements to Professor Keromytis "r[an] contrary to Norton's defense"); JA51-52 (similar). The district court cited no authority for that extraordinary proposition, which would require separate counsel for nearly every employee-witness, and it is not the law.

As an initial matter, it is far from clear exactly what Dr. Dacier said to Professor Keromytis during their brief and casual conversation "sometime between 2017 and 2018," JA43, or whether anything in that conversation actually showed that Dr. Dacier's testimony would potentially be harmful to Norton's defense. During seven hours of questioning by Columbia's counsel in 2014, Dr. Dacier provided sworn testimony that although he had been involved in some of the research that led to the '643 patent, he was not in a position to know whether the

Columbia professors should have been listed as inventors because he did not even read the patent application, much less conduct a technical analysis of its claims. *See* JA65479-80. The district court's assertion that Dr. Dacier's alleged remarks to Professor Keromytis "speak directly, and more expansively" to Columbia's fraudulent concealment and inventorship claims than *seven hours* of questioning by Columbia's counsel, JA52, is completely backwards. Indeed, even Columbia's own attorney, Mr. Guzior, conceded that it is impossible to know "what Dr. Dacier meant when he said he was sorry" or "when he said he believed what had happened was wrong." JA54124-25. Dr. Dacier himself confirmed that his 2014 deposition testimony provided all the useful information that he had about the case, repeatedly indicating that he had nothing to add to what he had said at his deposition. JA35940; *see* JA14326 ("no problem to come repeat my testimony"); JA16023 ("repeat what I have already said in 2014"); JA35888 ("I do not have anything to add"). Accordingly, even taking at face value Professor Keromytis's account two years later of his "brief[]," informal conversation with Dr. Dacier, JA15989, it comes nowhere close to establishing that if Dr. Dacier had appeared at trial, he would have "expand[ed]," "supplement[ed]," and "clarif[ied] his earlier deposition testimony" in any way that undermined Norton's defense. *Contra* JA52.

In any event, even assuming that some aspect of Dr. Dacier's testimony might have undermined Norton's arguments at trial, the district court erred as a matter of

law in equating that possibility with a conflict of interest. On the contrary, the possibility that some aspect of a witness's testimony could potentially harm a party's litigating position is wholly unremarkable and virtually unavoidable. Any cross-examination worth its salt will elicit some testimony that is unhelpful for the party that called the witness. If that were enough to create a conflict of interest, it would be virtually impossible for joint representations of parties and non-party witnesses to exist. That practice is nonetheless ubiquitous, because simply providing testimony that is not unalloyedly helpful—or wishing the whole unpleasantness of the litigation would go away—does not remotely rise to the level of a conflict of interest. *See Occidental*, 606 F.Supp. at 1474 (even assuming employee's testimony would be "adverse to" the defendant corporation, it would not "create[] a likelihood of a significant conflict"); *Guillen v. City of Chicago*, 956 F.Supp. 1416, 1423-24 (N.D. Ill. 1997) (even assuming that employees' testimony would be "damaging" to their employer's defense, it did not create a disqualifying conflict of interest).

The district court thus erred as a matter of law in concluding that Dr. Dacier's alleged statements to Professor Keromytis demonstrated a conflict of interest. Even if those statements could be read to indicate that some aspects of Dr. Dacier's testimony at trial might be unhelpful for Norton, nothing in those statements remotely suggests that Dr. Dacier had any concrete personal interest in the litigation, much less one that would conflict with Norton's interest in avoiding liability. The

district court's contrary view—that a conflict of interest arises whenever any aspect of a witness's testimony is potentially harmful to a party—not only has no legal support, but would radically multiply the number of potential ethical conflicts in any litigation and make simultaneous representation of a party and nonparty witnesses effectively impossible. This Court should not allow that flawed and dangerous ruling to stand.

**B.      Any Purported Conflict of Interest Did Not Justify Automatically Disqualifying Quinn Emanuel From Representing Dr. Dacier.**

Because there was no conflict whatsoever between Dr. Dacier's and Norton's interests in this litigation, the district court erred in finding a conflict of interest at all, and this Court can reverse on that ground alone. But even if some possible conflict had "developed" as a result of Dr. Dacier's alleged comments to Professor Keromytis, JA45—comments that were not relayed to Quinn Emanuel until years after the fact—the district court independently erred in treating that conflict as a non-waivable basis for automatic disqualification, let alone *retroactive* disqualification dating back to "sometime between 2017 and 2018," JA43, long before Quinn Emanuel was even aware of Dr. Dacier's alleged comments and the purported potential conflict. *See* JA55 n.7 (concluding that Quinn Emanuel "should not have been representing" both Dr. Dacier and Norton after the purported conflict arose). Indeed, since the district court plainly viewed the alleged comments as a game-

changer, finding Quinn Emanuel both conflicted and disqualified years before it even learned of the comments makes no sense at all.

As the Fourth Circuit has explained, attorney disqualification is a "drastic step" that should not be taken lightly. *Shaffer*, 966 F.2d at 146. It "must be based on a finding of an actual present conflict between the positions taken by the two clients," rather than "'conjecture' or the 'mere possibility of a conflict.'" *Simms v. Deggeller Attractions, Inc.*, 2013 WL 49756, at *9 (W.D. Va. Jan. 2, 2013) (quoting *Richmond Hilton Assocs.*, 690 F.2d at 1089); *see Shaffer*, 966 F.2d at 146; *Aetna*, 570 F.2d at 1200. Under Virginia Rule of Professional Conduct 1.7(a), an actual "concurrent conflict of interest" warranting disqualification exists only where (1) two parties are "directly adverse" or (2) "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." Va. R. Prof'l Conduct 1.7(a). Even if a concurrent conflict of interest exists, moreover, disqualification is not required if "each affected client consents" in writing to the simultaneous representation, the lawyer reasonably believes she will be able to provide each client competent and diligent representation, neither client is asserting a claim against the other, and the representation is not otherwise prohibited by law. *Id.* 1.7(b). Under those rules—which, remarkably, the district court never cited—the purported conflict that the district court identified here comes nowhere

near warranting the court's automatic (and retroactive) disqualification of Quinn Emanuel from continuing to represent both Dr. Dacier and Norton.

First, Dr. Dacier indisputably was not "directly adverse" to Norton here. *Id.* 1.7(a)(1). Under Virginia law, direct adversity exists only between "opposing parties in litigation"—a conflict of interest that cannot be waived. *Id.* 1.7 cmt.23; *see id.* 1.7(b)(3) (conflict is not waivable if it "involve[s] the assertion of a claim by one client against another client"). Dr. Dacier and Norton were not opposing parties in this litigation; indeed, Dr. Dacier is not a party to this litigation at all. Dr. Dacier and Norton therefore plainly are not "directly adverse." *Id.* 1.7(a)(1).

Second, there was also no "significant risk" that Quinn Emanuel's representation of Dr. Dacier would be "materially limited" by the firm's responsibilities to Norton, or vice versa—and even if there were, that purported potential conflict would have been waivable (and so could not warrant automatic disqualification). *Id.* 1.7(a)(2); *see id.* 1.7(b). As counsel to Dr. Dacier, Quinn Emanuel was ethically bound to protect Dr. Dacier's interests as a nonparty witness, such as by guarding him against "unwarranted inquiries" and unjustified impositions on his time. *Occidental*, 606 F.Supp. at 1474. As counsel to Norton, Quinn Emanuel was ethically bound to also protect Norton's interests as a party, including by defending Norton against Columbia's claims. Nothing in Dr. Dacier's alleged comments to Professor Keromytis provides any basis for finding any significant risk

that Quinn Emanuel's obligations to either Dr. Dacier or Norton would materially limit its ability to fully represent the other here, let alone a risk so overwhelming that it could not be waived.

To be sure, a lawyer's representation of two clients may be "materially limited" where one client's testimony will factually contradict the other's testimony, such that zealous representation of the former client would require attempting to impugn the latter client's credibility through a vigorous cross-examination. *See, e.g.*, *Adkisson v. Jacobs Eng'g Grp., Inc.*, 2016 WL 6534273, at *3 (E.D. Tenn. Nov. 1, 2016). But as the record shows, there was no realistic prospect that any such factual contradiction between Dr. Dacier's and Norton's testimony would materialize in this case. On the contrary, Dr. Dacier sat for a seven-hour deposition, and nothing in that testimony elicited such an obvious contradiction (or was the basis for the district court's actions), which is why no party in 2014 even suggested the existence of any conflict of interest.

Dr. Dacier's conversation with Professor Keromytis at a cybersecurity conference "sometime between 2017 and 2018," JA43, did not create some new direct contradiction automatically disqualifying Quinn Emanuel from continuing to represent both Dr. Dacier and Norton. Norton never disputed that some conversation along those lines may have occurred, and that Dr. Dacier may have told Professor Keromytis that he felt sorry about some of Norton's actions related to the

development of the '643 patent. JA43, JA48; *accord* JA54411. Instead, Norton maintained only that Dr. Dacier's remarks were colored by Dr. Dacier's friendship with Professor Keromytis, and that they did not show that Norton had engaged in any unlawful conduct—particularly since Dr. Dacier also testified that he had not "read the patent application," much less conducted a technical analysis of its claims. JA54411-12. Far from attempting to impugn Dr. Dacier's credibility, Norton's counsel told the jury that he "testified truthfully" and "in a balanced way." JA54412; *see also* JA53918 (eliciting testimony that Dr. Dacier was "very bright," "knowledgeable," and "well respected in the computer security field"); JA54127-28 (objecting to one of Columbia's proposed jury instructions because it suggested Dr. Dacier was not "honest and forthright"). And given that Dr. Dacier stood by his deposition testimony and said he had nothing material to add, the offhand remarks in 2017 or 2018 could not open up some fissure between Norton and Dr. Dacier that obligated Norton to attack Dr. Dacier's credibility.

Put simply, even if Dr. Dacier's alleged remarks to Professor Keromytis could somehow be read to indicate a possible conflict of interest between Dr. Dacier and Norton, that "mere possibility of a conflict" was not sufficient to warrant imposing automatic and retroactive disqualification dating back to whenever Dr. Dacier's remarks were made, with no opportunity for Dr. Dacier and Norton to waive that purported conflict. *Richmond Hilton Assocs.*, 690 F.2d at 1089. A district court

cannot disqualify counsel based on mere "speculation that a chain of events … could lead counsel to act counter to his client's interests," *Shaffer*, 966 F.2d at 145, let alone impose automatic and retroactive disqualification based on speculation about a waivable conflict.  The district court's contrary approach—concluding that the mere possibility that Dr. Dacier could conceivably have presented adverse testimony meant that Quinn Emanuel automatically "should not have been representing Dr. Dacier and Norton" ever since 2017, JA55 n.7, without any opportunity for a waiver—is thus entirely unsustainable.

## II. The District Court Erred In Holding That Any Purported Conflict Of Interest Destroyed Attorney-Client Privilege.

The district court's errors did not end with its mistaken conflict-of-interest and disqualification rulings.  Even if the district court had correctly identified a disqualifying conflict of interest—which it plainly did not, *see supra* Part I—that would not have justified ordering Quinn Emanuel to disclose privileged attorney-client communications.  Quite the opposite:  As numerous courts have recognized, under settled law, a lawyer's conflict of interest does not destroy the client's attorney-client privilege, let alone authorize a court to order disclosure "on the record in writing" of communications covered by that privilege.  JA57.  The district court's contrary order cannot be permitted to stand.

## A. Any Purported Conflict of Interest Did Not Destroy Attorney-Client Privilege Over Dr. Dacier's Communications With Quinn Emanuel.

The district court's disclosure order depended on a critical premise: that Quinn Emanuel's purported conflict of interest vitiated the attorney-client privilege over communication between Dr. Dacier and Quinn Emanuel for the duration of the conflict.  JA55 n.7; *see* JA57; JA89.  That premise is profoundly mistaken.  As a matter of both black-letter law and common sense, an attorney's conflict of interest in an attorney-client relationship does not eliminate the client's privilege over communications made within that relationship.  That alone is sufficient to require reversal:  Even if the district court had been correct to find a disqualifying conflict of interest here, the court had no authority to demand that Quinn Emanuel "disclose on the record in writing" its attorney-client communications as a result.  *Contra* JA55 n.7.  That disclosure order was wholly invalid, and the district court's contempt finding and sanctions for violating it must therefore be reversed.  *See Ashcraft*, 218 F.3d at 301 (civil contempt finding requires violation of "a valid decree").

The district court provided almost no justification, and zero authority, for its *sua sponte* order demanding that Quinn Emanuel disclose attorney-client communications.  *See* JA55 n.7; *see also* JA57.  Its sole explanation for that order consists of a single cursory footnote:

> Quinn Emanuel should not have been representing Dr. Dacier and Norton after 2020—and perhaps since 2014.  As such, no later than

> March 16, 2022, counsel for Norton must disclose on the record in writing any information garnered from Dr. Dacier during the period their representation of Dr. Dacier was a conflict.

JA55 n.7; *see* JA49 (identifying the period of conflict as "at least … 2017 through 2020"); JA89 (same). As far as that footnote reveals, the court apparently concluded that because (in its view) Quinn Emanuel "should not have been representing Dr. Dacier" from at least 2017 through 2020 due to the purported conflict, the attorney-client privilege over its communications with Dr. Dacier during that period automatically disappears, leaving the court free to order Quinn Emanuel to disclose those communications "on the record in writing." JA55 n.7.

That view perversely punishes the client for the attorney's conflict and has been repeatedly and uniformly rejected by every court to consider the issue. Instead, as numerous courts have recognized, it is "black-letter law" that a conflict of interest does not affect the existence of attorney-client privilege: Even "when an attorney (improperly) represents two clients whose interests are adverse, the communications are [still] privileged ... notwithstanding the lawyer's misconduct." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 368 (3d Cir. 2007) (citing 8 J. Wigmore, Wigmore on Evidence §2312 (McNaughton rev. ed. 1961)); *see, e.g.*, *Eureka Inv. Corp. v. Chi. Title Ins. Co.*, 743 F.2d 932, 938 (D.C. Cir. 1984) ("[C]ounsel's failure to avoid a conflict of interest should not deprive the client of the privilege."); *New Phoenix Sunrise Corp. v. Comm'r*, 408 F.App'x 908, 919 (6th Cir. 2010) ("[T]he fact that an

*attorney* has a conflict of interest does not mean that the *client* forfeits the benefit of the attorney-client privilege."); *Caekaert v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 2023 WL 3587287, at *4 (D. Mont. May 22, 2023) (same); *Cantu Servs., Inc. v. Worley*, 2021 WL 2323721, at *5 (W.D. Okla. June 7, 2021) (same); *Marketel Media, Inc. v. Mediapotamus, Inc.*, 2015 WL 3650765, at *4 (E.D.N.C. June 11, 2015) (same); *Madanes v. Madanes*, 199 F.R.D. 135, 144 (S.D.N.Y. 2001); *RFF Fam. P'ship, LP v. Burns & Levinson, LLP*, 991 N.E.2d 1066, 1079 (Mass. 2013) (same). Not one court—other than the district court below—has ever reached the opposite and perverse conclusion.

The district court offered no rationale for departing from this unbroken line of caselaw. Indeed, it never grappled with that caselaw at all, because it issued its order without briefing or argument. Nor could the district court have justified its approach if it tried, as it defies all reason to deprive a *client* of his privilege over his attorney-client communications—through "on the record" disclosure of "all information" he conveyed to his counsel over the previous four years, no less—just because his attorney was laboring under a purported conflict of interest. *See, e.g.*, *Eureka*, 743 F.2d at 938 ("The privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable."); *Teleglobe Commc'ns*, 493 F.3d at 368 (same). Indeed, while Quinn Emanuel did not breach any ethical obligations by representing both Dr. Dacier and Norton, the one thing that would have come far

closer to such a breach would have been immediate and full compliance with the district court's order by disclosing Dr. Dacier's privileged communications without his waiver or consent.

### B. Any Purported Conflict of Interest Did Not Somehow Automatically Terminate Dr. Dacier's Attorney-Client Relationship With Quinn Emanuel.

While the only reason that the district court gave for its disclosure order is that Quinn Emanuel "should not have been representing Dr. Dacier" due to the purported conflict, JA55 n.7, elsewhere in its opinion, it suggested a more sweeping theory: that there *was no* attorney-client relationship (and so no attorney-client privilege) between Quinn Emanuel and Dr. Dacier after 2017, because Dr. Dacier's comments to Professor Keromytis automatically and abruptly "void[ed] the retainer agreement" under which Quinn Emanuel had agreed to represent Dr. Dacier. JA48. That theory is equally untenable.

1. When, as here, a client retains a law firm for purposes of "a specific matter," the representation generally continues until "the matter has been resolved," unless the client discharges the lawyer or the lawyer formally withdraws from the representation. Va. R. Prof'l Conduct 1.3, cmt.4; Va. R. Prof'l Conduct 1.16; *see, e.g.*, *Atl. Diving Supply, Inc. v. Komornik*, 2021 WL 8775676, at *3 (Va. Cir. Ct. 2021) ("Termination of [an attorney-client] relationship occurs when the particular matter is concluded, the client terminates the relationship, with or without cause, or

the attorney terminates the relationship via withdrawal."). While a client is generally free to "discharge [his] lawyer at any time, with or without cause," Va. R. Prof'l Conduct 1.16(d), cmt.4, there must be an actual discharge. Otherwise, a lawyer generally "should carry through to conclusion all matters undertaken for a client," Va. R. Prof'l Conduct 1.3, cmt.4, and may only withdraw from a representation for good cause and must give "reasonable notice to the client." Va. R. Prof'l Conduct 1.16(d); *see, e.g.*, *In re Schwartz*, 493 A.2d 1248, 1253 (N.J. 1985) ("Once an attorney undertakes to represent a client, he cannot withdraw from employment without properly advising his client of his intention to do so.").

Consistent with these principles, Quinn Emanuel represented Dr. Dacier from June 2014, when Dr. Dacier signed the Engagement Agreement, until March 2022, when Quinn Emanuel formally withdrew from representing him at the district court's insistence. *See* JA16567; JA34921. While there were periods during that representation when Quinn Emanuel and Dr. Dacier were not in regular contact—including the long period from November 2014 through August 2018 when Columbia stayed all the claims as to which Dr. Dacier's testimony might be relevant—the representation continued throughout that period under the plain terms of the Engagement Agreement, which confirmed that Dr. Dacier had retained Quinn Emanuel to represent him "for purposes of" Columbia's entire lawsuit against

Norton, not just the June 2014 deposition or any other discrete event within the litigation.  JA16566.

To be sure, the terms of the Engagement Agreement may not have been top of mind for Dr. Dacier when Columbia's counsel unexpectedly (and improperly) initiated contact with him in October 2019, purportedly leading Dr. Dacier (according to Columbia's counsel) to state that he was no longer represented by Quinn Emanuel.  *See* JA17737-38.  But that is part of why the ethical rules forbid such out-of-the-blue contacts with represented parties and witnesses in ongoing litigation.  In all events, once Dr. Dacier reconnected with Quinn Emanuel in April 2020, he filed a sworn statement affirming that "Quinn Emanuel ha[d] represented [him] since June 18, 2014, and continue[d] to represent [him], in connection with the Columbia case."  JA16552.  That affidavit leaves no doubt that Dr. Dacier and Quinn Emanuel remained in an attorney-client relationship from June 2014 until March 2022, when Quinn Emanuel withdrew from the representation in response to the district court's conflict-of-interest ruling.  *See, e.g.*, JA51339-40.

2.  The district court suggested otherwise by embracing—yet again, without briefing or argument—a completely untenable interpretation of the Engagement Agreement.  *See* JA48.  Seizing on one partial sentence from the Engagement Agreement, without considering context or providing meaningful analysis, the court observed that the Engagement Agreement by its terms was "conditioned on the fact

that [Dr. Dacier] and [Norton] share a common interest in the matters." JA48 (brackets original) (quoting JA16567). According to the court, the "effect" of Dr. Dacier's alleged remarks to Professor Keromytis was to negate that "condition[]," and thereby automatically "void the retainer agreement." JA48. That is, the court read the Engagement Agreement to automatically and immediately terminate Quinn Emanuel's representation of Dr. Dacier if at any time Dr. Dacier made a comment indicating that he and Norton no longer "share[d] a common interest" in the litigation, even if neither Quinn Emanuel nor Dr. Dacier had ever informed the other (or were even aware) that the common interest had disappeared. JA48.

That unlikely reading cannot be squared with either the plain text of the Engagement Agreement or the importance of clarity in attorney-client relationships. As to the former, the Agreement states in relevant part:

> This will also confirm that our representation of you in connection with these matters is conditioned on the fact that you and [Norton] share a common interest in the matters. We have confirmed that this is so, based on our discussions with you and [Norton], and on our current understanding of the pertinent facts. In the future, should we become aware of some reason why it would no longer be appropriate for our firm to represent you in these matters, we will so inform you and withdraw from representing you. You may also terminate this relationship at any time, by providing us with written notice to that effect.

JA16567. The first sentence—and statement that Quinn Emanuel's representation is "conditioned on" Dr. Dacier's and Norton's common interest— merely invokes the applicable ethical rules regarding concurrent representation, which generally is

appropriate only where the two clients "hav[e] similar interests" Va. R. Prof'l Conduct 1.7 & cmt.23. The second sentence makes clear that Quinn Emanuel had verified that Dr. Dacier's interests were aligned with Norton's before agreeing to represent him. Neither sentence addresses the circumstances under which that representation would automatically terminate. To the contrary, the next two sentences specify exactly how the representation may be terminated and foreclose the possibility of an automatic termination without one party's knowledge. Instead, those sentences make clear that even if future events cause interests to unexpectedly diverge, the Engagement Agreement's provisions for knowing and orderly termination apply.

The district court's contrary view not only contradicts the plain text of the Engagement Agreement but undermines the attorney-client relationship. The attorney-client relationship is simply too important to both attorney and client for the relationship to be vitiated by offhand comments or without knowledge of the attorney. On the district court's view, neither party to the Engagement Agreement could ever be sure whether their attorney-client relationship (and attorney-client privilege) continued to exist, because any divergence between Dr. Dacier's and Norton's interests would instantly terminate that relationship—even if neither Quinn Emanuel nor Dr. Dacier knew of the divergence. It is hard to imagine any interpretation more destructive of the "'full and frank communication' between a

client and his lawyer" on which "sound legal advice [and] advocacy ... depends." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 173 (4th Cir. 2019) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

At bottom, the district court's order cannot be squared with the first principles of the attorney-client privilege and the attorney-client relationship. Not only can Quinn Emanuel not be sanctioned for refusing to immediately comply with that order, but given that Dr. Dacier reaffirmed the ongoing attorney-client relationship from 2014 to 2020, Quinn Emanuel was duty bound to resist.

## III. The District Court's Repeated Forays Outside The Adversarial Process And Remarkable Procedural Irregularities Provide Another Independent Basis For Reversal.

The district court's serious substantive errors were matched only by its equally serious procedural irregularities, which themselves necessitate reversal. By repeatedly raising and deciding issues *sua sponte*, without briefing or argument, the district court not only deprived itself of the opportunity to hear from counsel on the relevant questions, but deprived the parties of a fair opportunity to address them. For that reason as well, the challenged orders cannot be permitted to stand.

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S.

237, 243 (2008). The district court here failed to follow that bedrock principle, repeatedly reaching out to decide issues no party had raised and to order relief no party had requested. Still worse, the court issued several of its *sua sponte* rulings without affording Norton "[t]he fundamental requirements of due process," i.e., "notice and an opportunity to be heard." *Doe v. Va. Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023). Those procedural irregularities independently require reversal here.

The district court's departure from the basic principle of party presentation began with its *sua sponte* decision to raise the purported conflict of interest in its March 2022 opinion resolving *Norton's* motions *in limine*. Those motions *in limine* presented entirely distinct evidentiary issues unrelated to any purported conflict, and the parties' briefing on those motions said nothing whatever about any purported conflict (let alone disqualification). *See* JA19383-88, JA20802-37. The court nevertheless "identifie[d]" the purported conflict of its own volition, JA47, and then proceeded to immediately rule that the purported conflict was fatal and that Quinn Emanuel "should not have been representing [both] Dr. Dacier and Norton" after 2017. JA47, JA49, JA55 n.7. That was plainly improper. Even if the district court (incorrectly) believed that Dr. Dacier and Norton "might have adverse interests," its *sua sponte* ruling—which amounted to "disqualifying the lawyers on the spot," rather than seeking briefing and argument from the parties on the issue—"was an

invalid response" to that concern. *Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir. 1993).

That irregular approach meant that the court failed to give Quinn Emanuel notice and a fair opportunity to be heard on whether any conflict existed and whether disqualification was warranted. While Columbia gestured toward a potential conflict in its June 2020 opposition to Norton's motion for sanctions, that issue was at best tangentially relevant to that motion, and in any event Columbia never raised the argument that the district court ultimately embraced—namely, that Dr. Dacier's remarks to Professor Keromytis created a disqualifying conflict. *See* JA15966-68. That briefing came nowhere near putting Quinn Emanuel on notice that the court might revisit the issue of its own volition nearly two years later, in the context of two unrelated motions *in limine* on evidentiary issues, and find a purported conflict without giving Quinn Emanuel any opportunity to address it.

The court's *sua sponte* order demanding that Quinn Emanuel disclose all its attorney-client communications with Dr. Dacier over the previous four years—on one day's notice—was an even more egregious departure from basic procedural principles. *See* JA57. Columbia never asked for such communications to be disclosed, and Quinn Emanuel had *zero* notice or opportunity to be heard before the deadline for disclosure. That order—the underlying order on which the district court's finding of contempt and subsequent sanctions are based—is not only

substantively invalid for all the reasons described above, but cannot be reconciled with the fundamental rule of party presentation and the most basic requirements of due process. *See Sineneng-Smith*, 590 U.S. at 374-76; *Doe*, 77 F.4th at 236.

The pattern of procedural irregularities continued in the district court's civil-contempt order, JA58-99, where the court imposed sanctions that Columbia had expressly *declined* to request. Consistent with the defining nature of civil contempt, Columbia moved for an order to show cause why Quinn Emanuel should not be held in civil contempt, seeking "only such reasonable sanctions as may be necessary to cause compliance"—for example, "imposing monetary sanctions until compliance is achieved." JA43926; *accord* JA45414, JA45423-24 (Columbia's reply). The court let Columbia's request for compliance-oriented sanctions languish for more than a year and a half before issuing an opinion that did not even deign to address it. *See* JA95-98. Instead, the court made up its own punitive sanctions—"a negative inference as to the contents of Quinn Emanuel's communications with Dr. Dacier" in connection with Columbia's post-trial motions for enhanced damages and attorneys' fees under 35 U.S.C. §§284 and 285, which enhanced the jury's award of damages for purported infringement of patents *different* from the '643 patent to which Dr. Dacier's knowledge pertained—and then imposed that penalty on Norton without notice or a hearing. JA98-99. By imposing sanctions on Norton for perceived failings by Quinn Emanuel, the district court once again conflated

attorneys and client and improperly punished a client for perceived transgressions of its attorneys.  But the problems do not even end there.

In imposing these draconian sanctions, the district court not only failed to provide the process due for civil contempt, but it jumped the tracks and imposed punitive, non-purgeable sanctions that would have required the additional safeguards necessary for criminal contempt.  As the Fourth Circuit has explained, sanctions for civil contempt must be intended "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy." *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004) (quoting *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995)).  In contrast, contempt sanctions are criminal rather than civil—and therefore require greater procedural protections, such as proof beyond a reasonable doubt and separate persons acting as prosecutor and judge—where the sanctions "seek[] to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct." *Id.* at 822 (quoting *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 133 (4th Cir. 1990)); *see id.* at 820.  Here as in *Cromer*, the contempt sanctions—an adverse inference against Norton—plainly were not tailored to coerce obedience by Quinn Emanuel or compensate Columbia for any losses from the purported contempt.  Instead, the court simply "took it upon [it]self" to impose those sanctions "without any indication that [Columbia] sought such a remedy," as a punishment for what the court deemed an

improper failure to comply with its disclosure order. *Id.* at 822. The court's decision to order those criminal sanctions "without the procedural safeguards necessary prior to the imposition of criminal penalties," *id.* at 822-23, thus independently requires reversal.

In sum, the district court committed a compendium of procedural errors in reaching its substantively flawed orders and sanctions. It took up the purported conflict of interest on which the underlying disclosure order was based *sua sponte*; held that purported conflict warranted disqualifying Quinn Emanuel based on an argument that Columbia never advanced; ordered disclosure of attorney-client communications across the previous four years *sua sponte*, with zero briefing or argument; and, when Quinn Emanuel refused to comply with that invalid order, imposed punitive sanctions that Columbia never requested. These gross departures from the principle of party presentation and the requirements of due process independently warrant reversal of the contempt order and accompanying sanctions.

## CONCLUSION

The contempt order and accompanying sanctions should be reversed.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
JOSEPH J. DEMOTT
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP*

April 5, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2024, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Federal Circuit

by using the CM/ECF system.  I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,826 words, excluding the parts of the brief exempted by Federal Circuit Rule 31(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

April 5, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement