**Nos. 24-1243, 24-1244**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,

*Plaintiff-Appellee*,

v.

GEN DIGITAL INC., fka Symantec Corporation, fka NortonLifeLock, Inc.,

*Defendant-Appellant*,

QUINN EMANUEL LLP,

*Sanctioned Party-Appellant*.

———————————

Appeals from the United States District Court for the Eastern District of Virginia
in No. 3:13-cv-00808-MHL, Judge M. Hannah Lauck

———————————

# CORRECTED NONCONFIDENTIAL OPENING BRIEF
# OF APPELLANT QUINN EMANUEL URQUHART & SULLIVAN, LLP

———————————

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP*

April 9, 2024

## CERTIFICATE OF INTEREST

Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") certifies the following:

1.     The full name of every party represented by us is: Quinn Emanuel Urquhart & Sullivan, LLP.

2.     There is no other real party in interest for Quinn Emanuel.

3.     Quinn Emanuel has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4.     Christopher Michel, of Quinn Emanuel, is the only attorney who filed an appearance on behalf of Quinn Emanuel in the lower tribunal.  In addition, the following attorneys from Quinn Emanuel appeared in the lower tribunal on behalf of Defendant-Appellant Gen Digital, Inc.:

Alexander Rudis, Athena Dalton, David Morad Elihu, David Aaron Nelson, Derek Lawrence Shaffer, Jared Weston Newton, John Poulos, Kaitlin P Sheehan, Meghan Elizabeth Bordonaro, Nathaniel Andrew Hamstra, Nina Tallon, Richard Wolter Erwine, Stephen Andrew Swedlow, Yury Kapgan

5.     Another appeal from the same civil action was previously decided by this Court in *Trustees of Columbia University in the City of New York v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016). Undersigned counsel is not aware of any

pending case in this Court or any other tribunal that will directly affect or be directly

affected by this Court's decision in these consolidated appeals.

Dated: April 9, 2024

s/Paul D. Clement
Paul D. Clement

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES ................................................. xi

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 5

STATEMENT OF THE ISSUES ............................................................ 5

STATEMENT OF THE CASE ................................................................ 6

I.    Quinn Emanuel's Attorney-Client Relationship With Dr. Dacier ................. 6

    A.    Dr. Dacier Formally Engages Quinn Emanuel to Represent Him for Purposes of This Lawsuit ....................................... 6

    B.    Columbia Chooses Not to Pursue Its Claims for Nearly Four Years, and the Case Is Administratively Closed ................................. 8

    C.    When the Case Is Reopened, Quinn Emanuel Reaffirms That Dr. Dacier Is Represented and Should Be Contacted Only Through Counsel ................................................................... 9

II.   Norton's Motion For Sanctions Against Columbia ..................................... 10

    A.    Columbia's Counsel Repeatedly Communicates Directly With Dr. Dacier Without Quinn Emanuel's Knowledge or Consent ................................................................................... 10

    B.    Dr. Dacier Reaffirms That He Is Represented by Quinn Emanuel, and Norton Moves to Sanction Columbia for Violating the "No Contact" Rule ...................................... 12

    C.    The District Court Denies Norton's Motion for Sanctions ................ 15

III.  The District Court's *Sua Sponte* Order To Disclose Attorney-Client Communications ............................................................ 16

A. Norton Files Motions *In Limine* to Exclude Evidence Regarding Dr. Dacier's Absence From Trial and Out-of-Court Conversations ...................................................... 16

B. The District Court Denies Norton's Motions *in Limine* and *Sua Sponte* Orders Quinn Emanuel to "Disclose on the Record in Writing All Information Garnered From Dr. Dacier" From 2017 Through 2020 ..................................... 18

C. Quinn Emanuel Refuses to Comply With the Court's *Sua Sponte* Order to Disclose Privileged Communications...................... 20

D. The District Court Denies Norton's Motion for Reconsideration, and Quinn Emanuel Withdraws From Representing Dr. Dacier ...................................... 20

IV. The District Court Finds Quinn Emanuel In Civil Contempt For Refusing To Disclose Attorney-Client Communications. .......................... 22

SUMMARY OF ARGUMENT .................................... 26

STANDARD OF REVIEW ........................................ 29

ARGUMENT ...................................................... 30

I. The District Court Erred In Holding That Dr. Dacier And Norton Had Conflicting Interests That Disqualified Quinn Emanuel From Representing Them Both .............................................. 31

A. There Was No Conflict of Interest Between Dr. Dacier and Norton.................................................. 33

B. Any Purported Conflict of Interest Did Not Justify Automatically Disqualifying Quinn Emanuel From Representing Dr. Dacier ...................................... 40

II. The District Court Erred In Holding That Any Purported Conflict Of Interest Destroyed Attorney-Client Privilege .............................. 45

A. Any Purported Conflict of Interest Did Not Destroy Attorney-Client Privilege Over Dr. Dacier's Communications With Quinn Emanuel.................................................. 46

B.    Any Purported Conflict of Interest Did Not Somehow Automatically Terminate Dr. Dacier's Attorney-Client Relationship With Quinn Emanuel ...................................................... 49

III.   The District Court's Repeated Forays Outside The Adversarial Process And Remarkable Procedural Irregularities Provide Another Independent Basis For Reversal .................................................................. 54

CONCLUSION ..................................................................................... 59

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), Quinn Emanuel provides the following description of the general nature of the material redacted in the public version of the addendum to its corrected brief:

The materials redacted from the Memorandum Opinion on Motion for an Order to Show Cause and the Memorandum Opinion on Motions for Enhanced Damages Under 35 U.S.C. § 284 and Attorneys' Fees Under 35 U.S.C. § 285 include references to proprietary information and attorney-client communications redacted by the district court pursuant to the district court's April 1, 2014 protective order.

No material is redacted in the public version of the brief itself.

# TABLE OF AUTHORITIES

## Cases

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  2016 WL 6534273 (E.D. Tenn. Nov. 1, 2016)....................................................43

*Aetna Cas. & Sur. Co. v. United States*,
  570 F.2d 1197 (4th Cir. 1978) ..................................................... *passim*

*Ashcraft v. Conoco, Inc.*,
  218 F.3d 288 (4th Cir. 2000) ......................................................... 30, 46

*Atl. Diving Supply, Inc. v. Komornik*,
  2021 WL 8775676 (Va. Cir. Ct. 2021)..................................................49

*Bonner v. Guccione*,
  1997 WL 91070 (S.D.N.Y. Mar. 3, 1997)............................................36

*Buffington v. Baltimore Cnty.*,
  913 F.2d 113 (4th Cir. 1990)..................................................................58

*Caekaert v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
  2023 WL 3587287 (D. Mont. May 22, 2023).....................................48

*Cantu Servs., Inc. v. Worley*,
  2021 WL 2323721 (W.D. Okla. June 7, 2021) ...................................48

*Cromer v. Kraft Foods N. Am., Inc.*,
  390 F.3d 812 (4th Cir. 2004).......................................................... 58, 59

*D.S. Mags., Inc. v. Warner Publisher Servs., Inc.*,
  623 F.Supp. 624 (S.D.N.Y. 1985) .......................................................36

*Doe v. Va. Polytechnic Inst. & State Univ.*,
  77 F.4th 231 (4th Cir. 2023).......................................................... 55, 57

*Eureka Inv. Corp. v. Chi. Title Ins. Co.*,
  743 F.2d 932 (D.C. Cir. 1984) ....................................................... 47, 48

*Farb v. Baldwin Union Free Sch. Dist.*,
  2011 WL 4465051 (E.D.N.Y. Sept. 26, 2011) ...................................34

*Greenlaw v. United States*,
    554 U.S. 237 (2008)......................................................................55

*Guillen v. City of Chicago*,
    956 F.Supp. 1416 (N.D. Ill. 1997) ..........................................39

*Hawkins v. Stables*,
    148 F.3d 379 (4th Cir. 1998)....................................................30

*In re Contempt Finding*,
    663 F.3d 1270 (D.C. Cir. 2011) ...............................................30

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*,
    658 F.2d 1355, 1356 (9th Cir. 1981)........................................32

*In re Gen. Motors Corp.*,
    61 F.3d 256 (4th Cir. 1995)......................................................58

*In re Schwartz*,
    493 A.2d 1248 (N.J. 1985)........................................................50

*In re Search Warrant Issued June 13, 2019*,
    942 F.3d 159 (4th Cir. 2019)....................................................54

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007)............................................... 47, 48

*In re Under Seal*,
    749 F.3d 276 (4th Cir. 2014)............................................. 29, 30

*Marketel Media, Inc. v. Mediapotamus, Inc.*,
    2015 WL 3650765 (E.D.N.C. June 11, 2015)..........................48

*Monsanto Co. v. E.I. Du Pont de Nemours & Co.*,
    748 F.3d 1189 (Fed. Cir. 2014) ...............................................29

*New Phoenix Sunrise Corp. v. Comm'r*,
    408 F.App'x 908 (6th Cir. 2010)...............................................47

*New York v. United Parcel Serv., Inc.*,
    2016 WL 10672076 (S.D.N.Y. Sept. 2, 2016) ....................31, 36

*Philips Med. Sys. Int'l B.V. v. Bruetman*,
  8 F.3d 600 (7th Cir. 1993) ................................................................56

*RFF Fam. P'ship, LP v. Burns & Levinson, LLP*,
  991 N.E.2d 1066 (Mass. 2013) ..........................................................48

*Richmond Hilton Assocs. v. City of Richmond*,
  690 F.2d 1086 (4th Cir. 1982) .............................................. 33, 41, 44

*Shaffer v. Farm Fresh, Inc.*,
  966 F.2d 142 (4th Cir. 1992) ................................................ 30, 41, 45

*Simms v. Deggeller Attractions, Inc.*,
  2013 WL 49756 (W.D. Va. Jan. 2, 2013) ...........................................41

*United States ex rel. Harris v. Lockheed Martin Corp.*,
  2013 WL 12328947 (N.D. Ga. Feb. 5, 2013) .....................................32

*United States v. Occidental Chem. Corp.*,
  606 F.Supp. 1470 (W.D.N.Y. 1985) ..................................... 36, 39, 42

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) .............................................................. 54, 57

*United States v. Smallwood*,
  365 F.Supp.2d 689 (E.D. Va. 2005) ...................................................14

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981) ............................................................... 54

**Rules**

Va. R. Prof'l Conduct 1.3, cmt.4 ..................................................... 49, 50

Va. R. Prof'l Conduct 1.7 ....................................................................53

Va. R. Prof'l Conduct 1.7(a) ......................................................... 34, 41

Va. R. Prof'l Conduct 1.7(a)(1) ........................................................42

Va. R. Prof'l Conduct 1.7(a)(2) ........................................................42

Va. R. Prof'l Conduct 1.7(b) .......................................................... 41, 42

Va. R. Prof'l Conduct 1.7(b)(3) ..................................................42

Va. R. Prof'l Conduct 1.7, cmt.23............................. 35, 42, 53

Va. R. Prof'l Conduct 1.16......................................................49

Va. R. Prof'l Conduct 1.16(d)..................................................50

Va. R. Prof'l Conduct 1.16, cmt.4............................................50

**Other Authorities**

J. Wigmore, Wigmore on Evidence (McNaughton rev. ed. 1961)..........................47

NYC Bar Ass'n, Formal Op. 2016-2 (July 22, 2016)...............................................31

## STATEMENT OF RELATED CASES

These consolidated appeals arise from a civil action in the U.S. District Court for the Eastern District of Virginia. *See Trustees of Columbia University in the City of New York v. Gen Digital Inc.*, No. 3:13-cv-00808-MHL (E.D. Va.). One other appeal arising from that civil action previously appeared in this Court: *Trustees of Columbia University in the City of New York v. Symantec Corp.*, No. 15-1146, *reported at* 811 F.3d 1359 (Fed. Cir. Feb. 2, 2016) ("*Columbia I*") (Dyk, J., joined by Prost, C.J. & Hughes, J.).

No other appeal from that civil action has previously arisen in this Court or any other appellate court. Counsel for Quinn Emanuel is not aware of any pending case in this Court or any other tribunal that will directly affect or be directly affected by this Court's decision in these consolidated appeals.

# INTRODUCTION

The district court's civil contempt finding against Quinn Emanuel and its associated sanctions were flawed at every turn.  The district court managed to turn an offhanded conversation into a cause for disqualification, the vitiation of the attorney-client privilege, and the imposition of massive sanctions.  In reality, there was no disqualifying conflict and absolutely no basis for vitiating *the client's* attorney-client privilege based on *the attorney's* perceived conflict.  The rulings' manifest substantive flaws are explicable only by the district court's serial disregard for the most basic principles of party presentation and due process, culminating in improper contempt sanctions unaccompanied by even the minimum necessary procedural protections.  The extraordinary orders and sanctions here cannot stand.

Plaintiff-Appellee Columbia University ("Columbia") filed this lawsuit against Defendant-Appellant Gen Digital, Inc., formerly known as NortonLifeLock, Inc. ("Norton"),[1] in December 2013.  Shortly thereafter, Dr. Marc Dacier—a French computer scientist who worked for Norton through April 2014—was identified as a potential witness.  Dr. Dacier formally retained Norton's counsel, Quinn Emanuel,

---

[1] When the litigation began, Gen Digital was known as Symantec Corporation.  JA48574.  In late 2019, it changed its name to NortonLifeLock, Inc.  JA48574.  Since early 2023, it has been known as Gen Digital.  JA48574.  Consistent with the district court's practice, this brief refers to the company as "Norton," including during periods when it operated under a different name.  JA48574.

in connection with the litigation, at Norton's expense, and Quinn Emanuel represented him during a full-day deposition in August 2014.

A few months later, Columbia stayed all the claims to which Dr. Dacier's testimony was potentially relevant, and those claims went dormant for nearly four years. During that prolonged lull, Dr. Dacier saw a Columbia professor named Angelos Keromytis at a cybersecurity conference and allegedly expressed regret about some of Norton's actions related to one of the patents at issue.

Columbia eventually revived the case, and in October 2019, based on Professor Keromytis's version of the conversion, Columbia's counsel reached out to Dr. Dacier directly—with full knowledge that Quinn Emanuel had been representing him—and had substantive discussions about the matter without Quinn Emanuel's knowledge or consent. When Quinn Emanuel learned of this violation of the long-settled ethical rule prohibiting an attorney from contacting a represented person, it immediately objected and eventually moved for sanctions. The court not only brushed Columbia's misconduct aside, but eventually rewarded it by treating Dr. Dacier's purported comments as the basis for a series of remarkable orders sanctioning Quinn Emanuel.

In January 2022, Dr. Dacier (who was then living in Saudi Arabia, outside the court's subpoena power) informed Quinn Emanuel that he had decided not to make the long trip to Virginia to testify at trial. Norton subsequently filed motions *in*

*limine* to exclude comments and arguments regarding Dr. Dacier's absence and to exclude evidence regarding Dr. Dacier's alleged statements to Professor Keromytis as inadmissible hearsay. Although the briefing on these motions contained no mention of any potential conflict, the district court *sua sponte* identified a perceived conflict of interest that had "developed" between Dr. Dacier and Norton "sometime between 2017 and 2018," because Dr. Dacier's alleged remarks to Professor Keromytis were "adverse to Norton's position." JA43, JA49, JA51-52. The court then concluded its *sua sponte* conflict-of-interest analysis by issuing a *sua sponte* order directing Quinn Emanuel to "disclose on the record in writing any information garnered from Dr. Dacier during the period [its] representation of Dr. Dacier was a conflict," which the court elsewhere defined as 2017 through 2020. JA57; *see* JA49. In other words, as *sua sponte* sanctions for a self-identified conflict by Quinn Emanuel, the district court vitiated the client's privilege and demanded that Quinn Emanuel disclose these attorney-client communications by *the very next day*. JA57.

Quinn Emanuel was well within its rights to disobey this extraordinary order; indeed, given Quinn Emanuel's longstanding attorney-client relationship with Dr. Dacier, which Dr. Dacier had reaffirmed in a sworn declaration in June 2020, immediate and full *compliance* with the order would have been the real ethical breach. The district court plainly erred at the threshold in *sua sponte* deeming Quinn Emanuel's simultaneous representation of Dr. Dacier and Norton a conflict of

interest. Attorneys routinely represent both companies and their current or former employees in pending litigation without any hint of an ethical conflict, even when those employees may not fully agree with their employers' actions and may not provide unalloyedly helpful testimony. As long as employers and employees do not have concrete adverse interests at stake in the litigation that would materially limit an attorney's ability to represent both, there is no ethical conflict in the ubiquitous practice of agreeing to a simultaneous representation. That was precisely what happened here: As a nonparty witness, Dr. Dacier has no personal interest whatsoever in this litigation and there was no conflict. That was all manifest when Quinn Emanuel represented Dr. Dacier in seven hours of deposition testimony, which is why no one suggested any conflict at that time. Even if Dr. Dacier's offhand comments years later might provide an angle for cross-examination, they did not create a disqualifying conflict.

But even if Quinn Emanuel had a conflict of interest here, it would not have authorized the court to vitiate the client's privilege over years of attorney-client communications. On the contrary, as numerous courts have recognized, it is black-letter law that the client cannot be punished for the attorney's conflict of interest. That bedrock principle—which the district court (acting without the benefit of briefing or argument) flatly disregarded—independently requires reversal.

4

These remarkable substantive errors were accompanied—and likely explained—by equally remarkable procedural missteps, which independently warrant reversal. In reaching its decision below, the court largely disregarded the parties' adversarial presentation, repeatedly raising issues *sua sponte* and ordering relief that no party had requested. In the non plus ultra of that mode of proceeding, the court responded to Columbia's request for compliance-inducing civil contempt sanctions (after more than a year of an apparent pocket veto) with punitive sanctions that could only have been awarded via the heightened procedural protections demanded for criminal contempt, followed by hundreds of millions in enhanced damages. In short, the contempt orders and sanctions here were riddled with errors from start to finish and must be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1338(a). *See* JA9904. The court issued its civil-contempt order on September 30, 2023, *see* JA100-01, and Quinn Emanuel timely appealed on October 25, 2023, *see* JA48581-83. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred as a matter of law in holding that Dr. Dacier and Norton had conflicting interests that disqualified Quinn Emanuel from representing them both.

2. Whether the district court erred as a matter of law in holding that any purported conflict destroyed attorney-client privilege over Dr. Dacier's communications with Quinn Emanuel from 2017 through 2020.

3. Whether the district court's repeated forays outside the adversarial process and other procedural irregularities provide an independent basis for reversal.

## STATEMENT OF THE CASE

**I.    Quinn Emanuel's Attorney-Client Relationship With Dr. Dacier.**

**A.    Dr. Dacier Formally Engages Quinn Emanuel to Represent Him for Purposes of This Lawsuit.**

Columbia filed the present lawsuit against Norton in December 2013, alleging that Norton's antivirus software infringed several of Columbia's patents and that two Columbia professors should be named as inventors on Norton's U.S. Patent No. 8,549,643 ("the '643 patent"). *See* JA1162-206 (first amended complaint). Dr. Marc Dacier is a professor of computer science who was employed by Norton when Columbia filed this suit. JA36149, JA36169-70. In its initial disclosures in March 2014, Norton identified Dr. Dacier as someone who would likely have discoverable information and indicated that he, like other Norton employees, should be contacted only through Quinn Emanuel. JA14294-95; *see* JA2018 (setting initial-disclosure deadline). Shortly thereafter, Dr. Dacier voluntarily left Norton to pursue other professional opportunities. JA36169-72.

In June 2014, Columbia's counsel (at the time, Irell & Manella LLP) contacted Quinn Emanuel asking whether the firm represented Dr. Dacier and whether it would accept a subpoena on his behalf.  JA14295.  Quinn Emanuel responded and confirmed that it "represent[ed] Marc Dacier in connection with this action." JA14294.  Although Dr. Dacier, as "a non-party residing in France," was not subject to the district court's subpoena power, Quinn Emanuel arranged for Columbia's counsel to depose him "at a mutually agreeable location in Europe."  JA14294.

On June 18, 2014, Dr. Dacier signed an engagement agreement (the "Engagement Agreement") formally confirming that he "ha[d] retained Quinn Emanuel" for purposes of this litigation.  JA16566-67.  The Engagement Agreement indicated that Norton would pay for the representation, noting that Quinn Emanuel had determined that Dr. Dacier and Norton "share[d] a common interest" in the litigation based on discussions with each client and an assessment of the pertinent facts.  JA16567.  The Engagement Agreement also made clear that Quinn Emanuel's representation of Dr. Dacier was not limited to the upcoming deposition but would continue throughout the litigation, unless and until Dr. Dacier provided "written notice" that he wished to terminate it or Quinn Emanuel "bec[a]me aware of some reason why [the representation] would no longer be appropriate" and formally withdrew.  JA16567.  Lastly, the Engagement Agreement provided that "in the event

of [Quinn Emanuel's] termination or withdrawal," Dr. Dacier "consent[ed] to [its]

continued representation of [Norton]" for purposes of Columbia's lawsuit.  JA16567.

In August 2014, Dr. Dacier appeared for a deposition in Brussels, Belgium.

*See* JA36128-367.  An attorney from Quinn Emanuel helped Dr. Dacier prepare for

the deposition and defended him during seven hours of questioning by Columbia's

counsel.  *See* JA36135, JA36169.  No one contemporaneously suggested that these

seven hours of testimony revealed any material conflict in Quinn Emanuel's

continuing representation of both Norton and Dr. Dacier.  Dr. Dacier testified about

his involvement in cybersecurity research that led to the filing of the '643 patent.

*See, e.g.*, JA36188-90, JA36202-42.  This testimony was potentially relevant to

Columbia's allegations that two Columbia professors—Angelos Keromytis and

Salvatore Stolfo—were the sole inventors, or at least co-inventors, of the subject

matter claimed in the '643 patent.  *See* JA1171-77, JA1197-205.  Dr. Dacier's

testimony had no relevance to counts 1-6 of Columbia's amended complaint, which

alleged infringement of six other patents.  *See* JA1165-71, JA1178-96.

**B.**     **Columbia Chooses Not to Pursue Its Claims for Nearly Four Years, and the Case Is Administratively Closed.**

On October 7, 2014, the district court issued a claim construction order that

fatally undermined all six of Columbia's patent-infringement claims.  *See* JA1-2.  On

November 4, 2014, the district court granted the parties' joint motion to stay

Columbia's claims regarding the '643 patent—the only claims to which Dr. Dacier's

testimony was potentially relevant—and to enter final judgment against Columbia on the six patent-infringement claims so that Columbia could immediately appeal the claim construction order.  JA6227-28; *see* JA6197, JA6203.

For nearly four years, Columbia's claims regarding the '643 patent remained dormant while the parties litigated issues related to the six other patents before the Patent Trial and Appeal Board and the Federal Circuit.  *See* JA6298-99 (order of Aug. 8, 2016, extending the stay until August 2017); JA6344-45 (order of Oct. 24, 2017, administratively closing the case).  Quinn Emanuel thus had no reason to— and did not—correspond with Dr. Dacier for several years.

### C.    When the Case Is Reopened, Quinn Emanuel Reaffirms That Dr. Dacier Is Represented and Should Be Contacted Only Through Counsel.

On August 7, 2018, the district court reopened the case and allowed Columbia's claims regarding the '643 patent to proceed.  *See* JA6435.  On December 28, 2018, Norton provided Columbia (now represented by Sullivan & Cromwell LLP) with supplemental disclosures that again identified Dr. Dacier as a person likely to have discoverable information.  JA14306-07.  These disclosures reiterated that Columbia's counsel was not authorized to communicate directly with Norton employees or other persons represented by counsel and expressly reaffirmed that Dr. Dacier should be contacted only through Quinn Emanuel.  JA14306-07.

## II.     Norton's Motion For Sanctions Against Columbia.

### A.     Columbia's Counsel Repeatedly Communicates Directly With Dr. Dacier Without Quinn Emanuel's Knowledge or Consent.

In October 2019, Professor Keromytis told one of Columbia's attorneys, Dustin Guzior, that he had seen Dr. Dacier at a professional event many months earlier and that Dr. Dacier had "made a statement … to the effect that he still felt very badly about what had happened with the ['643] [P]atent." JA14319; *cf.* JA15989 (Keromytis declaration of May 2020 averring that this alleged statement was made sometime "between late 2017 and late 2018"). Mr. Guzior knew that Quinn Emanuel had been representing Dr. Dacier in connection with this matter. *See, e.g.*, JA14322. But instead of contacting Quinn Emanuel and ascertaining whether Dr. Dacier continued to be represented by the firm, Mr. Guzior asked Professor Keromytis to "make an introduction" via email, which he did. JA14319-20. Within minutes, Mr. Guzior responded to the introductory email asking if Dr. Dacier would be available for a phone call. JA16013.

On November 14, 2019, Mr. Guzior and two other attorneys for Columbia had a 10- to 15-minute phone conversation with Dr. Dacier without Quinn Emanuel's knowledge or consent. JA15982. Mr. Guzior claims to have begun the call by "explain[ing]" that he needed to "confirm" that Dr. Dacier was "not represented" by Quinn Emanuel. JA15982; *see* JA14322; *cf.* JA35939 ("According to Dr. Dacier, Columbia's counsel … informed him that he was no longer represented by Quinn

Emanuel."). Mr. Guzior also asserts that Dr. Dacier "responded that he … never had been or wanted to be represented by counsel." JA15982. *But see* JA16552 (sworn declaration by Dr. Dacier stating that Quinn Emanuel began representing him in June 2014 and continued to represent him as of June 2020); JA16566-67 (Engagement Agreement). Mr. Guzior proceeded to ask Dr. Dacier about the substance of his conversation with Professor Keromytis regarding the '643 patent and whether he would be willing testify about it at trial, JA15983—including incorrectly advising him "that the recording of his 2014 deposition could not be used at trial, so he had to attend the trial in person," JA35939.

On January 26, 2020, Columbia's counsel again contacted Dr. Dacier without Quinn Emanuel's knowledge or consent, asking for a second phone call. JA16019. That call took place on February 11, 2020. JA15984. This time, four of Columbia's attorneys were on the line. JA15984. According to Mr. Guzior, Dr. Dacier relayed a "decision" that "he was not, and did not want to be, represented by counsel in this matter." JA15984. Attorneys for Columbia proceeded to send Dr. Dacier a copy of his deposition transcript and "to coordinate a pre-trial meeting to review the deposition and discuss trial logistics." JA15984.

Following that phone call, attorneys for Columbia exchanged a series of emails with Dr. Dacier and made plans to travel to southern France for an in-person witness preparation session on April 1, 2020. JA16026-28. In mid-March 2020,

11

however, the meeting had to be postponed due to the COVID-19 pandemic.
JA16032-34.

  **B.**  **Dr. Dacier Reaffirms That He Is Represented by Quinn Emanuel, and Norton Moves to Sanction Columbia for Violating the "No Contact" Rule.**

On March 27, 2020, Columbia sent Norton a witness list that included Dr. Dacier. JA14290. Prompted by this list, an attorney from Quinn Emanuel reached out to Dr. Dacier and asked whether he had spoken to anyone from Columbia about the case. JA16063. On April 10, 2020, Dr. Dacier responded that he had "been contacted by the law firm representing Columbia" and had spoken to Columbia's counsel on the phone several times. JA14326. Dr. Dacier further informed Quinn Emanuel that in November 2019, he had sent two emails to Norton's then-Chief Technology Officer—a non-attorney—to ask whether "the [Quinn Emanuel] lawyer, paid by [Norton], that was present at [his] deposition [wa]s still representing [him]." JA14327. The CTO did not respond and left the company shortly thereafter. *See* JA14326. Neither Quinn Emanuel nor Norton's in-house litigation counsel received Dr. Dacier's emails to the CTO until April 10, 2020, when they learned of Columbia's attorneys' unauthorized *ex parte* communications with Dr. Dacier. JA14273-74. Later that day, Norton's in-house counsel responded to Dr. Dacier, confirming—consistent with the Engagement Agreement—that Quinn Emanuel continued to represent him (at Norton's expense). JA16073.

Upon learning of Columbia's attorneys' unauthorized, *ex parte* communications with its client, Quinn Emanuel contacted Mr. Guzior to express concern about the apparent violations of the "no contact" rule codified at Virginia Rule of Professional Conduct 4.2. JA14323. Mr. Guzior denied any such violation, asserting that it was proper for him and his colleagues to contact Dr. Dacier without notifying Quinn Emanuel in order to "ha[ve] a short discussion … to find out if he was actually represented by counsel," JA16069—despite the fact that Quinn Emanuel had expressly informed Columbia that it "represent[ed] [Dr.] Dacier in connection with this action," JA14294; arranged Dr. Dacier's deposition, JA14294-95; helped Dr. Dacier prepare for that deposition and represented him during it, JA36135, JA36169; and repeatedly indicated that Dr. Dacier should be contacted only through Quinn Emanuel, *see, e.g.*, JA14294-95, JA14306-07. Mr. Guzior refused to explain why he contacted Dr. Dacier directly, instead of simply asking Quinn Emanuel whether the firm continued to represent him. JA14318. Instead, Mr. Guzior asserted that Quinn Emanuel owed him "an apology" for raising concerns about his direct communications with Dr. Dacier and accused Quinn Emanuel of "wast[ing] time and distract[ing] [him] from imminent substantive deadlines," concluding: "[W]e are done with this topic." JA16065.

As further discussions appeared futile, Norton moved for sanctions. *See* JA14265-88. In connection with that motion, Dr. Dacier submitted a sworn

declaration stating: "Quinn Emanuel has represented me since June 18, 2014, and continues to represent me, in connection with the Columbia case." JA16552; *see also* JA35940 (reporting a phone conversation of June 17, 2020, in which Dr. Dacier "stated that he never intended to terminate Quinn Emanuel's representation, [and] confirmed that he wanted to continue to be represented by Quinn Emanuel"). As Norton's motion explained, Virginia Rule of Professional Conduct 4.2 "make[s] unmistakably clear that a lawyer may not ethically contact or direct others to contact a known represented party about the subject of that representation without the knowledge or consent of that party's counsel." JA14277 (quoting *United States v. Smallwood*, 365 F.Supp.2d 689, 695 (E.D. Va. 2005)). Accordingly, to the extent Columbia's counsel had any legitimate doubt about whether Quinn Emanuel still represented Dr. Dacier in October 2019, they were ethically obligated to contact Quinn Emanuel instead of reaching out directly to Dr. Dacier. JA14277-82.

Columbia attempted to avoid this straightforward conclusion on at least six separate grounds: It asserted that (1) Dr. Dacier did not wish for Quinn Emanuel to represent him in connection with this case, JA15962-64; (2) Quinn Emanuel's representation of Dr. Dacier was limited to the August 2014 deposition, JA15964; (3) the attorney-client relationship "terminated as a result of Norton's and Quinn Emanuel's failure to communicate with Dr. Dacier" from 2015-2019, JA15964-66; (4) "at least some of Dr. Dacier's deposition testimony was significantly adverse to

14

Norton," which supposedly required Quinn Emanuel "to perform a conflicts analysis," and "the only conclusion consistent with the [alleged] failure to analyze the [purported] conflict and obtain consent is that Quinn Emanuel does not represent Dr. Dacier," JA15966-69; (5) Mr. Guzior reasonably believed that Quinn Emanuel did not represent Dr. Dacier when the unauthorized, *ex parte* communications took place, JA15969-74; and (6) neither Dr. Dacier nor Norton was prejudiced by Columbia's violations of the "no contact" rule, JA15974-76.

Given the scattershot approach of Columbia's opposition brief, Norton had only limited space available in its reply brief to address Columbia's conflict-of-interest argument. *See* JA16544-46. Norton nevertheless squarely refuted that argument, explaining that "Dr. Dacier's deposition created no conflicts of interest because his testimony is fully consistent with Norton's interests" and, in all events, "any purported conflicts or alleged failure to perform conflict checks would not terminate Quinn Emanuel's attorney-client relationship with Dr. Dacier" as a matter of law. JA16544.

## C.    The District Court Denies Norton's Motion for Sanctions.

On September 29, 2021, the district court denied Norton's motion for sanctions. JA17736-38. Despite Quinn Emanuel's repeated statements making clear that it represented Dr. Dacier, the district court concluded that Columbia's counsel "reasonably believed that Dr. Dacier was not represented by [Quinn Emanuel]" when

they directly contacted him and had substantive conversations regarding the case. JA17738. It rested that conclusion primarily on Columbia's counsel's assertion that Dr. Dacier had informed them that he was no longer represented by counsel—even though Dr. Dacier had signed a formal retention agreement with Quinn Emanuel in June 2014, and even though Dr. Dacier submitted a sworn declaration in support of Norton's motion stating that Quinn Emanuel "ha[d] represented [him] since June 18, 2014, and continue[d] to represent" him. JA16552.

In reaching its decision to deny Norton's motion, the court did not address Columbia's assertion that Dr. Dacier's 2014 deposition testimony tended to harm Norton's litigating position, nor did it evaluate whether any such testimony might have created a potential conflict between Dr. Dacier and Norton that might have affected Quinn Emanuel's concurrent representation of both clients. Instead, the court explicitly found it unnecessary to decide "whether Dr. Dacier was or was not represented by Norton's attorneys in October 2019." JA17738 n.3.

## III. The District Court's *Sua Sponte* Order To Disclose Attorney-Client Communications.

### A. Norton Files Motions *In Limine* to Exclude Evidence Regarding Dr. Dacier's Absence From Trial and Out-of-Court Conversations.

After reviewing the district court's September 2021 order, two Quinn Emanuel attorneys contacted Dr. Dacier. JA35941. They informed him "that the decision of whether to attend the trial was his alone." JA35941. Dr. Dacier stated that "he would

prefer not to be involved in the litigation, and further confirmed that he did not have anything to say beyond what had already been discussed at his 2014 deposition." JA35941; *see also* JA35940 (noting that this was Dr. Dacier's consistent position over many months).

In January 2022, Dr. Dacier was living and working in Saudi Arabia, beyond the reach of the district court's subpoena power. JA18495; *accord* JA40 n.3. After conferring with Dr. Dacier, Quinn Emanuel informed Columbia's counsel that Dr. Dacier had "decided not to travel from Saudi Arabia to the United States to provide trial testimony." JA18497; *see* JA18495. In lieu of live testimony, Columbia designated excerpts from Dr. Dacier's videotaped deposition to be played at trial. JA18495.

Norton filed two motions *in limine* in light of Dr. Dacier's decision not to attend trial. JA19383-88. The first motion sought to exclude comments and arguments regarding Dr. Dacier's absence from trial because they "would be speculative, irrelevant, more prejudicial than probative, and would likely confuse the jury." JA19384. The second motion sought to exclude any out-of-court statements that Dr. Dacier had allegedly made to Professor Keromytis or to Columbia's counsel as inadmissible hearsay. JA19386-88.

**B.    The District Court Denies Norton's Motions *in Limine* and *Sua Sponte* Orders Quinn Emanuel to "Disclose on the Record in Writing All Information Garnered From Dr. Dacier" From 2017 Through 2020.**

On March 15, 2022, the district court denied both motions *in limine*.  JA57. First, the district court ruled that it would allow Columbia to comment on Dr. Dacier's absence from trial and would issue a "missing witness" instruction, finding that Dr. Dacier was "available" to Norton and suggesting that Quinn Emanuel improperly discouraged Dr. Dacier from testifying at trial, including by incorrectly telling Dr. Dacier that the court had concluded Quinn Emanuel represented him.  *See* JA49-53.  Second, the district court ruled that Dr. Dacier's alleged statements to Professor Keromytis at professional conferences in 2017-2019 would be admitted under the residual hearsay exception of Federal Rule of Evidence 807.  *See* JA53-56.

Instead of confining itself to the issues in the parties' briefing on the motions *in limine*, and without notice to the parties, the district court proceeded to hold that Quinn Emanuel had "developed" a conflict of interest in representing both Dr. Dacier and Norton "sometime between 2017 and 2018," when Dr. Dacier ran into Professor Keromytis at a conference and allegedly said that he was "sorry about what Norton had done" and "had opposed Norton's actions at the time."  JA43, JA45; *see* JA47 ("[T]he Court identifies a conflict of interest for Quinn Emanuel as to Dr. Dacier's 2019 [*sic*] statement that he was 'sorry' about what Norton did … and that

he felt or expressed his disagreement at the time."); JA49 ("[A]t least in 2017 through 2020, Quinn Emanuel developed a conflict in representing both Norton and Dr. Dacier.").  Despite simultaneously concluding that Norton and Dr. Dacier had a sufficient community of interest that Norton could have ensured Dr. Dacier's presence at trial, the court found that the alleged statement by Dr. Dacier "clearly runs contrary to Norton's defense," and so created a conflict of interest that prevented Quinn Emanuel from representing both.  JA47.  Indeed, according to the court, the effect of Dr. Dacier's alleged "statements against Norton's interest" to Professor Keromytis was to automatically "void the retainer agreement" between Quinn Emanuel and Dr. Dacier, which "was 'conditioned on the fact that Dr. Dacier and Norton share a common interest in the matters.'"  JA48 (brackets and emphasis omitted) (quoting JA16567).

The district court then went even further.  Based on its conclusion that Quinn Emanuel "should not have been representing" both Dr. Dacier and Norton after the purported conflict arose, the district court *sua sponte* ordered in a footnote that "no later than March 16, 2022"—the *very next day*—Quinn Emanuel "must disclose on the record in writing any information garnered from Dr. Dacier during the period [its] representation of Dr. Dacier was a conflict." JA55 n.7; *see* JA57.  The court's footnote provided no explanation whatsoever for why its *sua sponte* conflict ruling—even if correct—would also require or even permit a *sua sponte* order

19

mandating that Quinn Emanuel disclose, on the record and in writing, Dr. Dacier's privileged communications with his attorneys for the previous four years (from "at least … 2017 through 2020," JA49).

### C. Quinn Emanuel Refuses to Comply With the Court's *Sua Sponte* Order to Disclose Privileged Communications.

On March 16, 2022, Norton filed a short response indicating that Quinn Emanuel would not comply with the district court's order "absent appellate review." JA34041-42.  That response disputed the district court's *sua sponte* determination that Dr. Dacier's alleged remarks had created to a disqualifying conflict of interest, noting that Columbia did not "raise any arguments relating to potential conflicts of interest" in its briefing on Norton's motions *in limine*.  JA34041.  The response further explained that irrespective of any purported conflict, the district court "ha[d] no authority to waive Dr. Dacier's attorney-client privilege."  JA34042.

### D. The District Court Denies Norton's Motion for Reconsideration, and Quinn Emanuel Withdraws From Representing Dr. Dacier.

On March 22, 2022—less than a week after the district court's order—Norton moved the district court to reverse its decision that a conflict of interest disqualified Quinn Emanuel from concurrently representing both Dr. Dacier and Norton, or in the alternative to allow the parties to submit briefing and evidence on that issue. JA34220-21.  Norton simultaneously requested to stay the proceedings until the conflict-of-interest issue was resolved.  JA34220.  Norton explained that even

assuming Dr. Dacier's alleged statements to Professor Keromytis were harmful to Norton's litigating position, they did not satisfy the demanding legal standard for disqualifying counsel—a standard that the district court's decision never even mentioned.  JA34237-39.

Norton also objected that it "did not have an opportunity to present evidence or argument about the alleged conflict of interest."  JA34240.  After all, Columbia's opposition to Norton's motions *in limine* did not reference any potential conflict. And the only time Columbia raised the specter of a conflict—almost two years earlier, as one of many arguments in opposition to Norton's motion for sanctions— it had argued that "at least some of Dr. Dacier's [August 2014] deposition testimony was significantly adverse to Norton."  JA15966-68.  But Columbia *never* raised— and Norton never had any reason to address—the argument that the district court adopted as the basis for its *sua sponte* conflict ruling: that a conflict arose only later based on Dr. Dacier's remarks to Professor Keromytis (in approximately 2017).  Nor did Norton (or Quinn Emanuel) have any opportunity to address whether any such conflict was waivable, or how any such conflict might affect the privileged nature of Dr. Dacier's communications with Quinn Emanuel from 2017 through 2020.

The district court denied the motion on the same day that it was filed.  The court held that Norton had received "a full and fair opportunity" to address the purported conflict 18 months earlier, in its reply brief in support of Norton's motion

to sanction Columbia's counsel.  JA34351.  The court also suggested that Norton should have somehow anticipated the court's *sua sponte* conflict analysis and preemptively introduced evidence showing that Quinn Emanuel should not be disqualified from concurrently representing Dr. Dacier and Norton.  *See* JA34351-52.

At a hearing on March 25, 2022, the district court noted that it had denied the motion for reconsideration and asked Quinn Emanuel "to take a position on who[m] you represent."  JA51337.  Consistent with the Engagement Agreement, Quinn Emanuel informed the court that it would "continue to represent Norton" and was "in the process of withdrawing from [its] representation of Dr. Dacier."  JA51337-38; *see* JA16567.  On March 28, 2022, Quinn Emanuel formally confirmed that it "ha[d] withdrawn from its representation of Dr. Dacier."  JA34921.  In light of the court's conflict-of-interest ruling, Norton also retained new lead counsel from Latham & Watkins LLP.

## IV.    The District Court Finds Quinn Emanuel In Civil Contempt For Refusing To Disclose Attorney-Client Communications.

On April 5, 2022, counsel from Latham & Watkins contacted Dr. Dacier to ask if he would be willing to testify at trial.  JA35890.  In the ensuing email exchange, Dr. Dacier waived attorney-client privilege over a portion of his communications with Quinn Emanuel from 2017 to 2020 by discussing them with Latham & Watkins.  *See* JA35887-89.  On April 7, 2022, Latham & Watkins

disclosed those emails to Columbia's counsel, who promptly filed them on the public docket. *See* JA35884-90.

On April 8, 2022, Quinn Emanuel filed a brief on its own behalf explaining that it did not "render[] Dr. Dacier unavailable" and that the court erred by ruling on the purported conflict of interest on a motion *in limine* in which neither party raised the issue. JA35926. This brief was accompanied by a sworn declaration from David Nelson, the Quinn Emanuel attorney who represented Dr. Dacier at his 2014 deposition. JA35936-43. Mr. Nelson recounted a June 17, 2020 conversation in which Dr. Dacier "stated that he never intended to terminate Quinn Emanuel's representation [and] confirmed that he wanted to continue to be represented by Quinn Emanuel," after which Dr. Dacier "signed a declaration to that effect." JA35940 (citing JA16552). Mr. Nelson further declared that "Quinn Emanuel acted in good faith throughout its representation of Dr. Dacier" and offered to appear in court and "answer any of th[e] Court's questions regarding this matter." JA35942-43. The court did not take Mr. Nelson up on this offer.

On May 24, 2022, Columbia moved for an order to show cause why Quinn Emanuel should not be held in civil contempt for failing to comply with the court's order directing it to disclose its attorney-client communications with Dr. Dacier. JA43929. Columbia emphasized that its motion was made "only to support compliance with" the court's order of March 15, 2022, and sought "only such

reasonable sanctions as may be necessary to cause [such] compliance"—e.g., "imposing monetary sanctions until compliance is achieved." JA43926.

On June 3, 2022, Quinn Emanuel filed its opposition. Quinn Emanuel explained that it was justified in "initially asserting the attorney-client privilege in its March 16, 2022 response," and that once Dr. Dacier waived privilege over certain of his communications by discussing them with Latham & Watkins, Quinn Emanuel substantially complied with the court's order by providing Mr. Nelson's declaration, which summarized Quinn Emanuel's communications with Dr. Dacier during the relevant timeframe. JA43947-48; *see* JA43950-51. On June 17, 2022, Columbia filed its reply, in which it maintained that Mr. Nelson's declaration was insufficient and reiterated that it was "seek[ing] only a coercive remedy that will encourage full compliance." JA45423-24.

For nearly a year and a half, the district court took no action on Columbia's show-cause motion. Finally, on September 30, 2023, the court issued a decision holding Quinn Emanuel in civil contempt for failing to comply with the court's *sua sponte* order to disclose attorney-client communications. JA58-99. The court concluded that Quinn Emanuel's obligation to "protect [Dr. Dacier's] confidences" did not justify its initial noncompliance with the underlying order and that, in any event, Mr. Nelson's declaration did not contain "'all information garnered from Dr. Dacier' by Norton's counsel from 2017 through 2020." JA91 & n.16 (quoting JA57).

In its contempt decision, the district court did not engage with (let alone grant) Columbia's request for compliance-inducing monetary sanctions aimed at causing Quinn Emanuel to disclose its attorney-client communications with Dr. Dacier. Instead, the district court invented its own remedies, choosing to consider—yet again, without a motion, briefing, or argument—whether to award Columbia some unspecified quantum of attorneys' fees or to sanction Norton by "mak[ing] a negative inference as to the contents of Quinn Emanuel's communications with Dr. Dacier" in connection with Columbia's post-trial motions for enhanced damages and attorneys' fees under 35 U.S.C. §§284 and 285.  JA98.  Speculating that the undisclosed attorney-client communications might contain "potential evidence of misconduct and bad faith," the court proceeded to hold *sua sponte* that it would "add a finding of egregious behavior in making findings as to enhanced damages and fees" in entering its judgment, JA97-98, even though the damages that Columbia sought to enhance were based on purported infringement of patents that were completely different from the '643 patent to which Dr. Dacier's testimony related, *see* JA238-39, and even though the court's adverse inference effectively punished Norton for Quinn Emanuel's refusal to comply.  The court ultimately awarded enhanced damages against Norton by multiplying the jury's damages award by 2.6—adding nearly $300 million to the damages amount, for a total award of over $481 million—and also awarded attorneys' fees.  JA143.

## SUMMARY OF ARGUMENT

The district court found Quinn Emanuel in civil contempt for failing to comply with its *sua sponte* order directing Quinn Emanuel to "disclose on the record in writing any information garnered from" its client Dr. Dacier from 2017 through 2020. When Quinn Emanuel refused, citing Dr. Dacier's attorney-client privilege, the district court found it in contempt and imposed sanctions that Columbia never even requested. That contempt finding and its accompanying sanctions must be reversed. The district court's order directing Quinn Emanuel to disclose its attorney-client communications with Dr. Dacier over the previous four years was invalid as a matter of law, and Quinn Emanuel properly refused to comply with that invalid order.

First, the district court erred at the threshold in finding any conflict of interest in Quinn Emanuel's simultaneous representation of Dr. Dacier and Norton. The district court concluded that a disqualifying conflict of interest "developed" based on statements that Dr. Dacier allegedly made to Professor Keromytis sometime in 2017 or 2018, which the court read as suggesting that if Dr. Dacier chose to appear at trial, some part of his testimony would be unhelpful to Norton. But even assuming that some of Dr. Dacier's testimony could potentially have undermined Norton's arguments at trial, the district court erred as a matter of law by concluding that any such unhelpful testimony would create a conflict of interest. Attorneys routinely represent both employers and their current and former employees, and it is hardly

unusual for an employee to be called upon to give some testimony that could harm his employer's case. None of that creates any kind of ethical conflict. The pertinent question for conflicts purposes is not whether some part of an employee's potential testimony might conceivably cut against the employer's litigating position, but whether the employee has any concrete personal interest in the litigation that conflicts with the employer's interests—and Dr. Dacier, as a nonparty witness, plainly had no such personal stake in the litigation here. And even if some potential conflict had existed, it would not have warranted the extreme remedy of automatically disqualifying Quinn Emanuel from representing Dr. Dacier, let alone retroactively disqualifying it as of 2017 (years before Quinn Emanuel even learned of Dr. Dacier's alleged comments to Professor Keromytis).

Even if there had been a disqualifying conflict of interest here, the district court committed an even more egregious error of law in concluding (without briefing or argument) that the Quinn Emanuel's purported conflict could destroy Dr. Dacier's attorney-client privilege. In fact, it is black-letter law that *an attorney's* conflict of interest does not negate *the client's* attorney-client privilege or otherwise authorize a court to order disclosure of attorney-client communications covered by that privilege. Numerous courts have recognized as much, and not one court—other than the district court below—has ever reached the opposite conclusion. And to the extent the district court believed that the purported conflict automatically terminated Quinn

Emanuel's representation of Dr. Dacier under the terms of the Engagement Agreement (and so no attorney-client relationship existed at all from 2017 on), the court plainly misread the relevant provision, which makes clear that the representation was to continue for the duration of the lawsuit unless either Quinn Emanuel or Dr. Dacier provided the other with formal notice of termination. The district court's contrary reading cannot be squared with either the text of the Engagement Agreement or settled ethical rules, and would create impossible results for both parties to the agreement, who could never be sure whether their attorney-client relationship (and attorney-client privilege) might be retroactively eliminated by the subsequent appearance of a previously unknown conflict.

The myriad substantive flaws can only be explained by the district court's serial procedural failures, which provide independent grounds for reversing the contempt finding and accompanying sanctions. Throughout the proceedings below, the district court repeatedly departed from the basic principles of party presentation and due process, raising and ruling on key issues on its own initiative without waiting for those issues to be properly presented or affording Quinn Emanuel any adequate notice and opportunity to respond. Those departures began with the underlying disclosure order itself, in which the court *sua sponte* raised the purported conflict of interest, immediately concluded that the purported conflict made Quinn Emanuel's representation of both Dr. Dacier and Norton improper, and then immediately

proceeded to order disclosure of Quinn Emanuel's attorney-client communications with Dr. Dacier the next day, all without giving Quinn Emanuel any notice or opportunity to be heard.  And when Quinn Emanuel refused to comply with that order and Columbia sought sanctions, the court ignored Columbia's request for compliance-inducing civil contempt sanctions and instead invented its own punitive sanctions—an adverse inference of egregious behavior—which it imposed without notice, briefing, or argument, and which punished *Norton* for a perceived lack of compliance with an order directed at Quinn Emanuel.  Those radical departures from the basic principles of the adversarial process not only help to explain the district court's egregious substantive errors, but independently warrant reversal.  For all of these reasons, the district court's contempt order and accompanying sanctions cannot stand.

## STANDARD OF REVIEW

Because the issues presented in this appeal do not involve patent law, this Court applies the law of the regional circuit—here, the Fourth Circuit.  *See, e.g.*, *Monsanto Co. v. E.I. Du Pont de Nemours & Co.*, 748 F.3d 1189, 1196 (Fed. Cir. 2014).  Under Fourth Circuit precedent, a party appealing from a civil-contempt order may challenge not only "whether contempt was proper" but also the validity of the underlying "order alleged to have been violated."  *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014); *see, e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301-03

(4th Cir. 2000) (civil contempt requires violation of "a valid decree," and so "reversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon").  This Court "review[s] the ultimate decision as to whether the contempt was proper for abuse of discretion, the underlying legal questions de novo, and any factual findings for clear error."  *In re Under Seal*, 749 F.3d at 285 (citation omitted).

The district court's determination that Quinn Emanuel could not ethically represent both Dr. Dacier and Norton after 2017 due to a purported conflict of interest is a legal question reviewed *de novo*.  *See Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992); *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1200 (4th Cir. 1978).  The district court's determination that the purported conflict of interest destroyed attorney-client privilege over Dr. Dacier's communications with Quinn Emanuel from 2017 through 2020 is also a legal question reviewed *de novo*.  *See Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998).  Finally, the issue of whether the district court's orders were procedurally improper is likewise reviewed *de novo*.  *In re Contempt Finding*, 663 F.3d 1270, 1274 (D.C. Cir. 2011).

## ARGUMENT

The district court's orders directing Quinn Emanuel to disclose privileged attorney-client communications, and then holding Quinn Emanuel in contempt for refusing to comply, were wrong from start to finish.  The court erred in finding any

conflict in Quinn Emanuel's simultaneous representation of Dr. Dacier and Norton; it erred in concluding that any such purported conflict would retroactively strip attorney-client privilege from Dr. Dacier's communications with his counsel; and it erred in raising and deciding these issues *sua sponte* rather than adhering to the traditional principle of adversarial presentation.  For all of these reasons, the district court's orders must be reversed.

## I.     The District Court Erred In Holding That Dr. Dacier And Norton Had Conflicting Interests That Disqualified Quinn Emanuel From Representing Them Both.

First and foremost, the district court erred in holding that there was any conflict of interest between Dr. Dacier and Norton that would have made it impossible for Quinn Emanuel to represent both.  As countless cases demonstrate, it is "common practice for counsel to represent both an employer and its current and/or former employees" who may be called as nonparty witnesses. *New York v. United Parcel Serv., Inc.*, 2016 WL 10672076, at *1 (S.D.N.Y. Sept. 2, 2016); *see, e.g.*, *Aetna*, 570 F.2d at 1202.

This type of concurrent representation offers significant benefits, as it "eliminat[es] the need to hire multiple law firms, enhanc[es] the attorney's ability to coordinate litigation strategy, and improv[es] efficiency by reducing time needed for multiple attorneys to familiarize themselves with the case in order to prepare for non-party depositions."  NYC Bar Ass'n, Formal Op. 2016-2 (July 22, 2016); *accord*

31

*Aetna*, 570 F.2d at 1202 (observing that concurrent representation of employer and employees can be "highly desirable"). And as numerous courts have recognized, there is nothing remotely improper about such an arrangement. *See, e.g.*, *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 658 F.2d 1355, 1356, 1358-59, 1361-62 (9th Cir. 1981); *United States ex rel. Harris v. Lockheed Martin Corp.*, 2013 WL 12328947, at *5 (N.D. Ga. Feb. 5, 2013). Indeed, Columbia's counsel itself represents several of Columbia's current and former employees in connection with this litigation, underscoring that simultaneous representations of both an employer in litigation and its current and former employees as nonparty witnesses is a common practice and generally appropriate. *See* JA20329-33 (listing multiple current and former Columbia employees represented by Columbia's counsel).

Not surprisingly, then, the district court did not find any conflict of interest in the fact that Quinn Emanuel agreed to simultaneously represent both Dr. Dacier and Norton in June 2014 and continued to represent Dr. Dacier at his deposition in August 2014. But the court then went quickly astray, holding that a conflict of interest "developed" later based on a conversation that Dr. Dacier allegedly had with Professor Keromytis at a professional event "sometime between 2017 and 2018." JA43, JA47, JA49. In a declaration filed more than two years after this conversation took place, Professor Keromytis asserted that Dr. Dacier had said "he was sorry

about what Norton had done with the decoy technology" and "was against Norton's decisions with respect to the decoy technology because Norton was wrong." JA43; *see* JA15989. According to the district court, these alleged statements created a conflict of interest that automatically disqualified Quinn Emanuel from concurrently representing Dr. Dacier and Norton from 2017 on (and destroyed attorney-client privilege over any communications between Quinn Emanuel and Dr. Dacier from that point on)—even though Quinn Emanuel did not even know those alleged statements had been made until years later. *See* JA47-48, JA50, JA55 n.7.

That remarkable holding is wrong several times over. Contrary to what the district court apparently believed, the fact that a current or former employee expresses regret or provides some testimony that could potentially be unhelpful to his employer's case does not create an ethical conflict of interest, let alone one that would disqualify the same firm from representing both—a rule that would make simultaneous representations of employer and employee practically impossible. This Court should correct that egregious misunderstanding and eliminate the indefensible sanctions that flowed from it.

### A.    There Was No Conflict of Interest Between Dr. Dacier and Norton.

The first question in determining whether a conflict of interest exists is, of course, "whether the interests of two clients will be or are likely to be in conflict." *Richmond Hilton Assocs. v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir. 1982);

*see* Va. R. Prof'l Conduct 1.7(a) ("concurrent conflict of interest" exists if clients are "directly adverse" or if there is "significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client"). In addressing that question, the district court here stumbled out of the gate. Rather than examine Dr. Dacier's and Norton's interests in this litigation and identify a potential conflict, the court simply assumed that a conflict existed just because Dr. Dacier might provide some testimony that could potentially be unhelpful to Norton—without identifying any "interest" that Dr. Dacier as a non-party witness might have had in the litigation, much less explaining how any such interest conflicted with Norton's interest in defeating Columbia's claims. That approach was plainly incorrect.

1. Concurrent representation may give rise to a conflict of interest where two clients have interests in the same litigation that are in actual or potential conflict, materially limiting a lawyer's ability to represent both—for instance, where one client could assert a legal claim against another, seek to avoid "personal liability" by "cast[ing] blame" upon the other, or increase its own monetary recovery at the expense of the other's recovery. *Aetna*, 570 F.2d at 1201; *see* Va. R. Prof'l Conduct 1.7(a); *Farb v. Baldwin Union Free Sch. Dist.*, 2011 WL 4465051, at *14 (E.D.N.Y. Sept. 26, 2011) (observing that cases involving "a conflict of interest based on simultaneous representation … tend to involve circumstances in which one client

34

might assert a claim against the other client or in which recovery of one client is at the expense of recovery of another"). Conversely, where the two clients have no actual or potentially adverse interests in the litigation—such as where one client is a party and the other is a non-party witness with no personal stake in the dispute—there is generally little to no risk of an ethical conflict, even when the witness's testimony would not be unalloyedly helpful to the party. *See* Va. R. Prof'l Conduct 1.7, cmt.23 (explaining that a concurrent conflict exists where an attorney represents "opposing *parties* in litigation" or "*parties* whose interests in litigation may conflict, such as *co-plaintiffs* or *co-defendants*" (emphasis added)).

The Fourth Circuit—whose law governs here—has accordingly recognized that a conflict of interest does not exist unless there is some actual or potential conflict between the clients' interests in the litigation. In *Aetna*, for example, the district court held that a conflict of interest prevented the Department of Justice from representing both the United States and four individual air traffic controllers employed by the Federal Aviation Administration who were sued in connection with a plane crash. 570 F.2d at 1199-200. The Fourth Circuit reversed—even though the air traffic controllers were not just witnesses but also co-defendants alongside their employer—because the district court's suggestion that the individual defendants and their employer might have conflicting interests was "based solely upon conjecture," and in fact "there [wa]s little or no possibility" that the employees would "incur any

personal liability as a result of th[e] litigation." *Id.* at 1201. Numerous other courts have reached the same view, concluding that "[t]here is no potential for conflict" between a corporate defendant and employee-witnesses who "are not parties to the litigation in any sense" and will not "be subject to any liability." *United Parcel Serv.*, 2016 WL 10672076, at *2; *see Bonner v. Guccione*, 1997 WL 91070, at *2 (S.D.N.Y. Mar. 3, 1997) (similar); *D.S. Mags., Inc. v. Warner Publisher Servs., Inc.*, 623 F.Supp. 624, 625 (S.D.N.Y. 1985) (similar); *United States v. Occidental Chem. Corp.*, 606 F.Supp. 1470, 1474 (W.D.N.Y. 1985) (similar).

Those same principles control here. Dr. Dacier had no interest in this lawsuit beyond the generic interest that any potential witness has in avoiding inappropriate questions, attacks on his credibility, and minimizing impositions on his time or friction with acquaintances associated with the adverse party. *See Occidental*, 606 F.Supp. at 1474 (former employee called as non-party witness has no "interest" except "to be protected from unwarranted inquiries and to be able to consult with counsel during questioning when doubts arise"). While Dr. Dacier voluntarily sat for a deposition in 2014 and may have been willing to travel to the United States for trial if his schedule had permitted, there was zero prospect of him becoming a litigant, and he had nothing riding on the outcome of Columbia and Norton's dispute. And while Dr. Dacier was "happy to help the judicial process" if necessary, JA35889, he repeatedly indicated "that he would prefer not to be involved in the

litigation," JA35940-41. In short, Dr. Dacier had "nothing against Norton," JA35887, and any interest he may have had in this litigation was entirely compatible with Norton's interest in defeating Columbia's claims.

2. Instead of identifying Dr. Dacier's interests (if any) in the litigation and then comparing them to Norton's, as Fourth Circuit precedent requires, the district court adopted the remarkable view that a nonparty witness becomes adverse to a party—and so the same firm cannot represent both—whenever some portion of the nonparty witness's testimony could potentially be harmful to the party's litigating position. *See* JA47-48 (concluding that there was "a conflict of interest" because, the court believed, Dr. Dacier's alleged statements to Professor Keromytis "r[an] contrary to Norton's defense"); JA51-52 (similar). The district court cited no authority for that extraordinary proposition, which would require separate counsel for nearly every employee-witness, and it is not the law.

As an initial matter, it is far from clear exactly what Dr. Dacier said to Professor Keromytis during their brief and casual conversation "sometime between 2017 and 2018," JA43, or whether anything in that conversation actually showed that Dr. Dacier's testimony would potentially be harmful to Norton's defense. During seven hours of questioning by Columbia's counsel in 2014, Dr. Dacier provided sworn testimony that although he had been involved in some of the research that led to the '643 patent, he was not in a position to know whether the

Columbia professors should have been listed as inventors because he did not even read the patent application, much less conduct a technical analysis of its claims.  *See* JA65479-80.  The district court's assertion that Dr. Dacier's alleged remarks to Professor Keromytis "speak directly, and more expansively" to Columbia's fraudulent concealment and inventorship claims than *seven hours* of questioning by Columbia's counsel, JA52, is completely backwards.  Indeed, even Columbia's own attorney, Mr. Guzior, conceded that it is impossible to know "what Dr. Dacier meant when he said he was sorry" or "when he said he believed what had happened was wrong."  JA54124-25.  Dr. Dacier himself confirmed that his 2014 deposition testimony provided all the useful information that he had about the case, repeatedly indicating that he had nothing to add to what he had said at his deposition.  JA35940; *see* JA14326 ("no problem to come repeat my testimony"); JA16023 ("repeat what I have already said in 2014"); JA35888 ("I do not have anything to add").  Accordingly, even taking at face value Professor Keromytis's account two years later of his "brief[]," informal conversation with Dr. Dacier, JA15989, it comes nowhere close to establishing that if Dr. Dacier had appeared at trial, he would have "expand[ed], "supplement[ed]," and "clarif[ied] his earlier deposition testimony" in any way that undermined Norton's defense.  *Contra* JA52.

In any event, even assuming that some aspect of Dr. Dacier's testimony might have undermined Norton's arguments at trial, the district court erred as a matter of

law in equating that possibility with a conflict of interest. On the contrary, the possibility that some aspect of a witness's testimony could potentially harm a party's litigating position is wholly unremarkable and virtually unavoidable. Any cross-examination worth its salt will elicit some testimony that is unhelpful for the party that called the witness. If that were enough to create a conflict of interest, it would be virtually impossible for joint representations of parties and non-party witnesses to exist. That practice is nonetheless ubiquitous, because simply providing testimony that is not unalloyedly helpful—or wishing the whole unpleasantness of the litigation would go away—does not remotely rise to the level of a conflict of interest. *See Occidental*, 606 F.Supp. at 1474 (even assuming employee's testimony would be "adverse to" the defendant corporation, it would not "create[] a likelihood of a significant conflict"); *Guillen v. City of Chicago*, 956 F.Supp. 1416, 1423-24 (N.D. Ill. 1997) (even assuming that employees' testimony would be "damaging" to their employer's defense, it did not create a disqualifying conflict of interest).

The district court thus erred as a matter of law in concluding that Dr. Dacier's alleged statements to Professor Keromytis demonstrated a conflict of interest. Even if those statements could be read to indicate that some aspects of Dr. Dacier's testimony at trial might be unhelpful for Norton, nothing in those statements remotely suggests that Dr. Dacier had any concrete personal interest in the litigation, much less one that would conflict with Norton's interest in avoiding liability. The

district court's contrary view—that a conflict of interest arises whenever any aspect of a witness's testimony is potentially harmful to a party—not only has no legal support, but would radically multiply the number of potential ethical conflicts in any litigation and make simultaneous representation of a party and nonparty witnesses effectively impossible. This Court should not allow that flawed and dangerous ruling to stand.

### B.   Any Purported Conflict of Interest Did Not Justify Automatically Disqualifying Quinn Emanuel From Representing Dr. Dacier.

Because there was no conflict whatsoever between Dr. Dacier's and Norton's interests in this litigation, the district court erred in finding a conflict of interest at all, and this Court can reverse on that ground alone. But even if some possible conflict had "developed" as a result of Dr. Dacier's alleged comments to Professor Keromytis, JA45—comments that were not relayed to Quinn Emanuel until years after the fact—the district court independently erred in treating that conflict as a non-waivable basis for automatic disqualification, let alone *retroactive* disqualification dating back to "sometime between 2017 and 2018," JA43, long before Quinn Emanuel was even aware of Dr. Dacier's alleged comments and the purported potential conflict. *See* JA55 n.7 (concluding that Quinn Emanuel "should not have been representing" both Dr. Dacier and Norton after the purported conflict arose). Indeed, since the district court plainly viewed the alleged comments as a game-

changer, finding Quinn Emanuel both conflicted and disqualified years before it even learned of the comments makes no sense at all.

As the Fourth Circuit has explained, attorney disqualification is a "drastic step" that should not be taken lightly. *Shaffer*, 966 F.2d at 146. It "must be based on a finding of an actual present conflict between the positions taken by the two clients," rather than "'conjecture' or the 'mere possibility of a conflict.'" *Simms v. Deggeller Attractions, Inc.*, 2013 WL 49756, at *9 (W.D. Va. Jan. 2, 2013) (quoting *Richmond Hilton Assocs.*, 690 F.2d at 1089); *see Shaffer*, 966 F.2d at 146; *Aetna*, 570 F.2d at 1200. Under Virginia Rule of Professional Conduct 1.7(a), an actual "concurrent conflict of interest" warranting disqualification exists only where (1) two parties are "directly adverse" or (2) "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." Va. R. Prof'l Conduct 1.7(a). Even if a concurrent conflict of interest exists, moreover, disqualification is not required if "each affected client consents" in writing to the simultaneous representation, the lawyer reasonably believes she will be able to provide each client competent and diligent representation, neither client is asserting a claim against the other, and the representation is not otherwise prohibited by law. *Id.* 1.7(b). Under those rules—which, remarkably, the district court never cited—the purported conflict that the district court identified here comes nowhere

near warranting the court's automatic (and retroactive) disqualification of Quinn Emanuel from continuing to represent both Dr. Dacier and Norton.

First, Dr. Dacier indisputably was not "directly adverse" to Norton here. *Id.* 1.7(a)(1). Under Virginia law, direct adversity exists only between "opposing parties in litigation"—a conflict of interest that cannot be waived. *Id.* 1.7 cmt.23; *see id.* 1.7(b)(3) (conflict is not waivable if it "involve[s] the assertion of a claim by one client against another client"). Dr. Dacier and Norton were not opposing parties in this litigation; indeed, Dr. Dacier is not a party to this litigation at all. Dr. Dacier and Norton therefore plainly are not "directly adverse." *Id.* 1.7(a)(1).

Second, there was also no "significant risk" that Quinn Emanuel's representation of Dr. Dacier would be "materially limited" by the firm's responsibilities to Norton, or vice versa—and even if there were, that purported potential conflict would have been waivable (and so could not warrant automatic disqualification). *Id.* 1.7(a)(2); *see id.* 1.7(b). As counsel to Dr. Dacier, Quinn Emanuel was ethically bound to protect Dr. Dacier's interests as a nonparty witness, such as by guarding him against "unwarranted inquiries" and unjustified impositions on his time. *Occidental*, 606 F.Supp. at 1474. As counsel to Norton, Quinn Emanuel was ethically bound to also protect Norton's interests as a party, including by defending Norton against Columbia's claims. Nothing in Dr. Dacier's alleged comments to Professor Keromytis provides any basis for finding any significant risk

that Quinn Emanuel's obligations to either Dr. Dacier or Norton would materially limit its ability to fully represent the other here, let alone a risk so overwhelming that it could not be waived.

To be sure, a lawyer's representation of two clients may be "materially limited" where one client's testimony will factually contradict the other's testimony, such that zealous representation of the former client would require attempting to impugn the latter client's credibility through a vigorous cross-examination. *See, e.g.*, *Adkisson v. Jacobs Eng'g Grp., Inc.*, 2016 WL 6534273, at *3 (E.D. Tenn. Nov. 1, 2016). But as the record shows, there was no realistic prospect that any such factual contradiction between Dr. Dacier's and Norton's testimony would materialize in this case. On the contrary, Dr. Dacier sat for a seven-hour deposition, and nothing in that testimony elicited such an obvious contradiction (or was the basis for the district court's actions), which is why no party in 2014 even suggested the existence of any conflict of interest.

Dr. Dacier's conversation with Professor Keromytis at a cybersecurity conference "sometime between 2017 and 2018," JA43, did not create some new direct contradiction automatically disqualifying Quinn Emanuel from continuing to represent both Dr. Dacier and Norton. Norton never disputed that some conversation along those lines may have occurred, and that Dr. Dacier may have told Professor Keromytis that he felt sorry about some of Norton's actions related to the

development of the '643 patent. JA43, JA48; *accord* JA54411. Instead, Norton maintained only that Dr. Dacier's remarks were colored by Dr. Dacier's friendship with Professor Keromytis, and that they did not show that Norton had engaged in any unlawful conduct—particularly since Dr. Dacier also testified that he had not "read the patent application," much less conducted a technical analysis of its claims. JA54411-12. Far from attempting to impugn Dr. Dacier's credibility, Norton's counsel told the jury that he "testified truthfully" and "in a balanced way." JA54412; *see also* JA53918 (eliciting testimony that Dr. Dacier was "very bright," "knowledgeable," and "well respected in the computer security field"); JA54127-28 (objecting to one of Columbia's proposed jury instructions because it suggested Dr. Dacier was not "honest and forthright"). And given that Dr. Dacier stood by his deposition testimony and said he had nothing material to add, the offhand remarks in 2017 or 2018 could not open up some fissure between Norton and Dr. Dacier that obligated Norton to attack Dr. Dacier's credibility.

Put simply, even if Dr. Dacier's alleged remarks to Professor Keromytis could somehow be read to indicate a possible conflict of interest between Dr. Dacier and Norton, that "mere possibility of a conflict" was not sufficient to warrant imposing automatic and retroactive disqualification dating back to whenever Dr. Dacier's remarks were made, with no opportunity for Dr. Dacier and Norton to waive that purported conflict. *Richmond Hilton Assocs.*, 690 F.2d at 1089. A district court

cannot disqualify counsel based on mere "speculation that a chain of events … could lead counsel to act counter to his client's interests," *Shaffer*, 966 F.2d at 145, let alone impose automatic and retroactive disqualification based on speculation about a waivable conflict. The district court's contrary approach—concluding that the mere possibility that Dr. Dacier could conceivably have presented adverse testimony meant that Quinn Emanuel automatically "should not have been representing Dr. Dacier and Norton" ever since 2017, JA55 n.7, without any opportunity for a waiver—is thus entirely unsustainable.

## II. The District Court Erred In Holding That Any Purported Conflict Of Interest Destroyed Attorney-Client Privilege.

The district court's errors did not end with its mistaken conflict-of-interest and disqualification rulings. Even if the district court had correctly identified a disqualifying conflict of interest—which it plainly did not, *see supra* Part I—that would not have justified ordering Quinn Emanuel to disclose privileged attorney-client communications. Quite the opposite: As numerous courts have recognized, under settled law, a lawyer's conflict of interest does not destroy the client's attorney-client privilege, let alone authorize a court to order disclosure "on the record in writing" of communications covered by that privilege. JA57. The district court's contrary order cannot be permitted to stand.

A.    **Any Purported Conflict of Interest Did Not Destroy Attorney-Client Privilege Over Dr. Dacier's Communications With Quinn Emanuel.**

The district court's disclosure order depended on a critical premise: that Quinn Emanuel's purported conflict of interest vitiated the attorney-client privilege over communication between Dr. Dacier and Quinn Emanuel for the duration of the conflict.    JA55 n.7; *see* JA57; JA89.    That premise is profoundly mistaken.    As a matter of both black-letter law and common sense, an attorney's conflict of interest in an attorney-client relationship does not eliminate the client's privilege over communications made within that relationship.    That alone is sufficient to require reversal:    Even if the district court had been correct to find a disqualifying conflict of interest here, the court had no authority to demand that Quinn Emanuel "disclose on the record in writing" its attorney-client communications as a result.    *Contra* JA55 n.7.    That disclosure order was wholly invalid, and the district court's contempt finding and sanctions for violating it must therefore be reversed.    *See Ashcraft*, 218 F.3d at 301 (civil contempt finding requires violation of "a valid decree").

The district court provided almost no justification, and zero authority, for its *sua sponte* order demanding that Quinn Emanuel disclose attorney-client communications.    *See* JA55 n.7; *see also* JA57.    Its sole explanation for that order consists of a single cursory footnote:

Quinn Emanuel should not have been representing Dr. Dacier and Norton after 2020—and perhaps since 2014.    As such, no later than

46

> March 16, 2022, counsel for Norton must disclose on the record in writing any information garnered from Dr. Dacier during the period their representation of Dr. Dacier was a conflict.

JA55 n.7; *see* JA49 (identifying the period of conflict as "at least … 2017 through 2020"); JA89 (same). As far as that footnote reveals, the court apparently concluded that because (in its view) Quinn Emanuel "should not have been representing Dr. Dacier" from at least 2017 through 2020 due to the purported conflict, the attorney-client privilege over its communications with Dr. Dacier during that period automatically disappears, leaving the court free to order Quinn Emanuel to disclose those communications "on the record in writing." JA55 n.7.

That view perversely punishes the client for the attorney's conflict and has been repeatedly and uniformly rejected by every court to consider the issue. Instead, as numerous courts have recognized, it is "black-letter law" that a conflict of interest does not affect the existence of attorney-client privilege: Even "when an attorney (improperly) represents two clients whose interests are adverse, the communications are [still] privileged ... notwithstanding the lawyer's misconduct." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 368 (3d Cir. 2007) (citing 8 J. Wigmore, Wigmore on Evidence §2312 (McNaughton rev. ed. 1961)); *see, e.g.*, *Eureka Inv. Corp. v. Chi. Title Ins. Co.*, 743 F.2d 932, 938 (D.C. Cir. 1984) ("[C]ounsel's failure to avoid a conflict of interest should not deprive the client of the privilege."); *New Phoenix Sunrise Corp. v. Comm'r*, 408 F.App'x 908, 919 (6th Cir. 2010) ("[T]he fact that an

47

*attorney* has a conflict of interest does not mean that the *client* forfeits the benefit of the attorney-client privilege."); *Caekaert v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 2023 WL 3587287, at *4 (D. Mont. May 22, 2023) (same); *Cantu Servs., Inc. v. Worley*, 2021 WL 2323721, at *5 (W.D. Okla. June 7, 2021) (same); *Marketel Media, Inc. v. Mediapotamus, Inc.*, 2015 WL 3650765, at *4 (E.D.N.C. June 11, 2015) (same); *Madanes v. Madanes*, 199 F.R.D. 135, 144 (S.D.N.Y. 2001); *RFF Fam. P'ship, LP v. Burns & Levinson, LLP*, 991 N.E.2d 1066, 1079 (Mass. 2013) (same).  Not one court—other than the district court below—has ever reached the opposite and perverse conclusion.

The district court offered no rationale for departing from this unbroken line of caselaw.  Indeed, it never grappled with that caselaw at all, because it issued its order without briefing or argument.  Nor could the district court have justified its approach if it tried, as it defies all reason to deprive a *client* of his privilege over his attorney-client communications—through "on the record" disclosure of "all information" he conveyed to his counsel over the previous four years, no less—just because his attorney was laboring under a purported conflict of interest.  *See, e.g.*, *Eureka*, 743 F.2d at 938 ("The privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable."); *Teleglobe Commc'ns*, 493 F.3d at 368 (same).  Indeed, while Quinn Emanuel did not breach any ethical obligations by representing both Dr. Dacier and Norton, the one thing that would have come far

closer to such a breach would have been immediate and full compliance with the district court's order by disclosing Dr. Dacier's privileged communications without his waiver or consent.

### B. Any Purported Conflict of Interest Did Not Somehow Automatically Terminate Dr. Dacier's Attorney-Client Relationship With Quinn Emanuel.

While the only reason that the district court gave for its disclosure order is that Quinn Emanuel "should not have been representing Dr. Dacier" due to the purported conflict, JA55 n.7, elsewhere in its opinion, it suggested a more sweeping theory: that there *was no* attorney-client relationship (and so no attorney-client privilege) between Quinn Emanuel and Dr. Dacier after 2017, because Dr. Dacier's comments to Professor Keromytis automatically and abruptly "void[ed] the retainer agreement" under which Quinn Emanuel had agreed to represent Dr. Dacier. JA48. That theory is equally untenable.

1.  When, as here, a client retains a law firm for purposes of "a specific matter," the representation generally continues until "the matter has been resolved," unless the client discharges the lawyer or the lawyer formally withdraws from the representation. Va. R. Prof'l Conduct 1.3, cmt.4; Va. R. Prof'l Conduct 1.16; *see, e.g.*, *Atl. Diving Supply, Inc. v. Komornik*, 2021 WL 8775676, at *3 (Va. Cir. Ct. 2021) ("Termination of [an attorney-client] relationship occurs when the particular matter is concluded, the client terminates the relationship, with or without cause, or

the attorney terminates the relationship via withdrawal."). While a client is generally free to "discharge [his] lawyer at any time, with or without cause," Va. R. Prof'l Conduct 1.16(d), cmt.4, there must be an actual discharge. Otherwise, a lawyer generally "should carry through to conclusion all matters undertaken for a client," Va. R. Prof'l Conduct 1.3, cmt.4, and may only withdraw from a representation for good cause and must give "reasonable notice to the client." Va. R. Prof'l Conduct 1.16(d); *see, e.g.*, *In re Schwartz*, 493 A.2d 1248, 1253 (N.J. 1985) ("Once an attorney undertakes to represent a client, he cannot withdraw from employment without properly advising his client of his intention to do so.").

Consistent with these principles, Quinn Emanuel represented Dr. Dacier from June 2014, when Dr. Dacier signed the Engagement Agreement, until March 2022, when Quinn Emanuel formally withdrew from representing him at the district court's insistence. *See* JA16567; JA34921. While there were periods during that representation when Quinn Emanuel and Dr. Dacier were not in regular contact— including the long period from November 2014 through August 2018 when Columbia stayed all the claims as to which Dr. Dacier's testimony might be relevant—the representation continued throughout that period under the plain terms of the Engagement Agreement, which confirmed that Dr. Dacier had retained Quinn Emanuel to represent him "for purposes of" Columbia's entire lawsuit against

Norton, not just the June 2014 deposition or any other discrete event within the litigation.  JA16566.

To be sure, the terms of the Engagement Agreement may not have been top of mind for Dr. Dacier when Columbia's counsel unexpectedly (and improperly) initiated contact with him in October 2019, purportedly leading Dr. Dacier (according to Columbia's counsel) to state that he was no longer represented by Quinn Emanuel.  *See* JA17737-38.  But that is part of why the ethical rules forbid such out-of-the-blue contacts with represented parties and witnesses in ongoing litigation.  In all events, once Dr. Dacier reconnected with Quinn Emanuel in April 2020, he filed a sworn statement affirming that "Quinn Emanuel ha[d] represented [him] since June 18, 2014, and continue[d] to represent [him], in connection with the Columbia case."  JA16552.  That affidavit leaves no doubt that Dr. Dacier and Quinn Emanuel remained in an attorney-client relationship from June 2014 until March 2022, when Quinn Emanuel withdrew from the representation in response to the district court's conflict-of-interest ruling.  *See, e.g.*, JA51339-40.

2.  The district court suggested otherwise by embracing—yet again, without briefing or argument—a completely untenable interpretation of the Engagement Agreement.  *See* JA48.  Seizing on one partial sentence from the Engagement Agreement, without considering context or providing meaningful analysis, the court observed that the Engagement Agreement by its terms was "conditioned on the fact

that [Dr. Dacier] and [Norton] share a common interest in the matters."  JA48 (brackets original) (quoting JA16567).  According to the court, the "effect" of Dr. Dacier's alleged remarks to Professor Keromytis was to negate that "condition[]," and thereby automatically "void the retainer agreement." JA48.  That is, the court read the Engagement Agreement to automatically and immediately terminate Quinn Emanuel's representation of Dr. Dacier if at any time Dr. Dacier made a comment indicating that he and Norton no longer "share[d] a common interest" in the litigation, even if neither Quinn Emanuel nor Dr. Dacier had ever informed the other (or were even aware) that the common interest had disappeared.  JA48.

That unlikely reading cannot be squared with either the plain text of the Engagement Agreement or the importance of clarity in attorney-client relationships. As to the former, the Agreement states in relevant part:

> This will also confirm that our representation of you in connection with these matters is conditioned on the fact that you and [Norton] share a common interest in the matters.  We have confirmed that this is so, based on our discussions with you and [Norton], and on our current understanding of the pertinent facts.  In the future, should we become aware of some reason why it would no longer be appropriate for our firm to represent you in these matters, we will so inform you and withdraw from representing you.  You may also terminate this relationship at any time, by providing us with written notice to that effect.

JA16567.  The first sentence—and statement that Quinn Emanuel's representation is "conditioned on" Dr. Dacier's and Norton's common interest— merely invokes the applicable ethical rules regarding concurrent representation, which generally is

appropriate only where the two clients "hav[e] similar interests" Va. R. Prof'l Conduct 1.7 & cmt.23.  The second sentence makes clear that Quinn Emanuel had verified that Dr. Dacier's interests were aligned with Norton's before agreeing to represent him.  Neither sentence addresses the circumstances under which that representation would automatically terminate.  To the contrary, the next two sentences specify exactly how the representation may be terminated and foreclose the possibility of an automatic termination without one party's knowledge.  Instead, those sentences make clear that even if future events cause interests to unexpectedly diverge, the Engagement Agreement's provisions for knowing and orderly termination apply.

The district court's contrary view not only contradicts the plain text of the Engagement Agreement but undermines the attorney-client relationship.  The attorney-client relationship is simply too important to both attorney and client for the relationship to be vitiated by offhand comments or without knowledge of the attorney.  On the district court's view, neither party to the Engagement Agreement could ever be sure whether their attorney-client relationship (and attorney-client privilege) continued to exist, because any divergence between Dr. Dacier's and Norton's interests would instantly terminate that relationship—even if neither Quinn Emanuel nor Dr. Dacier knew of the divergence.  It is hard to imagine any interpretation more destructive of the "'full and frank communication' between a

client and his lawyer" on which "sound legal advice [and] advocacy ... depends." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 173 (4th Cir. 2019) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

At bottom, the district court's order cannot be squared with the first principles of the attorney-client privilege and the attorney-client relationship. Not only can Quinn Emanuel not be sanctioned for refusing to immediately comply with that order, but given that Dr. Dacier reaffirmed the ongoing attorney-client relationship from 2014 to 2020, Quinn Emanuel was duty bound to resist.

## III. The District Court's Repeated Forays Outside The Adversarial Process And Remarkable Procedural Irregularities Provide Another Independent Basis For Reversal.

The district court's serious substantive errors were matched only by its equally serious procedural irregularities, which themselves necessitate reversal. By repeatedly raising and deciding issues *sua sponte*, without briefing or argument, the district court not only deprived itself of the opportunity to hear from counsel on the relevant questions, but deprived the parties of a fair opportunity to address them. For that reason as well, the challenged orders cannot be permitted to stand.

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S.

237, 243 (2008).  The district court here failed to follow that bedrock principle,

repeatedly reaching out to decide issues no party had raised and to order relief no

party had requested.  Still worse, the court issued several of its *sua sponte* rulings

without affording Norton "[t]he fundamental requirements of due process," i.e.,

"notice and an opportunity to be heard."  *Doe v. Va. Polytechnic Inst. & State Univ.*,

77 F.4th 231, 236 (4th Cir. 2023).  Those procedural irregularities independently

require reversal here.

The district court's departure from the basic principle of party presentation

began with its *sua sponte* decision to raise the purported conflict of interest in its

March 2022 opinion resolving *Norton's* motions *in limine*.  Those motions *in limine*

presented entirely distinct evidentiary issues unrelated to any purported conflict, and

the parties' briefing on those motions said nothing whatever about any purported

conflict (let alone disqualification).  *See* JA19383-88, JA20802-37.  The court

nevertheless "identifie[d]" the purported conflict of its own volition, JA47, and then

proceeded to immediately rule that the purported conflict was fatal and that Quinn

Emanuel "should not have been representing [both] Dr. Dacier and Norton" after

2017.  JA47, JA49, JA55 n.7.  That was plainly improper.  Even if the district court

(incorrectly) believed that Dr. Dacier and Norton "might have adverse interests," its

*sua sponte* ruling—which amounted to "disqualifying the lawyers on the spot,"

rather than seeking briefing and argument from the parties on the issue—"was an

invalid response" to that concern. *Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir. 1993).

That irregular approach meant that the court failed to give Quinn Emanuel notice and a fair opportunity to be heard on whether any conflict existed and whether disqualification was warranted.   While Columbia gestured toward a potential conflict in its June 2020 opposition to Norton's motion for sanctions, that issue was at best tangentially relevant to that motion, and in any event Columbia never raised the argument that the district court ultimately embraced—namely, that Dr. Dacier's remarks to Professor Keromytis created a disqualifying conflict. *See* JA15966-68. That briefing came nowhere near putting Quinn Emanuel on notice that the court might revisit the issue of its own volition nearly two years later, in the context of two unrelated motions *in limine* on evidentiary issues, and find a purported conflict without giving Quinn Emanuel any opportunity to address it.

The court's *sua sponte* order demanding that Quinn Emanuel disclose all its attorney-client communications with Dr. Dacier over the previous four years—on one day's notice—was an even more egregious departure from basic procedural principles. *See* JA57. Columbia never asked for such communications to be disclosed, and Quinn Emanuel had *zero* notice or opportunity to be heard before the deadline for disclosure.   That order—the underlying order on which the district court's finding of contempt and subsequent sanctions are based—is not only

substantively invalid for all the reasons described above, but cannot be reconciled with the fundamental rule of party presentation and the most basic requirements of due process. *See Sineneng-Smith*, 590 U.S. at 374-76; *Doe*, 77 F.4th at 236.

The pattern of procedural irregularities continued in the district court's civil-contempt order, JA58-99, where the court imposed sanctions that Columbia had expressly *declined* to request. Consistent with the defining nature of civil contempt, Columbia moved for an order to show cause why Quinn Emanuel should not be held in civil contempt, seeking "only such reasonable sanctions as may be necessary to cause compliance"—for example, "imposing monetary sanctions until compliance is achieved." JA43926; *accord* JA45414, JA45423-24 (Columbia's reply). The court let Columbia's request for compliance-oriented sanctions languish for more than a year and a half before issuing an opinion that did not even deign to address it. *See* JA95-98. Instead, the court made up its own punitive sanctions—"a negative inference as to the contents of Quinn Emanuel's communications with Dr. Dacier" in connection with Columbia's post-trial motions for enhanced damages and attorneys' fees under 35 U.S.C. §§284 and 285, which enhanced the jury's award of damages for purported infringement of patents *different* from the '643 patent to which Dr. Dacier's knowledge pertained—and then imposed that penalty on Norton without notice or a hearing. JA98-99. By imposing sanctions on Norton for perceived failings by Quinn Emanuel, the district court once again conflated

attorneys and client and improperly punished a client for perceived transgressions of its attorneys.  But the problems do not even end there.

In imposing these draconian sanctions, the district court not only failed to provide the process due for civil contempt, but it jumped the tracks and imposed punitive, non-purgeable sanctions that would have required the additional safeguards necessary for criminal contempt.  As the Fourth Circuit has explained, sanctions for civil contempt must be intended "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy." *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004) (quoting *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995)).  In contrast, contempt sanctions are criminal rather than civil—and therefore require greater procedural protections, such as proof beyond a reasonable doubt and separate persons acting as prosecutor and judge—where the sanctions "seek[] to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct." *Id.* at 822 (quoting *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 133 (4th Cir. 1990)); *see id.* at 820.  Here as in *Cromer*, the contempt sanctions—an adverse inference against Norton—plainly were not tailored to coerce obedience by Quinn Emanuel or compensate Columbia for any losses from the purported contempt.  Instead, the court simply "took it upon [it]self" to impose those sanctions "without any indication that [Columbia] sought such a remedy," as a punishment for what the court deemed an

improper failure to comply with its disclosure order. *Id.* at 822. The court's decision to order those criminal sanctions "without the procedural safeguards necessary prior to the imposition of criminal penalties," *id.* at 822-23, thus independently requires reversal.

In sum, the district court committed a compendium of procedural errors in reaching its substantively flawed orders and sanctions. It took up the purported conflict of interest on which the underlying disclosure order was based *sua sponte*; held that purported conflict warranted disqualifying Quinn Emanuel based on an argument that Columbia never advanced; ordered disclosure of attorney-client communications across the previous four years *sua sponte*, with zero briefing or argument; and, when Quinn Emanuel refused to comply with that invalid order, imposed punitive sanctions that Columbia never requested. These gross departures from the principle of party presentation and the requirements of due process independently warrant reversal of the contempt order and accompanying sanctions.

## CONCLUSION

The contempt order and accompanying sanctions should be reversed.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
JOSEPH J. DEMOTT
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP*

April 9, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,826 words, excluding the parts of the brief exempted by Federal Circuit Rule 31(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

April 9, 2024

s/Paul D. Clement
Paul D. Clement

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

| Page No. | Date | Description |
|---|---|---|
| Appx37 | 03/15/2022 | Memorandum Opinion on Defendant's Motions *in Limine* 5 and 6, ECF No. 889<br><br>—Submitted publicly by agreement of the parties |
| Appx57 | 03/15/2022 | Order on Defendant's Motions *in Limine* 5 and 6, ECF No. 890 |
| Appx58 | 09/30/2023 | Memorandum Opinion on Motion for an Order to Show Cause, ECF No. 1331<br><br>—SEALED<br><br>—REDACTED, ECF No. 1345-1 |
| Appx100 | 09/30/2023 | Order on Motion for an Order to Show Cause, ECF No. 1332 |
| Appx102 | 09/30/2023 | Memorandum Opinion on Motions for Enhanced Damages Under 35 U.S.C. §284 and Attorneys' Fees Under 35 U.S.C. §285, ECF No. 1333<br><br>—SEALED<br><br>—REDACTED, ECF No. 1345-2 |
| Appx144 | 09/30/2023 | Order on Motions for Enhanced Damages Under 35 U.S.C. §284 and Attorneys' Fees Under 35 U.S.C. §285, ECF No. 1334 |
| Appx238 | 09/30/2023 | Final Judgment, ECF No. 1342 |
| N/A | 06/30/2005 | Virginia Rule of Professional Conduct 1.7 & cmt.23 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**THE TRUSTEES OF COLUMBIA**
**UNIVERSITY IN THE CITY OF**
**NEW YORK,**

      **Plaintiff,**

   **v.**

**NORTONLIFELOCK, INC.,**

      **Defendant.**

**Civil Action No. 3:13cv808**
**UNDER SEAL**

## MEMORANDUM OPINION

This matter comes before the Court on two of Defendant NortonLifeLock, Inc.'s ("Norton") Motions *in Limine*: **Norton V** and **Norton VI**, part of ECF No. 768, at 20-25. **Norton V** seeks to exclude any arguments and comments regarding the absence from trial of Dr. Marc Dacier. (ECF No. 768.) **Norton VI** seeks to exclude any out-of-court statements, described below, made by Dr. Dacier to Dr. Keromytis at a time well beyond his 2014 deposition and 2014 departure from Norton's employ.

### Introduction

Norton seeks to exclude statements made by Dr. Marc Dacier in 2017-2019 that he was sorry about how Norton handled Dr. Keromytis' and Dr. Stolfo's (the "professors") decoy technology when applying for a provisional patent in 2010, and, ultimately, the '643 Patent in 2011. (ECF 803, Ex. OO; *see* Patent number 8,549,643.) The '643 Patent—listing Mr. Shou and Dr. Dacier as inventors (but listing the professors nowhere)— issued on April 4, 2011. (ECF 803, Ex. OO.) It was entitled "INTEGRATING DECOYS AND DATA LOSS

PREVENTION."[1]  (ECF 803, Ex. OO.)  Both the provisional and the final patent application

papers named Dr. Dacier, alongside Darren Shou, as an inventor.  (ECF 803, Ex. KK, OO.)

While at Norton, Dr. Dacier was a senior director in Norton Research who supervised

Darren Shou, the Norton employee listed as the first named inventor of the '643 Patent.  During

that time frame, Dr. Dacier also collaborated with Dr. Keromytis on a government grant proposal

regarding decoy technology.  Norton attorneys asked and were affirmatively told as late as

March 24, 2010—by Professors Keromytis and Stolfo—that they considered themselves

inventors or co-inventors of the '643 technology.  That date was just before the filing for the

provisional patent.  In contemporaneous March 24, 2010 email chains, Dr. Dacier told the

professors that the link with DLP technology may not be worth a patent, but thought that he "told

[Norton] to make sure with [the professors] that [Norton] had the inventorship right since the last

thing [he] wanted was to start [the] possible collaboration [with the professors] on the wrong

foot."  (ECF 803, Ex. JJ.)

While earlier documents included Professors Keromytis and Stolfo as inventors, the April

2, 2010 provisional patent application that Norton filed for what would become the '643 Patent

---

[1] The description of the invention in the provisional patent application included the
following:

> A [proposed] method and apparatus for creating, distributing and tracking decoy
> documents for data loss prevention . . . .
>   We propose a novel integrated architecture for the creation, distribution and
> tracking of decoys that will identify malicious activity where other technical means
> have not or cannot detect them.  [that will] specifically focus on two thrusts: (a) the
> investigation and development of realistic, self-consistent communications (e.g.,
> email threads and IM conversations)that will present attractive targets to stealthy
> adversaries , and  (b) the integration of a decoy architecture within an enterprise
> network and in particular with existing Data Loss Prevention (DLP) technologies.

(ECF No. 803, Ex. KK.)

listed only Dr. Dacier and Mr. Shou as the inventors. (ECF 801, Ex. KK.) The professors were

not told that they were not listed inventors.

The '643 Patent, identifying Mr. Shou and Dr. Dacier as inventors (and not listing the

professors anywhere) issued on April 4, 2011. (ECF 803, Ex. 1.)[2] (ECF 803, Ex. OO.) For a

second year in a row, days before the 2011 filing of the patent application, Norton attorneys

asked Professors Keromytis and Stolfo if they considered themselves to be inventors. The

professors again said yes. As with the provisional patent application, the professors were not

told that they had been omitted as inventors or co-inventors in the final patent application.

The Fraudulent Concealment and Inventorship Counts brought by Columbia pertain to

this '643 Patent. Three remaining counts pertain to this testimony:

(1) Fraudulent Concealment (Count VII);
(2) Correction of Inventorship—Sole Inventorship (Count X); and,
(3) Correction of Inventorship—Joint Inventorship (Count XI).

Norton seeks to exclude any arguments and comments regarding the absence from trial of

Dr. Marc Dacier. Norton also seeks to exclude any out-of-court statements made by Dr. Dacier

to Dr. Keromytis at a time well beyond his 2014 deposition and 2014 departure from Norton's

---

[2] The description of the invention in the provisional patent application included the
following:

A [proposed] method and apparatus for creating, distributing and tracking decoy
documents for data loss prevention . . . .
We propose a novel integrated architecture for the creation, distribution and
tracking of decoys that will identify malicious activity where other technical means
have not or cannot detect them. [that will] specifically focus on two thrusts: (a) the
investigation and development of realistic, self-consistent communications (e.g.,
email threads and IM conversations)that will present attractive targets to stealthy
adversaries , and (b) the integration of a decoy architecture within an enterprise
network and in particular with existing Data Loss Prevention (DLP) technologies.

(ECF No. 803, Ex. KK.)

employ.  Norton cites Federal Rules of Evidence 401, 402, 403, and 803 as the basis for these

Motions *in Limine*.  Columbia presents counterargument under each of Norton's evidentiary

theories.  Columbia also asserts that Dr. Dacier's statements and related evidence should be

admissible under Federal Rule of Evidence 807, the residual hearsay exception.

At base, Columbia counters that Norton *prevented* Dr. Dacier from testifying.[3]  Counsel

for Norton only belatedly claimed that Quinn Emanuel personally represented Dr. Dacier *after* it

learned that Dr. Dacier intended to offer testimony at trial that he was "sorry" about what Norton

had done with the professors' decoy technology.  He indicated that what Norton did was wrong.

(ECF 803, Ex. BB – L Decl.)  Columbia also posits that Norton attorneys have a conflict in

representing Norton along with Dr. Dacier, even personally, because he has offered testimony

adverse to Norton's interest.

## I.  Legal Standards

### A.      Norton V:  Missing Witness

Columbia seeks a Missing Witness instruction regarding (or permission to comment

about) Dr. Dacier's absence from trial.  **Norton V** opposes a missing witness instruction and

seeks to exclude any arguments and comments regarding the absence of Dr. Marc Dacier.

"The missing witness instruction traces its origins to the Supreme Court's decision in

*Mammoth Oil Co. v. United States*, 275 U.S. 13 (1927), in which the Court held that, based on

the failure of a key witness to testify, 'it just[ly] may be inferred that [the witness] was not in the

position to combat or explain away any fact or circumstance so supported by evidence and

material to the [party's] case.'"  *Scott v. Watsontown Trucking Co.*, 920 F. Supp. 2d 644, 653

---

[3] Because Dr. Dacier now lives in Saudi Arabia and lived before in France, neither party
disputes that Dr. Dacier has been beyond the subpoena power of the Court during the course of
this litigation.

4

**Appx40**

(E.D. Va. 2013), *aff'd* 533 F. App'x 259 (4th Cir. 2013) (second alteration in original) (quoting *Mammoth Oil Co.*, 275 U.S. at 52). The missing witness instruction has long been established as a "statement of the settled rule that the unexplained failure of a party to call an available material witness gives rise to an inference, sometimes called a presumption, that the testimony of such absent witness would be adverse to such party." *Scott*, 920 F. Supp. 2d at 653 (quotations omitted). When a party fails to call an "available material witness," an inference can arise that the missing witness' testimony would have been adverse to the party that failed to call them. *Id.*

"The essential elements of the rule . . . are availability and materiality." *Id.* Of course, the complaining party must also establish that the testimony is relevant and non-cumulative. *Id.* (citations omitted).

"*Availability* may be translated as the power of the party to produce." *Id.* The unavailability can be in a "physical or practical sense" and does not turn "solely" on physical presence at trial or accessibility to subpoena. "Rather, availability also will turn on the witness's relationship to the nonproducing party." *Id.* "Available is equated to 'control in some cases, that is the witness is available if [he or she] is in such a relationship with the party that it is likely [the witness's] presence could be procured.'" Some courts dub this as being "peculiarly within [the] power of one of the parties." *United States v. Bran*, 950 F. Supp. 2d 863, 875 (E.D. Va. 2013) (citations and quotations omitted).

*Materiality* means that "the witness is believed to have testimony that would 'elucidate the transaction.'" *Bran*, 950 F. Supp. 2d at 875 (citations and quotations omitted).

The United States Court of Appeals for the Fourth Circuit has observed that "an aura of gamesmanship frequently accompanies request for missing witness charges." *Scott*, 533 F. App'x at 652 (quoting *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004)). Courts also

have explained the rule by saying that "the rationale of the rule is generally accepted—that the adverse inference is justified in circumstances where it . . . appears that the witness' testimony would have been produced but for the party's apprehension about what it would reveal." *Id.* (quoting *Poland v. Potomac Family Practice,* 51 Va. Cir. 414, 2000 WL 516308 (internal citations omitted)). The Fourth Circuit "afford[s] a district judge considerable discretion in deciding when [the missing witness instruction] should or should not be given." *Id.* (quoting *Gaskin,* 364 F.3d at 463) (citations omitted)).

### B.    Norton VI:  Residual Hearsay Exception

Columbia seeks to introduce the statements Dr. Dacier made to Dr. Keromytis under the residual hearsay exception. *See* Fed. R. Evid. 807. Norton seeks to limit any introduction of those statements through Dr. Keromytis, as Norton submits that they are untrustworthy hearsay that could not be subject to cross examination.

Federal Rule of Evidence 807(a), the residual hearsay exception, gives courts the discretion to allow hearsay not excepted under Rules 803 and 804 if:

> (1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Rule 807(b) provides that the statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to contest it. Written notice of the statement and the declarant's name must occur before the trial or hearing, or in other form during the trial or hearing if the court finds good cause. Fed. R. Evid. 807.

6

"The hallmark of Federal Rule of Evidence 807 is that the hearsay sought to be admitted is trustworthy." *United States v. Lucas*, 836 F. App'x 142, 145 (4th Cir. 2020). Courts should focus on the circumstances of the hearsay statement itself over "other evidence offered" at trial when evaluating trustworthiness. *Lucas*, 836 F. App'x at 145–46 (4th Cir. 2020) (quoting *United States v. Shaw*, 69 F.3d 1249, 1253 n.4 (4th Cir. 1995). "[A] court should consider the "'totality of the circumstances that surround the making of the statement' in determining whether the statement has a 'ring of reliability' about it." *Lucas,* 836 F. App'x at 146 (quoting *United States v. Clarke*, 2 F.3d 81, 84–85 (4th Cir. 1993)) (citing *Idaho v. Wright*, 497 U.S. 805, 822 (1990)). "This trustworthiness requirement [] serves as a surrogate for the declarant's in-court cross-examination." *Shaw*, 69 F.3d at 1253 (citing *Wright*, 497 at 820)).

## II.  Background

### A.    The Previous Challenge to the Admission of Dr. Dacier's Statements: Norton's Motion for Sanctions Seeking Exclusion of Evidence from Dr. Dacier

This issue has come before the Court before.  In June of 2020, Norton sought exclusion of evidence from Dr. Dacier as a sanction against Columbia for communicating with Dr. Dacier because Norton deemed him a represented party. (ECF No. 477.)  Dr. Keromytis had seen Dr. Dacier at work-related events, and, sometime between 2017 and 2018, Dr. Dacier had told Dr. Keromytis that he was "sorry about what Norton had done with the decoy technology" the professors had developed.  Dr. Dacier also said he was against Norton's decisions with respect to the decoy technology because Norton was wrong. (ECF 801, Ex. BB.)  Dr. Dacier said he had opposed Norton's actions at the time.  In 2019, after speaking to Dr. Keromytis, Dr. Dacier agreed to testify as a fact witness here about this belief.

In its Motion for Sanctions (the "Sanctions Motion"), Norton charged that Columbia counsel had violated Virginia Code of Professional Conduct Rule 4.2 ("Rule 4.2") by contacting a represented party when Columbia interacted with Dr. Dacier in 2019. (ECF No. 663, 3–5.) Norton argued that Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") had continuously represented Dr. Dacier personally since his 2014 deposition.

However, in a September 2021 Memorandum Order, the Court readily concluded that Columbia counsel did *not* violate Rule 4.2 when interacting with Dr. Dacier in 2019. (ECF 663, 3–5.) As to the Sanctions Motion, the Court operated from the following facts:[4]

> In response, Columbia argue[d] that Dr. Dacier was not represented by defense counsel . . . and that . . . when plaintiff's counsel contacted Dr. Dacier in 2019, Dr. Dacier communicated "unequivocally that he was not represented by counsel and was happy to come to trial to give . . . testimony." . . . Dr. Dacier said that he wanted to contact his daughter, who is an attorney, to discuss the issue with her, as well as Symantec (now "Norton") to confirm that he would not be breaking an employment contract by testifying at trial. . . . Columbia submits emails that confirm Dr. Dacier contacted Symantec on November 19, 2019, and then again on November 28, 2019 to follow up, but that Symantec did not respond for months, and did so only after Dr. Dacier was identified as a witness for Columbia. Norton then claimed representation . . .
>
> In February 2020, while his emails remained unanswered, Dr. Dacier stated on a phone call with Columbia's attorneys that his daughter confirmed he was not represented by counsel, that he did not want to be represented by counsel, and that he wanted to continue speaking with Columbia's attorneys.

(ECF 663. 4–5 (internal quotations and citations omitted).)

### B.     In 2020, Before Quinn Emanuel's Involvement, Dr. Dacier Readily Agreed to Testify in the United States

It is crystal clear that, in 2020 and before, Dr. Dacier repeatedly expressed a willingness to testify as a fact witness in this case even if doing so involved flying from France to New York during a pandemic. He repeatedly notified Norton to that effect. Specifically, on November 19

---

[4] Mr. Guzior, (ECF No. 547-1), Dr. Keromytis, (ECF No. 547-2), and Mr. Erbach, (ECF No. 547-4), presented declarations supporting these facts.

and 28 of 2019, Dr. Dacier sent an email informing Norton that he had been asked to be deposed as a fact witness in this litigation. (ECF No. 546-2.)  In the email, *he indicated that he did not think he had counsel representing him*, but wanted to know whether he was "bound by any kind of contract or obligation with [Norton] that would prevent [him] from responding positively to the request to attend the trial." (ECF No. 546-2, at 4.)  He highlighted that he was "*not asking for [Norton] to represent [him].*" (ECF No. 546-2 at 4 (emphasis added).)  He advised Norton that if he heard no response, he would presume that "[Norton] is not representing [him,] and [*he was*] *free to go testify.*" (ECF No. 546-2, at 4 (emphasis added)).  Neither Norton nor Quinn Emanuel responded to his emails.

In late March or early April of 2020, Columbia served its witness list on Norton, identifying Dr. Dacier as a fact witness for the then-scheduled 2020 trial.  On April 10, 2020, a lawyer from Quinn Emanuel responded to Dr. Dacier's third email.  This was the first contact counsel had with Dr. Dacier in over five years. (ECF No. 801, Ex. CC).  In response, Dr. Dacier told both Norton and Columbia counsel he had "no problem" coming to testify despite that it was now timed during "[C]oronavirus and a travel ban" and that New York would not be his "favorite travel destination." (ECF No. 546-2, at 3.)  Indeed, he stated that he hoped "things [would] soon get better." (ECF No. 546-2, at 3.)

Just over three weeks later, Norton filed its Motion for Sanctions claiming that, in communicating with Dr. Dacier, Columbia had improperly contacted a represented party in violation of Virginia Code of Professional Conduct Rule 4.2. (ECF No. 477.)  Quinn Emanuel asserted that it has represented Dr. Dacier, personally since 2014, and continuously thereafter.  Columbia presented strong evidence to the contrary.  Importantly, seeing an obvious duty for Norton to investigate the compelling evidence of a potential conflict that developed on the

9

record, this Court specified that whether Dr. Dacier was or was not represented by Norton's counsel in October of 2019 remained an open question. (ECF No. 663 n.3 ("It remains undetermined whether Dr. Dacier was or was not represented by Norton's attorneys in October 2019.").)

## C.    Evidence Offered During Sanctions Briefing

Columbia presented the June 2020 declaration of attorney Leslie A.T. Haley with its Memorandum in Opposition to Norton's Motion for Sanctions. (ECF No. 547-3.) Ms. Haley thoroughly examined the case and offered expert testimony regarding legal ethics and professional responsibility (for which the Court finds her qualified under Federal Rule of Evidence 702). *Ms. Haley determined that the "only [] reasonable conclusion [was] that Dr. Dacier was not represented by Norton's counsel" in 2019.* (ECF No. 547-3, at 7, 10 (emphasis added).) Ms. Haley based her opinion not only on her expertise but also on the following (and other) commonsensical facts:

(1)    When initially spoken to, Dr. Dacier stated more than once that he did not want representation and did not seek it (suggesting—even under Norton's theory—constructive discharge);

(2)    Counsel for Norton had not been in contact with Dr. Dacier between 2014 and 2019;

(3)    Dr. Dacier had not been employed by Norton since approximately April of 2014;

(4)    Before speaking in depth, Dr. Dacier consulted his daughter (a lawyer), who told him she did not think Norton's counsel represented him;

(5)    Counsel for Norton failed to apprise Dr. Dacier, pursuant to Virginia Code of Conduct Rule 1.4 and its duty of loyalty under Rule 1.7, that actions were being taken on behalf of Norton without apprising Dr. Dacier;

(6)    Dr. Dacier's 2014 deposition, though facilitated and attended by a Qunin Emanuel attorney, included testimony from Dr. Dacier that was adverse to Norton's interests, rendering a conflict about which Norton would have had to conduct a conflict analysis;

10

**Appx46**

(7)   Dr. Dacier's statements between 2017-2019 to Dr. Keromytis also were contrary to Norton's interests, which created another basis for conflict of interest as to Quinn Emanuel; and,

(8)   Virginia State Bar LEO 1589 was "directly on point" when concluding that "a company's attorney cannot create an attorney-client relationship simply by telling that former employee that the company's counsel represents him or her.

(ECF 547-3.) Ms. Haley opined that, given these circumstances, counsel for Norton had an ethical obligation to conduct a Conflict Check in order to continue representing both parties. (ECF 547-3.) A Bar Opinion also could have been attained.

During Sanctions briefing, Norton tried to create a record. Norton countered these conclusions by producing a June 18, 2014 retainer agreement signed by Dr. Dacier "conditioned on the fact that [he] and [Norton] share a common interest in the matters." (ECF 562-4.) Norton also placed on the record a barebones three-paragraph declaration from Dr. Dacier in which he stated that he had been represented by Quinn Emanuel since June 18, 2014, and that the law firm continued to represent him. (ECF 562-1.) Norton offered these documents in June 2020, well after Dr. Dacier said anything to Dr. Keromytis between 2017-19. These documents also appeared after Dr. Dacier agreed to testify (not thinking Norton's attorneys represented him). Finally, Norton retained a qualified expert who indicated that counsel for Columbia had violated Rule 4.1 when contacting Dr. Dacier. (ECF 562-3.) *That ethics expert did not challenge or even speak to Ms. Haley's finding that a conflict existed.*

**D.    Conclusion**

Any 2014 conduct aside, the Court identifies a conflict of interest for Quinn Emanuel as to Dr. Dacier's 2019 statement that he was "sorry" about what Norton did as to the 643 Patent and that he felt or expressed his disagreement at the time. First, this statement clearly runs contrary to Norton's defense against the Fraudulent Concealment Count, as well as the Sole

11

**Appx47**

Inventorship and Joint Inventorship Correction of Inventorship Counts. Dr. Dacier, a named

inventor of the Integrating Decoy and Data Loss Prevention '643 Patent, has worked with Dr.

Kerotymis while the patent was developed. Dr. Dacier's statements show that he thought Dr.

Keromytis should be considered an inventor.

Second, the effect of that testimony was to void the retainer agreement that was

"conditioned on the fact that [Dr. Dacier] and [Norton] share a common interest in the matters."

(ECF 562-4.) Consequently, this statement is obviously material to a jury's consideration

inventorship, and of fraudulent concealment, which turns on how and why the professors were

not told about the issuance of the '643 patent.

Ms. Haley has opined that the apparent conflict required Quinn Emanuel to conduct a

conflict check or seek a Bar opinion. This record does not demonstrate—or even suggest—that

Quinn Emanuel did so.

### E.    Quinn Emanuel Fails to Establish a Lack of Conflict in "Personally" Representing Dr. Dacier Since at Least 2017

In the Motions *in Limine* at bar, Norton again presses its position that its counsel, Quinn

Emanuel, has represented Dr. Dacier personally and continuously since one of its lawyers

attended his deposition for this litigation in 2014, shortly after Dr. Dacier left Norton's employ.

As it did its Sanctions Motion, Norton seeks to exclude information obtained from Dr. Dacier

and to exclude any testimony from him at trial. (ECF No. 663, at 3–5.)

*Tellingly, throughout these motions, Norton has never denied that Dr. Dacier made the*

*statements against Norton's interest that Dr. Keromytis says he did.* Nor does it identify any

direct statement from Dr. Dacier denying the 2017-2019 comments. Quinn Emanuel has not

offered a conflict waiver form signed by Dr. Dacier or by Norton. While counsel for Norton

states that Dr. Dacier *now* does not want to come to testify from Saudi Arabia, Dr. Dacier has not

12

**Appx48**

said so directly on this record. (ECF No. 801, Ex. QQ.) Nothing shows that Dr. Dacier knew he could disengage Quinn Emanuel. Indeed, the record is bereft of *any* document (absent bald assertions by Quinn Emanuel) showing that no conflict existed or that Norton confirmed whether one existed. That Quinn Emanuel has not offered evidence of a non-conflict shows that it has no such evidence. It is evident that, at least in 2017 through 2020, Quinn Emanuel developed a conflict in representing both Norton and Dr. Dacier.

In addition to constituting a conflict, Norton's assertion in 2020 of representation of Dr. Dacier is, at best, questionably timed. Only after it learned that Dr. Dacier would testify against Norton's position on inventorship of the '643 Patent, and only after Dr. Dacier was brought into this litigation, did Quinn Emanuel resurrect its communication with him. This was after more than five years of silence. Once Quinn Emanuel entered the conversation, Columbia and the Court were told by Norton's counsel that Dr. Dacier reversed his previously unequivocal and oft-expressed willingness to testify, and communication with Columbia or Dr. Keromytis ceased. And Columbia had to scurry to respond to a virtually meritless motion for sanctions. This timing does not inure to the benefit of finding Quinn Emanuel acted fully in Dr. Dacier, and not Norton's, interest.

More than any conflict or strategically obstructive conduct, however, the Court is most disturbed by counsel for Norton *misrepresenting* to Dr. Dacier in 2021, "that the Court concluded he is represented by Norton's Counsel." (ECF 803-31, Ex. QQ.) This is manifestly untrue. This conclusion could not have been more clearly left *open*. (ECF No. 663, n.3 ("It remains undetermined whether Dr. Dacier was or was not represented by Norton's attorneys in October 2019.").) This is direct evidence that Quinn Emanuel has exerted improper control over Dr. Dacier since at least that time in 2021. Circumstantial evidence since 2020 also bespeaks

13

gamesmanship by Quinn Emanuel when improperly barring Columbia from access to this material witness and obstructing a full and fair trial by interfering with the availability of a material witness.

This Court concludes that a conflict existed when Dr. Dacier contacted Quinn Emanuel in 2020, and that the firm knew or reasonably should have known that to be the case. And the actual misrepresentation about its representation of Dr. Dacier as late as November compounded the damage done.

### III. Analysis

#### A.    Norton V:  Missing Witness Instruction

Norton seeks to thwart Columbia's effort to have the Court issue a missing witness instruction should Dr. Dacier fail to testify. It is established that the unexplained "failure of a party to call an available material witness gives rise to an inference, sometimes called a presumption, that the testimony of such absent witness would be adverse to such party." *Scott v. Watsontown Trucking Co.*, 920 F. Supp. 2d 644, 653 (E.D. Va. 2013), *aff'd* 533 F. App'x 259 (4th Cir. 2013) (quotations omitted).

"The essential elements of the rule . . . are availability and materiality." *Id.* (quoting *Neeley*, 211 S.E.2d at 107). Of course, as with any testimony, the complaining party must establish that the testimony is relevant and non-cumulative. *Id.*

Columbia asserts convincingly that Dr. Dacier is available to Norton, who, while lacking subpoena power, likely has "the power to produce" him. *Id.* Dr. Dacier's "unavailability" exists "in a . . . practical sense" and does not turn "solely" on accessibility by subpoena. *Id.* (citation omitted). "Rather, availability also will turn on the witness's relationship to the nonproducing party." *Id.* (citation omitted).

14

**Appx50**

Courts recognize, as they should, that "[a]vailable is equated to 'control' in some cases, that is the witness is available if [he or she] is in such a relationship with the party that it is likely [the witness's] presence could be procured." *Scott*, 920 F. Supp. 2d at 653. Some courts dub this being "peculiarly within [the] power of one of the parties." *United States v. Bran*, 950 F. Supp. 2d 863, 875 (E.D. Va. 2013) (citations and quotations omitted).

The interaction of Quinn Emanuel with Dr. Dacier is peculiar. Quinn Emanuel readily injected itself as personal counsel—after over five years of no contact—when Columbia pursued him as a fact witness in 2019. Years earlier, in 2014, Norton procured Dr. Dacier as a non-employee deponent. Under the retainer agreement they placed on the record, Quinn Emanuel was retained to represent him *at Norton's expense*. (ECF No. 562.) In circumstances suggesting an "an aura of gamesmanship," *Scott*, 533 F. App'x at 262, after Quinn Emanuel asserted representation, Dr. Dacier abruptly stopped saying he would testify at all, much less happily.

And by filing an ill-founded Motion for Sanctions once Dr. Dacier resurfaced, Quinn Emanuel effectively barred any discussion between plaintiffs and Dr. Dacier. Quinn Emanuel had the peculiar power to procure and submit a declaration from Dr. Dacier in support of its motion for sanctions. And, apparently, Dr. Dacier is available enough to Quinn Emanuel that they feel able to say on his behalf that he no longer wants to testify.

But now, when Dr. Dacier is needed as a witness against it, Norton disavows control because he has not been employed there since 2014 (even though counsel for Norton attended his deposition in 2014 when he was not an employee).[5] Norton goes so far as to say that his 2014 testimony is not adverse. Even if Dr. Dacier's testimony in 2014 were ambiguous, absolutely no

---

[5] Norton similarly posits that Dr. Dacier's statements cannot be introduced as a statement against interest of a party opponent because, as a non-employee, he does not speak for Norton. But Dr. Dacier's complete turnabout on whether he would testify has the unfortunate appearance that counsel for Norton seeks to have it both ways while shielding adverse testimony.

doubt exists that his 2017–2019 statements *are* adverse with respect to the three counts at issue

here. And Norton's turnabout in describing the relationship rings hollow.

Certainly Dr. Dacier is not available to Columbia. And because the comments Columbia

seeks to introduce involve events and conversations that had not happened in 2014, the

comments' admission would not be cumulative to Dr. Dacier's earlier deposition.

**B.**     **Materiality**

If Dr. Dacier were to testify that he was sorry about what Norton did with respect to the

'643 Patent, the testimony would have a more-than-probable "bearing on the proper

determination of the" fraudulent concealment and inventorship claims. *Neeley*, 211 S.E.2d at

107. Certainly, Dr. Dacier's 2017–2019 comments suggesting that Norton improperly omitted

the professors as inventors or co-inventors from the '643 Patent would, at the very least, serve to

"elucidate the transaction." *United States v. Bran*, 950 F. Supp. 2d at 875 (E.D. Va. 2013)

(citations and quotations omitted).

Columbia correctly argues that Dr. Dacier, given his involvement with Professor

Keromytis in the development of the decoy with DLP technology, has material information to

offer. His 2017–2019 statements speak directly, and more expansively, than his 2014 deposition

testimony, to fraudulent concealment and inventorship. They are not cumulative to statements in

his 2014 deposition. The statements at issue establish that Dr. Dacier's testimony would have

been adverse to Norton's position on fraudulent concealment and inventorship. Indeed, Dr.

Dacier's post-deposition comments would expand, supplement, and clarify his earlier deposition

testimony.

Norton's actions here clearly speak to the rationale "that the adverse inference is justified

in circumstances where it . . . appears that the witness' testimony would [be] produced but for the

party's apprehension about what it would reveal." *Scott*, 920 F. Supp.2d at 652 (quoting *Poland v. Potomac Family Practice*, 51 Va. Cir. 414, 2000 WL 516308 (internal citations omitted)).

And, as detailed above, Norton's failure to investigate its conflict and its falsely advising Dr. Dacier that the Court had determined that Quinn Emanuel represented him support the giving of the Missing Witness Instruction with respect to Dr. Dacier, and allowing Columbia's counsel from commenting on his absence. The evidence permits only one conclusion: that Quinn Emanuel rendered Dr. Dacier unavailable. The instruction will be given and the commentary will be allowed.

## C.    Norton VI:  Residual Hearsay Exception

In addition to the missing witness instruction, Columbia seeks to introduce the content of the statements Dr. Dacier made to Dr. Keromytis, via Dr. Keromytis, under the residual hearsay exception. *See* Fed. R. Evid. 807.[6] Norton seeks to preclude introduction of those statements as untrustworthy hearsay that could not be subject to cross examination. However, this record is the rare one that supports the invocation of the residual hearsay exception.

---

[6] As identified above, the residual hearsay exception gives courts the discretion to allow hearsay not otherwise excepted if:

(1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).  Rule 807(b) provides that the statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to meet it.  Fed. R. Evid. 807.  Written notice of the statement and the declarant's name must occur before the trial or hearing, or in other form during the trial or hearing if the court finds good cause.  Fed. R. Evid. 807.

Dr. Dacier's comments to Dr. Keromytis satisfy the "hallmark" of admissible hearsay under Rule 807: trustworthiness. *United States v. Lucas*, 836 F. App'x 142, 145 (4th Cir. 2020). Most strikingly, neither Norton nor Quinn Emanuel has ever denied Dr. Dacier made the statements. Especially in 2017–2018, Dr. Dacier spoke spontaneously, and, before Quinn Emanuel became involved, voluntarily. *Navedo v. Primecare Med., Inc.*, 2014 WL 1451836 (M.D. Pa. Apr. 14, 2014) ("whether the declarant voluntarily made the statement" and the "statement's spontaneity" are relevant to trustworthiness). Looking to other evidence offered, Dr. Dacier told the professors in 2010—when the provisional patents were being sought—that he wanted to be sure their involvement as inventors was credited by Norton. On March 24, 2010, Dr. Dacier sent an email saying he thought the link with DLP technology may not be worth a patent but that he "told [Norton in 2010] to make sure with [the professors that Norton] had the inventorship right since the last thing [he] wanted was to start our possible collaboration on the wrong foot… :-(" (ECF No. 803, Ex. JJ.); *see Lucas*, 836 F. App'x at 145–46 (4th Cir. 2020). Still, neither professor was ever listed as an inventor.

Under the totality of the circumstances, what Dr. Keromytis reports Dr. Dacier as saying "has a 'ring of reliability' about it." *Id.* at 146 (quoting *United States v. Clarke*, 2 F.3d 81, at 84–85 (4th Cir. 1993)). Dr. Dacier repeated in 2017–2018 sentiments consistent with those he had expressed as the patent was processing when he was employed by Norton. Dr. Dacier made the statements to Dr. Keromytis at two different work-related events, expressing surprise each time that the litigation over the '643 Patent was still ongoing. And these statements could not have been addressed in his 2014 deposition because they had not yet been made.

The residual hearsay exception is granted sparingly, and rightly so. The "trustworthiness requirement . . . serves as a surrogate for the declarant's in-court cross-examination." *Shaw*, 69

18

F.3d at 1253) (citing *Wright*, 497 at 820)).  But exceptional circumstances are before the Court.

Quinn Emanuel asserted personal representation contrary to Dr. Dacier's belief.

Contemporaneous documentation makes this plain.  When first contacting Quinn Emanuel, Dr.

Dacier told the firm that he thought he was *not* represented by Quinn Emanuel.  He

memorialized his understanding to Norton, expressing his desire to testify, but without inviting

"any trouble." (ECF 803, Ex. PP.)  In 2019, Dr. Dacier explicitly said that he was "not asking

for [Quinn Emanuel] to represent" him, that he was asking to be "*free to go testify*;" and, that he

had "no problem" going to New York to testify *in the middle of a pandemic*.  Dr. Dacier's

expressed willingness to testify vanished after Quinn Emanuel's intercession.

    Even more fundamentally, Norton cannot complain of unfair prejudice from Rule 807

hearsay when it has had years of access to Dr. Dacier in which it could have addressed these and

explored these issues with him.  Because Norton's counsel continues to assert proper

representation now, they have had access to Dr. Dacier under the guise of being his personal

attorney throughout.[7]  Quinn Emanuel has been peculiarly in control of Dr. Dacier since 2019.  It

asserted that relationship even though it had not been determined whether Dr. Dacier was or was

not represented by Norton's counsel, (ECF No. 663 n.3.), while falsely telling Dr. Dacier that

this Court had ruled that Norton's counsel *did* represent him.

    While at Norton, Dr. Dacier was intimately involved in the development of the '643

Patent.  He worked with the professors when constructing it, because (as with the professors) he

was initially a named inventor.  He ended up being the only inventor named beyond that of the

Norton employee he supervised.  Dr. Dacier holds material and relevant information on the

---

[7] Quinn Emanuel should not have been representing Dr. Dacier and Norton after 2020—
and perhaps since 2014.  As such, no later than March 16, 2022, counsel for Norton must
disclose on the record in writing any information garnered from Dr. Dacier during the period
their representation of Dr. Dacier was a conflict.

subject of inventorship. Allowing Dr. Keromytis to testify as to what Dr. Dacier said to him is more directly probative of Norton's handling of inventorship and any misrepresentations about it than Columbia can obtain through reasonable efforts. *See* Fed. R. Evid. 807. It is direct evidence of what a Norton named inventor thought about inventorship while the patenting of the '643 Patent progressed.

Finally, Norton has been on notice about the content of the testimony and Columbia's intent to offer it into evidence since 2020. That more than suffices as reasonable notice under Federal Rule of Evidence 807.

### IV.  Conclusion

For the foregoing reasons, the Court will deny Norton's Motions *in Limine* V and VI.

Date: 3-15-2022
Richmond, Virginia

M. Hannah Lauck
United States District Judge

20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK,

      Plaintiff,

                                            Civil Action No. 3:13cv808

  v.

NORTONLIFELOCK, INC.,

      Defendant.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Court DENIES

Norton's Motions *in Limine* V and VI, part of ECF No. 767.

The Court also ORDERS that, no later than March 16, 2022, counsel for Norton must

disclose on the record in writing any information garnered from Dr. Dacier during the period

their representation of Dr. Dacier was a conflict.

It is SO ORDERED.

Date: 3-15-2022
Richmond, Virginia

                                      M. Hannah Lauck
                                      United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK,

        Plaintiff,

v.                                    Civil Action No. 3:13cv808
                                             **UNDER SEAL**

GEN DIGITAL INC.,
f/k/a SYMANTEC CORPORATION,
f/k/a NORTONLIFELOCK, INC.,

        Defendant.

## MEMORANDUM OPINION

      This matter comes before the Court on the Trustees of Columbia University in the City of New York's ("Columbia") Motion for an Order to Show Cause (the "Motion"). (ECF No. 1230.) The Motion requests that the Court order NortonLifelock, Inc. ("Norton")[1] to show cause as to why Norton's initial lead counsel and counsel of record, Quinn Emanuel Urquhart & Sullivan ("Quinn" or "Quinn Emanuel"),[2] should not be held in civil contempt for failure to comply with the Court's March 15, 2022 Order, (ECF No. 890). (ECF No. 1230, at 1.) The Order required Norton's counsel to, "no later than March 16, 2022, . . . disclose on the record in writing any

---

    [1] The Court previously issued a Notice explaining that it will refer to the Defendant as "Norton" on a default basis, and why. (ECF No. 1328.)

    [2] Quinn Emanuel served as Norton's initial lead counsel until shortly before trial when Latham & Watkins LLP ("Latham"), Norton's second lead counsel, took over that role. On April 8, 2022, just three days before trial, Quinn attorneys moved to withdraw their *pro hac vice* appearances. (ECF No. 1093.) Based on their past egregious conduct, the Court denied that motion the same day. (ECF No. 1094.) Quinn attorneys remain counsel of record in this matter. (*See* ECF No. 1101, at 4; Apr. 8 Tr. 4:11–18 ("I am going to clarify that I'm not going to strike Quinn from the case. . . . I'm not going to strike them from the case. . . . [W]e wouldn't be able to have a trial, and as I said, we are definitely going to have a trial.").)

**CONFIDENTIAL MATERIAL OMITTED**

information garnered from Dr. Dacier during the period their representation of Dr. Dacier was a conflict."[3]  (ECF No. 890, at 1.)

Columbia's Brief in Support of Motion for an Order to Show Cause requests that the Court set a date for an evidentiary hearing regarding Quinn's noncompliance and require the attendance of Quinn attorneys who communicated with Dr. Dacier during the identified conflict period. (ECF No. 1231, at 2; ECF No. 1229, at 2 (sealed).)  Columbia contends that at the conclusion of such hearing, the Court should hold Quinn in civil contempt and issue sanctions. (ECF No. 1231, at 2; ECF No. 1229, at 2 (sealed).)  Columbia seeks such relief "because it believes that the information [Quinn] was ordered to produce by the Court's [March 15, 2022] Order" would further support Columbia's Motion for Enhanced Damages Under 35 U.S.C. § 284, (ECF No. 1252), and Motion for Attorneys' Fees Under 35 U.S.C. § 285, (ECF No. 1260). (ECF No. 1231, at 2; ECF No. 1229, at 2 (sealed).)

Norton filed a Response on behalf of itself and its second lead counsel, Latham,[4] as well as an Opposition from Norton's initial lead counsel, Quinn Emanuel. (ECF Nos. 1239, 1240.) In its Opposition, Quinn contends it "fully complied" with the March 15, 2022 Order by producing "a detailed summary of its communications with Dr. Dacier on April 8, 2022[5] via Quinn Emanuel's Response to the Court's [March 15, 2022] Order Regarding Dr. Dacier ([ECF No.] 1083) and the Declaration of [Quinn's lead counsel for Norton].  [ECF No.] 1089-2." (ECF No. 1240-1, at 4.) Quinn suggests that "[i]n light of its full compliance with the Order,

---

[3] The Court identified ███████████████████████████████████
████████████████████████████████ (ECF No. 889, at 13 (sealed).)

[4] This response reiterated that Latham was not Norton's counsel at the time of the March 15, 2022 Order and states that Latham and Norton do not possess any undisclosed communications between Dr. Dacier and Quinn Emanuel. (ECF No. 1239, at 1.)

[5] The production of the communications was due March 16, 2023.  (ECF No. 890, at 1.)

Columbia's request for an Order to Show Cause, a hearing, and sanctions should be denied." (ECF No. 1240-1, at 4.)

Columbia filed a reply to Quinn Emanuel's opposition. (ECF No. 1268.) In reply, Columbia again asks for an Order to Show Cause, or in the alternative, "requests that the Court find [Quinn] in contempt and order payment of an appropriate coercive fine or other steps to encourage compliance until [Quinn] fully complies with the Order." (ECF No. 1268, at 2.)

For the reasons that follow, the Court will DENY IN PART and GRANT IN PART Columbia's Motion. (ECF No. 1230.) Specifically, the Court declines to hold an evidentiary hearing on the issue of contempt because the record and the parties' briefing contains fulsome information sufficient to allow the Court to rule on the issue of civil contempt. Based on the record and having considered the parties' briefing, the Court holds Quinn Emanuel in civil contempt for its failure to comply with the Court's March 15, 2022 Order. (ECF No. 890.) As the appropriate sanction, the Court will make a negative inference of egregiousness regarding any unproduced communications with Dr. Dacier from 2017 through 2020 for the purpose of deciding Columbia's pending motions for enhancement of the jury's damage award under 35 U.S.C. § 284,[6] (ECF No. 1252), and for attorneys' fees under 35 U.S.C. § 285,[7] (ECF No. 1260).

## I. Factual Background and Procedural History

### A.    Dr. Dacier's Employment with Norton and the '643 Patent

Dr. Marc Dacier was an employee of Norton at the time of its filing of Patent Number 8,549,643 (the "'643 Patent") that is the patent at the center of three claims Columbia asserted

---

[6] Regarding enhanced damages where infringement has been found, this statute provides in relevant part: "[T]he court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.

[7] This statute provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

3

# CONFIDENTIAL MATERIAL OMITTED

against Norton: (1) Fraudulent Concealment; (2) Correction of Inventorship—Sole Inventorship; and (3) Correction of Inventorship—Joint Inventorship. (ECF No. 889, at 2, 3 (sealed).) In 2014, Dr. Dacier served as the senior director of Norton Research. (ECF No. 889, at 2 (sealed).) He also supervised Darren Shou, the Norton employee listed as the first named inventor of the '643 Patent. (ECF No. 889, at 2 (sealed).) While employed at Norton, Dr. Dacier collaborated with Columbia professor Dr. Angelos Keromytis on a government grant proposal regarding decoy technology. (ECF No. 889, at 2 (sealed).)

Norton's '643 Patent—issued on October 1, 2013 and entitled "INTEGRATING DECOYS AND DATA LOSS PREVENTION"[8]—began as a provisional patent application that Norton filed on April 4, 2011 and was "related to and claim[ed] the benefit of the filing date of U.S. Provisional Application No. 61/320,609, filed April 2, 2010." (ECF No. 803-42, at 2, 3, 5.) Norton attorneys asked and were affirmatively



(ECF No. 889, at 2 (sealed).)

---

[8] The description of the invention in the provisional patent application included the following:

> A [proposed] method and apparatus for creating, distributing and tracking decoy documents for data loss prevention . . . .
> We propose a novel integrated architecture for the creation, distribution and tracking of decoys that will identify malicious activity where other technical means have not or cannot detect them [that] will specifically focus on two thrusts: (a) the investigation and development of realistic, self-consistent communications (e.g., email threads and IM conversations) that will present attractive targets to stealthy adversaries, and (b) the integration of a decoy architecture within an enterprise network and in particular with existing commercial Data Loss Prevention (DLP) technologies.

(ECF No. 803-38, at 9–10.)

4

# CONFIDENTIAL MATERIAL OMITTED



(ECF No. 320-9, at 2 (sealed).)

(ECF No. 321-15, at 6; ECF No. 320-13, at 2 (sealed).)

(ECF No. 320-14, at 2 (sealed).)

Also on March 24, 2010,

(ECF No. 889, at 2 (sealed); ECF No. 801-25, at 5 (sealed).)  At trial, Dr. Stolfo testified that Dr. Dacier's assertions "gave [him] confidence that [the application] was going to happen properly," and Dr. Keromytis testified that he understood Dr. Dacier to be saying that "at the very least, [Dr. Stolfo] and [he] would be co-inventors in any patent application filed."  (ECF No. 1210, at 262; Apr. 13 Trial Tr. 669:25–670:3; ECF No. 1211, at 96; Apr. 14 Trial Tr. 816:9–10.)

Despite these and other discussions, on April 4, 2011, Norton filed the provisional application listing only Norton employees Dr. Dacier and Mr. Shou as inventors.  (ECF No. 803-38, at 2, 5; ECF No. 803-42, at 5, 12; *see* Patent Number 8,549,643 (PX-0788).)  Neither the '643 Patent nor the related April 2, 2010 provisional patent application listed Dr. Keromytis or Dr. Stolfo, the Columbia professors.  (ECF No. 803-38, at 5; ECF No. 803-42, at 12; *see* Patent

5

Case 3:13-cv-00808-MHL Document 1315 SEALED *10/30/23* Page 42 PageID# 63090

Number 8,549,643 (PX-0788).) Even though earlier documents included the professors as inventors, the professors were never told that they ultimately would not be listed.

For a second year in a row, days before the 2011 filing of the patent application, Norton attorneys asked Drs. Keromytis and Stolfo if they considered themselves to be inventors. (ECF No. 889, at 3.) The professors again said yes. (ECF No. 889, at 3.) As with the provisional patent application, the Columbia professors were not told that they had been omitted as inventors or co-inventors in the final patent application. (ECF No. 889, at 3.)

The '643 Patent issued on October 1, 2013, identifying Mr. Shou as the sole inventor. (PX-0788; ECF No. 803-42, at 3.)

**B.**    **Dr. Dacier's 2014 Deposition and 2019 to early 2020 Willingness to Testify**

In August 2014, Dr. Dacier traveled from France to Belgium to voluntarily appear for a non-party deposition in this case.[9] (ECF No. 768, at 25.) During his deposition, Dr. Dacier described the context of some of the above-referenced communications. (ECF No. 768, at 20.) He stated that, "we really wanted to have the Columbia people on board as coinventors" and that "[the professors] should be coinventors because [the technology] is really just a result of our joint brainstorming." (ECF No. 1120-1, at 83; Dacier Dep. Trial Designations Tr. 82:12–13; ECF No. 1120-1, at 122–23; Dacier Dep. Trial Designations Tr. 121:21–122:9.) Dr. Keromytis and Dr. Dacier each separately have characterized their relationship with each other as "friends" and they have kept in touch over the years. (ECF No. 1211, at 110; Apr. 14 Trial Tr. 830:3–4; ECF No. 1120-1, at 165–66; Dacier Dep. Trial Designations Tr. 164:21–

---

[9] Counsel for Norton represented Dr. Dacier at his deposition but had no further contact with Dr. Dacier between 2014 and 2020. See Part I.E.4, *infra*, for a detailed discussion of Quinn's Declaration regarding Quinn's contacts with Dr. Dacier since 2020, (ECF No. 1089-2).

6

165:13.) At trial, Dr. Keromytis recounted a conversation he had with Dr. Dacier in 2017. He

recalled:

> I mentioned that this patent dispute had been still ongoing to which [Dr. Dacier] expressed surprise . . . he hadn't heard anything in a few years about the matter. And then he told me he was very sorry . . . about everything that had happened, including that [Norton] had filed for a patent without [Dr. Stolfo] and me on them as co-inventors because this was our work and that he had tried to make it not happen, but he didn't prevail on that.

(ECF No. 1211, at 110; Apr. 14 Trial Tr. 830:6–16.) Dr. Keromytis also testified as to a

conversation with Dr. Dacier over one year later, in January of 2019:

> I had my deposition for the case, which was therefore fresh in my memory, and there were a lot of questions about [Dr. Dacier] and [his] involvement. So I reached ought [*sic*] to [Dr. Dacier] and asked him if this case ever actually went to trial, given how long it had been going on, whether he'd be willing to come talk, testify, and say his recollection, his knowledge of the relevant facts.

(ECF No. 1211, at 111; Apr. 14 Trial Tr. 831:17–24.) Dr. Keromytis further testified that he

informed Columbia's counsel, Sullivan & Cromwell LLP ("Sullivan"), that he thought Dr.

Dacier would "be willing to testify" and eventually connected Sullivan with Dr. Dacier. (ECF

No. 1211, at 112; Apr. 14 Trial Tr. 832:2–8.)

Columbia's counsel proceeded to have two phone conversations with Dr. Dacier, on

November 14, 2019 and February 11, 2020,[10] in which Dr. Dacier "again expressed willingness

to testify at trial, but . . . expressed nervousness that Norton would threaten him with contractual

'trouble' if he provided testimony." (ECF No. 803, at 28.) Dr. Dacier stated he wanted to

contact his daughter, who is an attorney, to discuss the issue with her, as well as reach out to

Norton to confirm he would not be breaking any employment contract by testifying at trial.

(ECF No. 546, at 13.)

---

[10] Counsel for Columbia explained in communications with Quinn Emanuel that during both phone calls Dr. Dacier stated that he was not, and did not wish to be, represented by counsel. (ECF No. 478-5, at 6.)

7

**Appx64**

# CONFIDENTIAL MATERIAL OMITTED

Following the initial conversation with Columbia's counsel, on November 19, 2019, Dr. Dacier emailed Norton to say that he was "not asking for [Norton] to represent [him]" but wanted to confirm that "[Norton] d[id] not consider that the lawyer, paid by [Norton], that was present at [his] deposition [wa]s still representing [him], since [he] left the company" and that he was "not bound by any kind of contract or obligation with [Norton] that would prevent [him] from responding positively to [Columbia's] request to attend the trial." (ECF No. 478-6, at 3.) Norton did not respond. (ECF No. 478-6, at 2.) On November 28, 2019, Dr. Dacier sent a follow-up email asking for acknowledgement of receipt, but again Norton failed to respond. (ECF No. 478-6, at 1–2.) Months later in February 2020, while his emails to Norton remained unanswered, Dr. Dacier informed Columbia's counsel that his daughter confirmed he was not represented by counsel, stated that he did not want to be represented by counsel, and expressed that he wanted to continue speaking with Columbia's attorneys. (ECF No. 547, at 14; ECF No. 546, at 14 (sealed).)

On March 27, 2020, Columbia served Plaintiff's Witness List, identifying potential trial witnesses. (ECF No. 478-1.) Because Dr. Dacier expressed willingness to testify at trial (and, presumably, because Dr. Dacier's testimony appeared damaging to Norton), Columbia listed Dr. Dacier as one of nine potential trial witnesses. (ECF No. 478, at 6; ECF No. 478-1.)

About two weeks later, on April 10, 2020, Norton's counsel contacted Dr. Dacier for the first time since 2014, stating: ███████████████████████

████████████████████████████████████████████

███████ (ECF No. 547-11, at 4–5; ECF No. 546-2, at 4–5 (sealed).) Dr. Dacier replied that he had been contacted by Columbia's counsel and had no problem testifying if needed. (ECF No. 547-11, at 3; ECF No. 546-2, at 3 (sealed).) Dr. Dacier copied Columbia's counsel on his

8

response "to avoid any possible . . . interference" from Norton with his plans to testify.  (ECF No. 547-11, at 2; ECF No. 546-2, at 2 (sealed).)

Columbia's counsel emailed Quinn Emanuel expressing "concerns" that Quinn might be "trying to encourage [Dr. Dacier] not to come to trial to testify" and asked to set up a meet and confer.  (ECF No. 547-12, at 7-8.)  A Quinn Emanuel attorney responded that counsel for Columbia's actions regarding Dr. Dacier appeared to violate the Virginia Code of Professional Conduct's prohibition on *ex parte* communications with persons represented by counsel.  (ECF No. 547-12, at 7.)  Thereafter, in the lead up to—and even during—the trial in this matter, the Court received numerous motions and briefs regarding Columbia's communications with Dr. Dacier, Norton's intervention, and Dr. Dacier's change in position regarding his willingness to testify at trial.

**C.    The Motion for Sanctions, the First Omnibus Motion *in Limine*, and the February 2022 Pretrial Order Issues Filing**

On May 6, 2020, Norton filed a Motion for Sanctions against Columbia's counsel, Sullivan, arguing that Sullivan violated Virginia Code of Professional Conduct Rule 4.2[11] by engaging in *ex parte* communications with Dr. Dacier despite his representation by Quinn Emanuel.  (ECF No. 477.)  Two days later, on May 8, 2020, Norton filed what later became its First Omnibus Motion *in Limine* that included two motions regarding Dr. Dacier.  (ECF No. 493, 494; ECF No. 498 (sealed).)  Motion *in Limine* No. 4 within the Omnibus Motion sought to exclude comments and arguments regarding Dr. Dacier's absence from trial if he "decide[d] not to attend."  (ECF Nos. 494, at 20; ECF No. 498, at 20 (sealed).)  Motion *in Limine* No. 5 sought

---

[11] Rule 4.2 provides:  In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. Va. Code of Pro. Conduct Rule 4.2.

9

**CONFIDENTIAL MATERIAL OMITTED**

to exclude evidence or information obtained from *ex parte* communications between Columbia's

counsel and Dr. Dacier ("First Omnibus Motion *in Limine*").  (ECF No. 493; ECF No. 494, at

20-24; ECF No. 498, at 20-24 (sealed).)  These motions involved numerous rounds of briefing.

(*See, e.g.*, ECF Nos. 516, 547, 566, 580–81, 602, 664.)

      After delaying trial due to the COVID-19 pandemic, the Court scheduled trial to begin on

April 12, 2022.  (ECF No. 719.)  On September 29, 2021, as part of the new round of pre-trial

matters, the Court denied the First Omnibus Motion *in Limine* and allowed the parties to refile in

accordance with forthcoming opinions on pending summary judgment and *Daubert* motions.

(ECF No. 663, at 8.)  In the same Memorandum Order, the Court denied the Motion for

Sanctions, concluding that Columbia reasonably believed that Dr. Dacier was not represented by

defense counsel at the time of their communications.  (ECF No. 663, at 5.)  In doing so, the

Court explicitly noted that ███████████████████████████████████

███████████████████████████ (ECF No. 663, at 5 n.3.)  The Court later

reiterated this in the Memorandum Order, stating, ███████████████████

███████████████████ in late 2019 to early 2020.  (ECF No. 663, at 7 n.5.)

      Despite these explicit statements in the Court's Memorandum Order, Quinn soon after

misrepresented the Court's ruling, telling Dr. Dacier that "the Court concluded he is represented

by Norton's Counsel."  (ECF No. 803-44, Ex. QQ at 1.)

      On February 25, 2022, the parties filed a notice identifying several Pretrial Order issues

in dispute.  (ECF No. 744.)  In this filing, Columbia made its first request that the Court provide

a Missing Witness Instruction regarding (or, in the alternative, grant Columbia permission to

comment on) Dr. Dacier's absence from trial.  (ECF No. 744-1, at 17.)  Norton objected to the

10

**Appx67**

Case 8:13-cv-00808-MHL Document 1334-5 SEALED * 10/30/2311 Page 21 of 42 PageID# 63095

inclusion of the issue in the filing and argued that the request for a missing witness instruction

Missing Witness Instruction should be denied. (ECF No. 744-1, at 17–18.)

### D.    The Second Motion *in Limine* Pertaining to Dr. Dacier, the Motion for Reconsideration, and Quinn's Withdrawal of Its Representation of Dr. Dacier

On February 28, 2022, Norton filed a new, second, Omnibus Motion *in Limine* pertaining

to the 2022 trial that again sought to exclude evidence about Dr. Dacier. (ECF No. 767.) Motion

*in Limine* No. 5 within the Second Omnibus Motion sought to exclude evidence about Dr.

Dacier's absence from trial, including by issuing a Missing Witness Instruction ("Second

Omnibus Motion *in Limine*"). (ECF No. 767; ECF No. 768, at 25; ECF No. 769, at 25 (sealed).)

Motion *in Limine* No. 6 sought to exclude evidence of any out-of-court statements about

conversations with Marc Dacier. (ECF No. 768, at 28; ECF No. 769, at 28 (sealed).)

Norton argued that Dr. Dacier was not "available" to testify because he was outside this

Court's subpoena power and "ha[d] indicated that he does not intend to voluntarily travel from

Saudi Arabia to Virginia for trial." (ECF No. 768, at 25–26; ECF No. 769, at 25–26 (sealed).)

On March 4, 2022, Columbia filed its Opposition to Norton's Second Omnibus Motion *in

Limine*, challenging Norton's claims about Dr. Dacier's unavailability. (ECF No. 803, at 24–25.)

Columbia contended that Dr. Dacier was available to Norton in fact because Dr. Dacier had

expressed his willingness to appear at trial and his relationship with Norton was such that "if

Norton asked Dr. Dacier to appear, he likely would." (ECF No. 803, at 24–25.)

On March 15, 2022, the Court issued a Memorandum Opinion denying Norton's Second

Omnibus Motion *in Limine* and granting Columbia's requested relief regarding Dr. Dacier's

change in availability to testify at trial. (ECF No. 889 (sealed).) Specifically, the Court decided

to allow the out-of-court statements Dr. Dacier made to Dr. Keromytis under Federal Rule of

11

**Appx68**

# CONFIDENTIAL MATERIAL OMITTED

Evidence 807, the residual hearsay exception, and to provide a Missing Witness Instruction with respect to Dr. Dacier. (ECF No. 889, at 14–20 (sealed).) The Court based its decision on the following findings:

- Between 2017 and 2019, Dr. Dacier made statements to Dr. Keromytis that were adverse to Norton, including apologizing to Dr. Keromytis for what Norton had done and stating he was "against Norton's decisions with respect to the decoy technology because Norton was wrong." (ECF No. 889, at 7 (sealed).)

- As a result of these statements, ███████████████████████████ ███████████████████████ (ECF No. 889, at 13 (sealed).)

- In 2019 and early 2020, Dr. Dacier unequivocally stated he was not represented by counsel. (ECF No. 889, at 8 (sealed).)

- In 2019 and early 2020, Dr. Dacier repeatedly agreed to testify at trial, even if doing so involved flying from France to New York during a pandemic. (ECF No. 889, at 7, 8 (sealed).)

- In April 2020, Norton's counsel contacted Dr. Dacier ███████████████ ████ after his name appeared on Columbia's witness list. (ECF No. 889, at 9 (sealed).)

- ████████████ █ ████████████████████████████████ ████ and resulted in Dr. Dacier purportedly reversing "his previously unequivocal and oft-expressed willingness to testify" and ceasing his "communication with Columbia or Dr. Keromytis." (ECF No. 889, at 13 (sealed).)

- Norton's counsel misrepresented the Court's order on its sanctions motion by informing ██████████████████████████████████ ███████ (ECF No. 889, at 13 (sealed).) That statement was ████████████ when the ████████████████████████████ (ECF No. 889, at 13 (sealed) (citing ECF No. 663, at 5 n.3 ████████████ ███████.)

Based on these findings, among others, the Court determined that: (1) Dr. Dacier had been available to Norton and was unavailable to Columbia given Norton's actions; (2) Dr.

**CONFIDENTIAL MATERIAL OMITTED**

Dacier's testimony would be material; and (3) Dr. Dacier's testimony would not be cumulative. (ECF No. 889, at 14–17 (sealed).)

In addition, ███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ (ECF

No. 889, at 13 (sealed).)  The Court also found direct evidence that ████████████████

████████████████████ and circumstantial evidence of ████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ (ECF No. 889, at

13–14 (sealed).)  The Court observed that ████████████████████████████

████████████████████████████████ (ECF No. 889, at 15

(sealed) (quoting *Scott v. Watsontown Trucking Co.*, 533 F. App'x 259, 262 (4th Cir. 2013)).)

The Court found that this indicated that ████████████████████████. (ECF

No. 889, at 13 (sealed).)

In addition to allowing the out-of-court statements Dr. Dacier made to Dr. Keromytis under the residual hearsay exception and agreeing to provide a Missing Witness Instruction with respect to Dr. Dacier, in the accompanying Order, the Court required Norton's counsel to, "no later than March 16, 2022, . . . disclose on the record in writing any information garnered from Dr. Dacier during the period their representation was a conflict." (ECF No. 890.)

On March 16, 2022, Norton filed a Response to the Court's March 15, 2022 Order.  (ECF No. 892.)  Norton claimed, absent any legal citation, that the Court's March 15, 2022 Order was made "outside of the parties' adversarial process, on an incomplete and one-sided record, and without basis in fact or law" and that the requirement to disclose information garnered from Dr.

13

Dacier was not a ruling on "the issues actually raised by the parties." (ECF No. 892, at 1.) The

Court had ruled that ███████████████████████████████████████

████████████████████████████████████████████████████████

███████. (ECF No. 889, at 12–13 (sealed).) Nevertheless, Norton stated that the information

garnered from communications between Quinn Emanuel and its client, Dr. Dacier, was

privileged and Quinn would not and could not waive that privilege "absent appellate review of

the Court's [March 15, 2022 O]rder." (ECF No. 892, at 1–2.) In sum, Norton refused to comply

with the Court's March 15, 2022 Order.

On March 22, 2022, Norton filed a Motion to Reconsider its Motions *in Limine* Nos. 5

and 6 within the Second Omnibus Motion *in Limine* pertaining to Dr. Dacier. (ECF No. 928.)

Norton also sought an Immediate Stay of the Proceedings. (ECF No. 928.) Norton requested

that the Court reverse its decision finding a conflict of interest in Quinn Emanuel's

representation of both Dr. Dacier and Norton and, in the alternative, that the Court reconsider its

denial of the Second Omnibus Motions *in Limine* "to permit the development of a record on the

conflict of interest issue." (ECF No. 928, at 1.)

That same day, the Court denied the Motion to Reconsider. (ECF No. 945.) The Court

explained that Columbia had raised the issue of a conflict in briefing and that Norton had a full

and fair opportunity to respond to that briefing. (ECF No. 945, at 1.) "The Court reviewed all

briefing and gave notice about the outstanding issue [of whether Dr. Dacier was or was not

represented by Norton's attorneys in 2019] in November of 2021. The parties, including Norton,

were explicitly notified that representation remained an outstanding question. No party sought

different review by the Court." (ECF No. 945, at 1–2.) The Court highlighted the necessity to

establish Dr. Dacier's representation given the disturbing revelation to "the Court [] in the

14

**Appx71**

Case 3:13-cv-00808-MHL Document 1334 *SEALED* 10/30/23 15 Page 15 of 42 PageID# 63099

Motions *in Limine* that, apparently, Norton incorrectly told Dr. Dacier the Court deemed Quinn Emanuel his lawyer." (ECF No. 945, at 3.) In light of that misrepresentation, the Court found it necessary to promptly address, once and for all, whether Quinn had represented or could represent Dr. Dacier. Again, the Court found that representing both would be a conflict absent an appropriate waiver. (ECF No. 945, at 2–3.)

On March 28, 2022, six days after the Court's denial of Norton's Motion to Reconsider, Quinn Emanuel withdrew its representation of Dr. Dacier. (ECF No. 987.)

**E.     The Final Pretrial Conference, the April 5–7 2022 Emails, and Related Pretrial Briefing**

**1.     The April 7, 2022 Final Pretrial Conference**

On April 7, 2022, the Court heard argument at the Final Pretrial Conference regarding a Missing Witness Instruction regarding Dr. Dacier. (ECF No. 1100.) Norton's second lead counsel, Latham, argued that the Court should revisit its decision to give a Missing Witness Instruction. Latham directed the Court to a "caution" underneath Virginia's model Missing Witness Instruction that "in all caps . . . says, 'This instruction shall rarely be given.'" (ECF No. 1100, at 44; Apr. 7 Tr. 44:7–12.) Latham also specifically argued that Norton should not be sanctioned with a jury instruction for Quinn Emanuel's actions and that sanctions against Quinn Emanuel would be more appropriate.

Columbia responded that the issue had already been decided and that Norton's arguments seemed to be a second motion for reconsideration. Columbia also argued that the instruction should be given despite the model instruction warning because "this is an exceptional case." (ECF No. 1100, at 72; Apr. 7 Tr. 72:12–17.)

During the April 7 Hearing, the Court identified the exceptionality of the case, noting that it has "never [before] had the feeling that a company hid a witness and was untruthful to the

15

**Appx72**

witness about what [the Court] said about it . . . [despite being in] trial litigation a long time . . .

never seen it . . . never." (ECF No. 1100, at 92; Apr. 7 Tr. 92:13–18.) The Court noted:

> I am not going to tell you that the missing witness instruction is not extraordinary.
> I know it is. I am facing an extraordinar[il]y litigated situation, and I want to try a
> just case. I have been saying for years now just try your case. Just try the case
> you have. Stop monkeying around. It's not to your client's benefit. It's not to
> the Court's benefit. It is not to the benefit of the justice system. And I'm clearly
> expressing frustration, and so I don't want that to drive any decision I make. It
> won't . . . . [but] I've hit this issue so many times.

(ECF No. 1100, at 94; Apr. 7 Tr. 94:3–14.) Later in the conference, the Court noted:

> I think it is the case that Norton knew because the same lawyer [who] was talking
> to them and [sic] was talking to Mr. Dacier. I don't know how that doesn't flow
> down to Norton being involved. So I think as far as the missing witness
> [instruction], I'm aware it's unusual. . . . I've read the cases. But I clearly am
> flummoxed by what is happening here. . . . I can't believe we're in this
> circumstance.

(ECF No. 1100, at 95; Apr. 7 Tr. 95:16–24.) At the end of the Final Pretrial Conference, the

Court ordered the parties to file statements of support for an appropriate remedy given the

Court's finding that Quinn Emanuel rendered Dr. Dacier unavailable. (ECF No. 1083.) Oddly,

counsel for Quinn suggested the proper remedy was to strike their representation. (ECF No.

1100, at 102; Apr. 7 Tr. 102:8–13.)

### 2.   The April 5–7 2022 Emails

On April 8, 2022, the day after the Final Pretrial Conference, Columbia filed a Notice of

Norton's Communications with Dr. Dacier between April 5 and April 7, 2022. (ECF No. 1084.)

Columbia became aware of the communications—a series of emails between Norton's second

lead counsel and Dr. Dacier (the "Latham Dacier emails")—on the night of April 7, 2022, when

Norton's counsel from Latham forwarded them emails between one of its attorneys and Dr.

Dacier that reflected his inability to testify at trial. (ECF No. 1084-2, at 7.) Columbia felt

compelled to provide the Court with the emails because Norton failed to disclose them while

Case 3:13-cv-00808-MHL Document 1334 SEALED *10/30/23 Page 17 of 42 PageID# 63101

counsel argued issues regarding Dr. Dacier the day prior.  (ECF No. 1084.)

 The Latham Dacier emails began on April 5, 2022 (two days before the April 7, 2022 Final Pretrial Conference) when a Latham attorney introduced himself to Dr. Dacier—then in Saudi Arabia—as a lawyer "working with the Quinn team on this case, representing Norton," and expressed his desire to have Dr. Dacier testify at trial.  (ECF No. 1084-1, at 5.)  In response, Dr. Dacier admitted he was "a bit surprised by this sudden rush after years of inaction" and conversations with Quinn Emanuel "in which they repeatedly told [Dr. Dacier] that there was no need for [him] to do anything, that they did not want [him] to do anything, [and] that [his deposition] testimony in Brussels was all that was needed."  (ECF No. 1084-1, at 4.)  Dr. Dacier further stated that he is "happy to help the judicial process though, as [he] ha[d] continuously said so far."  (ECF No. 1084-1, at 4.)  After being informed of the April 12th trial date just six days away, Dr. Dacier explained that although he was "more than willing to help," "such an extremely short notice . . . ma[de] it impossible for [him] to come" and that had he been "warned months ago, when [counsel], most probably, had been given the trial dates," he could have "frozen some days to make [himself] available."  (ECF No. 1084-1, at 3, 4.)

 The Latham Dacier emails continued until at least the morning of April 7, 2022, the day of the Final Pretrial Conference.  (ECF No. 1084-1, at 1.)  Dr. Dacier confirmed in these emails that his testimony is "indeed, in [his] opinion, harmful for Norton's case" and that he can "see now why the Quinn team has done what they have done over the years, while pretending to 'represent' [him]."  (ECF No. 1084-1, at 2.)

 Upon receipt of the Latham Dacier emails on the evening of April 7, 2022, counsel for Columbia replied that he was "astounded by the record of misconduct" detailed in the email exchange.  (ECF No. 1084-2, at 5.)  He inquired as to why counsel for Norton had not mentioned

17

Case 3:13-cv-00808-MHL Document 1334 *SEALED* Filed 09/30/23 Page 18 of 42 PageID# 63102

these communications to the Court during the hearing earlier in the day. (ECF No. 1084-2, at 5.) Counsel for Norton responded that "the accusations of misconduct [were] baseless" and asserted that Latham informed both Columbia and the Court of efforts to secure Dr. Dacier's appearance in Norton's objection to the Missing Witness Instruction. (ECF No. 1084-2, at 3–4.) Counsel for Columbia replied that Columbia "obviously would be delighted if Dr. Dacier appeared at trial, and [Columbia] take[s] no issue with Latham trying to make that happen" but that the email chain "contradicts many representations to the Court made by Norton, including as recently as yesterday." (ECF No. 1084-2, at 2.)

For example, at the Final Pretrial Conference, Norton argued that "Quinn/Norton did not actually tell Dr. Dacier that they did not want him to appear at trial," yet the Dacier emails show that Dr. Dacier was more than willing to appear at trial and help the judicial process but was "repeatedly told" that they "did not want [him] to do anything." (ECF No. 1084-2, at 2.) Second, Norton informed the Court that Dr. Dacier was unavailable to appear at trial despite Norton's request that he do so, whereas the Dacier emails suggest that Dr. Dacier would have been willing to appear at trial had been given more than six days' notice of the trial dates. (ECF No. 1084-2, at 2.) And third, Norton took the position that Dr. Dacier's testimony was not actually adverse to Norton, but the Dacier emails show Dr. Dacier's own opinion that his testimony would be "harmful" to Norton. (ECF No. 1084-2, at 2.)

In the email communications, counsel for Columbia also expressed confusion at Latham's claim that Norton's search for emails between Norton and Dr. Dacier between 2017 and 2021 "would not include potential correspondence between Dacier and the Quinn firm, which Quinn has claimed privilege over." (ECF No. 1084-2 at 7.) Counsel for Columbia correctly pointed out that "***Dr. Dacier*** (as the purported 'client') is the owner of any privilege

18

Case 3:13-cv-00800-MHL Document 1334 SEALED* 10/30/2023 Page 29 of 42 PageID#
63103

and [he] has never asserted it . . . [and] it is inconceivable that [he] would assert 'privilege' given
his statements in the email chain" Latham had just sent. (ECF No. 1084-2, at 6.) Columbia's
counsel further stated: "*Norton* (not Quinn) purported to assert Dr. Dacier's privilege in
Norton's March 16 notice to the Court (when it directed Quinn to go into contempt), but there is
no conceivable privilege to assert unless Dr. Dacier chooses to do so." (ECF No. 1084-2, at 6.)
Latham responded that Columbia's confusion "relate[s] to Quinn" and that Quinn, not Norton,
asserted attorney-client privilege. (ECF No. 1084-2, at 4.) Latham further explained, "given the
assertion of privilege, Latham does not have these documents and so far as we know, Norton has
never seen them and is not in possession of them." (ECF No. 1084-2 at 4.)

Norton filed a response to Columbia's Notice that highlighted its proactive provision of
the Latham Dacier emails to Columbia and explained plans to address the communications in the
ordered submissions to the Court. (ECF No. 1085, at 1.)

### 3.     The April 8, 2022 Emergency Status Conference

The Court held an emergency status conference that day—April 8, 2022—to discuss the
emergence of the Latham Dacier emails. (ECF Nos. 1092, 1101.) At the conference, the Court
informed the parties that it found the emails "troubling with respect to some of the positions that
were taken by Latham" at the hearing the day prior. (ECF No. 1101, at 5; Apr. 8 Tr. 5:8–12.)
The Court expressed its distress that "these emails existed, that [the Court] had a whole hearing
about Dr. Dacier, that [Latham] presented some of the arguments [it] did, and that [the Court]
didn't know [these emails] existed." (ECF No. 1101, at 8; Apr. 8 Tr. 8:6–9.) The Court
concluded the emergency hearing by noting that "when a judge says they're troubled by your
omissions, it's worth thinking about." (ECF No. 1101, at 15; Apr. 8 Tr. 15:18–20.) The Court
also ordered the parties to file proposed Missing Witness Instructions by the end of that day.

19

**Appx76**

(ECF No. 1101, at 10; Apr. 8 Tr. 10:1–4; ECF No. 1091.) Columbia and Norton timely

complied with this latest order. (ECF Nos. 1096, 1097.)

### 4.    Related Pretrial Briefing

Maintaining its objection to the Court providing any Missing Witness Instruction, Norton

proposed the following instruction:

> Unexplained Failure to Produce Important Witnesses: If you believe that Norton, without explanation, failed to call Dr. Dacier as a live witness at trial, you may, but are not required to, infer that Dr. Dacier's testimony would have been unfavorable to Norton.

(ECF No. 1096, at 2.) Columbia advocated for the following instruction:

> During the trial, you heard the videotaped deposition testimony of Dr. Marc Dacier, a former Norton employee. Dr. Dacier previously indicated a desire to testify live at trial. The Court has found that Dr. Dacier was reasonably available to Norton. If a party fails to call a person as a witness who has knowledge about the facts in issue, and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not.

(ECF No. 1097, at 1.)

In addition, later that day, Columbia, Latham, and Quinn Emanuel filed their Responses

to the Court's Request for Appropriate Sanctions. (ECF Nos. 1088, 1089, 1102.) Notably,

Latham argued that no Missing Witness Instruction should be issued, but that if the Court did

issue the instruction, no other remedies should be imposed. (ECF No. 1088-1, at 3.) In

Columbia's filing, in addition to requesting a Missing Witness Instruction, Columbia sought the

following as sanctions for Norton's misconduct in rendering Dr. Dacier unavailable: (1) a Court

order precluding Mr. Shou, one of the named inventors on the '643 Patent, from testifying live at

trial; and (2) a Court order allowing Columbia to use the Latham Dacier emails as exhibits at

trial. (ECF No. 1102, at 4, 8.) Quinn Emanuel argued no sanction was appropriate. (ECF No.

1089-1.)

20

**Appx77**

Interestingly, Quinn Emanuel's April 8, 2022 filing also included a Declaration from one of the former lead counsel in the Norton case ("Counsel for Norton"). (ECF No. 1089-2.) A few weeks before this filing, Norton refused to comply with the Court's March 15, 2022 Order, claiming that attorney-client privilege between its counsel, Quinn, and Dr. Dacier prevented it from doing so. (ECF No. 892.) This filing, however, disclosed some, but perhaps not all, conversations between Dr. Dacier and Norton's counsel. For example, the Declarant described a June 17, 2020 conversation with Dr. Dacier in which Dr. Dacier "informed us that Columbia's counsel had claimed to him that the recording of his 2014 deposition could not be used at trial, so he had to attend the trial in person" and that "Columbia's counsel had also informed him that he was no longer represented by Quinn Emanuel." (ECF No. 1089-2, at 5.)

According to Norton Counsel's Declaration, after Quinn counsel told Dr. Dacier in 2020 that his deposition testimony could be used at trial and that no one could compel him to attend, Dr. Dacier apparently stated that "he never intended to terminate Quinn Emanuel's representation," "that he wanted to continue to be represented by Quinn Emanuel in the above-captioned action," "that he was willing to sign a declaration attesting to that fact," "that he did not have anything to add to his 2014 deposition testimony," "that he did not want to travel to the United States for trial, and would prefer to end his involvement in the litigation," and "that he never expressed an opinion that any person at Columbia should be named as an inventor on [the

**CONFIDENTIAL MATERIAL OMITTED**

'643 Patent] . . . he had only expressed regret that the parties' dispute was ongoing.'"[12] (ECF No. 1089-2, at 5–6.)

Counsel for Norton declared that after the Court's September 29, 2021 Order denying Norton's Motion for Sanctions (ECF No. 663), he contacted Dr. Dacier to inform him of the ruling (ECF No. 1089-2, at 7). The Declarant claimed that Dr. Dacier "reiterated his previous statements that he would prefer not to be involved in the litigation" and "that he did not have anything to say beyond what had already been discussed at his 2014 deposition." (ECF No. 1089-2, at 7.)

Counsel for Norton also explained that, despite having nearly two weeks to do so, he had been unable to find a time to connect with Dr. Dacier to explain Quinn Emanuel's March 27, 2022 withdrawal from representing him. (ECF No. 1089-2, at 7.) Nor, apparently, did he or any

---

[12] This Declaration, (ECF No. 562-1 (sealed)), was discussed in previous filings. (*See, e.g.,* ECF No. 889, at 11 (sealed) (describing Dr. Dacier's "three-paragraph" Declaration as "barebones").) The Court reiterates that Dr. Dacier's Declaration has only one substantive sentence, which states: ██████████████████████████████████████ ██████████████████████████████ (ECF No. 562-1, at 2 (sealed)).)

Tellingly, Dr. Dacier's Declaration is bereft of any of the sentiments Quinn counsel now attributes to Dr. Dacier. Dr. Dacier does *not* address whether, in fact, he "intended to terminate Quinn Emanuel's representation," "wanted to continue to be represented by Quinn," "ha[d] anything to add to his 2014 deposition testimony," "want[ed] to travel to the United States for trial," or "would prefer to end his involvement in the litigation." (*See* ECF No. 1089-2, at 6; *see also* ECF No. 562-1 (sealed) (lacking any reference to these statements).) Dr. Dacier's Declaration also does *not* address whether he ever "expressed an opinion that any person at Columbia should be named as an inventor on [the '643 Patent]" or that he "only expressed regret that the parties' dispute was ongoing." (*See* ECF No. 1089-2, at 6; *see also* ECF No. 562-1 (sealed) (lacking any reference to these statements).) The Court sees no reason why Dr. Dacier's sentiments needed to be excised from his sworn statement, especially given the Court's comments on these matters at the time.

22

other counsel have or find time—or seek time—to obtain any direct statement from Dr. Dacier himself.

Counsel for Norton further declared that, having seen only that morning the Latham Dacier emails, reports that he "saw where Dr. Dacier stated that Norton's counsel was 'pretending' to represent him." (ECF No. 1089-2, at 8.) Expressing sorrow that Dr. Dacier "now apparently feels that way," Counsel for Norton denies pretending to represent Dr. Dacier and states he wished Dr. Dacier and Columbia had done more to identify the problem. (ECF No. 1089-2, at 8–9.)[13]

Importantly, in his Declaration, Counsel for Norton did *not* attest that the above-referenced communications with Dr. Dacier constituted all the information garnered from Dr. Dacier between 2017 and 2020, the period identified by the Court during which Quinn Emanuel would have operated under a conflict of interest if it represented both Norton and Dr. Dacier.

On April 10, 2022, the Court requested by email that the parties provide testimony and evidence at issue for Mr. Shou and Dr. Dacier that would be relevant to determining appropriate sanctions. The parties provided those excerpts from Mr. Shou and Dr. Dacier's depositions *ex parte* that day and later filed the submissions under seal on April 13, 2022. (ECF Nos. 1118, 1120 (sealed).)

**F.    Orders and Filings Made During Trial**

**1.    Initial Briefing on Missing Witness Instruction and Dacier Evidence**

On April 12, 2022, the Court ordered the parties to provide briefing on three issues: (1) which party's Missing Witness Instruction should be given to the jury; (2) whether the jury

---

[13] Counsel for Norton continues by saying, "if Columbia's counsel had ever asked for a further deposition of Dr. Dacier, we would have facilitated that request" if Dr. Dacier agreed. (ECF No. 1089-2, at 8–9.) No mention of the Motion for Sanctions against Columbia's counsel for contacting Dr. Dacier is made.

23

should hear evidence to explain Dr. Dacier's absence; and (3) if so, what evidence would be presented. (ECF No. 1116.) On April 14, 2022, the parties filed their responses. (ECF Nos. 1123, 1124.)

In its response, Norton proposed a revised Missing Witness Instruction as follows:

Unexplained Failure to Produce Important Witnesses: Because Norton failed to call Dr. Dacier as a live witness at trial, you may, but are not required to, infer that Dr. Dacier's testimony would have been unfavorable to Norton.

(ECF No. 1123, at 2.) Norton argued that the Court should adopt Norton's revised proposed Missing Witness Instruction, which made the issue of "whether Norton has an explanation for Dr. Dacier's absence" moot and therefore the jury should not hear evidence on the issue. (ECF No. 1123, at 2–4.) Norton also argued that the April 5 to 7 2022 emails between counsel for Norton and Dr. Dacier should not be admitted into evidence. (ECF No. 1123, at 6–7.)

Meanwhile, in its brief, Columbia proposed the following revised instruction:

Earlier you heard the videotaped deposition testimony of Dr. Marc Dacier. Dr. Dacier did not appear at trial. If a party fails to call a witness who has knowledge about the facts and is reasonably available to that party, and who is not reasonably available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not do so.

(ECF No. 1124, at 3.) Columbia argued that the Court should adopt Columbia's revised proposed Missing Witness Instruction and elaborated that the revised instruction would "only address Columbia's prejudice if Columbia is able to introduce the Dacier Emails as an exhibit (and make appropriate argument regarding the same)." (ECF No. 1124, at 3.) Columbia invoked Federal Rule of Evidence ("FRE") 804(b)(6) as the basis of this argument, stating that the Dacier emails met the standard for admitting hearsay when a defendant intends to render a

24

declarant unavailable as a witness.  *See United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012); (ECF No. 1124, at 4.)

On April 15, 2022, the parties replied to each other's briefs.  (ECF Nos. 1126, 1127.) Norton argued that Columbia's revised instruction remained "confusing and needlessly complicated" and that arguments surrounding hearsay exceptions did not address the procedural concerns Norton had raised with introducing evidence.  (ECF No. 1126, at 2–6.)  Norton added that "the three-prong test for FRE 804(b)(6) has not been met" because Norton "did not engage in anything remotely approaching the extreme 'wrongdoing' contemplated by the Rule or the caselaw interpreting it," such as "where the defendant has silenced a witness through the use of threats, violence or murder."  (ECF No. 1126, at 5 (quoting *United States. v. Gray*, 405 F.3d 227, 242 (4th Cir. 2005).)  In contrast, Columbia argued that Norton's proposed instruction "downplay[ed] its own misconduct" and that a discussion of the Dacier emails is "central to *this trial*," rather than a trial within a trial as Norton suggested.  (ECF No. 1127, at 2, 4 (emphasis in original).)

### 2.  *Dinkins* Briefing

Upon review of these filings, the Court ordered the parties to file additional briefing based on its finding that neither party had adequately addressed the test set forth in *United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012).  (ECF No. 1130.)  The Court ordered the parties to address the test and how, if at all, the record supported or precluded application of the test in this case.  (ECF No. 1130, at 1.)

On April 18, 2022, the parties filed their responses to the Court's April 15, 2022 Order. (ECF Nos. 1139, 1144, 1143 (sealed).)  Norton argued that the "degree of 'wrongdoing' necessary to justify use of the forfeiture-by-wrongdoing exception must be so 'abhorrent' that it

'strikes at the heart of the system of justice itself'" and that Norton's alleged conduct did not meet this level. (ECF No. 1139, at 3 (quoting *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012).) Norton characterized the alleged conduct as "at worst . . . an 'example of non-wrongdoing that might cause a witness to decline to testify' that 'do[es] not trigger Rule 804(b)(6).'" (ECF No. 1139, at 5 (quoting 30B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 7033 (2022).) In its response, Columbia argued that Norton's conduct did in fact satisfy "wrongdoing" under FRE 804(b)(6). (ECF No. 1144, at 2–7; ECF No. 1143, at 2–7 (sealed).) Columbia argued that "a party's wrongdoing need not consist of a criminal act" and that "[c]ourts have found that repeated efforts to dissuade a witness from testifying are sufficient to establish wrongdoing under the *Dinkins* test." (ECF No. 1144, at 2 (internal citations omitted); ECF No. 1143, at 2 (sealed) (internal citations omitted).)

### 3.    Briefing on Introduction of Dacier Emails into Evidence

Further, on April 19, 2022, the parties filed briefing as to how, from a procedural standpoint, the Dacier emails would come into evidence. (ECF Nos. 1147, 1148.) Norton asserted that if the emails are to be admitted the Court "should simply read them to the jury, to avoid any unnecessary argument or emphasis." (ECF No. 1147, at 2.) Columbia stated that it expected Norton's witness, Mr. Shou, to testify to his relationship with Dr. Dacier, and if so, Columbia would impeach his testimony on cross examination with the Dacier emails. (ECF No. 1148, at 3–4.)

After considering the parties' briefing on these issues, in-court arguments and testimony, and the factual and procedural history of issues in this litigation involving Dr. Dacier, the Court delivered the following Missing Witness Instruction to the jury:

> Dr. Marc Dacier's deposition testimony was presented to you by Columbia as part of its case in chief. You have heard testimony that, after the date his deposition

26

was given, Dr. Dacier made certain statements to Dr. Stolfo and Dr. Keromytis about Norton's conduct in identifying inventors on the application for the '643 Patent. Because Norton did not call Dr. Dacier in its case to address any events that occurred after 2014, you may, but are not required to, infer that his testimony would have been unfavorable to Norton.

(ECF No. 1220, at 14; Apr. 27 Trial Tr. 2817:11–21.)[14]  In light of its Missing Witness

Instruction to the jury, the Court denied Columbia's request to admit the Latham Dacier

emails into evidence.  (ECF No. 1167, at 16.)  At trial, the Court gave the Missing Witness

Instruction identified in the final jury instruction conference.  (Tr. 2817:11–21.)

### II. Legal Standard: Civil Contempt

"It is well-established that federal courts possess an inherent power to punish for

contempts." *Chesapeake Bank v. Berger*, No. 4:14CV66, 2014 WL 5500872, at *2 (E.D. Va.

Oct. 30, 2014) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).

To establish civil contempt in the Fourth Circuit, the movant must show the following

elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;
> (2) that the decree was in the movant's "favor";
> (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and
> (4) that the movant suffered harm as a result.

---

[14] In a written order, the Court had proposed the following missing witness jury instruction:

> Dr. Marc Dacier's deposition testimony was presented to you by Columbia as part of its case in chief.  You have heard testimony that, after the date his deposition was given, Dr. Dacier made certain statements to Dr. Stolfo and Dr. Keromytis about Norton's conduct in identifying inventors on the application for the '643 Patent.  Because Norton did not call Dr. Dacier in its case to address what he allegedly told Dr. Stolfo and Dr. Keromytis, you may, but are not required to, infer that his testimony on that topic would have been unfavorable to Norton.

(ECF No. 1167, at 15.)

*See Tattoo Art, Inc. v. Tat Intern., LLC*, No. 2:10CV323, 2012 WL 3912572, at *2 (E.D. Va. Sept. 7, 2012) (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (*quoting Colonial Williamsburg Found. v. Kittinger Co.*, 792 F. Supp. 1397, 1405–08 (E.D. Va. 1992), *aff'd*, 38 F.3d 133, 136 (4th Cir. 1994))).

Defenses available for civil contempt include "substantial compliance or the inability to comply." *See Chesapeake Bank*, 2014 WL 5500872, at *3 (citing *Consolidation Coal Co. v. Local 1702, United Mineworkers of Am.*, 683 F.2d 827, 832 (4th Cir. 1982) (further citations omitted)). While a good faith attempt to comply, even if such an attempt proves ineffective, can also be a defense, "good faith alone does not immunize a party from a civil contempt sanction for non-compliance with a court order." *McLean v. Central States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985); *see also Chesapeake Bank*, 2014 WL 5500872, at *3.

In determining appropriate due process and sanctions for a contempt finding, the Court must consider the nature and purpose for which the contempt sanction is imposed.

> When the nature of the relief and the purpose for which the contempt sanction is imposed is remedial and intended to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained, the contempt is civil; if, on the other hand, the relief seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal.

*Cromer v. Kraft Foods N. Am. Inc.*, 390 F.3d 812, 822 (4th Cir. 2004) (citing *Buffington v. Baltimore Cnty.*, 913 F.2d 113, 133 (4th Cir. 1990)). "Imposition of civil contempt sanctions requires fewer procedural protections than those necessary for the imposition of criminal contempt sanctions." *Id.* at 821 (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 830–31 (1994)). For example, "[t]he burden is on the complainant to prove civil contempt by clear and convincing evidence," and "[w]illfulness is not an element of civil contempt." *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (citing *Project*

28

Case 3:13-cv-00808-MHL Document 1334-5 SEALED* Filed 10/20/23 Page 29 of 43 PageID# 63113

*B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) and *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). Civil contempt sanctions "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard" and "[n]either a jury trial nor proof beyond a reasonable doubt is required." *Bagwell*, 512 U.S. at 827.

"The court need not hold an evidentiary hearing before granting a civil contempt motion." *SmartSky Networks, LLC v. Wireless System Solutions, LLC*, 630 F. Supp. 3d 718, 730 (M.D.N.C. 2022) (citing *Cree, Inc. v. Bain*, No. 1:15CV547, 2015 WL 12911462, at *3 (M.D.N.C. July 20, 2015)); *see also Cree, Inc.*, 2015 WL 12911462, at *3 ("A court is not necessarily required to hold an evidentiary hearing before granting a civil contempt motion.") (citing *In re Gen. Motors Corp.*, 110 F.3d 1003, 1015 (4th Cir. 1997)). "A court may rely on pleadings alone to determine an appropriate remedy for civil contempt," and "[a]n evidentiary hearing is not necessary 'if, given the nature []and] circumstances of the case, the parties had a fair opportunity to present relevant facts[][and] arguments to the court, to counter the opponent's submissions." *Summerville v. Local 77*, No. 1:06CV719, 2008 WL 3983118 at *5 n.4 (M.D.N.C. Aug. 26, 2008) (quoting *In re General Motors Corp.*, 110 F.3d 1003, 1016 (4th Cir. 1977)); *see also Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (noting that "'an opportunity to be heard' . . . does not require an evidentiary hearing in every case" and finding that "under the facts and circumstances of the present case, the opportunity to submit briefs was an 'opportunity to be heard' within the meaning of Rule 37(c)(1)") (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)); *see also Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000) ("[A]n opportunity to be heard does not require an oral or evidentiary hearing on the issue" and "[t]he opportunity to brief the issue fully satisfies due process requirements") (citations omitted); *White v. General*

29

Case 3:13-cv-00808-MHL Document 1334 SEALED Filed 09/30/23 Page 30 of 43 PageID# 63114

*Motors Corp.*, 908 F.2d 675, 686 (10th Cir. 1990), *cert. denied*, 498 U.S. 1069 (1991) (finding that in the sanctions context, "an opportunity to be heard does not require an oral or evidentiary hearing on the issue" because "[t]he opportunity to fully brief the issue is sufficient to satisfy due process requirements" and noting that "[t]his rule has been adopted in most other circuits") (citing *Braley v. Campbell*, 832 F.2d 1504, 1514, 1515 (10th Cir. 1987) (en banc)); *Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 246 (1st Cir. 2010) (finding district court was within its discretion to sanction an attorney without holding a hearing, in part because he had the opportunity to brief the sanctions issue in his opposition to the other party's fee request).

Sanctions for civil contempt "may be imposed either to enforce a court order or to compensate the other party for any losses sustained as a result of the contempt." *Tattoo Art, Inc*, 2012 WL 3912572, at *2 (citing *Cromer*, 390 F.3d at 821). This compensation may include reimbursement to the movant for reasonable attorney's fees. *See Chesapeake Bank*, 2014 WL 5500872, at *4 (citing *In re General Motors Corp.*, 61 F.3d at 259).

"The appropriate remedy for civil contempt is within the court's broad discretion," but "the remedies and sanctions must be remedial and compensatory and, unlike criminal contempt, nonpunitive." *In re General Motors Corp.*, 61 F.3d at 259 (citations omitted). "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief," which "may entail the doing of a variety of acts." *McComb*, 336 U.S. at 193–94 (noting as appropriate relief ordering "the production of books" or "the payment of money"); *see also Finn v. Schiller*, 72 F.3d 1182, 1188 (4th Cir. 1996) (finding that "[a]n injunction to stop further or future release of grand jury material" would be an appropriate civil contempt sanction); *Colonial Williamsburg Found.*, 792 F. Supp. at 1409–10 (ordering—in addition to disgorgement of profits, unpaid royalties, and attorney's fees and costs—that the defendant held

30

Case 3:13-cv-00808-MHL Document 1334 *SEALED* Filed 10/20/23 Page 31 of 42 PageID# 63115

in civil contempt "surrender to [the plaintiff]" all products bearing the plaintiff's trademarks, be "enjoined from marketing or selling" any related products, and "make its premises, books, and records available for inspection" by the plaintiff).

The Court will address each element of civil contempt in turn before identifying the appropriate remedy.

### III. Analysis

As discussed below, the Court finds each element of civil contempt satisfied and therefore holds Norton's counsel, Quinn Emanuel, in civil contempt. First, the Court finds that its March 15, 2022 Order was a valid court order and that Quinn Emanuel had knowledge of it. The Court also concludes that the Order was in Columbia's favor given Columbia's continued efforts to secure the information Quinn Emanuel was ordered to provide. Contrary to Quinn Emanuel's arguments otherwise, it has not made a good faith effort to comply with the Court's March 15, 2022 Order. Instead, Norton's filing on March 16, 2022 refuses to comply with the Court's March 15, 2022 Order, and Quinn continues to knowingly defy the Order. Finally, Columbia alleges potential harm to their pending motions for enhancement of the jury's damage award under 35 U.S.C. § 284 and for attorneys' fees under 35 U.S.C. § 285 without knowledge of the information Quinn Emanuel and Latham had garnered from communications with Dr. Dacier.

Because the record outlined above enables the Court to make these findings and all parties have had an opportunity to respond to the issue of whether a contempt finding should be entered, the Court declines to hold an evidentiary hearing regarding Quinn Emanuel's failure to comply with the Court's March 15, 2022 Order. Instead, based on the record before the Court, and having fully considered the briefing and arguments presented by the parties, the Court finds

31

**Appx88**

**CONFIDENTIAL MATERIAL OMITTED**

Case 2:13-cv-00808-MHL Document 1334 SEALED* Filed 09/30/23 Page 32 of 43 PageID#
Case 3:13-cv-00808-MHL Document 1345 *SEALED* Filed 10/2/2023 Page 32 of 43 PageID# 63905
63116

Quinn in civil contempt. As the appropriate sanction, the Court will make a negative inference
of egregiousness as to the information Quinn Emanuel garnered from communications with Dr.
Dacier during the time of conflict when reviewing Columbia's pending Motion for Enhanced
Damages Under 35 U.S.C. § 284, (ECF No. 1252), and Motion for Attorneys' Fees Under 35
U.S.C. § 285 (ECF No. 1260).

### A.    Quinn Emanuel's Knowledge of a Valid Court Order

Quinn Emanuel had actual and constructive knowledge of the Court's March 15, 2022
Order unambiguously requiring counsel to, "no later than March 16, 2022, . . . disclose on the
record in writing any information garnered from Dr. Dacier during the period their representation
was a conflict." (ECF No. 890.) The Order's accompanying Memorandum Opinion also clearly
stated that ███████████████████████████████████████████████
███████████████████████████████ (ECF No. 889, at 13 (sealed).)

Norton, by its counsel Quinn Emanuel, acknowledged this Order in its first,
noncompliant Response to the Order. (ECF No. 892, at 1 (submitting a "notice in response to
[ECF] No. 890 (the 'Order')").) It further conceded knowledge of the Order through its Motion
for Reconsideration, (ECF No. 928), and briefing for the present Motion. (ECF No. 1240.)
Therefore, the record establishes by clear and convincing evidence that Quinn had actual
knowledge of the existence of a valid[15] Court order.

---

[15] Although Quinn's Opposition no longer appears to challenge the validity of the Court's
March 15, 2022 Order, (*see generally* ECF No. 1240), Norton's March 16, 2022 response labels
the Order as made "outside of the parties' adversarial process, on an incomplete and one-sided
record, and without basis in fact or law," (ECF No. 892, at 1), and a subsequent filing from
Quinn characterizes the Order as based on "erroneous statements and findings," (ECF No. 1089-
1, at 6.) To the extent Quinn challenges the validity of the Court's March 15, 2022 Order, this
argument fails. As a factual matter, and as the Court found in denying Norton's motion to
reconsider its ruling, Norton had a full and fair opportunity to be heard on these issues
surrounding Dr. Dacier. (ECF No. 945.) As a legal matter, Quinn points to no authority that

32

**Appx89**

**B.**   <u>The Order was in Columbia's Favor</u>

The Court's March 15, 2022 Order was in Columbia's favor because the information Quinn was ordered to provide was intended to eliminate confusion regarding Dr. Dacier's representation and willingness to testify at trial, an outcome Columbia desired.  Columbia filed this instant motion "only to support compliance with the order," which indicates Columbia's continued interest in receiving the information Quinn Emanuel garnered from communications with Dr. Dacier from 2017 through 2020.  (ECF No. 1231, at 5; ECF No. 1229, at 5 (sealed).) Thus, the record establishes by clear and convincing evidence that the Court Order favored Columbia.

**C.**   <u>Quinn Emanuel's Knowing Noncompliance with the Order</u>

Quinn Emanuel has not complied with the Court's March 15, 2022 Order requiring counsel to, "no later than March 16, 2022, . . . disclose on the record in writing any information garnered from Dr. Dacier during the period their representation of Dr. Dacier was a conflict." (ECF No. 890.)  The identified period of conflict was from 2017 through 2020.  (ECF No. 889, at 13 (sealed).)

As described above, on March 16, 2022, Norton, through its counsel, Quinn, filed a response in which it refused to comply with the Court's March 15, 2022 Order.  (ECF No. 892.) Although the Court had ruled that Quinn could not represent both Norton and Dr. Dacier absent an appropriate waiver of a conflict of interest and had acted in Norton's interest in making Dr. Dacier unavailable, Norton's Response asserted privilege over the communications between Dr. Dacier and Quinn.  (ECF No. 892, at 1–2.)  It refused to disclose the Court-ordered information "absent appellate review of the Court's [March 15, 2022 O]rder."  (ECF No. 892, at 2.)

---

would permit a party to label an Order as "invalid" largely because it disagrees with the Court's ruling.

Quinn Emanuel, however, argues that it complied with the Court's March 15, 2022 Order through the untimely April 8, 2022 filing,[16] which attached a Declaration from Quinn's lead counsel for Norton. (ECF No. 1089-2.) Despite the assertion a few weeks earlier of an "inability" to comply with the Court's March 15, 2022 Order based on privilege, this filing partially discloses communications between Norton's counsel and Dr. Dacier. But as described above, the Declaration summarizes only a few communications between counsel and Dr. Dacier from June 2020 to September 2021 and contains no statement that those sparse communications constitute "all information garnered from Dr. Dacier" by Norton's counsel from 2017 through 2020.

---

[16] Quinn Emanuel describes at length its reasons for filing the Declaration twenty-two days later than the Court ordered deadline. Specifically, Quinn contends that Norton's initial refusal to comply with the Court's March 15, 2022 Order should be deemed as "Norton's [good faith] efforts to protect its client's confidences" and therefore cannot support a finding of civil contempt. (ECF No. 1240-1, at 14.) Although not relevant to the Court's finding that Quinn Emanuel has still not complied with the Order, the Court does not find the reasons persuasive to justify the delay.

Counsel did not request leave to delay compliance to file and receive a ruling on a Motion for Reconsideration and a Motion for Stay. Additionally, the Motion for Stay was denied on March 22, 2022 (ECF No. 945) and "absent a stay . . . appeal is the remedy for decisions believed to be erroneous." *McLean*, 762 F.2d at 1210.

Additionally, Counsel's claim that the communications with Dr. Dacier cannot be produced due to privilege is unfounded. Rule 1.6 of the Virginia Rules of Professional Conduct allows attorneys to reveal information protected by the attorney-client privilege "to comply with law or a *court order*." R 1.6(b)(1) (emphasis added). Quinn Emanuel quotes the commentary associated with this rule to imply the Court's March 15, 2022 Order was not a "final order." (ECF 1240-1, at 11.) However, court-ordered filings are considered final for purposes of the Rules of Professional Conduct in the Eastern District of Virginia, and, as this case has shown in spades, can be filed under seal, or (more likely the case here) *in camera*. *See United States v. Lawson*, No. 4:99CR55-06, 2015 WL 13743435, at *2 (E.D. Va. June 23, 2015).

For these reasons, the Court concludes that good faith does not excuse Norton's conduct in refusing to comply with the Court's directive in its March 16, 2022 filing. (ECF No. 892.)

34

In addition, there are "very good reasons," as Columbia noted, to question the scarcity of communications reported in Counsel for Norton's Declaration as well as the accuracy of the summaries of the few communications provided. (ECF No. 1268, at 4.)   For example, the Declarant does not mention any conversations with Dr. Dacier before Norton filed its Motion for Sanctions against Columbia's counsel, a time when he should have surely been in contact with his purported "client."

These summaries also cannot constitute "any information garnered from Dr. Dacier," especially when they seem to explicitly contradict the email correspondence from Dr. Dacier already in the record.[17]  Far from showing substantial compliance, these omissions render this Declaration plainly inadequate to comply with the Court's March 15, 2022 Order.

The record again conclusively establishes that Norton's counsel, Quinn, by its conduct, violated the terms of the March 15, 2022 Order and had actual (or at least constructive) knowledge of such violations.

### D.   Columbia Has Suffered Harm as a Result

Columbia alleges that it has suffered harm as the result of Quinn Emanuel's noncompliance with the Court's March 15, 2022 Order to provide the information garnered from communications with Dr. Dacier because it believes the information being withheld "likely will further support Columbia's motions under §§ 284 and 285." (ECF No. 1231, at 7; ECF No. 1229, at 7 (sealed).)  Columbia points to a number of Dr. Dacier's statements to explain its position, including Dr. Dacier's written statement about a week before the 2022 trial that he was "happy to help the judicial process" as he has "continuously said so far" but that Norton's

---

[17] In addition to the discrepancies discussed herein, Columbia highlights a number of these contradictions, including Dr. Dacier's statements regarding his desire not to be represented, his willingness to attend trial and testify, and his belief that his testimony was harmful to Norton. (ECF No. 1268, at 4–6.)

35

Case 3:13-cv-00808-MHL Document 1334 *SEALED* 10/20/2023 Page 36 of 42 PageID#
63120

counsel had "repeatedly told [him] that there was no need for [him] to do anything, that they did

not want [him] to do anything . . . ."  (ECF No. 1231, at 7 (citing ECF No. 1084-1, at 4); ECF

No. 1229, at 7 (sealed).)

In response, Quinn contends that Columbia suffered no harm because:  (1) Counsel's

Declaration provides the Court-ordered disclosures; (2) Columbia's counsel spoke with Mr.

Dacier in 2019 and 2020; and (3) Columbia already received the benefit of a Missing Witness

Instruction.  (ECF No. 1240-1, at 14.)  The Court rejects each contention.  As to the first, the

Court has already found that the Declaration, which described scant discussions between

Norton's counsel and Dr. Dacier, failed to satisfy the Court's March 15, 2022 Order.  Second,

Columbia's knowledge of its own conversations with Dr. Dacier from late 2019 to early 2020,

and which abruptly ended in 2020 due to Norton's sanctions motion, does not equate to

knowledge of Norton's counsel's communications with Dr. Dacier from 2017 to 2020.  Finally,

the Missing Witness Instruction issued to the jury does nothing to remedy harm suffered by

Columbia through its inability to present the Court-ordered disclosures in connection with its

motions under 35 U.S.C. §§ 284 and 285.

As discussed in the Court's forthcoming Memorandum Opinion and Order on those

pending motions, those statutes permit the Court to award enhanced damages where appropriate

following an egregiousness analysis and to award attorneys' fees to a prevailing party in

exceptional cases.  35 U.S.C. §§ 284, 285.  In conducting the egregiousness analysis for

enhanced damages, courts frequently look to factors delineated by the Federal Circuit in *Read*

*Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992).  Such factors include, among others, the

infringer's behavior as a party to the litigation, a party's misconduct and duration of such

misconduct, and a party's attempts to conceal its misconduct.  *Id.* at 827.  And in deciding

36

**Appx93**

whether a case is exceptional for purposes of awarding attorneys' fees, courts may again look to a party's misconduct and/or bad faith.

As the Court outlined above, the record shows that Dr. Dacier believed his testimony would have been harmful to Norton and was willing and able to testify at trial (even if that meant flying to New York at the height of the COVID-19 pandemic) until Norton's counsel, Quinn, interfered. The record establishes that Quinn inaccurately told Dr. Dacier that the Court had determined Quinn represented him and, according to Dr. Dacier, then instructed Dr. Dacier that it did not want him to do anything. The record also shows that Dr. Dacier did not know about the trial date, or Columbia's desire to call him as a witness, until six days before the start of trial, at which time he could not make himself available—from Saudi Arabia. In this way, Norton, through its counsel, made Dr. Dacier unavailable, and this prejudiced Columbia. Norton and its counsel then refused to comply with the Court's March 15, 2022 Order to disclose all information Quinn garnered from Dr. Dacier from 2017 to 2020—the period their representation was a conflict. At all times discussed above, Quinn has acted in Norton's interest, rather than in Dr. Dacier's interest.

On this record, the Court finds by clear and convincing evidence that Quinn's failure to comply with Court-ordered disclosures has harmed Columbia. Quinn's refusal to disclose communications with Dr. Dacier serves no purpose other than to shield it, and by extension Norton, from further evidence of misconduct and/or bad faith. This is especially true in light of Quinn's April 8, 2022 filing that purports to disavow prior efforts to hide behind a claim of privilege. Given Quinn's failure to turn over the Court-ordered information, Columbia is harmed by its inability to present further evidence of Norton's litigation misconduct, bad faith, and efforts to conceal the same.

37

Having reviewed the voluminous briefing and the record before it, the Court concludes that the record establishes each element of civil contempt by clear and convincing evidence. Thus, the Court holds Norton's counsel, Quinn Emanuel, in civil contempt. After making necessary findings about second lead counsel, the Court will then determine the appropriate sanction.

### E.   <u>Latham's Actions</u>

Unfortunately, Quinn Emanuel is not the only Norton counsel to have impeded this Court's functioning. Norton's second lead counsel, Latham, poured fuel on the fire. Latham hid key communications with Dr. Dacier from this Court, as recounted in detail in Part I.E., *infra*. The pattern of questionable conduct thus outlasted Quinn's direction of the litigation, and as the Court has noted before, the Court does not presume that Norton was truly unaware of its attorneys' ultimately successful efforts to prevent a key adverse witness and former Norton employee from testifying. The Court accordingly rejects Norton's argument that a finding of civil contempt as to Quinn Emanuel would unduly prejudice them as Quinn's client, given the extensive and unprecedented record before this Court as to the disquieting conduct of both sets of Norton's attorneys.

### F.   <u>The Court Will Make a Negative Inference of Egregiousness as a Sanction</u>

Sanctions for civil contempt are only "imposed either to enforce a court order or to compensate the other party for any losses sustained as a result of the contempt." *Tattoo Art*, 2012 WL 3912572, at *2 (citing *Cromer*, 390 F.3d at 821). Columbia filed this instant motion "only to support compliance with the order" and to obtain further evidence to support its motions under 35 U.S.C. §§ 284 and 285. (ECF No. 1231, at 6; ECF No. 1229, at 6 (sealed).)

### 1.     Attorneys' Fees Are an Inappropriate Sanction in This Context

Although civil contempt sanctions *may* take the form of reimbursement to the movant for reasonable attorneys' fees, *Chesapeake Bank*, 2014 WL 5500872, at *4, attorneys' fees are not the only permissible sanction and "the appropriate remedy for civil contempt is within the court's broad discretion." *See In re General Motors Corp.*, 61 F.3d at 259 (citations omitted).  In this case, Columbia's Motion for Attorney Fees, (ECF No. 1260), already implicates attorneys' fees, which the Court awards in a separate opinion, (ECF No. 1333).  The Court also cannot order the equivalent of "the production of books," "[a]n injunction to stop further or future release of grand jury material," or the "surrender to [the plaintiff]" of all infringing products.  *See McComb*, 336 U.S. at 193–94; *Finn*, 72 F.2d at 1188; *Colonial Williamsburg Found.*, 792 F. Supp. at 1409–10.

But the Court has motions seeking enhanced damages and attorneys' fees before it.  (*See* ECF Nos. 1252, 1260.)  Given that courts must consider egregious conduct when addressing aspects of those motions, the most equitable relief available is a negative inference of egregiousness.  *See McComb*, 336 U.S. at 193–94; *Finn*, 72 F.2d at 1188; *Colonial Williamsburg Found.*, 792 F. Supp. at 1409–10.

This negative inference of egregiousness is tailored to equitably compensate Columbia for its inability to present support for its Motion for Enhanced Damages Under 35 U.S.C. § 284 (ECF No. 1252), and Motion for Attorneys' Fees Under 35 U.S.C. § 285 (ECF No. 1260).  This inability flows directly from Norton's counsel's refusal to disclose its communications with Dr. Dacier during the period when its representation was a conflict, in defiance of this Court's March 15, 2022 Order.

Case 3:13-cv-00808-MHL Document 1345 SEALED* Filed 10/12/23 Page 40 of 42 PageID# 63315

### 2.    The Missing Witness Instruction Is Likewise Insufficient

The Court holds Quinn Emanuel in civil contempt for its failure to comply with the Court's March 15, 2022 Order, (ECF No. 890), which ordered Quinn to "disclose on the record in writing any information garnered from Dr. Dacier during the period their representation of Dr. Dacier was a conflict." (ECF No. 1230.) As discussed in Part III.D., *supra*, although the Missing Witness Instruction has already been awarded in response to Norton's consequential conduct in preventing Dr. Dacier from testifying at trial, (*see* ECF No. 1167), that instruction does not constitute a fully adequate sanction for the finding of civil contempt the Court makes today. Whereas the Missing Witness Instruction compensated Columbia for the *evidentiary* loss due to its inability to examine Dr. Dacier as a live witness *at trial*, it does not compensate Columbia for its inability to present further evidence of Norton's litigation misconduct that is relevant to evaluating Columbia's *posttrial* motions for enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.[18] (ECF No. 1231, at 2; ECF No. 1229, at 2 (sealed).) Because Quinn's refusal to disclose all of its relevant communications with Dr. Dacier continues to this day, Columbia continues to be prejudiced by Quinn's contempt and must be compensated accordingly.

### 3.    A Negative Inference Is the Most Equitable Compensatory Sanction

The imposition of an additional, post-trial equitable sanction is thus entirely appropriate and furthers the civil contempt purpose of compensating the movant for the losses sustained as a result of the contempt. *See Cromer*, 390 F.3d at 821–22; *In re General Motors Corp.*, 61 F.3d at 258. Because Quinn's contempt continues to shield Norton from disclosing potential evidence of

---

[18] Columbia's Motion for Enhanced Damages Under 35 U.S.C. § 284 is located at ECF No. 1252, and Columbia's Motion for Attorneys' Fees Under 35 U.S.C. § 285 is located at ECF No. 1260.

40

Case 3:13-cv-00808-MHL   Document 1331 *SEALED*   Filed 09/30/23   Page 41 of 43 PageID#
Case 3:13-cv-00808-MHL   Document 1345 *SEALED*   Filed 10/20/23   Page 41 of 42 PageID# 63316
63125

misconduct and bad faith in its dealings with Dr. Dacier and harms Columbia's ability to further

support its Motion for Enhanced Damages Under 35 U.S.C. § 284, (ECF No. 1252), and Motion

for Attorneys' Fees Under 35 U.S.C. § 285, (ECF No. 1260), the Court finds that a negative

inference of egregiousness regarding the contents of the undisclosed communications between

Quinn and Dr. Dacier to be the appropriate sanction. To do otherwise would permit Norton to

receive an unfair advantage as a consequence of its attorneys' unseemly litigation tactics.

Considering that enhanced fees flow from egregious conduct, the most equitable sanction is to

migrate a negative inference into the post-trial enhanced damages and attorneys' fees decisions

where appropriate.

Thus, the Court will add a finding of egregious behavior in making findings as to

enhanced damages and fees. Accordingly, when reviewing Columbia's pending motions under

35 U.S.C. §§ 284 and 285, the Court will make a negative inference as to the contents of Quinn

Emanuel's communications with Dr. Dacier where appropriate.

### IV. Conclusion

For the foregoing reasons, the Court DENIES IN PART and GRANTS IN PART

Columbia's Motion.  (ECF No. 1230.)  The parties have had appropriate notice and an

opportunity to be heard.  The Court holds Quinn Emanuel in civil contempt for its failure to

comply with the Court's March 15, 2022 Order.  The Court will impose the sanction of making a

negative inference of egregiousness regarding any unproduced communications with Dr. Dacier

from 2017 through 2020 for the purpose of deciding Columbia's pending motions for

enhancement of the jury's damage award under 35 U.S.C. § 284 and for attorneys' fees under 35

U.S.C. § 285.

Date: September 30, 2023
Richmond, Virginia

_____
M. Hannah Lauck
United States District Judge

42

**Appx99**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**THE TRUSTEES OF COLUMBIA**
**UNIVERSITY IN THE CITY OF**
**NEW YORK,**

       **Plaintiff,**

    **v.**                                        Civil Action No. 3:13cv808

**GEN DIGITAL INC.,**
**f/k/a SYMANTEC CORPORATION,**
**f/k/a NORTONLIFELOCK, INC.,**

      **Defendant.**

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Court DENIES

IN PART and GRANTS IN PART Columbia's Motion for an Order to Show Cause. (ECF No.

1230.) The parties have had notice and an ample opportunity to be heard through briefs. Based

on the record and having considered the parties' briefing, the Court finds Quinn Emmanuel

Urquhart & Sullivan in civil contempt for its failure to comply with the Court's March 15, 2022

Order, (ECF No. 890).

The Court will impose a sanction of making a negative inference of egregiousness regarding any unproduced communications with Dr. Dacier from 2017 through 2020 for the purpose of deciding Columbia's pending motions for enhancement of the jury's damage award under 35 U.S.C. § 284, (ECF No. 1252), and for attorneys' fees under 35 U.S.C. § 285, (ECF No. 1260).

It is SO ORDERED.

Date:  September 30, 2023
Richmond, Virginia

M. Hannah Lauck
United States District Judge

2

**Appx101**

Case 3:13-cv-00808-MHL Document 1345 SEALED *10/20/2309 Page 1 of 49 PageID# 63129

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK,

        **Plaintiff,**

    v.

GEN DIGITAL INC.,
f/k/a SYMANTEC CORPORATION,
f/k/a NORTONLIFELOCK, INC.,

        **Defendant.**

**Civil Action No. 3:13cv808**
**UNDER SEAL**

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff The Trustees of Columbia University's

("Columbia") Motion for Enhanced Damages Under 35 U.S.C. § 284 (the "Motion for Enhanced

Damages") (ECF No. 1252), and Columbia's Motion for Attorneys' Fees Under 35 U.S.C. § 285

(the "Motion for Attorneys' Fees") (ECF No. 1260). Defendant NortonLifeLock, Inc.

("Norton")[1] responded to both motions, (ECF Nos. 1277, 1271), and Columbia replied, (ECF

Nos. 1308, 1307 (sealed), 1294.). These matters are ripe for adjudication. The Court dispenses

with oral argument because the materials before it adequately present the facts and legal

contentions, and argument would not aid the decisional process. For the reasons that follow, the

Court will grant both the Motion for Enhanced Damages and the Motion for Attorneys' Fees.

### I. Factual and Procedural Background

This case has been pending for nearly ten years. It was litigated in this district court in

2014, after which each party took a different path to appeal the Court's decision to the United

---

[1] The Court previously issued a Notice explaining that it will refer to the Defendant as
"Norton" on a default basis, and why. (ECF No. 1328.)

States Court of Appeals for the Federal Circuit.  On remand, a 15-day jury trial eventually

occurred.  The jury awarded $185,112,727.00 in damages to compensate Columbia University

for Norton's infringement of two patents developed by Professors Salvatore Stolfo and Angelos

Keromytis at Columbia University.  (ECF No. 1206, at 4.)

   The $185,112,727.00 damages verdict included $94,037,265.00 in royalties "for sales to

non-U.S. customers," and $91,075,462.00 in royalties "for sales to U.S. customers."  (ECF No.

1206, at 5 (alterations omitted).)

   A third patent developed by the two Columbia professors spawned correction of

inventorship and fraudulent concealment claims.  The jury concluded that, along with a Norton

employee, Professors Stolfo and Keromytis were joint inventors of the third patent.  (ECF No.

1206, at 6.)  However, the jury did not find that the two professors were the sole inventors of the

patent, or that Norton committed fraudulent concealment regarding this last patent.  (ECF No.

1206, at 5–6.)

   In its post-trial motions, Columbia now seeks enhanced damages under 35 U.S.C. § 284

and attorneys' fees under 35 U.S.C. § 285.  Under Section 284, the Court "may increase the

damages up to three times the amount found or assessed."  35 U.S.C. § 284.  Such an

enhancement is warranted where the Court, in its discretion, finds sufficiently egregious

behavior.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016).  Section 285

further permits an award of reasonable attorneys' fees to the prevailing party in "exceptional

cases."  35 U.S.C. § 285.  Exceptional cases include those that stand out, for example, due to the

"unreasonable manner in which the case was litigated," again as found in the Court's discretion.

*Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (citing *Octane*

*Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

2

**Appx103**

Case 3:13-cv-00888-MHL   Document 1345 SEALED *10/20/2009*30/23   Page 3 of 42 PageID #: 63131

For the reasons discussed herein, as well as in other decisions incorporated below,[2] the Court finds that: (1) Norton deliberately copied Columbia's ideas or designs; (2) Norton did not undertake an adequate investigation to determine whether Columbia's patents were valid or whether Norton's products infringed upon Columbia's patents; (3) Norton engaged in substantial and egregious misconduct throughout the litigation; (4) Norton's non-infringing business would not be unduly prejudiced by an enhancement due to its size and financial condition; (5) the jury easily decided this case against Norton, meaning this was not a close case; (6) Norton's infringement has gone on for nearly a decade; and (7) Norton failed to take remedial measures to address its infringement. In addition, Norton litigated this case in an unreasonable manner, which makes it an exceptional one. Therefore, the Court finds by a preponderance of evidence and in its discretion that this case warrants both enhanced damages and an award of reasonable attorneys' fees.

## A.     Pretrial Litigation Conduct

Norton's substantial litigation misconduct both before and during trial weighs heavily in favor of enhancement and also supports an award of attorneys' fees in this case. While the Court's incorporated opinions detail much of this litigation misconduct, the Court highlights a few instances herein as well.

---

[2] The Court provided an in-depth discussion of the procedural history and factual background of this case in its prior Memorandum Opinions—the *Inter Partes Review* Opinion, (ECF No. 251); the Markman Opinion, (ECF No. 253); the Court's opinion addressing Norton's Rule 12(c) Motion, (ECF No. 288); the Court's opinion regarding Norton's Motion for Partial Summary Judgment, (ECF No. 684); the Court's opinion on Norton's Motion and Renewed Motion for Judgment as a Matter of Law, (ECF No. 1337); the Court's opinion on Norton's Motion for a New Trial, (ECF No. 1339); and the Court's opinion on Columbia's Motion for an Order to Show Cause (ECF No. 1331)—and incorporates those descriptions here. The Court assumes familiarity with those decisions.

3

**Appx104**

### 1.    Norton's Misconduct Relating to Dr. Dacier

Much of Norton and its counsel's conduct pertinent to the Motion for Enhanced Damages and the Motion for Attorneys' Fees involves its (mis)handling of Dr. Marc Dacier, a former Norton employee at the center of one of the three patents at issue in this litigation. The Court's Memorandum Opinion on Columbia's Motion to Show Cause (ECF No. 1331) discusses that misconduct in detail, and the Court incorporates that opinion and its related findings herein.

As the Court found therein, Dr. Dacier was willing to testify at trial and believed his testimony would be harmful to Norton. (ECF No. 1331, at 6–7, 18–19, 36 n.17.) Dr. Dacier had made several comments contrary to Norton's position on inventorship. (ECF No. 1331, at 5–7.) After Columbia identified Dr. Dacier on its witness list, Norton interfered and filed a baseless motion for sanctions against Columbia. (ECF No. 1331, at 8–10.) Thereafter, Norton incorrectly informed Dr. Dacier that the Court had determined that Norton's counsel represented Dr. Dacier and also told him that Norton did not need anything from him. (ECF No. 1331, at 15, 17.) Norton's conduct rendered Dr. Dacier unavailable to Columbia. (ECF No. 1331, at 13–14.)

When deciding how to possibly mitigate the prejudice suffered by Columbia due to Norton's misconduct, the Court identified the exceptionality of the case, noting that it has "never [before] had the feeling that a company hid a witness and was untruthful to the witness about what [the Court] said about it . . . [despite being in] trial litigation a long time . . . never seen it . . . never." (ECF No. 1100, at 92; Apr. 7 Tr. 92:13–18.)

4

Case 3:13-cv-00808-MHL Document 1334-5 Filed 10/20/2023 Page 42 Page 42 Page ID# 63133

### 2.     Relitigating Application Community Claim Construction

Norton also took steps on numerous occasions to relitigate issues that had already been decided.  Sometimes it would do so through self-identified motions to reconsider.  But on many occasions, Norton sought to rehash arguments already lost through other cumulative filings.

For example, Norton thrice attempted to concoct an end-run around this Court's construction of the term "application community."  In its 2014 Opening Claim Construction Brief, Norton argued that the Court should construe "application community" to mean "members of a community running the [specific] modeled program." (ECF No. 107, at 33; *see also* ECF No. 439, at 12 (Norton acknowledging that it previously argued in its claim construction briefs that "'application community'" should require that "the program the members of the community run is the ***program that is modeled***") (emphasis in original) (citing ECF No. 109, at 26).)  "The Court rejected that construction in favor of one that includes all members running the same program or a *portion* of that same program." (ECF No. 703 (sealed), at 13 (emphasis added) (citing ECF No. 123).)

Despite the Court having settled this issue in 2014, Norton presented a markedly similar argument in its 2020 *Daubert* Motion to Strike Certain Testimony of Dr. Michael Bailey (one of Columbia's experts).  (ECF No. 361.)  In that motion, Norton argued that the Court should strike Dr. Bailey's testimony because the testimony relied on an improper definition of "application community." (ECF No. 362, at 8–11.)  Norton averred that Dr. Bailey had not properly applied the antecedent basis principle of claim interpretation to the Court's definition of "application community," and that applying that principle would necessarily make the "program" in the Court's 2014 Claim Construction definition the same specific program for each user.  (ECF No. 362, at 8–11.)  But as the Court found in ruling on the motion to strike, Norton "inappropriately"

5

used this *Daubert* motion "to 'rehash' previously dismissed claim construction arguments."
(ECF No. 703 (sealed), at 11  (quoting *Balt. Aircoil Co., Inc. v. SPX Cooling Techs. Inc.*, No. 13-
2053, 2016 WL 4426681, at *13 (D. Md. Aug. 22, 2016)).)  The Court again rejected Norton's
prior argument that the "modeled program" run by the application community should be the
same program rather than a *portion* of that program.  (*See* ECF No. 703 (sealed), at 11–14.)  The
Court noted that it "ha[d] already decided that users within an 'application community' need not
run the same specific program executing in the emulator."  (ECF No. 703 (sealed), at 13
("Norton now attempts to relitigate the same issue addressed in the Court's 2014 Claim
Construction Order using marginally altered terms.").)  The Court "warned" that Norton may not
use a *Daubert* motion to "rehash" arguments the Court had previously rejected.  (ECF No. 703,
at 14.)

Norton also advanced that same rehashed argument in its Memorandum in Opposition to
Columbia's *Daubert* motion addressing Dr. Trent Jaeger, one of Norton's witnesses.  (ECF Nos.
416, 420 (sealed).)  Appealing to the antecedent basis principle, Norton sought "to superimpose
[the Court's 2014 definition of 'application community'] directly into the claim language,"
which would again have restricted the pool of users to those running the same specific program.
(ECF No. 717 (sealed), at 11.)  Highlighting both the Court's 2014 Claim Construction Order
and its prior Memorandum Opinion addressing Dr. Bailey's testimony, the Court noted its
frustration that "[t]his [wa]s the third time the Court ha[d] had to address Norton's antecedent
basis argument even though it considers the matter settled law in this case."[3]  (ECF No. 717

---

[3] To be sure, Norton filed its pertinent briefs in its Bailey and Jaeger *Daubert* motions
before the Court addressed the antecedent basis principle in its Opinion regarding Dr. Bailey.
Nevertheless, that Norton relied on this same duplicative argument *twice* after the Court
addressed it in 2014 indicates Norton's willingness to vigorously pursue arguments on which the
Court had already ruled.

Case 3:13-cv-00808-MHL Document 1345 SEALED 10/02/2023 Page 147 of 190 PageID#
63135

(sealed), at 10.)  The Court *again* repeated its ruling that "members of the application community

need only be running the same program—or a portion of that program—in common with each

other."  (ECF No. 717 (sealed), at 11 (emphasis removed).)

### 3. Attempting to Exclude a Set of License Agreements by Mischaracterizing the Record

Through one of Norton's Motions *in Limine*, Norton sought to prevent Columbia "from

discussing, relying on, or presenting testimony on [certain] licenses that were not produced in

discovery."  (ECF No. 1016, at 2 (quoting ECF No. 769, at 21); ECF No. 898 (sealed), at 2

(quoting ECF No. 769, at 21).)  It argued that during discovery, it requested "'[a]ll documents,

communications[,] and things concerning the Georgia Pacific factors[4],' and that in response,

'Columbia produced a small set of licenses in discovery, ███████████████████

███████'"  (ECF No. 1016, at 2–3 (redacted in original); ECF No. 898 (sealed), at 2–3

(quoting ECF No. 769, at 10) (alterations in original).)  Norton contended that despite these

requests, "in his damages expert report, [Columbia's damages expert] Dr. Ryan Sullivan

discusses Columbia's licensing practices with ████████████████

████████ even though Columbia had failed to produce details about licensing practices with

'████████████'" in discovery."  (ECF No. 1016, at 3 (redacted in original); ECF No. 898

(sealed), at 3 (quoting ECF No. 769, at 21).)

As Columbia pointed out and as the Court found, however, this was an unabashed

mischaracterization of the relevant events.  The parties had "already," mutually, "narrowed the

---

[4] The *Georgia-Pacific* factors are used by courts to determine an ongoing royalty rate
based on a post-judgment hypothetical negotiation. *Philip Morris Prod. S.A. v. R.J. Reynolds
Vapor Co.*, No. 120CV393, 2023 WL 2843796, at *2 (E.D. Va. Mar. 30, 2023) (citing *Arctic Cat
Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017) (further
citations omitted)).  There are fifteen factors considered when conducting this inquiry. *See
Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 11120 (S.D.N.Y. 1970).

**CONFIDENTIAL MATERIAL OMITTED**

scope of documents relating to licenses that Columbia would produce." (ECF No. 1016, at 3;

ECF No. 898 (sealed), at 3.) "After Columbia objected to Norton's original request for

"[d]ocuments sufficient to show the terms of any offer or counter-offer (whether accepted to not)

made by Columbia or received by Columbia to take a license to any Columbia-owned patent or

patent application, . . . Norton narrowed its request for production." (ECF No. 1016, at 3

(redacted in original); ECF No.  898 (sealed), at 3 (citing ECF No. 801-15, at 5) (first alteration

in original).)  Thereafter, it sought only "███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████" (ECF No. 1016, at 3 (redacted in original); ECF No. 898 (sealed), at 3

(quoting ECF No. 801-16, at 3 (emphasis added)).)  "Columbia . . . complied with this later,

more circumstanced request, and Norton d[id] not dispute that Columbia complied." (ECF No.

1016, at 3 (citing ECF No. 801, at 22; ECF No. 852, at 12–14); ECF No. 898 (sealed), at 3

(citing ECF No. 801, at 22; ECF No. 852, at 12–14).)  The Court ruled that Norton could not

"now seek to exclude information based on the defunct broader request for information regarding

*Georgia-Pacific* factors after Norton agreed to narrow its request as to documents relating to

licenses." (ECF No. 1016, at 3; ECF No. 898 (sealed), at 3.)  In sum, Norton advanced a

frivolous—and misleading—argument.

CONFIDENTIAL MATERIAL OMITTED

#### 4. Improperly Instructing Norton's Expert to Consider Post-Hypothetical Negotiation Data with No Caveats

In one of its Motions *in Limine*, Columbia sought to exclude "certain data from the years 2015 through 2019—showing the number of malicious programs detected by SONAR/BASH[5] versus those detected by BPE during those years—in [Norton's] valuation of the technology at issue in this litigation." (ECF No. 1019, at 1; ECF No. 903 (sealed), at 1.) Norton's technical apportionment expert, Dr. Jaeger, relied on that data "to show the number of malware detections made by SONAR/BASH as a percentage of SONAR." (ECF No. 1019, at 4; ECF No. 903 (sealed), at 4.) ███████████████████ ███████████████████ ███████████████████ (ECF No. 1019, at 4 (redacted in original); ECF No. 903 (sealed), at 4.) Dr. Jaeger's reliance on these figures allowed him to reach a comparatively low damages figure. The Court found the 2015 to 2019 data patently irrelevant.

As the Court noted in ruling on Columbia's Motion *in Limine*, "[n]either party dispute[d] that Norton launched the infringing SONAR/BASH feature in 2009 and that the hypothetical negotiation dates were in 2011 (for the '115 Patent) and 2013 (for the '322 Patent)." (ECF No. 1019, at 1; ECF No. 903 (sealed), at 1.) Not only did the 2015 to 2019 data post-date the hypothetical negotiation, but Norton also failed to otherwise show how the parties would have

---

[5] As explained previously:



(ECF No. 737 (sealed), at 3 n.3 (citations omitted).)

Case 3:13-cv-00808-MHL   Document 1334   Filed 10/20/2023   Page 12 of 42 PageID#
63138

anticipated such a decline in malware detection during the 2011 and 2013 hypothetical

negotiations. (ECF No. 1019, at 4; ECF No. 903 (sealed), at 4.) Indeed, according to Dr. Jaeger,

Norton affirmatively ███████████████████████████████████████████

████████████████████████████████[6] (ECF No. 1019, at 4 (emphasis in original); ECF

No. 903 (sealed), at 4 (emphasis in original).) As presented to this Court, it was not proper, and

the Court so found. (ECF No. 1019, at 5; ECF No. 903 (sealed), at 5.)

### B.     <u>Trial Litigation Conduct</u>

Norton's misconduct did not stop with the commencement of trial, and the Court

highlights but a few examples of additional or continued misconduct once trial began.

### 1.     <u>Cross-Examining Using Incorrect or Misleading Predicates</u>

At several points during trial, the Court had to admonish counsel for Norton—and only

Norton—that counsel may not cross-examine witnesses with factually incorrect predicates.

While the Court normally need not, and does not, speak to such trial moments, in many cases

Columbia objected and the admonishment accompanied sustaining the objection. It was only

after the number of such instances accumulated enough to create concerns that the Court

---

[6] The Court wishes to be clear that instructing an expert to account for post-hypothetical data will not always, by itself, constitute misconduct. As the factors laid out in *Georgia-Pacific Corp.* illustrate, certain post-hypothetical negotiation evidence may be relevant in some cases, and a party can choose to base its figures on that data if it pleases (although it may subject that data to a higher likelihood of exclusion later). *See* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing factors that include post-hypothetical negotiation evidence). In the normal course, attempting to introduce post-hypothetical negotiation evidence may be a legitimate litigation tactic, or at least one a party believes in good faith is legitimate.

But here, Dr. Jaeger's expert report  The Court thus finds it likely that Norton instructed Dr. Jaeger in this way as a deliberate attempt to reduce Dr. Jaeger's apportionment figure.

10

Case 3:13-cv-08888-MHL Document 1345 SEAL ED 10/20/2030 Page 311 Page 42 Page 42 PageID# 63139

exercised its discretion to assure that it secured a just, speedy, and fair trial. *See* Fed. R. Civ.

P. 1.[7]

First, during the cross-examination of Professor Stolfo, Norton's counsel "continued to

ask [Professor Stolfo] questions he can't possibly know," many of which were "based on

premises that really [weren't] before the Court." (ECF. No 1210, at 283; Apr. 13 Trial Tr.

690:17–21.) Later that same day, the Court informed Norton's counsel that it was making "a

pretty big presumption" and that it was "putting numbers in that have no basis." (ECF No. 1210,

at 294; Apr. 13 Trial Tr. 701:6–7.) The Court then reminded counsel for Norton that if it wanted

to make "a presumption that has weight," then it needed to do so with its "own witness[]." (ECF

No. 1210, at 294; Apr. 13 Trial Tr. 701:13–16.)

Norton's counsel continued this practice during its cross-examination of Professor

Keromytis. Counsel for Norton mischaracterized testimony from Professor Keromytis' direct

examination by stating that Professor Keromytis "had highlighted" or "emphasized" a portion of

an exhibit. (ECF No. 1211, at 124; Apr. 14 Trial Tr. 844:5–23.) This was incorrect, and the

Court clarified this error. (ECF No. 1211, at 124; Apr. 14 Trial Tr. 844:5–23.) Norton's counsel

again misstated Professor Keromytis' testimony by confusing what had been said and done by

Professor Keromytis during his direct examination and what had been said and done by

Columbia's counsel. (*See* ECF No. 1211, at 126; Apr. 14 Trial Tr. 846:14–23.) The Court

corrected Norton's counsel and informed him that this was akin to "put[ting] words in [Professor

Keromytis'] mouth." (ECF No. 1211, at 126; Apr. 14 Trial Tr. 846:24–25.) While successful

cross-examination *should* challenge a witness's testimony, when it devolves into a string of

---

[7] Federal Rule of Civil Procedure 1 states: "These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81. They should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

questions that places incorrect evidence before the jury to this degree cannot go unchecked. The

Court reminded Norton's counsel that it should "be careful about how [it] characterize[s] the

witness's testimony on cross." (ECF No. 1211, at 158; Apr. 14 Trial Tr. 878:14–20). However,

it appears these gentle reminders did not deter Norton's counsel.

Second, during its cross-examination of Dr. Bailey, Norton presented a version of one of

Dr. Bailey's demonstrative slides. In Dr. Bailey's original demonstrative, certain portions of a

provisional patent application had been highlighted to indicate certain ideas that the Columbia

Professors had contributed to the application. (ECF No. 1212, at 34; Apr. 15 Trial Tr. 991:2–

23.) In its own version of that demonstrative however, Norton removed all highlighting from the

demonstrative and asked Dr. Bailey to highlight certain portions of that demonstrative that had

*not* been previously highlighted. (ECF No. 1213, at 262–67; Apr. 18 Trial Tr. 1368:21–

1373:13.) This resulted in a misleading and confusing demonstrative suggesting that the

Professors had contributed fewer ideas to the application than Dr. Bailey claimed they did. The

Court thus warned Norton's counsel: "[i]f portions of [the original demonstrative] are

highlighted, show it as highlighted. I don't want foundational statements that are incorrect

placed in front of the jury. I think we talked about that." (ECF No. 1213, at 267; Apr. 18 Trial

Tr. 1373:14–17.)

Third, the Court pointed out several instances where Norton's cross-examinations crossed

the line into improper or misleading questioning. The Court raised concerns about this pattern

with counsel on numerous occasions. For example, with the jury excused, the Court

reprimanded Norton's counsel for this *precise* type of conduct, warning:

> I do appreciate strong advocacy, I really do, but I think you have heard me say . . .
> I'm a little concerned about how you have presented some of your questions to the
> witnesses. Cross-examination is fair, but it is not fair if you misrepresent what a
> witness has said.

Case 3:13-cv-00808-MHL Document 1334 SEALED Filed 10/20/2020 Page 42 of 42 PageID# 63141

So I'm going to tell you, I think I should have shored you up, but I think in your first examination of Mr. Herskowitz you said that he had testified about a particular part of an exhibit that was not the one that he testified to. And you went down a whole row of questions.

...

I have noticed from you[]all[,] a predilection to say . . . —["]yesterday you said this happened in 2013, and then you said this[ . . . "].

And what the witness testified to was that it happened in 2015.

And maybe it's just an error, but I'm just putting you on notice it has been very consistent in my mind, and that's why I've started correcting what I think are not accurate factual predicates.

...

[I]t just has to stop, especially with experts. Do not present things as a predicate of a question that are inaccurate. Just be really careful about that.

(ECF No. 1214, at 9–10; Apr. 19 Trial Tr. 1412:6–1413:19.)

Nevertheless, and as discussed further below, Norton's counsel did just that in its cross of Dr. Cole—presented Norton's counsel's theory of damages based on inaccurate factual predicates followed by math calculations that no witness adopted. Norton's counsel repeatedly discounted the witness's rejection of the accuracy of counsel's factual predicate, telling the witness, for example, "I understand you may disagree with the premise, but I want to do some math." (ECF No. 1214, at 248–49; Apr. 19 Trial Tr. 1651:25–1652:1.) Or stating, "I didn't expect that you'd agree. I'm just making sure the math is right," following the witness's statement of "for the record, I don't agree with those numbers." (ECF No. 1214, at 249; Apr. 19 Trial Tr. 1652:14–15, 1652:18–19.) Norton's counsel closed his cross-examination with the following exchange:

[Q]    . . . . You trust me on the math there?

13

> A      Generally on the math, but once again, you're just putting random numbers and just doing random calculations. So to me there's no foundation for what you just put up there.
>
> Q      I understand. But if we then multiple and use your original report numbers, we use Mr. Nachenberg's[8] testimony, we get to these numbers, and that would reduce, even before we get to [Columbia's damages expert] tomorrow, the damages they're asking for from 227 million to less than $30 million. Are you aware of that?
>
> A      I'm not aware of the numbers on the damage's side, and I don't agree with the assessment for the numbers on the slide.

(ECF No. 1214, at 250–51; Apr. 19 Trial Tr. 1653:17–1654:6.) After Norton's improper cross-examination of Dr. Cole—employing the same conduct against which the Court had warned—the Court stated, again outside the jury's presence: "Don't do it again. Do you hear me? Not by accident, not respectfully, not any way. Do not do it again. I will instruct the jury that you are doing that too many times, and they should take it into account. I'm telling you that." (ECF No. 1214, at 253; Apr. 19 Trial Tr. 1656:12–16.)

### 2.      Improper Introduction of an Apportionment Figure

In response to one of Columbia's Motions *in Limine*, the Court excluded Dr. Jaeger's ultimate "near-zero" valuation of Columbia's patented technology. (ECF No. 1020, at 1 (quoting ECF No. 753-1, at 28); ECF No. 905 (sealed), at 1 (quoting ECF No. 753-1, at 28).) These ultimate near-zero percentages (0.07% to 0.09%) were derived from three figures multiplied together: ▇▇▇▇▇▇▇▇ (ECF No. 1020, at 1 (redacted in original) (quoting ECF No. 753-1, at 28); ECF No. 905 (sealed), at 1 (quoting ECF No. 753-1, at 28).) However, as the Court concluded, that 1% figure was based on entirely improper information "that post-dated the hypothetical negotiation." (ECF No. 1020, at 2; ECF No. 905 (sealed), at 2.) As a result, the Court excluded Dr. Jaeger's ultimate "near zero" apportionment figures. (ECF No. 1020, at 3

---

[8] As discussed below, Cary Nachenberg is a Norton senior fellow and lay witness.

14

**Appx115**

(redacted in original); ECF No. 905 (sealed), at 3.)  The Court also entered an Order, based on the parties' agreement during the Final Pretrial Conference, prohibiting any witness from "present[ing] an ultimate damages figure *while relying on Dr. Jaeger's (excluded) damages testimony*. This includes phrases such as '*de minimis*' or 'nominal.'" (ECF No. 1086, at 1 (emphasis added).)

Despite this Court's rulings, at trial, Norton attempted an end-run around its self-imposed inability to offer an ultimate damages opinion of its own.  Norton senior fellow[9] (and lay witness), Cary Nachenberg, testified through recorded deposition at trial.  In his testimony, "Mr. Nachenberg guessed that, of the 70% or 60% of SONAR's approximate contribution, only 4% was attributable to 'BASH machine learning.'"  (ECF No. 1155, at 4; ECF No. 1214, at 241; Apr. 19 Trial Tr. 1644:18–25.)  Norton then attempted to bootstrap Nachenberg's lay "guess" as to apportionment into something more through its cross-examination of Dr. Cole.

During that cross-examination, Norton's counsel conducted his own calculations with Nachenberg's "guess" as the basis.  He pointed out that Nachenberg "guess[ed]" that of the 60 to 70% of value attributed to malware detection in the pertinent products as a whole, the BASH technology contributed 4%.  (ECF No. 1214, at 241; Apr. 19 Trial Tr. 1644:18–23.)  Dr. Cole never adopted that 4% figure—neither in his Expert Report nor on the stand.  (*See* ECF No. 1214, at 242; April 19 Trial Tr. 1645:5–7.)  In addition, Mr. Nachenberg's 4% guess was in response to a question about the value of BASH machine learning, not the value of BASH in its entirety, which is how Norton's counsel wanted to use the 4% figure.  (ECF No. 1155, at 5 n.2 (noting that "[t]his was indeed a comparison of apples to oranges").)

---

[9] "Typically, . . . a senior fellow is the highest technical position" in a company.  (ECF No. 1214, at 185; Apr. 19 Trial Tr. 1588:22–23.)

15

Case 3:13-cv-00808-MHL Document 1334 SEALED 10/20/2023 Page 16 Page 42 PageID#
63144

Undeterred, Norton's counsel asserted that at "level 2" of the apportionment analysis,[10]

Mr. Nachenberg "testifie[d]" to this 4% figure.[11]  (ECF No. 1214, at 242; April 19 Trial Tr.

1645:8–14.)  Counsel then proceeded to "level 3," which Dr. Cole calculated as 35%.  (ECF No.

1214, at 243; Apr. 19 Trial Tr. 1646:19–23.)  He directed Dr. Cole to "do some math" with him.

(ECF No. 1214, at 249; Apr. 19 Trial Tr. 1652:1.)  Counsel "multipl[ied]" one of Dr. Cole's

figures (60%) by Mr. Nachenberg's figure of "about 4[%]."  (ECF No. 1214, at 249; Apr. 19

Trial Tr. 1652:2–4.)  Multiplying the resulting figure by Dr. Cole's level 3 percentage (35%)

yielded 0.84%.  (ECF No. 1214, at 249; Apr. 19 Trial Tr. 1652:2–5.)  Crucially though, as stated

above, at no point did Dr. Cole rely on, attest to, or adopt Nachenberg's 4% figure.  (ECF No.

1214, at 249; Apr. 19 Trial Tr. 1652:14–17.)  He thus protested: "for the record, I don't agree

with those numbers.  You're mixing apples and oranges and just sort of putting random numbers

on the screen."  (ECF No. 1214, at 249; Apr. 19 Trial Tr. 1652:14–17.)  As Norton's counsel

attempted to employ the same tactic to calculate additional percentages, Dr. Cole again pushed

back, noting that "to [him] there's no foundation for what [counsel] just put up there."  (ECF No.

1214, at 250; Apr. 19 Trial Tr. 1653:19–22.)  Using this math, Norton's counsel reduced

Columbia's requested damages from $227 million to less than $30 million.  (ECF No. 1214, at

---

[10] This apportionment analysis involved three levels.  At level 1, the expert would determine "what percent of the overall product is contributed to malware detection."  (ECF No. 1214, at 179; Apr. 19 Trial Tr. 1582:3–10.)  At level 2, the expert determined "how much of [the patents comprise] the accused functionality" (here, SONAR).  (ECF No. 1214, at 179; Apr. 19 Trial Tr. 1582:18–19.)  At level 3, the expert calculates "[w]hat percentage of the value of [the accused functionality] is the patented features."  (ECF No. 1214, at 179; Apr. 19 Trial Tr. 1582:23–24.)  To reach an ultimate apportionment figure, the expert then multiplies these three percentages together.  (ECF No. 1214, at 82–83; Apr. 19 Trial Tr. 1485:25–1486:2.)

[11] Again, Mr. Nachenberg's guess was in response to a question about the value of BASH machine learning, not the step two apportionment question for which counsel used the guess:  the value of BASH in its entirety.  (ECF No. 1155, at 5 n.2 ("This was indeed a comparison of apples to oranges.").)

16

**Appx117**

250–51; Apr. 19 Trial Tr. 1653:23–1654:3.)  He did this through his own "testimony," while Dr.

Cole, the witness on the stand, repeatedly rejected the factual predicate which served as the

entire basis of counsel's calculations.  (ECF No. 1214, at 250, 251, 252; Apr. 19 Trial Tr.

1653:14–17 ("[F]or the record, I don't agree with those numbers.  You're mixing apples and

oranges and just sort of putting random numbers on the screen."); 1653:19–22 ("[O]nce again,

you're just putting random numbers and just doing random math.  So to me there's no

foundation[.]"); 1654:5–6 ("I don't agree with the assessment for the numbers on the slide.").)

In response, Columbia requested that the Court "give the jury an instruction [the next

day] to disregard" these calculations.  (ECF No. 1214, at 254; Apr. 19 Trial Tr. 1657:16–17.)

The Court issued a Memorandum Order granting this request.  (ECF No. 1155, at 9.)  It

concluded that "[c]ounsel's inappropriate suppositions"—that is, his own mathematical

calculations—"in no way will assist the trier of fact."  (ECF No. 1155, at 6.)  In sum, the Court

found that counsel's demonstration was "an utterly improper alternate form of apportionment

analysis."  (ECF No. 1155, at 7.)  The Court thus struck this testimony, prohibited Norton from

raising such figures before any other witness, and offered a limiting instruction to the jury.  (ECF

No. 1155, at 7–8.)

### 3.    Improper and Misleading Use of Demonstrative Exhibits

Not only did Norton engage in improper or misleading lines of questioning, but it also

displayed demonstrative exhibits during such questioning which further compounded the

potential for jury confusion and prejudice to Columbia.  For this reason, the Court struck three

demonstrative exhibits used by Norton's counsel during Dr. Cole's testimony alone.

Norton used one demonstrative exhibit during Dr. Cole's cross-examination to show

"some of the features that are in a Norton AntiVirus."  (ECF No. 1214, at 210; Apr. 19 Trial Tr.

17

1613:4; ECF No. 1149-3.) The demonstrative highlighted the malware detection feature and then purported to show all other features in Norton AntiVirus. (ECF No. 1214, at 210–11; Apr. 19 Trial Tr. 1613:12–1614:1.) Norton's counsel used this demonstrative to challenge Dr. Cole's assignment of value for the product features. Dr. Cole acknowledged that he assigned 90 percent of the value of the Norton AntiVirus product to the malware protection and 10 percent to all other features but questioned the accuracy of the demonstrative, stating "I believe a few of these [other non-malware features] might not actually be a Norton AntiVirus." (ECF No. 1214, at 211; Apr. 19 Trial Tr. 1614:3–6.) Following an objection from Columbia and briefing from both parties on this issue, the Court sustained Columbia's objection, finding the demonstrative misleading given Dr. Cole's testimony as to the factual inaccuracy. (ECF No. 1214, at 254–56; Apr. 19 Trial Tr. 1657:13–1659:4; ECF Nos. 1149, 1150; ECF No. 1155, at 7.)

Norton used two other demonstratives during its cross of Dr. Cole while improperly introducing counsel's apportionment figure. Even after Dr. Cole rejected the 4% guess from Mr. Nachenberg, Norton's counsel wrote that percentage on a demonstrative for the jury's consideration as the level 2 apportionment figure. (ECF No. 1214, at 242; Apr. 19 Trial Tr. 1645:11–17; ECF No. 1149-1; ECF No. 1152-1.) Norton's counsel then turned to another demonstrative to do his own "math" and propose a full apportionment analysis. (ECF No. 1214, at 248; Apr. 19 Trial Tr. 1651:25; ECF No. 1149-2, ECF No. 1152-2.) Again, Dr. Cole never adopted counsel's numbers and instead stated, "You're . . . just sort of putting random numbers on the screen," (ECF No. 1214, at 249; Apr. 19 Trial Tr. 1652:13–17), and "you're just putting random numbers and just doing random calculations. So to me there's no foundation for what you just put up there." (ECF No. 1214, at 250; Apr. 19 Trial Tr. 1653:19–22.)

18

Case 3:13-cv-00808-MHL   Document 1334   SEALED*10/20/2309 P30/23 19 Page 1 Page 42 PageID# 63147

Columbia objected to the use of these demonstratives, and after considering argument and written submissions from the parties, the Court sustained Columbia's objection. (ECF No. 1155.) The Court struck the demonstratives because they were based on an inadmissible, unreliable, and unendorsed 4% guess from Mr. Nachenburg. (ECF No. 1155, at 5.) The Court found that the improper line of questioning and demonstrative exhibits created "immense prejudice" to Columbia and issued a curative instruction as a result. (ECF No. 1155, at 7–8.)

## II. Analysis

The Court will grant both the Motion for Enhanced Damages and the Motion for Attorneys' Fees. Columbia is entitled to enhanced damages because analysis of the *Read* factors[12] overwhelmingly supports a finding that Norton has acted egregiously. Furthermore, Columbia is entitled to certain attorneys' fees because this is an exceptional case.

### A.     The Court Will Enhance Columbia's Damages Pursuant to 35 U.S.C. § 284

The Court will enhance the jury's damages award by 2.6 times, for a total of $481,293,090.00. The *Read* factors weigh in favor of such an enhancement. Norton willfully infringed Columbia's patents, took no steps to form a good-faith belief of noninfringement, engaged in numerous flagrant acts of misconduct, is financially stable enough to survive an enhanced award, did not present a close case, infringed Columbia's patents for at least a near-decade, and took no steps to remedy its infringement. Although one *Read* factor does not apply to the case at hand and another one weighs slightly against enhancement, the remaining seven factors weigh in favor of enhancement. On balance, and even without considering the Court's negative inference towards Norton regarding the unproduced communications (which are the

---

[12] As discussed below, courts often consider a list of non-exhaustive factors delineated by the Federal Circuit in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), to analyze a party's egregiousness and consider an enhancement.

19

**Appx120**

subject of the Court's Memorandum Opinion and Order on Columbia's Motion for an Order to
Show Cause (ECF Nos. 1331, 1332)), the *Read* factors as a whole show that Norton's conduct in
this case has been sufficiently egregious to warrant enhanced damages.

### 1.     Legal Standard: Enhanced Patent Damages

"Once a defendant's infringement has been deemed willful by a jury and judgment
entered in favor of a plaintiff, [courts have] discretion to award damages over and above th[e]
amount found to be appropriate by the jury." *SRI Int'l., Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d
680, 721 (D. Del. 2017). U.S. patent law 35 U.S.C. § 284 permits courts reviewing patent
damages awards to "increase the damages up to three times the amount found or assessed." 35
U.S.C. § 284.

In 2016, the United States Supreme Court decided *Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016). The *Halo* court concluded that "[t]he subjective willfulness of a patent
infringer, intentional or knowing, may warrant enhanced damages, without regard to whether
[their] infringement was objectively reckless." *Id.* at 105. The *Halo* court also held that
enhanced damages are to be "governed by a preponderance of the evidence standard." *Id.* at 107.
(quoting *Octane Fitness LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557 (2014)).
Finally, the *Halo* court held that courts of appeal should review a district court's grant of
enhanced damages for abuse of discretion only. *Id.* at 107–08.

Although after *Halo*, a "finding of willful infringement is a prerequisite to the award of
enhanced damages," *see EagleView Techs., Inc. v. Xactware Solutions, Inc.*, 522 F. Supp. 3d 40,
48 (D.N.J. 2021) (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir.
2010)), once courts find willfulness, they enjoy discretion as to whether the circumstances of that
case warrant enhanced damages. *WCM Indus.*, 721 F. App'x at 971 (quoting *Rite-Hite Corp. v.*

20

**Appx121**

Case 3:13-cv-00808-MHL   Document 1334   SEALED   Filed 10/02/23   Page 42 of 42 PageID# 63149

*Kelley Co.*, 56 F.3d 1538, 1543 (Fed. Cir. 1995) (en banc)).  Ultimately, the Supreme Court "eschew[ed] any rigid formula for awarding enhanced damages under § 284." *Halo*, 579 U.S. at 107.  But the Court's language in *Halo* provides some guidance to district judges.  "Awards of enhanced damages . . . are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for *egregious infringement behavior*." *Id.* at 103. (emphasis added)  "The sort of conduct warranting enhanced damages has been variously described . . . as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 103–04.  Lower courts, then, have settled on a touchstone for enhanced damages post-*Halo*: egregiousness.

Egregiousness, of course, implicates a broader swath of conduct than willfulness alone. *See WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 969 (Fed. Cir. 2018) ("*Halo* emphasized that subjective willfulness alone . . . *can* support an award of enhanced damages." (alteration in original) (emphasis added)).  To help structure an egregiousness analysis, courts frequently look to nine non-exhaustive factors delineated by the Federal Circuit in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992):

> (1) whether the infringer deliberately copied the ideas or design of another;[]
>
> (2) whether the infringer, when [it] knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; . . .
>
> (3) the infringer's behavior as a party to the litigation[] . . .
>
> (4) Defendant's size and financial condition[;]
>
> (5) Closeness of the case[;]
>
> (6) Duration of defendant's misconduct[;]
>
> (7) Remedial action by the defendant[;]

21

(8) Defendant's motivation for harm[; and,]

(9) Whether defendant attempted to conceal its misconduct.

*Read*, 970 F.2d at 827; *see WCM Indus.*, 721 F. App'x at 972–74 (affirming a district court's application of the *Read* factors post-*Halo*).

### B.    The *Read* Factors Establish That Norton Acted Egregiously

In its Memorandum Opinion addressing Norton's Renewed Motion for Judgment as a Matter of Law (ECF No. 1337), the Court affirmed the jury's finding of willful infringement. The Court "will rely on that finding," and thus Columbia has established the first prerequisite for enhanced damages: willfulness. *See EagleView Techs.*, 522 F. Supp. 3d at 48.

Further, on balance, the nine *Read* factors indicate that Norton engaged in sufficiently culpable conduct to warrant enhancing damages in this case.

#### 1.    Factor One: Deliberate Copying

The first factor looks to whether Norton deliberately copied Columbia's ideas or design, but not necessarily whether Norton copied Columbia's actual patent. *Barry v. Medtronic*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017). Neither "[s]lavish copying" nor "[s]moking gun" evidence of copying is required, but rather even a "recklessness towards copying alone" may warrant an enhancement. *Id.* In conducting this inquiry, courts may consider copying even if it was done before the patent was issued. *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 900 (E.D. Wis. 2017).

In about 2004, Professors Stolfo and Keromytis conceived the invention of "application communities." (ECF No. 1210, at 149, 152; ECF No. 1211, at 68–69; Apr. 13 Trial Tr. 556:10–15, 559:1–3; Apr. 14 Trial Tr. 788:23–789:6.) Based on this invention, Columbia created a simulation of the system. (ECF No. 1210, at 160–62; Apr. 13 Trial Tr. 567:22–569:8.) In

22

**Appx123**

October 2005, Columbia filed a provisional patent application for the "application communities"
system and concept. (ECF No. 1210, at 153–55; ECF No. 1211, at 67–68, 73–74, 154–55; Apr.
13 Trial Tr. 560:25–561:11, 562:10–14; Apr. 14 Trial Tr. 787:25–788:7, 793:4–794:8, 874:13–
875:22.) This provisional patent application was "published in May of 2007 so the whole world
could see it." (ECF No. 1214, at 163; Apr. 19 Trial Tr. 1566:1–4.)

In the fall of 2004, the Defense Advanced Research Projects Agency ("DARPA") asked
Professors Stolfo and Keromytis to lead and participate in a workshop centered around the
"application communities" invention. (ECF No. 1210, at 166; ECF No. 1211, at 74; Apr. 13
Trial Tr. 573:1–9; Apr. 14 Trial Tr. 794:14–25.) Brian Witten, Norton's then Director of
Government Research, attended the DARPA workshop, where he learned the details of the
invention and was interested to the point that he sought out a license so it could be used in
Norton products and even discussed specific financial terms. (ECF No. 1210, at 166–69, 171–
72, 175–78, 223, 228–29; Apr. 13 Trial Tr. 573:25–575:14, 576:8–12, 578:11–579:2, 579:14–25,
582:21–25, 583:22–584:2, 584:9–17, 584:23–585:5, 630:2–8, 635:12–636:3; ECF No. 1211, at 75–
76, 150–52; Apr. 14 Trial Tr. 795:8–796:25, 870:14–871:14, 871:25–872:6; PX-83.) The
undisputed evidence shows that Mr. Witten was informed that a patent application had been
filed, (ECF No. 1210, at 220, 297; Apr. 13 Trial Tr. 627:3–17, 704:1–23), and understood the
connotations of such an action by asking to license the intellectual property rights. (ECF No.
1210, at 178–79, 218, 222; Apr. 13 Trial Tr. 585:11–15, 586:13–17; 625:14–18, 629:14–17.)

The record evidence thus shows that Norton was aware of the "application
communities" invention in 2005. Norton does not deny this knowledge, but merely alleges that
Columbia did not have any "rights in the application communities technology until 2011," when
the '115 Patent was issued. (ECF No. 1277, at 14). The law does not require that Norton

23

Case 3:13-cv-00808-MHL Document 1334 SEALED 10/20/2309 Page 24 Page 42 PageID# 63152

copied the exact patent itself, but simply the ideas or design behind the patent.  Notably absent

from the record is any evidence or argument that Norton arrived at this idea or developed the

Accused Products independent of the "application communities" technology.  Thus, the Court

finds by a preponderance of the evidence that Norton copied the "application communities"

technology.  Therefore, the first factor weighs in favor of enhancement.

### 2.      Factor Two: Good-Faith Belief of Non-Infringement

"The second factor assesses the extent of [Norton's] efforts to determine whether the

patent was valid and whether [its] product infringed upon it."  *Milwaukee Elec. Tool Corp.*, 288

F. Supp. 3d at 901.  Absent evidence of an "adequate investigation," courts will likely find that

the infringing party did not have a reasonable belief that the patent was invalid.  *Id.*  Courts

conduct this inquiry and determine culpability "at the time of the infringing conduct."  *Barry*,

250 F. Supp. 3d. at 116.

SONAR/BASH was launched in 2009.  (ECF No. 1214, at 72; Apr. 19 Trial Tr. 1475:4–

6.)  As discussed above, Norton was aware of Columbia's invention in 2005.  Mr. Witten not

only was present at a workshop that centered around the technology in question, but he also

engaged in correspondence with Columbia to discuss the possibility of licensing the "application

communities" invention.  Columbia's patent application was published in 2007 and, with even

minimal investigation, could have easily been discovered by Norton prior to the launch of

SONAR/BASH.  However, Norton failed to investigate any potential infringement at that point.

In fact, Norton as a matter of policy does not investigate or design around pre-existing patents.

(Trial Tr. 1418:5; JX-005 67:8–10; 69:6–15.)  To be sure, once this litigation ensued, Norton

took steps to argue a good-faith belief that the Accused Products were non-infringing.  However,

the test requires the Court to look at the conduct "at the time of the infringing conduct," *Barry*,

24

250 F. Supp. 3d. at 116, not at the conduct or defenses a party can conjure in preparation for litigation. *See Halo*, 579 U.S. at 105. Therefore, the Court finds by a preponderance of the evidence that Norton did not conduct a reasonable investigation or make other good faith efforts to determine whether the patents were valid and whether its products infringed upon the patents. The second factor weighs slightly in favor of enhancement.

### 3. Factor Three: Litigation Conduct

The third factor looks to Norton's "behavior as a party to the litigation." *EagleView Techs*, 522 F. Supp. 3d at 51. Courts will look to see if the party engaged in litigation misconduct, such as "bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." *i4i Ltd. P'ship*, 598 F.3d at 859. If this conduct rises to the level of malicious, enhanced damages are appropriate. *Purewick Corp. v. Sage Prods., LLC*, No. CV 19-1508, 2023 WL 2734418, at *14 (D. Del. Mar. 31, 2023), *appeal dismissed*, No. 2023-1868, 2023 WL 4230367 (Fed. Cir. June 28, 2023). Here, Norton's abhorrent litigation conduct in this matter strongly indicates that it acted with sufficiently culpable conduct to support an enhancement.

#### a. Dr. Dacier

The Court describes in detail Norton's improper conduct with respect to Dr. Dacier in its Memorandum Opinion on Columbia's Motion to Show Cause, which is fully incorporated herein. (ECF. No. 1331.) In sum, the Court has found that Norton—through counsel and in bad faith—prevented Dr. Dacier from testifying at trial. Dr. Dacier appeared ready and able to offer what would almost certainly be damaging testimony to Norton. Only after Norton's intervention and flagrant misrepresentation that the Court found that Norton's counsel represented Dr. Dacier

25

**Appx126**

Case 3:13-cv-00888-MHL Document 1345 SEALED 10/20/2023 Page 26 Page 42 PageID # 63154

did he purportedly renounce his desire to testify.[13]  Moreover, Dr. Dacier's later emails clarify that he was always "willing to help," but had been told by Norton's counsel there was no need or desire for him to do anything.

As previously found by the Court, this misconduct justifies a negative inference that further supports a finding of egregiousness.  Indeed, this Court can characterize Norton's conduct with respect to Dr. Dacier as nothing other than "egregious."  The record abundantly shows that Norton, through its counsel, prevented Dr. Dacier from testifying at trial through a combination of active misrepresentations and passive obstreperousness.  Based on this conduct, counsel for Norton was found in contempt.  Even without the resulting negative inference, there is ample support to find that this factor weighs strongly in favor of enhancement.  *See Cargill, Inc. v. Sears Petroleum & Trans. Corp.*, 388 F. Supp. 2d 37 (N.D.N.Y. 2005) (finding case exceptional and awarding attorneys' fees largely based on party's misconduct regarding production of witness).

---

[13] Citing *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161 (Fed. Cir. 2022), Norton argues that its counsel's and Norton's litigation conduct (including its handling of Dr. Dacier) do not warrant enhanced damages because it "ha[s] no connection whatsoever to infringement of the '115 and '322 patents."  (ECF No. 1277, at 27.)  But *Sonoco* noted only that "acts of litigation misconduct standing *alone* 'are not sufficient for an increased damages award.'"  32 F.4th at 1179; *see also i4i Ltd. P'ship*, 598 F.3d at 859 ("Microsoft is correct that it would have been improper to enhance damages based *solely* on litigation misconduct . . . ." (emphasis added)).  As discussed *supra* and *infra*, the Court relies on additional *Read* factors to conclude that Norton's conduct was egregious.  *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (affirming district court's award of enhanced damages where the lower court considered "at least 'the infringer's behavior as a party to the litigation,' the infringer's 'size and financial condition,' the infringer's 'motivation for harm,' and the '[c]loseness of the case.'" (alteration in original)).

26

b.       **Repetitive Arguments Before and During Trial**

Likewise, Norton's consistent relitigation of settled issues—and a refusal to abide by the Court's warnings at trial—constitute egregious behavior.  For instance, Norton attempted to insert a back-door claim construction argument into its *Daubert* motion regarding Dr. Bailey and its brief regarding Columbia's *Daubert* motion regarding Dr. Jaeger.  (ECF Nos. 362, 416.)  The Court had clearly rejected Norton's preferred construction of the term "application community"—yet Norton nevertheless tried to resurrect that same preferred construction in its *Daubert* briefing.  Moreover, Norton, at least purportedly, sought to introduce Columbia's unaccepted offers to license other patents to third parties to prove a point of fact *that was not in dispute*.  (ECF 1014, at 3; ECF No. 891 (sealed), at 3.)

Further, in another troublesome dispute, Norton attempted to exclude testimony regarding licenses that Columbia had not disclosed during discovery as a sanction for failing to disclose those licenses.  (ECF No. 769, at 21.)  Yet Norton's briefing badly mischaracterized the pertinent events:  the parties had mutually agreed that Columbia would not produce those licenses in discovery.  (ECF No. 1016 at 3; ECF No. 898 (sealed), at 3 (quoting ECF No. 801-16, at 3).)  Likewise, in another tactic evincing highly improper representations to the Court, Norton affirmatively instructed its expert witness—Dr. Jaeger—to incorporate post-hypothetical negotiation data driving down SONAR/BASH's value into his analysis.  (ECF No. 1019 at 4; ECF No. 903 (sealed), at 4.)

Perhaps most "egregiously," Norton attempted another end-run at trial:  this time, in an effort to circumvent the Court's ruling excluding Dr. Jaeger's ultimate apportionment figure. Norton's counsel attempted to rely on a guess from a *lay* witness to introduce an apportionment figure calculated by counsel alone to compete with Dr. Cole's calculations.  (*See* ECF No. 1214,

27

Case 3:13-cv-00888-MHL Document 1345 SEALED 10/20/2023 Page 28 Page 42 PageID# 63156

at 249–251; Apr. 19 Trial Tr. 1652:2–1654:6); *cf. Joyal Prods., Inc. v. Johnson Elec. N.A., Inc.*, No. 04-5172, 2009 WL 512156, at *6 (D.N.J. Feb. 27, 2009) (noting in its discussion of the third *Read* factor that "counsel repeatedly asked questions" to a damages expert "of a technical nature after being warned by the Court that the witness was not presented as a technical expert"). Furthermore, Norton's counsel attempted to introduce this new figure only through cross-examination of one of Columbia's witnesses who repeatedly rejected the basis for the counsel's calculations. (*See* ECF No. 1214, at 249; Apr. 19 Trial Tr. 1652.) In other words, faced with an inability to introduce a damages total during its own case-in-chief, Norton instead sought to conjure a new figure through cross-examination—without any foundation laid by an expert witness. The Court reiterates its position that it "appreciate[s] strong advocacy." (ECF No. 1214, at 9; Apr. 19 Trial Tr. 1412:6–7.) But employing blatantly improper cross-examination in an attempt to subvert a prior ruling of the Court strays out of the realm of strong advocacy and into the zone of grossly improper conduct.

Finally, Norton ignored repeated warnings of this Court not to present witnesses with factually incorrect predicates when cross-examining witnesses. Despite having clearly "put[] [Norton's counsel] on notice" that the Court was "concerned about how" Norton had "misrepresent[ed] what a witness has said," Norton's counsel—later that same day—again attempted to cross-examine a Columbia witness on an apportionment figure that lacked any proper foundation. (ECF No. 1214, at 9–10, 249–251; Apr. 19 Trial Tr. 1412:6–1413:6, 1652:2–1654:6.)

In short, as to litigation conduct, Norton consistently relitigated settled issues, ignored prior warnings about perceived misconduct, and adopted astonishing litigation positions that were, as described in the Memorandum Opinion on Columbia's Motion to Show Cause (ECF.

28

Case 3:13-cv-00888-MHL Document 1345 SEALED Filed 10/20/2030 Page 29 Page 42 PageID #
63157

No. 1331), highly questionable at best. *See Cyntec Co., Ltd. v. Chilisin Elecs. Corp.*, No.
18cv939, 2022 WL 1443232, at *14–15 (N.D. Cal. May 6, 2022) (finding that relitigation of
claim construction issues weighed in favor of enhanced damages and trebling damages on the
basis of that and other *Read* factors); *accord Saint-Gobain Autover USA v. Xinyi Glass N. Am.,
Inc.*, 707 F. Supp. 2d 737, 752–53 (N.D. Ohio 2010) (noting that the defendant "'pursued a
strategy of giving superficial recognition to the Court's claim construction rulings, while
continuing to press its own interpretation of the claims'" (quoting *Kellogg v. Nike, Inc.*, No.
8:07cv70, 2009 WL 3165529, at *12 (D. Neb. Sept. 30, 2009))).

Like its conduct regarding Dr. Dacier, Norton's actions before and during trial were
egregious. On the whole, and as characterized by Columbia, Norton (i) engaged in
"gamesmanship" and "appalling," "strategically obstructive," and "facial[ly] bad faith" conduct
(ECF No. 1100 at 55–57, 88, 90; April 7 Tr. 55:25–57:5; 88:4-10, 90:8-9; ECF No. 889 (sealed),
at 13–14), (ii) made ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (ECF No. 889 (sealed), at 13; ECF No. 1101 at 5;
April 8 Tr. 5:8-10), (iii) repeatedly filed motions that were "meritless" or "inappropriately
s[ought] to 'rehash'" decided issues (ECF No. 889 (sealed), at 13; ECF No. 703 (sealed), at 11),
(iv) engaged in "utterly improper" trial conduct that "misrepresent[ed] the record and . . .
misle[d] the jury" (ECF No. 1155 at 6-7), and (v) attempted "to make a messy record" to obscure
the merits (ECF No. 897, at 10; March 17 Tr. 10:17–18). The third *Read* factor thus weighs as
heavily in favor of enhancement as it could.

### 4.    Factor Four: Defendant's Size and Financial Condition

Under the fourth *Read* factor, a "[d]efendant's size and financial condition should be
viewed both relative to the [p]laintiff and also individually to ensure that enhanced damages

29

would 'not unduly prejudice the [defendant's] non-infringing business.'" *Packet Intelligence LLC v. NetScout Sys., Inc.*, Case No. 2:16cv230, 2018 WL 11352445, at *4 (E.D. Tex. Sept. 7, 2018) (quoting *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009)), *vacated on other grounds by Packet Intelligence LLC v. NetScout Sys., Inc.*, Case No. 2:16cv230, 2022 WL 1406915 (E.D. Tex. May 4, 2022); *see Alfred E. Mann Foundation for Scientific Rsch. v. Cochlear Corp.*, No. CV 07-8108, 2018 WL 6190604, at *29 (C.D. Cal. Nov. 4, 2018) ("In evaluating this *Read* factor, the proper focus is on the size and financial condition of the infringer and not on the ability of a plaintiff to protect its patent.").

Here, this factor tips toward enhancement. Norton is a large company, employing 2,700 people. (ECF No. 1217, at 102–03; Apr. 22 Trial Tr. 1980:12–1981:19.) And it is a *successful* company, earning around $2.6 billion in revenue in 2021. (ECF No. 1255-30, at 7.) It acknowledged this financial success in its 2021 letter to investors, noting that Norton "finished fiscal year 2021 with strong results, delivering record revenue and non-GAAP profit in Q4," and "annualized free cash flow in excess of $900 million." (ECF No. 1255-30, at 7.) Norton's non-infringing business would therefore not be "unduly prejudiced" by enhancing the jury's award of $185 million. Although Norton argues that the maximum possible award "would wipe out Norton's entire net income in 2021,". (ECF No. 1277, at 29), the Federal Circuit has indicated that courts may look to a company's *revenue* across a relevant period, not its net income. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010). Here, Norton's $2.6 billion in 2021 revenue  dwarfs even the maximum available award here of $555 million. Moreover, courts may enhance an award where damages are "only a small fraction of [the infringer's] profits from the sale of [infringing] products." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010). Here, Norton earned $18.5 billion in revenue for its sales of products that

Case 3:13-cv-00808-MHL Document 1334 SEALED *10/20/2309 Page 31 Page 42 PageID# 63159

included infringing technology through February 2022. (ECF No. 1216, at 1738; Apr. 21 Trial Tr. 1738:3–16.)

The Court acknowledges that Columbia University is also a large entity with vast resources. But while the size of the plaintiff may be *relevant* to the fourth *Read* factor, it is not dispositive. In *i4i Ltd. P'ship*, the Federal Circuit affirmed the district court's determination that the fourth factor warranted enhanced damages, looking only to the defendant's size and financial condition. 598 F.3d at 858. Indeed, the Court finds the financial size of Columbia particularly irrelevant here where Columbia is a nonprofit entity that does not compete with Norton and, therefore, Columbia's success will not directly jeopardize Norton's business. Thus, in light of Norton's otherwise healthy financial condition, the Court finds that the fourth *Read* factor tips in favor of enhancement.

### 5.    Factor Five: Closeness of the Case

"The fifth factor examines whether the case involved a meaningful defense to the claims or whether it was easily decided against the infringer" and "ties in closely with the second factor." *Milwaukee Elec. Tool Corp.*, 288 F. Supp. 3d at 903. This factor weighs in favor of enhancement.

As noted in the analysis of the second factor, Norton failed to conduct an investigation into the scope of the "application community" patents to obtain good-faith belief that the patents were invalid or not infringed by the SONAR/BASH technology. Instead, its defenses were devised by its counsel upon being sued by Columbia, and factor two weighs in favor of enhancement.

When looking at factor five, Norton relies heavily on decisions of this Court, the Federal Circuit, and the Patient Trial and Appeal Board ("PTAB") which occurred in the first five years

31

**Appx132**

Case 3:13-cv-00808-MHL Document 1334 SEALED 10/20/2309 Page 32 of 42 PageID# 63160

of this litigation to claim the case was not close because it's "noninfringement and invalidity arguments got rid of 97% of Columbia's original claims." (ECF 1277, at 19.)  However, this Court ruled prior to trial that "the Previously Asserted Patents cannot be admitted to prove that 'Norton's belief in non-infringement and invalidity of the asserted patents was objectively reasonable.'" (ECF No. 912 (sealed), at 3.)  Similarly, the Previously Asserted Patents are not relevant to whether Norton's conduct as to the infringed patents was egregious.

The infringement claims pertaining to the '115 and '322 Patents were kept by both the Federal Circuit and the PTAB.  After multiple rounds of claims construction and invalidity and non-infringement claims in front of this Court, and then two separate appeals, the claims regarding Norton's infringement on the '115 and '332 Patents remained alive.  This does not support a finding that the issues relating to the '115 and '322 Patents were close.  In looking at the litigation history which occurred after the Federal Circuit and PTAB rulings as to these two patents, Columbia has prevailed on the vast majority of issues.  *See Stryker Corp. v. Zimmer, Inc.*, No. 1:10–CV–1223, 2017 WL 4286412, at \*5 (W.D. Mich. July 12, 2017) (favoring enhancement where "[e]very major decision—from claim construction to post-verdict motions—went against [infringer]"), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018).

Furthermore, despite the issuance of an *Allen* charge,[14] this was not a close case for the jury.  *See Briese*, 2013 WL 12061874 at \*6 ("[T]he Court can only speculate as to whether the jury was deadlocked on patent liability or one of the many other issues presented by this case.")  The jury question necessitating the *Allen* instruction indicated that the jury was at an impasse on

---

[14] "An *Allen* charge, based on the Supreme Court's decision in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is '[a]n instruction advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument.'" *United States v. Burgos*, 55 F.3d 933, 935 (4th Cir. 1995) (quoting *United States v. Seeright*, 978 F.2d 842, 845 n. \* (4th Cir.1992)).

32

Case 3:13-cv-00808-MHL Document 1334 SEALED 10/24/2023 Page 42 PageID# 63161

only one of the fourteen questions they were presented on the verdict form and that "a significant amount of time ha[d] been spent on this situation with no result." (ECF No. 1222, at 4–5; Apr. 29 Trial Tr. 2964:18–2965:4.) This was at approximately 4:45 on Friday night. (ECF No. 1222, at 18–23; Apr. 29 Trial Tr. 2978:15–2983:13.) After receiving the *Allen* instruction and given the option to return on Monday, the jury took less than five minutes to decide to recess for the weekend. Once the jury returned the next business day, it took approximately two hours to finalize a verdict that was overwhelmingly in favor of Columbia. (*See* ECF No. 1206.)

In sum, viewing the litigation pertaining to the '115 and '322 Patents in totality, and the issues that were in front of the jury, the Court does not find that this case was close. It was excessively litigated, but not close. Thus, the fifth *Read* factor tips in favor of enhancement.

### 6.    **Factor Six: Duration of Defendant's Misconduct**

"The sixth factor considers the duration of the infringer's misconduct." *Wash World Inc. v. Belanger Inc.*, No. 19-C-1562, 2023 WL 3216684, at *10 (E.D. Wis. Mar. 30, 2023). This factor favors enhancement. "Continuing to sell infringing products after receiving notice of infringement, during the course of the litigation and/or after a finding of infringement supports an enhancement of damages." *Alfred E. Mann*, 2018 WL 6190604, at *30 (citing *PPC Broadband, Inc. v. Corning Optical Comms. RF, LLC*, No. 5:11-cv-761, 2016 WL 6537977, at *8 (N.D.N.Y. 2016)). At a minimum, Norton became aware of its infringing activities at the inception of this litigation in 2013. And it continued to sell the Asserted Products that implemented accused functionalities throughout this nearly decade-long case. (ECF No. 1217, at 115–16; Apr. 22 Trial Tr. 1993:23–1994:2); *see Alfred E. Mann*, 2018 WL 6190604, at *31 (finding this factor weighed in favor of enhancement when "there was substantial evidence that [the defendant] infringed for 11 years after it was directly notified of the . . . patent and seven

33

**Appx134**

years after this case was filed"). Almost ten years of infringement certainly favors enhanced damages.

Norton attempts to counter, contending that "the fact that Norton did not design around Columbia's patents reflects only Norton's continued good-faith belief in its noninfringement." (ECF No. 1277, at 32.) This argument fails for two reasons. First, the jury already found that Norton willfully infringed the '115 and '322 Patents (a verdict this Court has upheld). *See Briese Lichtenchnik Vertriebs GMBH v. Langton*, No. 09cv9790, 2013 WL 12061874, at *5 (S.D.N.Y. Dec. 18, 2013) (noting in its discussion of the second *Read* factor that "the Court and the jury found that Defendant's [products] infringed on every element of claim one" of the patent at issue). Second, the U.S. Supreme Court has already rejected such a defense to enhanced damages in *Halo*. Indeed, one of the Supreme Court's primary concerns that led it to abrogate the prior standard for enhancement was that it "aggravate[d] the problem" of preventing the most culpable offenders from receiving enhanced damages "by making dispositive the ability of the infringer to muster a reasonable (even though unsuccessful) defense at the infringement trial." *Halo*, 579 U.S. at 105; *see WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340–41 (Fed. Cir. 2016) ("[A]s the Supreme Court explained in *Halo*, timing *does* matter. [A defendant] cannot insulate itself from liability for enhanced damages by creating an (ultimately unsuccessful) invalidity defense for trial after engaging in the culpable conduct of copying, or 'plundering,' [the plaintiff's] patented technology prior to litigation.").

Likewise, the court in *Alfred E. Mann* rejected the same argument Norton advances now, repudiating the defendant's "implicit proposition that the clock on infringing activity does not start until a trier of fact definitively rules on whether the patent at issue has been infringed." 2018 WL 6190604, at *30. "Under [that] approach, the sixth *Read* factor is unnecessary, and

34

large corporations . . . would be incentivized to infringe a smaller entity's patent and run out the

clock until the patent expires." *Id.* This Court concurs with that analysis. In light of the jury's

finding that Norton willfully infringed the '115 and '322 Patents, Norton's argument that it

believed in good faith that it had not infringed cannot prevail.[15] *See EagleView Techs.*, 522 F.

Supp. 3d at 53 (noting that the "vast majority" of courts to address this argument have rejected

it). The sixth *Read* factor thus favors enhancement.

### 7.    Factor Seven: Remedial Action by Defendant

The seventh factor analyzes "whether the infringer took any remedial action to address its

infringement." *Wash World Inc.*, 2023 WL 3216684, at *10. This factor likewise tips in

Columbia's favor.

Norton does not dispute that it never attempted to design around Columbia's patents or

take any other remedial steps, such as implementing a non-infringing alternative.[16] Norton's

witness testified he had not looked at the technology. (ECF No. 1217, at 115–16; Apr. 22 Trial

Tr. 1993:23–1994:2; ECF No. 1277, at 32.); *see EagleView Techs.*, 522 F. Supp. 3d at 53

("Defendants continued to infringe, seemingly took no efforts to design around the patent, and

---

[15] Norton's additional argument—that Columbia prolonged this litigation—fairs no
better. The focus of the sixth *Read* factor is not on the length of litigation, but on the defendant's
infringement activity *during* that litigation. Whether Columbia's actions extended this case's
duration has no bearing on whether Norton infringed during the case's pendency.

[16] Norton's proffered evidence of a non-infringing alternative was struck by the Court
because it rested on inadmissible data that post-dated the time of the hypothetical negotiation.
(ECF No. 904, at 6.) Norton had improperly sought to use BPE data, meaning that it would not
have been available at the time of the hypothetical negotiation. (ECF No. 904, at 6.) Moreover,
Norton offered no probative evidence, expert or otherwise, that the version of BPE that existed at
the time of the 2011–2013 hypothetical negotiation could remove SONAR/BASH such that the
system would function by only using BPE. (ECF No. 904, at 6–7.) This leans towards a finding
that Norton *knew* this.

35

kept their products on the market until the very end."). Indeed, Norton has a *policy* of refusing to

design around patents. (ECF No. 1214, at 15; Trial Tr. 1418:5; JX-005 67:8–10; 69:6–15.)

Further, Norton failed to make efforts to license the technology before Columbia resorted

to litigation, even though it was aware of the infringement. *Alfred E. Mann*, 2018 WL 6190604,

at *31 ("The court finds it significant that plaintiff tried to resolve the matter without

immediately resorting to litigation by contacting [the defendant] and offering to license the

patent."); *see SRI Int'l*, 127 F.3d at 1465–69 (affirming district court's award of treble damages

where defendant was alerted to the possibility of infringement after having been offered a

nonexclusive license to the patent). In light of Norton's undisputed failure to take any remedial

efforts, the Court finds that the seventh *Read* factor favors enhancement.

### 8. Factor Eight: Defendant's Motivation for Harm to Plaintiff's Business

The eighth *Read* factor does not apply in this case. "[T]his factor is typically viewed as

supporting enhanced damages where 'the infringer engages in infringing conduct to gain an edge

over the patentee in a competitive market.'" *Pavo Solutions LLC v. Kingston Tech. Co., Inc.*,

No. 8:14cv01352, 2021 WL 3116849, at *14 (C.D. Cal. Feb. 16, 2021) (quoting *Funai Elec. Co.

v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1116 (N.D. Cal. 2009)). "'Because this factor

focuses on marketplace conduct, it is less significant where . . . the parties are not competitors.'"

*Id.* (alteration in original) (quoting *Powell v. Home Depot U.S.A., Inc.*, 715 F. Supp. 2d 1285,

1299 (S.D. Fla. 2010)); *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co*., No. 15 CIV. 10154,

2022 WL 17851810, at *77 (S.D.N.Y. Dec. 22, 2022) ("when the infringer is a direct competitor,

this factor generally weighs in favor of enhanced damages.") (internal citations omitted).

Here, Columbia "does not design, manufacture, or sell any products"; instead, its research

laboratory was "formed for the sole purpose of" developing patents and "find[ing] licensing

36

opportunities for" those patents. *Pavo Solutions LLC*, 2021 WL 3116849, at *14 (alteration in original). Thus, "the parties are plainly not competitors." *Id.* Nor does the record indicate that Norton was specifically "[motivated] out of greed and spite," despite perhaps the instances of litigation conduct already accounted for by this Court. *Id.* (alteration in original). For these reasons, the Court finds that the eighth factor has no application here.

### 9. Factor Nine: Whether Defendant Attempted to Conceal Its Misconduct

Lastly, the ninth *Read* factor looks to whether the infringer tried to conceal its infringement. *Wash World Inc.*, 2023 WL 3216684, at *10. This factor weighs slightly against enhancement on the present record. Columbia argues that "Norton withheld documents and information relevant to its willful infringement by (i) failing to produce any documents regarding Norton's 2005 interest in licensing Columbia's 'application communities' technology[]"— namely, communications involving Norton employee Brian Witten—and "(ii) removing Mr. Witten from Norton's Rule 26 disclosures in 2018 on the plainly incorrect premise that Mr. Witten had no information relevant to the case." (ECF No. 1255 at 33–34; ECF No. 1251 (sealed), at 33–34.)

With respect to the first accusation, the present record is not sufficiently clear for the Court to conclude by a preponderance of the evidence that Norton intentionally withheld these communications. Norton contends that it "produced all of Mr. Witten's communications in its possession, but did not have emails going back to 2005." (ECF No. 1277, at 33.) Columbia counters that this appears to be untrue, as "Norton has produced at least 96 emails from 2005, including an email from Mr. Witten." (ECF No. 1308 at 24; ECF No. 1307 (sealed), at 24.) Crucially, however, Columbia never moved to compel production of these undisclosed communications. It stands to reason that if Columbia had an inkling that Norton was

37

withholding critical documents—an inkling it at least *should* have had[17]—it would have moved

the Court for an order compelling Norton to produce those documents.  The record is likewise

unclear about Norton's rationale for removing Mr. Witten from its initial witness disclosures

when this case resumed in 2018.  In other words, both parties call into doubt the veracity of each

other's factual characterizations—but Columbia bears the burden of proof as the moving party.

*See Purewick Corp.*, 2023 WL 2734418, at \*15.  Thus, in light of an ambiguous record, the

Court declines to find that Norton intentionally withheld information related to Mr. Witten.

Thus, this factor weights slightly against enhancement.

### 10.    Balancing the *Read* Factors

On balance, the *Read* factors indicate that enhancement is warranted.  As discussed, the

first, second, fourth, fifth, and sixth factors weigh in favor of enhancement, the third and seventh

factors weigh strongly in favor of enhancement, the eighth factor does not apply in this case, and

the ninth factor weighs slightly against enhancement.  In addition to willfully infringing for a

long period of time—and failing to take steps to remedy that infringement—Norton's

misconduct in litigating this case has been some of the most "egregious" this Court has ever

observed.

As a whole, the clear weight of the *Read* factor analysis weighs heavily in favor of

enhancement, especially in light of the Court's negative inference stemming from its contempt

---

[17] Indeed, Columbia expressly knew before trial that Mr. Witten had been involved in at least some type of discussions about the "application communities" technology.  One of its own exhibits (PX-83) is a "November 2005 e-mail chain" with Professors Stolfo and Keromytis in which "Mr. Witten expressed interest in the . . . technology."  (ECF No. 1255 at 13; ECF No. 1251 (sealed), at 13.)

Case 3:13-cv-00808-MHL  Document 1334 SEALED  Filed 10/20/2023  Page 39 of 42 PageID# 63167

finding (ECF No. 1331). Seven out of eight of the applicable *Read* factors,[18] or 87.5%, support enhancement. While it is possible that this record might support treble enhancement under the *Read* analysis even absent consideration of the negative inference, the Court in its discretion finds it appropriate to enhance the jury's damages award by 2.6 times, which is roughly 87% of the permissible enhancement, for a total of $481,293,090.00.

### B. The Court Will Grant Columbia Attorneys' Fees Because This Case Is Exceptional

#### 1. Legal Standard: Attorneys' Fees Under the Patent Act

In patent actions, district courts may, pursuant to 35 U.S.C. § 285, "award reasonable attorney fees to the prevailing party" in "exceptional cases." 35 U.S.C. § 285. The Supreme Court has "held that an exceptional case is 'one that stands out from others with respect to the substantive strength of a party's litigating positions (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'" *Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). "This analysis considers the case based on the totality of the circumstances, requiring a movant to show the case is exceptional by a preponderance of the evidence." *Id.* (citing *Octane Fitness*, 572 U.S. at 554, 557–58). District courts are afforded "great deference" in their exceptional-case determinations. *Id.* And like with enhanced damages, courts of appeals review a district judge's exceptionality determination for abuse of discretion. *Id.*

The Federal Circuit has clarified that "a district court has discretion, in an appropriate case, to find a case exceptional based on a single, isolated act." *Intell. Ventures I LLC v. Trend*

---

[18] As discussed above, the Court finds one of the nine *Read* factors, specifically the eighth factor—Defendant's motivation for harm to Plaintiff's business, inapplicable in this case because the parties are not competitors in the marketplace.

39

**Appx140**

*Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019). Indeed, a willfulness finding by itself "is a 'compelling' indication" that a case is exceptional. *Georgetown Rail Equip. Co. v. Holland, L.P.*, No. 6:13cv366, 2016 WL 3346084, at *22 (E.D. Tex. June 16, 2016) (quoting *S.C. Johnson & Son v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986)). But district courts must find "an exceptional case," not an exceptional portion of a case. *Intell. Ventures I LLC* at 944 F.3d at 1384 In other words:

> The district court must determine whether the conduct, isolated or otherwise, is such that when considered as part of and along with the totality of circumstances, the case is exceptional, i.e., the case stands out among others with respect to the substantive strength of a party's litigating position or the unreasonable manner in which the case was litigated.

*Id.* (citing *Octane Fitness*, 572 U.S. at 554).

Further, "a court must award fees in an amount that 'bear[s] some relation to the extent of the misconduct.'" *Id.* (quoting *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1278 (Fed. Cir. 2018)). That is because "attorney fees under § 285 are compensatory, not punitive." *In re Rembrandt Techs.*, 899 F.3d at 1278. Thus, a "'fee award may go no further than to redress the wronged party "for losses sustained"; it may not impose additional amount as punishment for the sanctioned party's misbehavior.'" *Id.* (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). Indeed, the Supreme Court has been clear that an order awarding attorneys' fees "is limited to the fees the innocent party incurred solely because of the misconduct," *i.e.*, "the fees that party would not have incurred but for the bad faith." *Goodyear Tire*, 137 S. Ct. at 104.

## 2.    Norton's Misconduct Renders This Case Exceptional

The unreasonable manner in which Norton litigated this case leads this Court to conclude that this was an exceptional case. *See Monolithic Power Sys., Inc. v. O2 Micro Intern. Ltd.*, 726

40

Case 3:13-cv-00808-MHL Document 1334 SEALED Filed 10/20/2030 Page 41 of 42 PageID# 63169

F.3d 1359, 1366 (Fed. Cir. 2013) ("'[L]itigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285.'" (quoting *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012))); *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 120 (E.D. Tex. 2017) ("[T]he infringer's behavior as a party to the litigation . . . squarely overlaps with the type of conduct the court should consider for exceptionality."). As fulsomely explained above, Norton engaged in misconduct both pre-trial and during trial, including preventing an important (and damaging) witness from testifying at trial, consistently rehashing settled issues, and improperly cross-examining witnesses on numerous occasions (and ignoring the Court's direction to cease that impropriety).

Moreover, this Court has upheld the jury's finding that Norton's infringement was willful. *See VirnetX, Inc., v. Apple Inc.*, 324 F. Supp. 3d 836, 871 (E.D. Tex. 2017) ("[W]illfullness . . . may be a sufficient basis in a particular case for finding the case 'exceptional.'"); *see also Saint-Gobain*, 707 F. Supp. 2d at 757 (concluding that "the jury's finding of willfulness and Defendants' litigation misconduct support a finding that the case is exceptional"). In *VirnetX*, the Court awarded attorneys' fees for an entire trial based on its findings of (1) willful infringement, (2) litigation misconduct, and (3) the defendant's "handling of . . . conflicts issues that arose on the eve of trial" that "demonstrate[d] a level of gamesmanship." 324 F. Supp. 3d at 872. All three were present in this case as well: the jury found that Norton willfully infringed both patents; Norton engaged in several instances of litigation misconduct; and, its handling of *at least* Dr. Dacier's status as a witness, demonstrated "a level of gamesmanship" as well. *Id.* Thus, the Court finds this case exceptional—and so exceptional as to allow for an award of attorneys' fees.

41

Accordingly, this Court will award Columbia attorneys' fees that are reasonably related to the post-remand[19] misconduct outlined herein.[20]  The parties must meet and confer in good faith in an effort to reach a stipulation as to a reasonable fee award, and absent an agreement, they shall involve the Court if necessary.

### III.  Conclusion

For the foregoing reasons, the Court will GRANT the Motion for Enhanced Damages and the Motion for Attorneys' Fees. (ECF Nos. 1252, 1260.)  The Court will enhance Columbia's damages by 2.6 times, for a total of $481,293,090.00.  The Court will also award Columbia attorneys' fees that are reasonably related to the post-remand litigation misconduct outlined herein.

Date:  September 30, 2023
Richmond, Virginia

M. Hannah Lauck
United States District Judge

---

[19] Fees should not be awarded for appellate litigation.  Although Columbia prevailed on both appeals, it was on a limited number of claims and did so after receiving an adverse decision in this Court in 2014.

[20] The Court declined to award fees in connection with its contempt finding.  (*See* ECF No. 1332, 1333.)  That makes the fee award here even more appropriate.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**THE TRUSTEES OF COLUMBIA**
**UNIVERSITY IN THE CITY OF**
**NEW YORK,**

        **Plaintiff,**

    **v.**                          **Civil Action No. 3:13cv808**

**GEN DIGITAL INC.,**
**f/k/a SYMANTEC CORPORATION,**
**f/k/a NORTONLIFELOCK, INC.,**

        **Defendant.**

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Court GRANTS

the Motion for Enhanced Damages Under 35 U.S.C. Section 284, (ECF No. 1252), and the

Motion for Attorney Fees Under 35 U.S.C. Section 285, (ECF No. 1260).

The Court ORDERS that the jury's award of $185,112,727.00 be enhanced 2.6 times to a

total of $481,293,090.00. The Court further ORDERS that Norton pay attorneys' fees

reasonably related to the post-remand litigation misconduct identified in the accompany

Memorandum Opinion. Finally, the Court ORDERS the parties to meet and confer in good faith

within 30 days from the date of this Order in an effort to reach a stipulation on the fee award. In

the event the parties cannot reach a stipulation on this issue, the parties may file an appropriate

fee petition to resolve any further dispute.

It is SO ORDERED.

Date:  September 30, 2023
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

**Appx144**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK,

   Plaintiff,

  v.            Civil Action No. 3:13cv808

GEN DIGITAL INC.,
f/k/a SYMANTEC CORPORATION,
f/k/a NORTONLIFELOCK, INC.,

   Defendant.

## FINAL JUDGMENT IN A CIVIL CASE

   This action between Plaintiff The Trustees of the Columbia University in the City of New

York ("Columbia") and Defendant Gen Digital, Inc., f/k/a NortonLifeLock, Inc. ("Norton")[1]

came before the Court for a trial by jury, and the jury rendered a verdict on May 2, 2022

regarding U.S. Patent Nos. 8,601,322 (the "'322 Patent"), 8,704,115 (the "'115 Patent"), and

8,549,643 (the "'643 Patent"). (ECF No. 1206.)

   It is now therefore finally ORDERED and ADJUDGED that:

   1.  Norton directly and literally infringed Claims 2, 11, and 27 of the '322 Patent.

   2.  Norton indirectly infringed Claims 2, 11, and 27 of the '322 Patent through

induced infringement.

   3.  Norton indirectly infringed Claims 2, 11, and 27 of the '322 Patent through

contributory infringement.

   4.  Norton directly and literally infringed Asserted Claim 2 of the '115 Patent.

---

[1] The Court previously issued a Notice explaining that it would refer to the Defendant as
"Norton" on a default basis, and why. (ECF No. 1328.)

5.      Norton willfully infringed the '322 Patent.

6.      Norton willfully infringed the '115 Patent.

7.      The infringing product sold to customers located outside of the United States was made in the United States.

8.      The infringing product sold to customers located outside of the United States was distributed from the United States.

9.      Professor Salvatore Stolfo and Professor Angelos Keromytis were joint inventors of the '643 Patent, together with Darren Shou.

10.      Pursuant to the jury's verdict, Columbia is awarded a reasonable royalty for Norton's past infringement of One Hundred Eighty-Five Million One Hundred Twelve Thousand Seven Hundred Twenty-Seven Dollars ($185,112,727.00) for the period from December 6, 2011 to February 28, 2022. Of this total amount, Ninety-One Million Seventy-Five Thousand Four Hundred Sixty-Two Dollars ($91,075,462.00) is for sales to customers located in the United States.

11.      The reasonable royalty includes a royalty for Norton's sales to customers located outside of the United States. Of the total reasonable royalty award, Ninety-Four Million Thirty-Seven Thousand Two Hundred Sixty-Five Dollars ($94,037,265.00) is for sales to customers located outside of the United States.

12.      Pursuant to the parties' stipulation, Columbia is awarded pre-verdict interest for the period from December 6, 2011, to February 28, 2022, in the amount of Forty-Six Million Four Hundred Twenty-Eight Thousand One Hundred Fifty Dollars ($46,428,150.00). (ECF No. 1335 (sealed), at 4.)

13.    Pursuant to the parties' stipulation, Columbia is awarded supplemental damages for "sales of infringing products between March 1, 2022 and the entry of judgment," to be "calculated by applying the jury's 1% royalty rate to Norton's revenue for sales of Adjudicated Products" during the relevant time frame.  (ECF No. 1247, at 7.)

14.    Pursuant to the parties' stipulation, Columbia is awarded pre-judgment interest for "sales of Adjudicated Products through the date of judgment."  (ECF No. 1247, at 3.)  The calculation of this prejudgment interest shall proceed according to the terms of the parties' stipulation.  (ECF No. 1247, at 3.)

15.    Pursuant to the parties' stipulation, Columbia is awarded a post-judgment running royalty for "sales of infringing products after the date of judgment," calculated "by applying the jury's 1% royalty rate to Norton's sales of Adjudicated Products after the date of judgment and through the expiration of the Asserted Patents."  (ECF No. 1247, at 3.)  The calculation, accounting, and making of post-judgment running royalty payments shall proceed according to the terms of the parties' stipulation.  (ECF No. 1247, at 6.)

16.    Pursuant to the parties' stipulation, Columbia is entitled to an award of post-judgment interest . . . on the total amount in the judgment, calculated at the statutory rate under 28 U.S.C. § 1961(a)." [3]  (ECF No. 1247, at 3.)

---

[3] Section 1961 reads:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court.  Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State.  Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment.  The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

3

17.    Columbia is awarded enhanced damages of 2.6 times the jury's award of One Hundred Eighty-Five Million One Hundred Twelve Thousand Seven Hundred Twenty-Seven Dollars ($185,112,727.00), for a total damages award of Four Hundred Eighty One Million Two Hundred Ninety Three Thousand Ninety Dollars ($481,293,090.00).  (ECF No. 1334.)

18.    Columbia is awarded reasonable attorneys' fees related to the post-remand litigation misconduct identified in the Court's Memorandum Opinion re: Columbia's Motion for Enhanced Damages Under 35 U.S.C. § 284 and Columbia's Motion for Attorneys' Fees Under 35 U.S.C. § 285.  (ECF No. 1333 (sealed).)  The Parties are ORDERED to meet and confer in good faith within 30 days from the date of this Final Judgment in an effort to reach a stipulation on the fee award.  In the event the parties cannot reach a stipulation on this issue, the parties may file an appropriate fee petition to resolve any further dispute.  (ECF No. 1334.)

---

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

(c)

    (1) This section shall not apply in any judgment of any court with respect to any internal revenue tax case.  Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1986.

    (2) Except as otherwise provided in paragraph (1) of this subsection, interest shall be allowed on all final judgments against the United States in the United States Court of Appeals for the Federal [C]ircuit, at the rate provided in subsection (a) and as provided in subsection (b).

    (3) Interest shall be allowed, computed, and paid on judgments of the United States Court of Federal Claims only as provided in paragraph (1) of this subsection or in any other provision of law.

    (4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section.

28 U.S.C. § 1961.

**Appx241**

The Court ENTERS FINAL JUDGMENT against Norton and DIRECTS the Court to

close the case.

It is SO ORDERED.


Date:  September 30, 2023                                        _____/s/_____
Richmond, Virginia                                              M. Hannah Lauck
                                                               United States District Judge

5

**Appx242**

## Virginia Rules of Professional Conduct

### RULE 1.7 Conflict of Interest: General Rule

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph(a), a lawyer may represent a client if each affected client consents after consultation, and:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> (4) the consent from the client is memorialized in writing.

### Comment

…

### *Conflicts in Litigation*

[23] Paragraph (a)(1) prohibits representation of opposing parties in litigation. Simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph(a)(2). An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met.