## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

─────────────────

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,

*Plaintiff-Appellee*,

v.

GEN DIGITAL INC., fka Symantec Corporation, fka NortonLifeLock, Inc.,

*Defendant-Appellant*,

QUINN EMANUEL URQUHART & SULLIVAN, LLP,

*Sanctioned Party-Appellant*.

─────────────────

Appeals from the United States District Court for the Eastern District of Virginia
in No. 3:13-cv-00808-MHL, Judge M. Hannah Lauck

─────────────────

### REPLY BRIEF OF APPELLANT
### QUINN EMANUEL URQUHART & SULLIVAN, LLP

─────────────────

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP*

September 12, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

ARGUMENT ............................................................................................................ 4

I.    The District Court's Order To Publicly Disclose Attorney-Client Communications Rested On A Legally Erroneous Conflict-Of-Interest Finding ........................................................................................ 6

    A.    There Was No Conflict of Interest Between Dr. Dacier and Norton ............................................................................................ 6

    B.    Any Purported Conflict of Interest Did Not Justify Automatically Disqualifying Quinn Emanuel From Representing Dr. Dacier ............................................................. 12

II.    The District Court's Order To Publicly Disclose Attorney-Client Communications Violated The Attorney-Client Privilege .......................... 15

    A.    The Purported Conflict of Interest Did Not Terminate the Attorney-Client Relationship or Otherwise Destroy Attorney-Client Privilege ................................................................................. 15

    B.    Columbia's Efforts to Supply an Alternative Rationale for the Contempt Order Are Unavailing ...................................................... 18

III.    The District Court's Repeated Forays Outside The Adversarial Process And Remarkable Procedural Irregularities Provide Another Independent Basis For Reversal ................................................................ 24

CONCLUSION ...................................................................................................... 29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. United States*,
570 F.2d 1197 (4th Cir. 1978)...................................................7, 8, 11

*Ashcraft v. Conoco, Inc.*,
218 F.3d 288 (4th Cir. 2000)..................................................... *passim*

*Cromer v. Kraft Foods N. Am., Inc.*,
390 F.3d 812 (4th Cir. 2004)................................................. 26, 28, 29

*Doe v. Va. Polytechnic Inst. & State Univ.*,
77 F.4th 231 (4th Cir. 2023)..............................................................25

*Eaton v. City of Tulsa*,
415 U.S. 697 (1974).........................................................................18

*EEOC v. Orson H. Gygi Co.*,
749 F.2d 620 (10th Cir. 1984)..........................................................13

*Eureka Inv. Corp. v. Chi. Title Ins. Co.*,
743 F.2d 932 (D.C. Cir. 1984) .........................................................15

*Fisher v. United States*,
425 U.S. 391 (1976)..................................................................... 3, 21

*Guillen v. City of Chicago*,
956 F.Supp. 1416 (N.D. Ill. 1997) .....................................................8

*In re Search Warrant Issued June 13, 2019*,
942 F.3d 159 (4th Cir. 2019).............................................................21

*In re Teleglobe Commc'ns Corp.*,
493 F.3d 345 (3d Cir. 2007)..............................................................15

*In re Under Seal*,
749 F.3d 276 (4th Cir. 2014)...............................................................4

*McLean v. Cent. States, Se. & Sw. Areas Pension Fund*,
762 F.2d 1204 (4th Cir. 1985)..............................................................4

*New York v. United Parcel Serv., Inc.*,
2016 WL 10672076 (S.D.N.Y. Sept. 2, 2016) .....................................7

*Philips Med. Sys. Int'l B.V. v. Bruetman*,
8 F.3d 600 (7th Cir. 1993)................................................. 12, 24

*Precision Specialty Metals, Inc. v. United States*,
315 F.3d 1346 (Fed. Cir. 2003) ............................................5

*Richmond Hilton Assocs. v. City of Richmond*,
690 F.2d 1086 (4th Cir. 1982).............................................11

*Sciolino v. City of Newport News*,
480 F.3d 642 (4th Cir. 2007)..............................................28

*Shaffer v. Farm Fresh, Inc.*,
966 F.2d 142 (4th Cir. 1992).........................................11, 12

*Trone v. Smith*,
621 F.2d 994 (9th Cir. 1980)..............................................13

*United States v. Carr*,
322 F. Supp. 3d 612 (E.D. Pa. 2018) .....................................13

*United States v. Delavan*,
2018 WL 5985683 (E.D. Va. Nov. 13, 2018) ...............................13

*United States v. Farrell*,
921 F.3d 116 (4th Cir. 2019)..............................................23

*United States v. Occidental Chem. Corp.*,
606 F.Supp. 1470 (W.D.N.Y. 1985)........................................8

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020).......................................................25

*United States v. Talao*,
222 F.3d 1133 (9th Cir. 2000) .............................................5

*Walker v. City of Mesquite*,
129 F.3d 831 (5th Cir. 1997)..............................................5

*Wink, Inc. v. Wink Threading Studio, Inc.*,
   2011 WL 3206915 (E.D. Va. July 26, 2011).......................................................13

*Wolfe v. Johnson*,
   565 F.3d 140 (4th Cir. 2009)...............................................................................11

**Rules**

Va. R. Prof'l Conduct 1.6........................................................................................21

Va. R. Prof'l Conduct 1.7......................................................................... 10, 12, 25

## INTRODUCTION

Columbia's response does not even try to defend critical (and critically flawed) aspects of the district court's analysis, and in the end only underscores that the court plainly exceeded its authority by holding Quinn Emanuel in contempt for declining to immediately disclose years' worth of privileged attorney-client communications on the public docket. Columbia likewise lacks any cogent response to the district court's repeated departures from basic principles of fair notice and party presentation, which themselves amply warrant reversal.

The district court held that "in 2017 through 2020, Quinn Emanuel developed a conflict of interest in representing both Norton and Dr. Dacier," Appx49, and so ordered Quinn Emanuel to "disclose on the record in writing any information garnered from Dr. Dacier during the period" when its "representation of Dr. Dacier was a conflict." Appx57. Columbia briefly (and unpersuasively) argues that a conflict existed, but it has no meaningful defense of either (1) the court's *sua sponte* treatment of that purported conflict as a non-waivable basis for disqualification or (2) the court's deeply flawed assumption that the purported conflict retroactively destroyed attorney-client privilege.

Columbia instead tries to run away from those issues, asserting that the challenged disclosure order "did not depend on the conflict finding." Resp.77. That is obviously wrong. In fact, the order *by its very terms* depends on the court's

erroneous conflict finding; if there was no "period" when Quinn Emanuel's "representation of Dr. Dacier was a conflict," Appx57, then the order did not require Quinn Emanuel to disclose anything at all.

Columbia likewise makes no attempt to defend the district court's assertion that the purported conflict "void[ed]" the written Engagement Agreement between Dr. Dacier and Quinn Emanuel. Appx48. That is telling, but unsurprising, as the Engagement Agreement expressly forecloses any possibility of automatic termination without one party's knowledge. Columbia instead asserts that "there was no real attorney-client relationship" between Dr. Dacier and Quinn Emanuel at all—without even acknowledging the existence of the Engagement Agreement or the undeniable fact that Quinn Emanuel defended Dr. Dacier during seven hours of deposition testimony. Resp.80-81.

Columbia's remaining arguments are equally meritless. Columbia baselessly accuses Quinn Emanuel of arguing only compliance and not privilege below, Resp.3, ignoring that Quinn Emanuel resisted the disclosure order by telling the district court it "ha[d] no authority" to flout "Dr. Dacier's attorney-client privilege" by compelling on-the-record disclosure of his "privileged communications [with] Quinn Emanuel." Appx34041-42. Columbia complains that Quinn Emanuel, not Dr. Dacier, invoked the privilege, but it is "universally accepted that the attorney-client privilege may be

raised by the attorney," *Fisher v. United States*, 425 U.S. 391, 402 n.8 (1976), and the Engagement Agreement obligated Quinn Emanuel to do so.

Columbia suggests that Quinn Emanuel could have avoided contempt by "requesting *in camera* review" or immediately "seeking a stay and interlocutory appeal" before the deadline for compliance. Resp.82. But neither option was realistic, as the district court ordered disclosure of the privileged communications at issue "on the record in writing" by *the very next day*. Regardless, none of that Monday-morning quarterbacking can transform the district court's erroneous disclosure order into "valid decree" capable of "serv[ing] as a basis to sustain the court's civil contempt rulings." *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000). In fact, Columbia's suggestion that Quinn Emanuel should have taken additional self-help measures to stave off contempt just underscores the district court's repeated departures from fundamental rules of party presentation and due process that Columbia all but ignores. The district court's mutually reinforcing substantive and procedural errors converted a routine joint representation of a company witness who testified for some seven hours while represented by Quinn Emanuel into a cause for disqualification and contempt. The district court's contempt order and accompanying sanctions cannot stand.

## ARGUMENT

Columbia does not dispute that a district court's civil contempt ruling cannot stand if the order underlying the sanction was itself invalid. Br.30. The applicable Fourth Circuit law on this point is clear. *See, e.g.*, *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) ("[A] party appealing from a civil contempt order … may challenge 'the order alleged to have been violated.'"); *Ashcraft*, 218 F.3d at 301-03 (reversing civil contempt ruling because the underlying order was invalid); *McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985) ("[R]eversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon.").

That principle controls here, as the district court's *sua sponte* order directing Quinn Emanuel to disclose years of attorney-client communications with Dr. Dacier by *the very next day* was invalid for multiple independent reasons. First, Quinn Emanuel's representation of Dr. Dacier did not raise any conflict of interest, much less a non-waivable conflict that would trigger automatic disqualification. Second, even if there had been a disqualifying conflict, it would not have retroactively destroyed attorney-client privilege over Dr. Dacier's communications with Quinn Emanuel. Third, the fatal substantive flaws in the district court's disclosure order are paired with (and perhaps explained by) its equally fatal procedural flaws, as the district court repeatedly deviated from basic principles of adversarial presentation

and the requirements of due process. Quinn Emanuel was not only justified in resisting the district court's invalid order, but had an ethical duty to protect Dr. Dacier's privileged communications absent a valid waiver of privilege.

These issues are anything but "academic." *Contra* Resp.3, 18. This Court and others have repeatedly held that attorneys have standing to appeal "a formal reprimand" for alleged misconduct—even if no other sanctions are imposed—given the obvious potential for reputational harm. *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1352 (Fed. Cir. 2003); *see, e.g.*, *Walker v. City of Mesquite*, 129 F.3d 831, 832-33 (5th Cir. 1997); *United States v. Talao*, 222 F.3d 1133, 1137-38 (9th Cir. 2000). Moreover, the district court made clear that the contempt sanctions it imposed—a negative inference of egregious conduct—influenced its enhanced damages analysis; indeed, the court explicitly stated that enhancement was warranted "especially in light of the Court's negative inference stemming from its contempt finding." Appx139-40; *see* Appx126-27 (negative inference "further supports a finding of egregiousness"). While the court also found that other factors would have weighed in favor of enhancement even without that negative inference, *see* Appx120-21, Appx127, it nowhere stated that the negative inference "did not affect" its enhancement analysis at all, or that it would have enhanced Columbia's award by the same eye-popping $300 million amount even absent that inference. *Contra* Resp.70. Columbia also ignores the practical reality

that the mistaken conflict finding and departures from due process that ultimately culminated in the contempt finding left Norton with little choice but to retain substitute counsel years into the proceedings. *See, e.g.*, Appx35933. This Court should reverse the district court's contempt order and the accompanying sanctions.

## I. The District Court's Order To Publicly Disclose Attorney-Client Communications Rested On A Legally Erroneous Conflict-Of-Interest Finding.

### A. There Was No Conflict of Interest Between Dr. Dacier and Norton.

1. The district court's *sua sponte* order to disclose attorney-client communications rested on the premise that "Quinn Emanuel developed a conflict in representing both Norton and Dr. Dacier" because of Dr. Dacier's alleged remarks to Professor Keromytis. Appx49; *see* Appx55 n.7, Appx47-50. That premise is incorrect as a matter of law. Dr. Dacier had no personal interest in Columbia's lawsuit against Norton; he was merely a potential non-party witness who had (amicably and voluntarily) left his job at Norton several years earlier and moved overseas, and who by his own account "ha[d] nothing against Norton." Appx35887; *see* Appx36169-72. In fact, Dr. Dacier sat for a seven-hour deposition represented by Quinn Emanuel in which he provided extensive testimony fully consistent with joint representation of Dr. Dacier and the company. Appx36135. Simply put, Dr. Dacier had zero prospect of becoming a party to Columbia's lawsuit, much less incurring any liability or receiving any benefit from it. Decisions from the Fourth

Circuit and numerous other courts make clear that "[t]here is no potential for conflict" under these circumstances. *New York v. United Parcel Serv., Inc.*, 2016 WL 10672076, at *2 (S.D.N.Y. Sept. 2, 2016); *see Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1199-202 (4th Cir. 1978); Br.36-37 (collecting cases).

Dr. Dacier's short, informal interaction with Professor Keromytis at a cybersecurity conference did not change all that or make Dr. Dacier "adverse" to Norton. *Contra* Appx51-52. At his August 2014 deposition, Dr. Dacier testified under oath that he had no way of knowing whether the Columbia professors should have been listed on the '643 patent because he had not even read the patent application, much less conducted an analysis of its claims. *See* Appx65479-80. Even crediting Professor Keromytis' account (memorialized two years after the alleged conversation) that Dr. Dacier said he was "was sorry about what Norton had done" and thought it "was wrong," Appx15989, any such remarks would not contradict his deposition testimony, let alone establish that Norton had a legal duty to list the Columbia professors on its patent application. Indeed, Columbia's own counsel conceded in open court that it is impossible to know "what Dr. Dacier meant" by his alleged statements to Professor Keromytis. Appx54125.

In all events, even assuming that some aspect of Dr. Dacier's testimony would have been damaging to Norton's arguments at trial, that is not remotely sufficient to create a disqualifying conflict of interest. Non-party witnesses represented by

counsel for the company, such as Dr. Dacier, are routinely called to testify in cases involving their current or former employer, and often provide testimony that is not unalloyedly helpful to the employer. If that were enough to create a disqualifying conflict of interest, it would effectively ban the ubiquitous and "highly desirable" practice of having a single law firm represent both a defendant entity and its employee-witnesses. *Aetna*, 570 F.2d at 1202. The mere fact that an employee's testimony could undermine his employer's defense in some particular does not create a disqualifying conflict of interest. *See, e.g.*, *Guillen v. City of Chicago*, 956 F.Supp. 1416, 1423-24 (N.D. Ill. 1997); *United States v. Occidental Chem. Corp.*, 606 F.Supp. 1470, 1474 (W.D.N.Y. 1985); Br.39-40.

2.    Columbia's cursory attempt to defend the district court's conflict-of-interest ruling goes nowhere. First, Columbia claims that if Dr. Dacier had appeared at trial, his testimony would have "factually contradict[ed]" the testimony of Norton employee Darren Shou. Resp.78-79. Not so. In fact, Columbia fails to identify *anything* in the transcript of Dr. Dacier's seven-hour deposition—which unlike his alleged comments at a conference, was under oath and defended by counsel—that even arguably conflicted with Mr. Shou's trial testimony. On the contrary, Dr. Dacier testified that he believed the '643 patent reflected "a new idea" that Mr. Shou invented "on his own"—making the patent's claims "different from" what Dr. Dacier and Mr. Shou had previously discussed with the Columbia professors—but that he

could not be certain because he had never read the patent application. Appx65481-82; *see* Appx65478-80.

Columbia claims that if Dr. Dacier had appeared at trial, he "would have testified" that some unspecified aspect of Norton's conduct was "wrong." Resp.78-79. Nothing in seven-plus hours of sworn testimony substantiates that rather vague claim. Regardless, Mr. Shou did not testify (and Norton did not need to establish) that "Norton did nothing wrong." *Contra* Resp.79 (misciting Appx53897-99, Appx53987, Appx53989-91). Mr. Shou instead denied specific allegations "of stealing and concealing from Columbia professors" by failing to list them on the '643 patent. Appx53990-91; *see* Appx54101. Dr. Dacier never "factually contradict[ed]" those statements in his seven-hour deposition, and there was no realistic prospect that he would do so at trial. *Contra* Resp.78-79.

Columbia next asserts that "Norton's counsel inevitably would need to impugn Dacier's credibility to defend Norton." Resp.79. Again, not so. Based on his deposition testimony, Norton had no need to impugn Dr. Dacier at all. And even after Columbia was able to convey Dr. Dacier's remarks to Dr. Keromytis to the jury, Norton's trial counsel never "t[old] the jury" that Dr. Dacier "was a bitter ex-employee." *Contra* Resp.79 (misciting Appx51989, Appx52346-47). On the contrary, Norton's counsel told the jury that Dr. Dacier "testified truthfully" and "in a balanced way." Appx54412. Indeed, Norton's counsel urged the jury to *credit* Dr.

9

Dacier's testimony that he had "never read the patent application" and so had no way of knowing if the Columbia professors should have been listed as inventors. Appx54411-12. Pointing out that Dr. Dacier was "friends with" the Columbia professors, Appx54411, and asking whether his interactions with them in around 2017 took place at a "cocktail party or a dinner," Appx52343, is a far cry from "attack[ing]" his "credibility." *Contra* Resp.79. Columbia thus fails to show any "significant risk" that Quinn Emanuel's representation of Dr. Dacier would have been "materially limited" by the firm's responsibilities to Norton. Va. R. Prof'l Conduct 1.7(a)(2); *contra* Resp.78-79.

Columbia's passing suggestion that the district court's decision to give a missing witness instruction somehow "establishes a conflict," Resp.79, is weaker still. The district court itself never suggested anything of the kind, and for good reason: The court's decision to give a missing witness instruction rested on a finding that Norton (through Quinn Emanuel) could have made Dr. Dacier available to appear at trial but failed to do so, *see* Appx50-53, Appx40478-79—not that Quinn Emanuel *prevented* Dr. Dacier from testifying "against his wishes," Resp.79 (misciting Appx53, Appx40478). It was entirely correct and proper for Quinn Emanuel to advise Dr. Dacier that, as a French citizen residing in Saudi Arabia, "the decision of whether to attend [trial] was completely his own." Appx35940. In all events, Dr. Dacier had no "interest" in voluntarily traveling to the United States for

trial; while he may have been *willing* to do so if necessary to "help the judicial process," Appx35889, he repeatedly stated "that he *did not want* to travel to the United States for trial, and would *prefer* to end his involvement in the litigation if his deposition testimony could be used." Appx35940 (emphasis added).

Perhaps recognizing the weakness of its arguments, Columbia attempts to ratchet up the standard of review. *See* Resp.78, 80 (invoking abuse-of-discretion standard). The Fourth Circuit has repeatedly held, however—including in one of the cases cited by Columbia—that questions regarding the "application of ethical norms" are reviewed *de novo*. *Aetna*, 570 F.2d at 1200; *accord Richmond Hilton Assocs. v. City of Richmond*, 690 F.2d 1086, 1088 (4th Cir. 1982); *see also Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992) ("We review a district court order disqualifying counsel for a conflict of interest *de novo*."). That standard governs the pure legal question of whether Dr. Dacier's alleged statements to Professor Keromytis gave rise to a conflict of interest. *See* Br.5, 37-41. And in any event, because the district court erred as a matter of law in finding a conflict, its decision cannot stand even under an abuse-of-discretion standard. *See, e.g.*, *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009) ("A court necessarily abuses its discretion when it makes an error of law.").

**B.    Any Purported Conflict of Interest Did Not Justify Automatically Disqualifying Quinn Emanuel From Representing Dr. Dacier.**

1. Even if Dr. Dacier's alleged comments to Professor Keromytis could have somehow given rise to a potential conflict of interest, the district court independently erred in treating that supposed conflict as grounds for automatically and retroactively disqualifying Quinn Emanuel as of "at least 2017."  Appx48 (emphasis altered); *see* Appx49, Appx55 n.7.  The applicable ethical rules—which the district court neither mentioned in its decision nor gave the parties any opportunity to brief—do not rigidly prohibit a lawyer from concurrently representing two clients whenever there is a "significant risk" that the representation of one client will be "materially limited by the lawyer's responsibilities to" the other client.  Va. R. Prof'l Conduct 1.7(a)(2). Instead, the rules *expressly authorize* concurrent representation under those circumstances as long as each client provides an informed waiver.  *Id.* 1.7(b).  The district court thus erred not only in "identif[ying] a conflict of interest for Quinn Emanuel," Appx47, but also by jumping directly to the conclusion that Quinn Emanuel could not ethically represent both parties as a result.  *See, e.g.*, *Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir. 1993) (district court improperly disqualified attorneys for potential conflict without giving them an opportunity to obtain a waiver); *Shaffer*, 966 F.2d at 145-46 (courts must exercise caution before taking the "drastic" step of disqualification).

Making matters worse, the district court imposed its erroneous automatic disqualification *retroactively*, dating it back to the unspecified point "between 2017 and 2018" when Dr. Dacier allegedly spoke to Professor Keromytis. Appx43; *see* Appx48-49, Appx55 n.7. The district court cited no authority whatsoever for that remarkable approach, which appears to be literally unprecedented. Even in cases where an attorney or law firm has been laboring under an unwaivable conflict, the proper remedy is *prospective* disqualification, not retroactive disqualification—let alone retroactive elimination of attorney-client privilege—as of whenever the conflict arose. *See, e.g.*, *EEOC v. Orson H. Gygi Co.*, 749 F.2d 620, 622 (10th Cir. 1984) (disqualifying counsel "from further representation of" client); *Trone v. Smith*, 621 F.2d 994, 1002 (9th Cir. 1980) (same); *United States v. Carr*, 322 F. Supp. 3d 612, 614 (E.D. Pa. 2018) (same); *United States v. Delavan*, 2018 WL 5985683, at *2 (E.D. Va. Nov. 13, 2018) (same); *Wink, Inc. v. Wink Threading Studio, Inc.*, 2011 WL 3206915, at *5 (E.D. Va. July 26, 2011) (same).

2. Columbia offers no meaningful defense of the district court's treatment of the supposed conflict here as grounds for immediate and retroactive disqualification. *Compare* Br.41-46 (challenging this aspect of the district court's decision), *with* Resp.78-80 (ignoring Quinn Emanuel's arguments). While Columbia (wrongly) asserts that Dr. Dacier's remarks to Professor Keromytis gave rise to a conflict under Virginia Rule of Professional Conduct 1.7(a)(2), *see* Resp.80; *but see supra* pp.6-11,

it offers no defense of treating that purported conflict as a basis for automatic disqualification or by making that disqualification retroactive—underscoring that the district court's ruling on both points is indefensible and was not the product of adversarial briefing below.

Unable to defend the district court's disclosure order on its own terms, Columbia does its best to rewrite that order, claiming that the order "did not depend on the [district court's] conflict finding." Resp.77-78. That defies the order itself. The disclosure order was explicitly grounded in the district court's *sua sponte* determination that "Quinn Emanuel should not have been representing [both] Dr. Dacier and Norton" because of the purported conflict of interest, and accordingly directed Quinn Emanuel to "disclose on the record in writing any information garnered from Dr. Dacier *during the period [its] representation of Dr. Dacier was a conflict*." Appx55 n.7, Appx57 (emphasis added). As that express language makes clear, the district court's conflict-of-interest ruling provided the justification for and set the metes and bounds of the disclosure order. Absent the conflict, it would not have required Quinn Emanuel to disclose anything *at all*. Because the court's conflict-of-interest ruling was incorrect as a matter of law, both the disclosure order and the district court's contempt finding premised on that order must be reversed. *Contra* Resp.77.

## II. The District Court's Order To Publicly Disclose Attorney-Client Communications Violated The Attorney-Client Privilege.

### A. The Purported Conflict of Interest Did Not Terminate the Attorney-Client Relationship or Otherwise Destroy Attorney-Client Privilege.

Even setting aside its incorrect conflict-of-interest holding, the district court independently erred as a matter of law by concluding that the purported conflict somehow vitiated the attorney-client privilege and authorized it to compel disclosure of attorney-client communications. *See* Appx55 n.7; Appx57; Appx89. In fact, that view has been repeatedly and uniformly rejected by every court to consider the issue. Br.46-49; *see, e.g.*, *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 368 (3d Cir. 2007) ("[W]hen an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged … notwithstanding the lawyer's misconduct."). As Columbia itself emphasizes, the attorney-client privilege belongs to the client. *See* Resp.81. It thus makes no sense to deprive a client of his privilege on the ground that "[his] attorney's conduct was ethically questionable." *Eureka Inv. Corp. v. Chi. Title Ins. Co.*, 743 F.2d 932, 938 (D.C. Cir. 1984). The district court gave no justification for departing from that well-settled principle—and indeed, never grappled with that principle at all, because it entered its disclosure order *sua sponte* without briefing or argument. *See* Br.19-20, 57-58.

Columbia makes no attempt whatsoever to defend the district court's (unexplained) view that a conflict of interest vitiates the attorney-client privilege.

*Compare* Br.46-49 (explaining the district court's error), *with* Resp.80-83 (providing no response). That is because the error is indefensible. Columbia also cannot bring itself to defend the district court's conclusory assertion that Dr. Dacier's comments to Professor Keromytis automatically "void[ed] the retainer agreement" setting forth the terms of Dr. Dacier's relationship with Quinn Emanuel, Appx48, as the plain text of the Engagement Agreement specifically addresses how and when it can be terminated and forecloses the possibility of automatic termination. *Compare* Br.50-55 (explaining the district court's error), *with* Resp.80-83 (again providing no response). The district court's reading of the Engagement Agreement not only conflicts with its plain text, but would seriously undermine the attorney-client relationship, as neither Dr. Dacier nor Quinn Emanuel could ever be sure their relationship was still intact if that relationship could be automatically terminated (unbeknownst to either side) by some as-yet-unidentified conflict. Br.54. Columbia offers no reason to adopt that impossible interpretation, and none exists.

Unable to defend the district court's holding, Columbia resorts to suggesting that Quinn Emanuel failed to invoke the attorney-client privilege below, rested exclusively on its compliance with the order, and has now "changed its story" on appeal. Resp.3; *see* Resp.71, 77. That is simply false. While Quinn Emmanuel did later argue in the alternative that it had "substantially complied" with the disclosure order (albeit after the 24-hour deadline) by submitting a summary of certain

attorney-client communications over which Dr. Dacier had subsequently waived privilege, Resp.76-77; *see* Appx43947-49, Quinn Emanuel expressly invoked the attorney-client privilege when it informed the district court in real time that it would not comply with the court's unlawful order, explaining that the court "ha[d] no authority" to "demand[] the disclosure of privileged communications between Quinn Emanuel and its client Dr. Dacier" and that Quinn Emanuel "also had no authority" to unilaterally "waive Dr. Dacier's attorney-client privilege." Appx34041-42. Columbia's efforts to mischaracterize the record only underscore that it has no substantive defense of the district court's errors.

Columbia invokes the district court's rejection of Quinn Emanuel's alternative substantial-compliance argument in an effort to evade the applicable standard of review. Calling that substantial-compliance determination the "key finding" that "led to the contempt holding," Columbia argues this Court should affirm on the ground that this "factual" finding "was not clear error." Resp.72, 76-77. That is a complete non sequitur. This appeal does not challenge the district court's substantial-compliance ruling; it challenges the validity of the district court's underlying order demanding that Quinn Emanuel disclose privileged attorney-client communications. *See, e.g.*, Br.26, 30-31. Because that underlying disclosure order was invalid, "it cannot serve as a basis to sustain the court's civil contempt rulings,"

whether Quinn Emanuel substantially complied with it or not. *Ashcraft*, 218 F.3d at 302-03.

**B.    Columbia's Efforts to Supply an Alternative Rationale for the Contempt Order Are Unavailing.**

Columbia eventually abandons any pretense of defending the district court's actual reasoning, and instead requests affirmance on "four alternative grounds" that the district court did not embrace. Resp.80-82. That does not work. For one thing, upholding the contempt sanctions against Quinn Emanuel based on reasons not given by the district court would raise yet another due process issue. *See infra* pp.24-29 (discussing district court's myriad procedural missteps); *cf. Eaton v. City of Tulsa*, 415 U.S. 697, 698-99 (1974) (per curiam) (a punitive contempt order cannot be upheld on grounds that the trial judge did not articulate). In all events, none of those four alternative rationales remotely justifies the district court's disclosure order.

1. Columbia begins with the bold claim that "there was no real attorney-client relationship" between Quinn Emanuel and Dr. Dacier. Resp.80. That claim is as wrong as it is bold, because as Columbia well knows but never acknowledges, Dr. Dacier had a signed engagement letter with Quinn Emanuel. As Quinn Emanuel's opening brief explains, Dr. Dacier formally retained Quinn Emanuel in June 2014 through a written Engagement Agreement. *See* Br.7-8; Appx16566-67. The district court repeatedly acknowledged as much. *See, e.g.*, Appx47-48 (discussing the Engagement Agreement); Appx34351 ("No party dispute[s] … that [Quinn

Emanuel] represented Dr. Dacier in 2014."). And as already discussed, the express terms of the Engagement Agreement specified that Dr. Dacier could unilaterally end the relationship "by providing [Quinn Emanuel] with written notice," and that Quinn Emanuel could "withdraw from representing" Dr. Dacier if it "bec[a]me aware of some reason why it would no longer be appropriate for [the] firm to represent [him]" and "so inform[ed] [him]." Appx16567. It is undisputed that neither of those things happened until Quinn Emmanuel withdrew from the representation in response to the district court's conflict-of-interest ruling in March 2022.

Astonishingly, Columbia *never even acknowledges the existence* of the Engagement Agreement, despite Quinn Emanuel's extensive discussion of the controlling terms of the Engagement Agreement in Quinn Emanuel's opening brief. *Compare* Br.7-8, 11, 13, 16, 19, 22, 28, 51-54, *with* Resp.80. Columbia likewise never acknowledges that Quinn Emanuel did in fact actively represent Dr. Dacier in connection with this case, including by helping Dr. Dacier prepare for his August 2014 deposition and representing him during seven hours of questioning by Columbia's counsel. *See* Br.7-8; Appx36128, Appx36135, Appx36169. To deny an attorney-client relationship under these circumstances is to deny reality.

Columbia's assertion that Dr. Dacier "said repeatedly" to Quinn Emanuel "that he did not want [its] representation," Resp.80, is flatly incorrect. The primary record citation that Columbia proffers for that assertion is a November 2019 email

from Dr. Dacier to Norton's Chief Technology Officer—*a non-attorney* unaffiliated with Quinn Emanuel—inquiring whether "the lawyer, paid by [Norton], that was present at [Dr. Dacier's] deposition [was] still representing" him. Appx16062. Even when subsequently forwarded to a Quinn Emanuel attorney, that email plainly did not constitute the "written notice" to Quinn Emanuel required by the engagement letter. *Cf.* Appx16567. The only other part of the record Columbia cites is even farther afield; it is an email from Dr. Dacier to a Latham & Watkins attorney that *postdates* Quinn Emanuel's withdrawal from the relationship. *See* Appx35887.

Columbia's assertion that Dr. Dacier lacked "knowledge of his right to disengage Quinn," Resp.80-81, is beside the point and equally disingenuous. Dr. Dacier is a highly educated university professor who entered into (and retained a copy of) a formal agreement providing that he was retaining Quinn Emanuel for purposes of Columbia's suit against Norton and that he "could terminate the relationship at any time, by providing [the firm] with written notice." Appx16567. Columbia's suggestion that Dr. Dacier was somehow unaware that he could end the representation by giving Quinn Emanuel written notice simply ignores those undisputed facts. It also ignores that Dr. Dacier *explicitly reaffirmed* in a sworn declaration in April 2020 that Quinn Emanuel "ha[d] represented [him] since June 18, 2014, and continue[d] to represent [him], in connection with the Columbia case,"

Appx16552.  In sum, the idea that the contempt order is justified by the absence of any real attorney-client relationship cannot be squared with the record in this case.

2. Columbia argues next that even if Quinn Emanuel and Dr. Dacier had an attorney-client relationship, Dr. Dacier himself did not invoke the attorney-client privilege.  *See* Resp.81.  That argument runs headlong into the "universally accepted" principle "that the attorney-client privilege may be raised by the attorney." *Fisher*, 425 U.S. at 402 n.8.  In fact, attorneys "are obliged to protect the attorney-client privilege to the maximum possible extent on behalf of their clients."  *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 173 (4th Cir. 2019); *see* Va. R. Prof'l Conduct 1.6(a).  Quinn Emanuel was not merely justified in invoking the attorney-client privilege on Dacier's behalf; it was duty-bound to do so absent an informed waiver.

Columbia is equally wrong to claim that there is "no evidence that Dacier invoked privilege."  *Contra* Resp.81.  Quite the opposite:  Not only did Dr. Dacier invoke the privilege via counsel, Appx34041-42, the Engagement Agreement (which Columbia continues to ignore) expressly provides that Dr. Dacier's communications with Quinn Emanuel were "protected by the attorney-client privilege" and would be "maintained in confidence."  Appx16566.  Columbia speculates that Dr. Dacier would have been willing to waive privilege, Resp.81, but that is both unsubstantiated and irrelevant.  What matters is that Dr. Dacier had not waived the attorney-client

privilege as of the March 16, 2022—the district court's *one-day* deadline for disclosure. Appx57. With no advance notice, a fast-approaching trial, and a client living halfway across the world, it was eminently reasonable for Quinn Emanuel to simply invoke the privilege instead of demanding that Dr. Dacier make a snap judgment about whether to waive privilege over years' worth of correspondence with his attorneys.

3. Columbia's contention that Dr. Dacier *actually* waived privilege over these huge swathes of attorney-client correspondence is weaker still. *See* Resp.81-82. Columbia cites two emails that Columbia's counsel obtained as a result of their improper *ex parte* outreach to Dr. Dacier from October 2019 through April 2020. *See* Br.10-14. In the first email, Dr. Dacier informs Quinn Emanuel of Columbia's counsel's improper contacts, copying two of Columbia's attorneys. *See* Appx16061. In the second, Dr. Dacier responds to yet another improper *ex parte* message from Columbia's counsel—which Columbia's counsel brazenly sent *after* Quinn Emanuel learned of and strenuously objected to Columbia's counsel's improper *ex parte* contacts—by making clear that Quinn Emanuel had *not* "tried to discourage or direct his participation" in the lawsuit. Appx16060. Neither email implies a knowing, voluntary waiver of privilege as to *any* prior attorney-client communications, much less a waiver of privilege as to *all* such communications over a multi-year period. In any event, it would defy all reason to allow Columbia to profit from its counsel's

misconduct by treating Dr. Dacier's responses to their improper *ex parte* outreach as a waiver of privilege.[1]

4.  Finally, Columbia asserts that "the district court had authority to order Quinn to disclose … privileged information to the court while still preserving any privilege." Resp.82. The order that the district court actually issued, however, demanded disclosure of the privileged attorney-client communications at issue "on the record in writing." Appx57. Given that clear order, Quinn Emanuel had no "option[] to comply with the Order while protecting [Dr. Dacier's] privilege." *Contra* Resp.82. And Columbia's suggestion that Quinn Emanuel could have avoided contempt by "requesting *in camera* review" or by immediately "seeking a stay and interlocutory appeal," Resp.82, is both unrealistic given the court's one-day deadline for compliance and beside the point in any event. The question here is not whether Quinn Emanuel could conceivably have persuaded the district court to amend its disclosure order or stay it pending an interlocutory appeal, but whether the disclosure order as written was a "valid decree" that can serve as the basis for

---

[1] Columbia's assertion that *Quinn Emanuel* somehow waived privilege over its communications with Dr. Dacier is equally nonsensical. Columbia provides no record citations for that purported waiver, and any disclosures by Quinn Emanuel in response to the district court's order itself cannot retroactively make that invalid order proper. *Contra* Resp.81-82. Regardless, Quinn Emanuel *could not* waive privilege over its communications with Dr. Dacier, since (as Columbia itself recognizes) attorney-client privilege "is controlled by 'the client, not the lawyer." Resp.81 (quoting *United States v. Farrell*, 921 F.3d 116, 136 (4th Cir. 2019)).

contempt sanctions. *Ashcraft*, 218 F.3d at 302-03. Because the disclosure order that the district court actually issued demanded public disclosure of privileged attorney-client communications, it cannot be upheld, and the district court's contempt sanctions must be reversed. *Id.*

## III. The District Court's Repeated Forays Outside The Adversarial Process And Remarkable Procedural Irregularities Provide Another Independent Basis For Reversal.

1. On top of its myriad substantive flaws, the district court's disclosure order was marred by serious procedural irregularities that both help explain the glaring substantive defects and independently warrant reversal. *See* Br.55-60. The district court first "identifie[d]" the purported conflict of interest on its own motion, while resolving unrelated motions *in limine*. Appx47. The court then proceeded to flout basic norms of adversarial presentation by immediately ruling, *sua sponte*, that the supposed conflict was disqualifying and that Quinn Emanuel "should not have been representing [both] Dr. Dacier and Norton" after 2017. Appx47, Appx49, Appx55 n.7. Because it did all this *sua sponte*, the district court did not even have the benefit of a motion from Columbia suggesting a legal basis for its rulings. As to Quinn Emanuel and Norton, the district court gave no opportunity whatsoever to submit briefing or present argument on whether any conflict existed and whether disqualification was warranted, *cf. Philips Med. Sys.*, 8 F.3d at 606, nor did it afford Dr. Dacier and Norton any opportunity to waive the purported conflict, *cf.* Va. R.

Prof'l Conduct 1.7(b). And the court then compounded its egregious departure from basic procedural principles by *sua sponte* demanding that Quinn Emanuel disclose all its attorney-client communications with Dr. Dacier over the previous four years—even though Columbia had never asked for those communications to be disclosed, and Quinn Emanuel had no notice or opportunity to be heard on the issue whatsoever. Those rulings cannot be reconciled with our adversarial system's basic "principle of party presentation," *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020), or "[t]he fundamental requirements of due process," *Doe v. Va. Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023).

The pattern of procedural irregularities continued in the district court's civil contempt order, Appx58-99, where the court imposed punitive sanctions that Columbia had expressly *declined* to request. The district court invented these sanctions—"a negative inference of egregiousness," imposed in connection with Columbia's post-trial motions for enhanced damages and attorneys' fees with respect to alleged infringement of patents *other than* the patent to which Dr. Dacier's knowledge pertained—on its own, and then imposed them on Norton without notice or a hearing. Appx98-99. Once again, the district court's approach cannot be reconciled with the party-presentation rule and the basic due process requirements of notice and an opportunity to be heard.

The district court's sanctions also went well beyond the limits of civil contempt, which must be tailored "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy." *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004). Instead, the court ordered *post hoc* punitive sanctions—i.e., sanctions meant "to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct"—without any possibility to purge. *Id.* at 822. It imposed those punitive sanctions without affording Norton and Quinn Emanuel "the procedural safeguards necessary prior to the imposition of [such] penalties," such as proof beyond a reasonable doubt and separate persons acting as prosecutor and judge. *Id.* at 822-23. For those reasons as well, the district court's contempt finding and accompanying sanctions cannot be sustained.

2. Once again, Columbia's primary response is misdirection. Columbia emphasizes that the district court received briefing and argument on Columbia's post-trial motion for civil contempt sanctions. Resp.83. But that process did not and could not cure the procedural deficiencies that accompanied *the underlying disclosure order itself*, which the district court issued *sua sponte* without any notice to the parties or opportunity to be heard. Because the disclosure order was procedurally (and substantively) invalid, the contempt finding and sanctions based on that order cannot stand, regardless of whether the later contempt finding and

sanctions were accompanied by adequate process (which they were not, *see infra* pp.28-29). *Ashcraft*, 218 F.3d at 302-03.[2]

Columbia's half-hearted attempts to defend the procedural irregularities surrounding the disclosure order are utterly unavailing. Remarkably, Columbia claims that Quinn Emanuel had advance "notice" of the district court's *sua sponte* conflict-of-interest ruling, and that the parties "fully addressed" the purported conflict in earlier briefing on Columbia's counsel's violations of the "no contact" rule. *See* Resp.83. But none of that prior briefing addressed whether Dr. Dacier's remarks to Professor Keromytis gave rise to a conflict of interest, whether any such conflict would warrant automatic disqualification, or whether the attorney-client privilege remained intact "during the period [Quinn Emanuel's] representation of Dr. Dacier was [supposedly] a conflict," Appx55 n.7. And while Columbia claims that Quinn Emanuel "had opportunities" after the district court issued its disclosure order to seek reconsideration, Resp.83-84, due process requires an opportunity to be heard "at a meaningful time"—here, *before* the district court decided to enter an order directing Quinn Emanuel to breach its ethical obligations by disclosing years' worth

---

[2] Quinn Emanuel also was not required to exhaustively reiterate at the contempt stage its argument that the disclosure order improperly invaded attorney-client privilege—an argument that Quinn Emanuel had already made in explaining its refusal to comply, *see* Appx34041-42, and noted again in opposing Columbia's motion for an order to show cause, *see* Appx43945, Appx43948; *contra* Resp.83.

of privileged communications. *Sciolino v. City of Newport News*, 480 F.3d 642, 653 (4th Cir. 2007).

Finally, Columbia has no persuasive defense of the district court's failure to afford Norton and Quinn Emanuel the procedural protections required for its contempt sanctions. Columbia does not (and cannot) dispute that the district court both concocted and imposed the "negative inference of egregiousness" all by itself, without giving either party an opportunity to weigh in. *Compare* Br.58, *with* Resp.84. That invented sanction was not "based on the nature of" any harm purportedly "caused by the contempt," *contra* Resp.84; in fact, Columbia did not suffer any apparent harm from the supposed contempt at all, as Columbia had never requested disclosure of the communications between Dr. Dacier and Quinn Emanuel in the first place (let alone an adverse inference regarding their contents).

As the Fourth Circuit has explained, a nominally "civil" sanction "[can]not have been designed to 'compensate the complainant for losses sustained'" where, as here, "there was no 'complainant'—other than the judge [her]self." *Cromer*, 390 F.3d at 822. In all events, the punishment that the district court imposed here—enhancing *Norton's* exposure to heightened penalties for alleged infringement of patents that had nothing to do with Dr. Dacier—was totally untethered from *Quinn Emanuel's* refusal to disclose privileged communications. The district court's sanctions were accordingly punitive rather than compensatory, and the court's

decision to order those sanctions "without the procedural safeguards necessary prior to the imposition of criminal penalties" independently requires reversal. *Id.* at 822-23.

## CONCLUSION

The contempt order and accompanying sanctions should be reversed.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
JOSEPH J. DEMOTT
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant Quinn Emanuel Urquhart & Sullivan, LLP*

September 12, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 6,498 words, excluding the parts of the brief exempted by Federal Circuit Rule 31(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

September 12, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement